UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
CARLOS RIVERA,                                                    Civil Action No.
                                                                 10 Civ. 6661 (WHP)
                        Plaintiff,
                                                                 Electronically Filed


PLAZA ACCESSORY OWNER, LP, et al.,

                        Defendants.

-----------------------------------------------------------X


PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT


                                        THE LAW OFFICES OF
                                        FAUSTO E. ZAPATA, JR., P.C.
                                        277 Broadway, Suite 501
                                        New York, New York 10007
                                        212-766-9870
                                        Attorneys for Plaintiff

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

I.      STATEMENT OF MATERIAL FACTS ................................................... 3

II.     ARGUMENT......................................................................................... 17

    Standard of Review for Summary Judgment ................................................. 17

    Summary Judgment in Employment Discrimination Cases .......................... 18

    A.   Standard of Proof under the ADEA, Title VII and the New York State and New

    York City Human Rights Laws..................................................................... 18

    POINT I ......................................................................................................... 20

    CONCLUSION................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)............................................. 17

Behringer v. Lavelle Sch. For the Blind, No. 08 Civ. 4899, 2010 WL 5158644, at *1

    (S.D.N.Y. Dec. 17, 2010)............................................................................................... 17

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) ...................................................... 17

Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994) ................................. 18

Cronin v. Aetna Life Insurance Co., 46 F.3d 196, 204 (2d Cir.1995)............................... 18

Fisher v. Vassar College, 114 F.3d 1332, 1335 .................................................................. 19

Forrest v. Jewish Guild for the Blind, 765 N.Y.S.2d 326, 333 (1st Dept. 2003), *aff'd* 786

    N.Y.S.2d 382 (2004)..................................................................................................... 19

Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994) .. 17

Ghirardelli v McAvey Sales & Serv., 287 F Supp 2d 379 (SDNY 2003) ......................... 19

Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990)............................ 18

Jute v. Hamilton Sundstrand Corp., 420 F.3d 166 (2d Cir. 2005)..................................... 19

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)................ 17

Matz v. Prospect Energy Corporation, 2008 NY Slip Op 33089U.................................... 19

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668

    (1973).............................................................................................................................. 18

NYC Admin. Code § 8-107(13)(2012)............................................................................... 24

Quaratino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir. 1995)............................................... 19

Sinha v State University of New York at Farmingdale, 764 F Supp 765, 768 (EDNY

    1991) ............................................................................................................................... 19

## Statutes

Fed. R. Civ. P. 56(a) ........................................................................................................ 18

## **PRELIMINARY STATEMENT**

Plaintiff started working for The Plaza in 1988, initially as a bus boy and over the years he was eventually promoted to a bartender at the Oak Bar. It should be noted that there were three bars at the hotel at the time and two of the bars were referred to as public bars and one of them was referred to as a service bar. The public bars bartender positions were better positions because they received gratuities from customers whereas the service bartender position was a non-tipped position because they serviced bartenders and made drinks for room service orders.

In 2005, The Plaza closed for renovations and the hotel offered its employees, including plaintiff, the choice of two severance packages. One of the packages offered enhanced severance if the employee waived the right to be recalled to their position and the other preserved the right to be recalled. Plaintiff opted for the severance package that reserved his right to be recalled.

When plaintiff was recalled, The Oak Bar no longer belonged to the hotel. However, there were two new public bars, The Champagne Bar and The Rose Club. Plaintiff was initially assigned to work at The Champagne Bar, but after working a day or two, he was demoted in that he was reassigned to work at a service bar, The Palm Court.

Notably, the individuals that were assigned to work at the public bars were significantly younger than plaintiff and Caucasian and they had far less experience than plaintiff. Plaintiff is from Dominican Republic and he was over 40-years old at the time.

Plaintiff challenged the hotel's actions by filing a grievance through his Union which culminated in arbitration. At arbitration, the hotel argued, in part, that plaintiff did not possess the skill set for the position and that he was not a bartender at The Plaza when

1

it closed in 2005. The arbitrator rejected the hotel's arguments and found that the hotel had violated plaintiff's seniority by appointing individuals with less seniority than plaintiff to the public bartender positions.

At arbitration it was revealed that Rajan Lai, The Plaza's Director of Human Resources, was the person that made the decision to demote plaintiff. It was also revealed that Liam Flanagan, who is Caucasian, was also recalled to the bartender position and he was also demoted from his prior classification, public bartender, to a service bartender position. However, Flanagan complained to Lai and Lai asked two managers that had worked at the hotel prior to its closure in 2005. After speaking to the managers, Lai reassigned Flanagan to a public bartender position. When plaintiff complained to Lai, Lai did not ask the same managers about plaintiff. Instead, he told plaintiff that he did not have the skill set required for the public bartender position (also referred to as a front bartender).

Shortly thereafter, plaintiff and his union representative complained to Lai that plaintiff's demotion was discriminatory and Lai laughed in their face. Lai never conducted an investigation into these complaints even though it was his responsibility to conduct such investigations.

The hotel now argues that it assigned plaintiff to the service bartender position because the documents given to it by the Union indicated that he was a service bartender. However, none of the documents identify plaintiff's classification as anything but bartender.

Plaintiff was discriminated against based on his race, color, national origin and age when he was demoted and much younger, less qualified, Caucasians were given the public bartender positions.

2

## I.   STATEMENT OF MATERIAL FACTS

Plaintiff started working at The Plaza on or around October 12, 1988 as a bus boy in the Oak Room. Over the years, he was promoted and eventually, he became a permanent public bartender, also referred to as front bartender, at the Oak Bar and had worked in this capacity for at least five years as of 2005. (Pl. Dep. at 19:19-2; 192:25-193:12; Flanagan Dep. at 13:2-25; Zapata Cert., Ex. I; Ex. J; Ex. K; Ex. M; Ex. T; Ex. U; Ex. V; Ex. Y; Ex. Z). During all times relevant, the hotel had three bars, two of which were designated public bars and one designated as a service bar. The service bartender position is a non-tipped position. (Zapata Cert., Ex. I). For this reason the front bar position is considered a better position than the service bartender position by most people, including The Plaza management. (Flanagan Dep. at 7:19-8:19).

The Plaza classified plaintiff as a bartender in the Food and Beverage Department and within that department in private dining, however he mostly worked at the Oak Bar from 2000 through 2005. (Evangelista Dep. at 8:7-18; Flanagan Dep. at 12:8-14:3; Bueno Dep. at 61:12-19; Pl. Dep. at 71:3-21; 79:19-80:2; 115:19-21; Cedeno Dep. at 7:24-8:9; 17:14-20; Bravo Dep. at 11:23-13:2).

In 2005, The Plaza closed for extensive renovations which was going to result in fewer jobs and as such, the Union that represented plaintiff entered into an agreement that provided for two severance options. (Zapata Cert. Ex. H).

Union members, including plaintiff, were told that their recall rights entitled them to return to The Plaza and that those with greater seniority could select their assignments. (Flanagan Dep. at 23:19-24:11). Cedeno, a Union representative, testified that after the hotel closed, workers would be recalled based on seniority to the their old jobs. (Cedeno Dep. at 10:19-11:7). Moreover, bartenders had the right to choose which bar they wanted

3

to work at based on seniority, however the Hotel did not allow Plaintiff to exercise this right. (Cedeno Dep. at 12:9-19; 14:25-15:23; Pl. Dep. at 80:7-14; 85:3-9; 156:24-157:2 Evangelista Dep. at 12:8-13:5; Bueno Dep. at 66:3-15; Flanagan Dep. at 23:19-25).

Liam Flanagan, also a public bartender, and plaintiff were the only public bartenders to preserve their right to be recalled to their positions. (Pl. Dep. at 130:22-132:14). Flanagan is Caucasian and was in his early 40's at the time that he preserved his right to be recalled. (Flanagan Dep. at 14:18-15:1).

Ultimately, the Union and The Plaza entered into an agreement referred to as the City Hall Agreement. In this agreement, the hourly rate for bartenders, service and front, were made the same. (Zapata Cert., Ex. H). The reason that there a single rate of pay for bartenders was negotiated is because the distinction between public and service bartenders was eliminated and what resulted was a single bartender position with the same hourly rate. (Cedeno Dep. at 17:8-20; 42:24-25).

Plaintiff was demoted to a service bartender position when he was recalled in 2008. To elaborate further, the Champagne Bar, a public bar, opened on March 1, 2008, Plaintiff, Liam Flanagan, Robert Kenyon, Prather Rehm, Heather Buesing, Eddie Meade and Scott Tegue were assigned to work there as bartenders. (Pl. Dep. at 112:16-24; 121:4-11; 124:9-15). Plaintiff worked at the Champagne Bar for one or two days before Bueno, Director of Outlets who was in charge of all the bars, told him that he was being demoted from the Champagne Bar to the Palm Court to work as a service bartender. (Pl. Dep. at 121:16-122:7).

Plaintiff questioned why he was being demoted and Bueno told him that he would look at Plaintiff's file and that if there was an error, Bueno would correct it. (Pl. Dep. at 123:9-13). Notably, Bueno told Plaintiff that he was changing Plaintiff's position

because Bueno and Lai, Director of Human Resources, had looked at Plaintiff's file and they discussed what Plaintiff's position would be, and that Plaintiff belonged in The Palm Court. (Pl. Dep. at 123:14-24). In contradiction to the position that Plaintiff was placed in the service bartender position because the Union's paperwork indicated that was his classification, Lai initially justified appointing Plaintiff to the service bar position on the grounds that Plaintiff did not have the requisite skill set to work in the front bar after acknowledging that Plaintiff had in fact held the front bartender's position prior to the hotel's closure in 2005. (Pl. Dep. at 127:5-23).

Additionally, on February 22, 2008, Fairmont indicated in its own internal forms, which were signed by Lai and Shank Creek, General Manager at The Plaza, that Plaintiff was a bartender at The Champagne Bar – a front bar. (Zapata Cert. Ex. Q; Zapata Cert. Ex. R.; Reus Dep. at 12:18- 14:6).

After being demoted from the Champagne Bar to The Palm Court, Plaintiff spoke to Lai about why he was being demoted and Lai told Plaintiff that he had a different set of skills and that the new Plaza required someone with a high level of skills. During this conversation, Lai acknowledged that Plaintiff's file indicated that he was a front bartender. (Pl. Dep. 127:5-23).

Notably, all of the bartenders hired to work at The Champagne Bar and The Rose Club were in their 20's and 30's and Caucasian. (Zapata Cert. Ex. O).

On or around March 2008, Plaintiff complained to Rajan Lai, Director of Human Resources, that he had been discriminated against because when he was recalled he was demoted from a front bartender position to a service bartender position and Lai responded by laughing at him. (Pl. Dep. at 128:4-10; 133:24-25; 134:1-2; Cedeno Dep. at 19:4- 22:5; 40:3-41:18).

To elaborate further, Front bartenders earn gratuities and service bartenders do not because front bartenders deal with the public. Moreover, the service bar is situated in the kitchen and the duties involve servicing waiters who bring drinks to the guest rooms. Front bartenders do not have to share gratuities with the service bartenders. (Pl. Dep. at 136:15-20; Flanagan Dep. at 5:15-6:6; 100:20-101:3; P 412; P 1). Notably, the front bartender position is earned through seniority. (Flanagan Dep. at 6:7-25).

To better understand Plaintiff's complaint, it is important to note that Plaintiff and Liam Flanagan were both front bartenders at the Plaza before it closed in 2005.

After Flanagan, who is Caucasian, was recalled to work at The Plaza, he was told that he was going to be assigned to work at The Palm Court, a service bar. (Flanagan Dep. At 32:15-25). He did not find this acceptable because he was told by the Union and Tom Torberg, The Plaza Beverage Manager in 2005, that he would be recalled as a front bartender. To address this issue, Flanagan spoke to Bjorn, The Palm Court Manager, and he explained to Bjorn that he had seniority rights to the front bartender position and Bjorn told him that he would inquire with Human Resources. After Bjorn spoke to Lai, he told Flanagan that Lai stated that if what Flanagan stated was true, he would be reassigned to the front bartender position. (Flanagan Dep. At 34:9-35:11). The following day, Flanagan told Lai that bartenders with greater seniority were entitled to select the bar and the schedule they wanted to work. Later that day, Lai told Flanagan that he was going to be reassigned to the Rose Club or the Champagne Bar, both of which were front bars. (Flanagan Dep. at 36:12-37:7).

A week after Flanagan spoke to Lai, Plaintiff also went to Human Resources to ask that he be reassigned to one of the front bars, but Plaintiff was told that he was a service bartender and that he would not be moved. Plaintiff was also told that he did not

have the skills required to be a front bartender. (Flanagan Dep. at59:17-60:8; Pl. Dep. at 127:5-12).

Flanagan discussed Plaintiff's situation with Evangelista, The Plaza Beverage Director. Evangelista was hired to work at The Plaza in 2007 as a Beverage Director. He was responsible for The Rose Club and the Champagne Bar. Evangelista was involved in the hiring process in that he made recommendations for people that he thought would be good bartenders and these individuals were interviewed by Bueno, Director of Sales, and Human Resources. As Director of Outlets, Bueno was in charge of all food and beverage functions, including The Palm Court, The Champagne Bar and The Rose Club. Flanagan told Evangelista that it appeared that he had "pawned" off to Human Resources Plaintiff's demotion and Evangelista stated that the decision to reassign Plaintiff to The Palm Court was made by Human Resources. Flanagan told Evangelista that he and Plaintiff were similarly situated. They held the same position, bartender at the front bars, and worked at The Plaza for almost the same amount of time so they had almost identical seniority in the bartender title. Flanagan reminded that Evangelista that Flanagan himself was assigned to The Palm Court after being recalled and that after he complained, he was reassigned to the front bartender position but when Plaintiff complained about the same thing happening to him, he was told that he was a service bartender. Flanagan noted that Evangelista had worked at The Plaza during the time that Plaintiff was a front bartender and that he surely saw Plaintiff working in this capacity. (Flanagan Dep. At 61:7-62:11; Cedeno Dep. At 29:22-30:14; Evangelista Dep. At 9:13-10:17; 15:12-18; Bueno Dep. at 5:25-6:5).

Flanagan also discussed Plaintiff's demotion with Bueno. Flanagan explained to Bueno that when he complained about being assigned to work as a service bartender, he

7

was reassigned to the front bartender position, but when Plaintiff complained nothing happened. Bueno did not respond to Flanagan's statements. (Flanagan Dep. at 63:12-64:8).

Flanagan and Plaintiff also discussed Plaintiff's belief that he had been discriminated because when Flanagan complained he was reassigned to a front bar position but when Plaintiff complained, he was told that he would not be reassigned from the service bartender position. (Flanagan 63:12-64:8).

According to Flanagan, his coworkers were asking why Plaintiff and Tejada, a former front bartender that was Hispanic and over 40 years old, were working as service bartenders when they should have been working as front bartenders. He further testified that there was an assumption that it was because Plaintiff and Tejada were Hispanic. (Flanagan Dep. at 64:9-20; Bueno Dep. at 55:19-56:17; Pl. Dep. at 130:24-131:11; 134:16-24). Flanagan also believed that Plaintiff had been discriminated against; Flanagan is Caucasian.

Notably, when Flanagan started working at The Champagne Bar in March 2008, all of the bartenders at front bars were newly hired and less qualified than Plaintiff. All of them were Caucasian and very young; they were in their early to mid 20's and early 30's.

For instance, Robert Kenyon was a bartender at one of the front bars. Kenyon is Caucasian man in his early 20's. Kenyon was terminated within a year due to his poor work performance. Evangelista testified that he was disappointed with Kenyon's work performance. Robert Kenyon was fired by Bueno for giving drinks away. (Flanagan Dep. at 38:16-39:16; 40:16-41:10; Bueno Dep. at 38:18-39:7; Evangelista Dep. at 21:25-22:13; 21:24-22:3).

8

Prather Remm was also a newly hired bartender at the Champagne Bar and the Rose Club in February 2008. She is Caucasian and was in her late 20's at the time that she was hired. Evangelista testified that he had disciplinary problems with Rehm and her work ethics were not up to par with his expectations. She was terminated by Bueno for poor work performance for mishandling money. Moreover, she was habitually late to work and she was extremely inexperienced. Flanagan testified that she created problems for other bartenders because she failed to put the bottles of liquor where they belonged, and that she was inexperienced and mentioned to Flanagan that she worked at a "beer and shots" type of bar before working at The Plaza. (Flanagan Dep. at 41:11-44:8; Bueno Dep. at 39:16 - 40:15; Evangelista Dep. at 22:14-22; 22:4-6).

Heather Buesing was also a newly hired bartender in March 2008 who also worked at the Champagne Bar and The Rose Club. (Pl. Dep. at 112:21-24; Evangelista Dep. at 19:7-12; Bueno Dep. at 41:3-12). Buesing was also Caucasian and in her early 30's. (Bueno Dep. at 44:18-20; Flanagan Dep. at 45:6-8).

Scott Teague was hired to work as a front bartender at The Rose Club and the Champagne Bar in February 2008. He was in his early 20's at the time. (Flanagan Dep. at 50:3-25; Evangelista Dep. at 14:10-16; Pl. Dep. at 112:21-24). According to Flanagan, Teague had far less experience than other front bartenders. He would get flustered working at The Rose Club because he was not used to the heavy flow of work. (Flanagan Dep. at 51:6-24). Teague was ultimately terminated for stealing from The Plaza by giving away drinks. (Flanagan Dep. at 51:25-52:21).

Eric Smades was also hired in February 2008 to work as a bartender at the Champagne Bar and The Rose Club. (Zapata Cert., Ex. P; Ex. O). Smades is Caucasian and in his early 30's when he was hired. He was ultimately terminated for poor work

9

performance; he refused a direct order from a Manager to make a drink, a mojito, for a guest on the grounds that he was too busy. (Flanagan Dep. at 52:22-54:8).

Sean O'Toole was also hired to work as a front bartender at the Champagne Bar and The Rose Club in or around June or July 2008. He was also Caucasian and in his late 20's or early 30's. (Bueno Dep. at 43:21-23; 44:8-10; Evangelista Dep. at 19:20-20:1; Flanagan Dep. at 46:9-47:12).

Laura Schwitzer was also a newly hired employee at The Plaza in April 2008. Notably, she was hired as a server and then she was transferred to a front bartender position at The Rose Club and Champagne Bar. (Evangelista Dep. at 20:12-18). Schwitzer was also Caucasian and in her early 20's. (Bueno Dep. at 43:24-44:7).

Jamiyla Westcott was also hired as a front bartender; she was very young and had no experience working as a bartender. She was demoted to work as service bartender very quickly. (Pl. Dep. at 183:14-184:3; Flanagan Dep. at 49:12-50:2; Zapata Cert. Ex. O).

Plaintiff had greater seniority than all of the newly hired bartenders assigned to work at The Rose Club and The Oak Bar in March 2008. (Bueno Dep. at 70:25-71:7). Moreover, he was far more than qualified to perform the duties of a front bartender than all the newly hired bartenders assigned to work at the front bars at the time that he was recalled in February 2008. In fact, Flanagan testified that he was very good with customers, which he observed when they worked together at The Plaza before it closed. (Flanagan Dep. at 27:25-28:7). Plaintiff performed his duties well enough that he and Flanagan trained the newly hired bartenders to perform their duties, including making specialty drinks. (Flanagan Dep. at 29:19-30:16). Notably, during the initial training period, from February 11, 2008, through March 1, 2008, Bueno observed Plaintiff during

10

the training sessions serving the owner of The Plaza and preparing cocktails, and Bueno gave Plaintiff a lot of compliments with respect to the quality of the drinks that he was making. (Pl. Dep. at 149:6-14).

In contradiction to the argument that Plaintiff was placed in the service bartender position because the Union's paperwork indicated that was his classification, Lai initially justified appointing Plaintiff to the service bar position on the grounds that Plaintiff did not have the requisite skill set to work in the front bar after acknowledging that Plaintiff had in fact held the front bartenders position prior to the hotel's closure in 2005. (Pl. Dep. at 127:5-23).

Notably, on February 22, 2008, Fairmont indicated in its own internal forms, which Lai signed, that Plaintiff was a bartender at The Champagne Bar – a front bar. (Zapata Cert., Ex. Q).

Plaintiff ultimately asked for a meeting with Lai and Edward Cedeno, Plaintiff's Union Representative. When the meeting took place in late March 2008, Plaintiff told Lai that he was not satisfied with working at The Palm Court because he had the qualifications and experience for a front bar position and that he had even worked as a front bartender for many years.

It was at this time that Plaintiff stated that he believed that he had been discriminated against and Lai laughed in response in the presence of Cedeno. During this meeting, Lai stated that Plaintiff did not have the qualifications to work as a Front Bartender. Cedeno then asked him how he came to this conclusion and he further pointed out that no one was recalled to work as a service bartender and Lai continued to state that Plaintiff did not have the qualifications and that is why he was assigned to work at The Palm Court. Cedeno then told Lai that he had personally seen Plaintiff working as a front

11

bartender at the Plaza in 2005. Lai then stated that he based this opinion on a conversation that he allegedly had with one of the Managers that had worked at the Plaza prior to its closure in 2005. (Pl. Dep. at 128:4-23; 133:24-134:2; Cedeno Dep. at 19:4-22:5; 48:6-14).

Although Cedeno complained of discrimination on behalf of Plaintiff, and Lai was the sole person charged with investigating such claims, the hotel did not investigate Plaintiff's and/or Cedeno's complaints of discrimination. (Cedeno Dep. at 48:19-23; Reus Dep. at 9:6-20; Zapata Cert. Ex. P). According to Cedeno, he saw no other reason except for discrimination as to why Plaintiff and Tejada were not appointed to work as front bartenders. (Cedeno Dep. at 49:6-22). After this meeting, Cedeno told Plaintiff that he was going to file a grievance to resolve this issue. (Pl. Dep. at 134:3-11).

At another meeting with Cedeno, Simo, Vanessa Miller, Evelio Tejada, and Lai, the Union and Plaintiff explained to Lai that Plaintiff was a front bartender and Lai again responded by stating that Plaintiff had a different set of skills than what was required for front bartenders. (Pl. Dep. at 134:12-24; 147:6-19). Moreover, during this meeting Plaintiff and Tejada both stated that they believed that they were being discriminated against when they were moved from front bartenders to service bartender positions and that front bartenders made more money in the form of gratuities because they interacted with guests and that it was a more prestigious position. (Pl. Dep. at 135:24-136:24). In addition to complaining to Lai, Plaintiff complained to Bueno and Bueno responded by becoming angry at Plaintiff and telling Plaintiff that he did not have time to discuss his complaint and that it was inappropriate for them to discuss Plaintiff's complaints of discrimination at that time. (Pl. Dep. at 138:17 – 140:17).

12

After dealing with Bueno and Lai, Plaintiff was discouraged from calling Fairmont's Human Resources hotline to complain about his belief that his transfer was discriminatory in nature. (Pl. Dep. 143:15-25). Notably, the Plaza's policy regarding discrimination was that if there was any instance of perceived or alleged discrimination, then it was to be brought to the attention of Human Resources immediately. (Lai 56:11-22). Bueno did not follow this policy because instead of reporting Plaintiff's complaints of discrimination, he only encouraged employees to report the complaints themselves to the Human Resources Department. Lai was the person responsible for investigating discrimination complaints at The Plaza, yet Bueno did not tell him of Plaintiff's complaint. (Bueno Dep. at 13:15-14:2; Lai 66:12-15; Reus 9:6-20).

Plaintiff implored Lai to confirm with Evangelista that he was in fact a permanent bartender at the Oak Bar because Plaintiff had worked with him prior to The Plaza's closure in 2005, and Lai never spoke to him. (Pl. Dep. at 187:14-25; Evangelista Dep. at 7:6-8:7).

Lai did not ask Evangelista any questions relating to Plaintiff's prior position at The Plaza even though Evangelista was one of the supervisors that actually supervised Plaintiff between 2002 and 2003. Evangelista worked at the Oak Bar/Oak Room between 2002 and 2003 as an assistant manager where he directed traffic and made sure that people had drinks, tables were clean, and make sure that people did not need anything. (Evangelista Dep. at 7:6-8:7). He first met Plaintiff during the time that he worked at the Oak Bar/Oak Room. (Evangelista Dep. at 8:8-14). Evangelista testified that Plaintiff was a bartender at the Oak Bar between 2002 and 2003. He was the steady bartender there and worked in this capacity on a constant basis. (Evangelista Dep. at 8:15-9:5).

Notably, as of 2005, Plaintiff routinely worked in the Oak Room and he wore a uniform that was unique to the Oak Room/Oak Bar. The uniform was different than the uniforms bartenders at The Oyster Bar and The Palm Court wore. (Bravo Dep. at 11:24-13:3). Bravo, who handled payroll, discussed Plaintiff's position with Lai. She told him that although he was categorized as a room service bartender, he worked at the Oak Room. Plaintiff became the permanent bartender at the Oak Room because two bartenders that worked at the Oak Room died. The Plaza needed a permanent bartender at that time and Plaintiff became a permanent bartender at the Oak Room. (Bravo Dep. at 13:4-14:11).

In 2005, Plaintiff was a bartender in the Food and Beverage Department and within this Department, there were different assignments, including private dining. (Zapata Cert., Ex. J). Plaintiff was a bartender in private dining and in addition to his regular wages, he earned gratuities. (Zapata Cert., Ex. J; Ex. Z). At the time that the hotel closed in 2005, Plaintiff had been working as a bartender at the Oak Bar for at least five years, and on occasion he would work at the service bars. (Pl. Dep. at 71:17-21; 115:19-20; Cedeno Dep. at 8:3-9; Flanagan Dep. at 13:2-15). In fact, Plaintiff was even featured in a book working at the Oak Bar as a front bartender making a specialty drink prior to 2004. (Zapata Cert. Ex. Y).

Moreover, when Plaintiff was recalled by the hotel, it referred to him as a bartender, not a service bartender. (Zapata Cert., Ex. N). Lai tried to argue that he referred to Plaintiff as bartender because the private dining department no longer existed. (Lai Dep. at 28:2-11). Lai contradicted himself by testifying that he intended to assign Plaintiff to work as a bartender in The Palm Court, a service bar, despite having signed internal hotel documents stating that Plaintiff was a bartender and that he was assigned to

14

work at the Champagne Bar effective February 11, 2008. (Lai Dep. at 41:20- 42:6). Moreover, a work schedule that was created in early January 2008 indicated that Plaintiff was a bartender and that he was assigned to work at The Champagne Bar and The Rose Club. (P.000368).

It is important to note that plaintiff was classified as a bartender in the Food and Beverage Department on the recall list, not a service bartender. (Zapata Cert., Ex. U).

Eventually, the Union took Plaintiff's grievance to arbitration. At arbitration the Hotel argued that the City Hall Agreement recall provision stated that employees were required to notify the Hotel of their willingness to be recalled and reemployed to their prior classification if there were positions in that classification available. The Hotel also argued that the bartender positions for the Champagne Bar and The Rose Club was posted and Plaintiff and Tejada did not apply. These arguments were rejected by the arbitrator, who also noted that the recall letter that Plaintiff received referred to him as a bartender, not a service bartender. (Zapata Cert. Ex. V).

Conversely, the Union argued that Plaintiff and Tejada, by virtue of their prior seniority were entitled to front bartender positions at The Champagne Bar and The Rose Club, ahead of new hires that the Hotel hired for those positions. (Zapata Cert., Ex. V).

Ultimately, the arbitrator found that The Plaza had violated the collective bargaining agreement by refusing to allow Tejada and Plaintiff to exercise their seniority rights. To be clear, the arbitrator found that Plaintiff and Tejada should have been placed in either The Champagne Bar or The Rose Club. (Zapata Cert., Ex. V).

The arbitrator noted that Lai testified at the arbitration that he never had any conversations with Hamid or Evangelista wherein he asked or discussed what Plaintiff's

15

or Tejada's positions were at The Plaza prior to its closure in 2005. Conversely, Lai also confirmed with both Evangelista and Hamid that Flangan was a front bartender at The Plaza prior to is closure in 2005. After confirming this with Hamid and Evangelista, Lai transferred Flanagan from The Palm Court to the Champagne Bar. (Zapata Cert., Ex. V).

As to Lai's credibility, no one supported his assertion that he and other people were involved in selecting the individuals appointed to the front bartender positions. In fact, when Bueno was deposed, he testified that he received the names of the individuals that were to be appointed to the bartender positions from The Plaza's Human Resources department. (Bueno Dep. at 27:2-13). According to Bueno, Lai and Reus were the only individuals that were involved in considering recalled bartenders in late 2007 and early 2008. (Bueno Dep. at 16-24). In fact, Bueno was given a list of the recalled employees with their seniority date and classification from Lai; he had absolutely no role in rehiring recalled employees. (Bueno Dep. at 23:6-17; Bueno Dep. at 27:2-13).

Bueno obtained classification lists that applied to Plaintiff from The Plaza's human resource department. (Bueno Dep. at 19: 20-24; 20:2-16; 23:6-17). Notably, the list approved by the Union classified Plaintiff as a bartender and the Human Resources Manager working at the Plaza in 2005, David C. Jones, provided Plaintiff a letter stating that he was a bartender as of 2005. (Zapata Cert., Ex. U; Ex. T).

It should be noted that the decision to appoint Plaintiff to the service bartender position at The Palm Court was made by Lai and then conveyed to Bueno. (Bueno Dep. at 33:10-34:9). Flanagan was also told by Evangelista that the decision to appoint Plaintiff to the service bartender position was made by Lai. (Flanagan Dep. at 65:20-66:14). Notably, in 2005, Flanagan was told by his Union that that those bartenders that did not accept the enhanced severance could return to work and those with greater

seniority could select which bars they wanted to work at. (Flanagan Dep. at 23:19-24:11).

## II.     ARGUMENT

### Standard of Review for Summary Judgment

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Behringer v. Lavelle Sch. For the Blind, No. 08 Civ. 4899, 2010 WL 5158644, at *1 (S.D.N.Y. Dec. 17, 2010).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654 (1962)); see also, Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a

reasonable inference could be drawn in favor of the nonmoving party. See, Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

### Summary Judgment in Employment Discrimination Cases

As the above summary judgment standard has been applied to cases of employment discrimination, the burden of proof that must be met to permit the plaintiff to survive a summary judgment motion at the *prima facie* stage is *de minimis*. Chambers v. TRM Copy Ctrs. Corp., 43 F. 3d 29, 37. Thus, it is established that, in determining whether an employment discrimination plaintiff has established a *prima facie* case, the function of the Court on a summary judgment motion is to determine "whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" Cronin v. Aetna Life Insurance Co., 46 F.3d 196, 204 (2d Cir.1995) (quoting Chambers, 43 F.3d at 38).

The Court must also be cognizant that "when a case turns on the intent of one party, as employment discrimination claims often do, a motion for summary judgment must be approached with special caution. Id. Because the employer rarely leaves direct evidence of its discriminatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions. See, Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990).

### A. Standard of Proof under the ADEA, Title VII and the New York State and New York City Human Rights Laws

Under the Age Discrimination in Employment Act, New York City Human Rights Law, New York State Human Rights Law, and Title VII, a plaintiff can utilize the indirect method of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); Matz v. Prospect Energy Corporation, 2008 NY

Slip Op 33089U; Ghirardelli v McAvey Sales & Serv., 287 F Supp 3d 379 (SDNY 2003). To establish a *prima facie* case of employment discrimination under the indirect method, a plaintiff must show that he belonged to a protected class, met his employer's legitimate job expectations, suffered adverse employment action, causation, and similarly situated non-class members were treated more favorably.

The courts in this circuit have generally recognized that the degree of proof necessary for a plaintiff to establish a *prima facie* case of employment discrimination under the McDonnell Douglas burden-shifting test is minimal. See, Jute v. Hamilton Sundstrand Corp., 420 F.3d 166 (2d Cir. 2005); Fisher v. Vassar College, 114 F.3d 1332, 1335; Quaratino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir. 1995) (all that is required at the first stage is a "de minimis" showing).

Once plaintiff meets his or her burden, the burden shifts to the defendant to articulate, through the introduction of admissible evidence, a legitimate, nondiscriminatory reason for the adverse action, after which the burden shifts back to the plaintiff to prove that the legitimate reason proffered by the defendant is merely a pretext for discrimination. Essentially, plaintiff must demonstrate, through evidence, that an improper motive, was the basis of his termination. Forrest v. Jewish Guild for the Blind, 765 N.Y.S.2d 326, 333 (1st Dept. 2003), *aff'd* 786 N.Y.S.2d 382 (2004).

To establish "pretext," plaintiff must demonstrate that (1) the articulated reasons are false, and that (2) discrimination was the real reason. Pretext "can be established by a showing that the 'asserted neutral basis was so ridden with' error that the employer obviously could not honestly have relied on it' or by showing that the reason advanced by the defendant 'was unworthy of credence.'" Sinha v State University of New York at Farmingdale, 764 F Supp 765, 768 (EDNY 1991).

19

## POINT I

Plaintiff's is from the Dominican Republic, he is over 40 years old, he was qualified for the front bartender position, when he was recalled he was demoted to a service bartender position, and less qualified much younger people were given the front bartender positions. The service bartender position is lesser position because individuals holding this position make less money and have no contact with the public. In fact, this position is considered to be a better position by employees and management alike.

There was ample evidence in possession of the employer in this case that clearly demonstrated that plaintiff was a front bartender at the Plaza before it closed for renovations in 2005.

To be clear, Cedeno, Flangan, Evangelista, and Bravo all testified that Plaintiff was a permanent front bartender at the Oak Bar before the hotel closed for renovations in 2005. Additionally, Lai himself sent Plaintiff a letter on January 25, 2008, wherein he explicitly told him that he was being recalled to a bartender position, not a service bartender position. (Zapata Cert. Ex. P). Plaintiff was scheduled to work at a front bar from February 24, 2008, to March 1, 2008. (Zapata Cert. Ex. O). Lai and Creek both signed an Employee Action Form which stated that Plaintiff was a bartender at a front bar, the Champagne Bar. To be clear, Lai signed this document on February 12, 2008, and Creek signed it on February 21, 2008. (Zapata Cert. Ex. Q). Additionally, during training Plaintiff was given $150 and made to sign a Cash Responsibility Receipt that identified his assigned bar as the Champagne Bar; this document is dated February 27, 2008. (Zapata Cert. Ex R). When Plaintiff returned for training, he was given a custom manual that identified him as a bartender, not a service bartender. (Zapata Cert. Ex. S;

Bueno Dep at 46:4-47:8). All the seniority and recall lists identified Plaintiff as a bartender, not a service bartender. This is important because other individuals were identified as service bartenders within these documents. (Zapata Cert. Ex. T; Ex. U; Ex. Z). The Plaza's own internal documents represented to the world that Plaintiff was a front bartender, including David C. Jones, Human Resources Manager in 2005, and Myoung A. Nam, Human Resources Administrative Assistant. (Zapata Cert. Ex. I; Ex. J; Ex. K). To be clear, in 2000, Plaintiff was given a letter from Mr. Jones stating that he was employed at a service bar and did not receive tips. (Zapata Cert. Ex. I). Flanagan and Plaintiff testified that service bartenders did not earn tips. In 2005, Plaintiff was given a letter from Ms. Myoung which stated that he worked as a bartender and he earned tips. (Zapata Cert. Ex. J).

Moreover, Plaintiff was extremely qualified for the position of front bartender in 2008 when he was demoted to the service bartender position. In fact, Mr. Jones's letter states that "Mr. Rivera has always shown himself to be hardworking, consistent and dedicated employee. He always appears to be cheerful and friendly with a high regard for the comfort and well being of our guests." (Zapata Cert. Ex. K). Flanagan testified that he observed Plaintiff work as a bartender for many years and that he was a good bartender. Flanagan also testified that most of the newly hired front bartenders in February/March 2008 had less experience than Plaintiff, and some were so incompetent that they were ultimately terminated.

The Defendant argues that documents given to it by the Union identified Plaintiff as being a service bartender, however Lai initially took the position that Plaintiff did not have the skill set to work as a front bartender. (Zapata Cert. Ex. X; Pl. Dep. at 127:5-12).

Moreover, it was Lai that hired the bartenders that were appointed to the front bar position and most of them were ultimately fired because they could not do the job. The same job that Plaintiff had performed for at least five years prior to the hotel's closure in 2005. Notably, the people appointed to the front bar were Caucasian and very young and inexperienced. Although, Westcott was initially given a front bar position, she too was quickly demoted like Plaintiff. In any case, Westcott had no experience and she too was very young.

Most importantly, Flanagan was similarly situated to Plaintiff and he was also demoted when he was recalled in February/March 2008 and when he complained, Lai spoke to Hamid and Evangelista because they worked at the hotel prior to its closure in 2005 and after confirming that Flanagan had in fact worked as a front bartender, he reassigned Flanagan to a front bar. However, when Plaintiff complained, Lai did not speak to Hamid or Evangelista. (Zapata Cert. Ex. V). Notably, Flanagan was classified within one of the seniority/recall list as a service bartender, whereas none of the lists identified Plaintiff as a service bartender. (Zapata Cert. Ex. T; Ex. U; Ex. Z).

Notably, Lai, as Director of Human Resources, was the person designated to investigate complaints of discrimination. In or around March 2008, Cedeno and Plaintiff complained to him that it appeared that Plaintiff was being discriminated against by being demoted and Lai laughed in their face. There was no investigation, he simply laughed at them. (Zapata Cert. Ex. P; Pl. Dep. at 128:4-23; 133:24-134:2; Cedeno Dep. at 19:4-22:5; 48:6-14).

Most importantly, there was a contract that protected Plaintiff's right to be recalled to his prior classification, bartender, in 2008. (Zapata Cert. Ex. P). And when

the Union challenged the Plaza's actions in demoting Plaintiff at arbitration, the arbitrator rejected the arguments that Defendants made. He rejected the argument that the positions were posted and Plaintiff and Tejada simply failed to apply for them. He rejected the argument that Plaintiff was not a front bartender at The Plaza prior to its closure in 2005. And, he rejected the argument that since the Oak Bar closed, Plaintiff and Tejada did not have a bar where they could be reinstated. All of these arguments failed because appointments to any of the bars were made on the basis of seniority for all bartenders, service and front alike. The arbitrator also pointed out that Flanagan was similarly situated to Plaintiff and when he complained about being assigned to work at a service bar, he was reassigned. Moreover, there were no witnesses to the alleged posting of the vacancies for the front bars. The arbitrator pointed out that the front bars were staffed with newly hired employees that clearly had far less seniority than Plaintiff and assignments were largely based on a bidding system that was based on sonority within the bartender classification – there was only one classification for bartender. (Zapata Cert. Ex. V).

The arbitrator ultimately concluded that Plaintiff had four years of seniority as a permanent front bartender at the Oak Bar at the time that the hotel closed for renovations in 2005. This was supported by testimony from Flanagan and Cedeno. The Arbitrator also based his decision on the fact that The Plaza itself had given Plaintiff letters identifying him as a bartender in 2005 and the letters stated that Plaintiff had been promoted to this position. (Zapata Cert. Ex. V).

The arbitrator pointed out that Lai asked two managers that had worked at the Plaza prior to the closure in 2005 whether Flanagan worked as a front bartender in an

effort to confirm this information, but he never did this for Plaintiff or Tejada. Both of whom were Hispanic and over 40 years old. (Zapata Cert. Ex. V). Ultimately, the arbitrator found that the hotel violated Plaintiff's seniority by demoting him to a service bartender position. (Zapata Cert. Ex. V).

There is ample reason to believe that the explanations given by Defendant are not worthy of belief here, given the evidence submitted that contradicts their claimed justifications. That is enough to meet plaintiff's burden of showing pretext. See also, *McCoy v. WGN Cont'l Broadcasting Co.*, 957 F.2d 368, 372 (7th Cir. 1992) ("Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment.")

The Court should deny the Defendants' motion because Plaintiff has shown that he is a member of protected classes under Title VII, ADEA, NYC Human Rights Law and New York State Human Rights Law. He is Dominican, a white Hispanic, and over 40 years old. He suffered adverse employment action in the form of a demotion that resulted in materially lesser terms and conditions of employment under conditions that raises the inference of discrimination; the individuals that were selected for the front bartender positions were significantly younger than Plaintiff, Caucasian, and far less qualified for the position than Plaintiff. Moreover, Lai was the person that made the decision to demote Plaintiff, he was the Director of Human Resources, and when Plaintiff and Cedeno complained of discrimination he laughed instead of investigating the allegations. Under the NYC Human Rights Law, this gives rise to automatic liability. NYC Admin. Code § 8-107(13)(2012).

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny

Defendants' motion for summary judgment.

Dated: New York, New York
      January 6, 2012

                      Respectfully submitted,

                      The Law Offices of Fausto E. Zapata, Jr., P.C.
                      Broadway Chambers Building
                      277 Broadway, Suite 501
                      New York, New York 10007
                      Tel:   212-766-9870

                      By:   /s/ Fausto E. Zapata, Jr.
                            Fausto E. Zapata, Jr. (FZ 4957)