UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CARLOS RIVERA,

                                        ECF CASE

                                        10 Civ. 6661 (WHP)

                Plaintiff,

                                        **CERTIFICATION OF FAUSTO E. ZAPATA, JR. IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

PLAZA ACCESSORY OWNER, LP, et al.,

                Defendants.

------------------------------------------------------------X

       Fausto E. Zapata, Jr. being of full age, certifies as follows:

1. I am an attorney licensed to practice before this Court and I am the owner of The Law Offices of Fausto E. Zapata, Jr., P.C, attorneys for Plaintiff Carlos Rivera in the within matter. I submit this Certification in support of Plaintiff's opposition to Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

2. Collectively attached hereto as **Exhibit A** are true and exact copies of the relevant portions of the transcript of the deposition of Plaintiff Carlos Rivera ("Plaintiff"), referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

3. Collectively attached hereto as **Exhibit B** are true and exact copies of the relevant portions of the transcript of the deposition of Liam Flanagan, referenced in Plaintiff's

Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

4. Collectively attached hereto as **Exhibit C** are true and exact copies of the relevant portions of the transcript of the deposition of Edward Cedeno, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

5. Collectively attached hereto as **Exhibit D** are true and exact copies of the relevant portions of the transcript of the deposition of Anthony Evangelista, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

6. Collectively attached hereto as **Exhibit E** are true and exact copies of the relevant portions of the transcript of the deposition of Rajan Lai, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

7. Collectively attached hereto as **Exhibit F** are true and exact copies of the relevant portions of the transcript of the deposition of Nancy Bravo, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

8. Collectively attached hereto as **Exhibit G** are true and exact copies of the relevant portions of the transcript of the deposition of Marta Reus, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

9. Collectively attached hereto as **Exhibit H** are true and exact copies of the City Hall Agreement, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

10. Collectively attached hereto as **Exhibit I** are true and exact copies of the June 6, 2000 letter from David C. Jones, The Plaza Human Resources Department, Employment Manager, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

11. Collectively attached hereto as **Exhibit J** are true and exact copies of the February 14, 2005 letter from Myoung A. Nam, The Plaza Human Resource Administrative Assistant, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

12. Collectively attached hereto as **Exhibit K** are true and exact copies of the April 26, 2005 letter from David C. Jones, The Plaza Human Resources Department, Employment Manager, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

13. Collectively attached hereto as **Exhibit L** are true and exact copies of the November 26, 2006 letter from John Martin, Fairmont Corporate Director, Employee Relations, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

14. Collectively attached hereto as **Exhibit M** are true and exact copies of the August 10, 2007 letter from Kenny Okutani, The Plaza Director of International Sales for Asian Market from November 1994 to February 14, 2005, referenced in Plaintiff's

Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

15. Collectively attached hereto as **Exhibit N** are true and exact copies of the January 28, 2008, letter from Rajan Lai to Plaintiff, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

16. Collectively attached hereto as **Exhibit O** are true and exact copies of the work schedule for February 24, 2008, to March 1, 2008, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

17. Collectively attached hereto as **Exhibit P** are true and exact copies of The Plaza's discrimination complaint procedure, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

18. Collectively attached hereto as **Exhibit Q** are true and exact copies of The Plaza Employee Action Form, dated February 22, 2008 referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

19. Collectively attached hereto as **Exhibit R** are true and exact copies of The Plaza Cash Responsibility Receipt, dated February 27, 2008, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

20. Collectively attached hereto as **Exhibit S** are true and exact copies of the first page of the training manual that plaintiff received when he was recalled to work at The Plaza,

referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

21. Collectively attached hereto as **Exhibit T** are true and exact copies of recall list, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

22. Collectively attached hereto as **Exhibit U** are true and exact copies of the Fairmont recall list, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

23. Collectively attached hereto as **Exhibit V** are true and exact copies of the arbitration decision, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

24. Collectively attached hereto as **Exhibit W** are true and exact copies of the wage rates for bartender position from July 1, 2001, to June 30, 2006, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

25. Collectively attached hereto as **Exhibit X** are true and exact copies of the union documents relating to the grievance that was filed on plaintiff's behalf, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

26. Collectively attached hereto as **Exhibit Y** are true and exact copies of the book cover and excerpt from book entitled Cocktail in New York, Where to Find 100 Classics and How to Make Them, by Anthony Giglio, with a copyright date of 2004, referenced in

Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

27. Collectively attached hereto as **Exhibit Z** are true and exact copies of the seniority list of bartenders, referenced in Plaintiff's Memorandum of Law and Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment.

28. I certify under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      January 6, 2012

                                  Respectfully submitted,

                                  The Law Offices of Fausto E. Zapata, Jr., P.C.
                                  Broadway Chambers Building
                                  277 Broadway, Suite 501
                                  New York, New York 10007
                                  Tel:    212-766-9870

                                  By:   /s/ Fausto E. Zapata, Jr.
                                         Fausto E. Zapata, Jr. (FZ 4957)

# Exhibit "A"

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3           CIVIL ACTION NO. - 1:10-cv-06661 (WHP)

 4

 5   CARLOS RIVERA,                              :

 6            Plaintiff,                         :

 7       -against-                               :

 8   PLAZA ACCESSORY OWNER LP, ELAD PROPERTIES   :

 9   NY LLC, CPC Q REALTY LLP LLC,               :

10            Defendants.                        :

11   - - - - - - - - - - - - - - - - - - - - - -:

12

13

14

15       CONTINUED DEPOSITION OF:   CARLOS RIVERA

16              THURSDAY, APRIL 14, 2011

17

18

19

20            ROSENBERG & ASSOCIATES, INC.

21         Certified Court Reporters & Videographers

22   425 Eagle Rock Ave., Ste 201   250 Park Ave., 7th Fl.

23   Roseland, NJ 07068              New York, NY 10177

24    (973) 228-9100    1-800-662-6878    (212) 868-1936

25            www.rosenbergandassociates.com
```

**62**

Deposition of CARLOS RIVERA, taken in the above-entitled matter before MICHELLE GALLO, a Certified Court Reporter and Notary Public of the State of New Jersey, taken at the offices of LITTLER MENDELSON, P.C., One Newark Center, 1085 Raymond Boulevard, Newark, New Jersey, on Thursday, April 14, 2011, commencing at 10:27 a.m.

**63**

APPEARANCES:

LAW OFFICES OF FAUSTO E. ZAPATA, JR., P.C.
BY: FAUSTO E. ZAPATA, JR., ESQ.
277 Broadway, Suite 501
New York, New York 10007
fz@fzapatalaw.com
(212) 766-9870
Attorney for Plaintiff

LITTLER MENDELSON, P.C.
BY: WILLIAM P. McLANE, ESQ.
One Newark Center, 8th Floor
1085 Raymond Boulevard
Newark, New Jersey 07102
wmclane@littler.com
(973) 848-4700
Attorneys for Defendants

ALSO PRESENT:
Raul Taveras, Spanish interpreter

**64**

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| CARLOS RIVERA | | |
| | MR. McLANE | 65;189 |
| | MR. ZAPATA | 178;192 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| D-2 | January 25, 2007 Letter | 73 |
| D-3 | Severance and Recall Rights Form | 75 |
| D-4 | August 10, 2007 Letter | 92 |
| D-5 | Equal Employment Opportunity Commission Intake Questionnaire | 150 |
| D-6 | Copy of paycheck | 152 |
| D-7 | February 3, 2005 Letter | 155 |
| D-8 | Notice of Right to Sue | 159 |
| D-9 | Second Amended Complaint | 159 |

**65**

RAUL TAVERAS,
the Spanish interpreter, sworn.
    CARLOS RIVERA,
66 Lexington Avenue, Maplewood, New Jersey, having been first duly sworn, is examined and testifies as follows:
    EXAMINATION
BY MR. McLANE:
    Q.  Good morning, Mr. Rivera.
    A.  Good morning.
    Q.  Today we're going to continue the deposition that we started back on March 7th. And today we are doing so with an interpreter to aid both the court reporter, me and you to make this procedure a little more smooth. You just took an oath to tell the truth today, and you took an oath back in March. Did you, indeed, tell the truth back in March?
    A.  Yes.
    Q.  And I think we did a pretty good job of this last time, but just to remind you that the court reporter who is sitting to your right and my left will be taking down all of my questions and your answers, and in order to help her out, it's important that you answer all my questions verbally today. Do you understand that?

Page 66

1  A. Yes.
2  Q. Is there any reason why you can't answer my
3  questions truthfully today?
4  A. No.
5  Q. The last time we were together, you were
6  taking a medication called Sertraline. Are you still
7  taking that medication?
8  A. Yes.
9  Q. And as I recall from your testimony last
10 time, that medication actually makes it easier for you
11 to recall events; is that correct?
12 A. Yes.
13 Q. Before we broke last time, you were about to
14 tell me about an incident that occurred in 1996 with
15 someone by the name of Thomas Norberg. Do you recall
16 that testimony?
17 A. Yes.
18 Q. What happened in 1996 with Mr. Norberg that
19 revolved around discrimination?
20 A. I think that Norbert was the director of --
21 the beverage director. There were some guys from
22 Bangladesh working there. And there was an incident
23 where they were called Taliban, and the hotel tried --
24 the manager was from France, he was calling them
25 Taliban. They were hiding many employees of Arabic

Page 67

1  nationality. That's what I remember.
2  Q. Now, is that different from an incident in
3  2001 around the time of the terrorist attacks that you
4  testified about last time where somebody called
5  somebody of Middle Eastern descent Taliban?
6  A. No. I think it's the same.
7  Q. It's the same event?
8  A. Yes.
9  Q. So other than this incident and the incident
10 that you testified about last time, any other issues
11 of discrimination of any kind at the Plaza that you
12 were aware of prior to its closing in 2005?
13 A. Yes. There was another -- a gentleman, his
14 name is Adel, the captain. He's from Cairo. He was
15 the head waiter, and he filled out a discrimination
16 incident report.
17 Q. When was that?
18 A. In 1998.
19 Q. You testified about an incident last time
20 with somebody from Cairo that ended in a settlement.
21 Is this the same incident?
22 A. Yes, correct.
23 Q. Anything other than that that related to
24 discrimination prior to the hotel's closing in 2005?
25 A. Not that I remember.

Page 68

1  Q. Last time we talked about your work history
2  between 2005 and when the hotel closed and when it
3  opened, including some employment at the Carlyle
4  Hotel, about a week at the Carlton hotel, the Hilton
5  hotel, I believe. Do you recall that testimony?
6  A. Yes.
7  Q. Any other employment during that time, other
8  than what you testified about last time we were here?
9  A. No.
10 Q. When were you first notified that the Plaza
11 was going to reopen and that they would be recalling
12 some of the former employees?
13 A. I received a letter on February 25, 2008
14 indicating that the hotel was going to reopen on
15 February 11, 2008.
16 Q. You received a letter on February 25, 2008?
17 A. The date on it is February 25th.
18 Q. Were you already back at the hotel when you
19 received that letter?
20 A. No. I was working at the Carlyle.
21 Q. What was the first day that you were back at
22 the Plaza Hotel in 2008?
23 A. February 11th of 2008.
24 Q. So what we're trying to figure out is if you
25 were back at the hotel on February 11, 2008 and you

Page 69

1  received a letter two weeks later, on February 25,
2  2008, how did you know to come back on February 11th?
3  A. I'm sorry. I received the letter on March
4  25, 2008.
5  Q. Let's try it this way. You're working at the
6  Carlyle Hotel up until February 2008?
7  A. No. Let me explain. The letter I received
8  was January 25th of 2008 indicating that the hotel
9  would reopen on February 11, 2008, for me to report to
10 the training room, Edwardian Room, one of the
11 restaurants at the Plaza.
12 Q. When you received that letter in January,
13 were you working at the Carlyle Hotel?
14 A. Yes.
15 Q. Did the letter that you received to come back
16 to the Plaza indicate that you would report back on
17 February 11th?
18 A. Yes. To call the hotel in two or three days.
19 Q. Who did the letter come from?
20 A. Rajan Lai, director of human resources.
21 Q. I'm sorry. Your testimony is that the letter
22 said that you would report back to the Edwardian Room?
23 A. Yes, correct.
24 Q. And if I'm correct, you had worked at the
25 Edwardian Room prior to the whole hotel closing at

Page 70

1  some point?
2  A. No.
3  Q. You never worked in the Edwardian Room?
4  A. Yes, but not -- the Edwardian Room closed in
5  2000 or 2001.
6  Q. When the hotel reopened in 2008, did the
7  Edwardian Room reopen?
8  A. No. Only for training.
9  Q. So the training was to take place in the
10 Edwardian Room?
11 A. Yes, correct.
12 Q. Did you do as the letter instructed, call
13 somebody at the hotel within three or four days?
14 A. Yes.
15 Q. And who did you speak to?
16 A. With Rajan Lai, the director of personnel.
17 Q. What do you recall about that telephone call?
18 A. I explained to him that I was going to
19 return, and I was bartender in the front bar, and I
20 wanted to know if my position would be available, how
21 many restaurants they were going to open, and I was
22 happy to return -- I was excited to return to a
23 five-star, five-diamond hotel.
24 Q. Any more?
25 A. Yes. Rajan explained to me that he had a

Page 71

1  position for me for service bar bartender at the Palm
2  Court Restaurant.
3  Q. What did you say when Mr. Lai told you that
4  there was a position at the service bar at the Palm
5  Court?
6  A. I was in disagreement with him. I explained
7  to him that my position was working as the front
8  bartender.
9  Q. And this conversation occurred before you
10 reported back to the Edwardian Room on February 11th?
11 A. Correct.
12 Q. When you informed Mr. Lai that he was
13 incorrect, what did he say?
14 A. He said that he would like to discuss that in
15 person when I returned to the Plaza.
16 Q. What exactly was Mr. Lai incorrect about?
17 A. In that when the hotel closed in 2005, I was
18 front bar bartender working with more than ten years
19 of experience, five years in the Oak Bar, one of the
20 restaurants which is in front of 59th Street, Central
21 Park South.
22 Q. Did Mr. Lai tell you in that conversation
23 that he thought you had worked somewhere else?
24 A. No.
25 Q. He merely told you that when you came back

Page 72

1  you were to report to the Edwardian Room to train for
2  a position in the Palm Court; correct?
3  A. No.
4  Q. What did he say?
5  A. The training would start on February 11,
6  2008, Monday, in the morning, at -- to report to the
7  Edwardian Room where all the new employees are going
8  to start a new training.
9  Q. Right. But you testified that during the
10 call he told you that you were going to get a position
11 in the service bar at the Palm Court; is that correct
12 or not?
13 A. Yes. But I was in disagreement, because my
14 position was front bar. And I explained to him on the
15 phone that if there was some error, I would like to
16 have it rectified, and he could see my file on the
17 computer if he had it available.
18 Q. I guess what I'm trying to find out is did
19 Mr. Lai say to you in that phone call that, look,
20 according to my records, you were a service bartender
21 in the Palm Court and, therefore, that's where you're
22 going back, or did he say to you we're reopening the
23 hotel, we're recalling you on February 11th, and when
24 you come back your position is going to be as a
25 service bartender in the Palm Court?

Page 73

1  A. No, negative.
2  Q. Was it one or the other or neither?
3  A. What he said was that my position would be in
4  the Palm Court service bar.
5  Q. And when he told you that, you told him that
6  can't be right because I was a front bartender?
7  A. Correct.
8  Q. And then he said he would talk to you about
9  where you would be assigned in person?
10 A. Yes. When I returned to the hotel.
11     MR. McLANE: Can we mark this as Exhibit
12 D-2.
13     (January 25, 2007 Letter is received and
14 marked as Exhibit D-2 for Identification.)
15 Q. Mr. Rivera, the court reporter has handed you
16 what she has marked as Exhibit D-2, which is a January
17 25, 2007 letter from you to Peter Ward at Local 6.
18 Why did you write D-2 -- strike that.
19     Did you write D-2?
20 A. Yes.
21 Q. Anybody help you write D-2?
22 A. No.
23 Q. Did you write that on a home computer?
24 A. Yes, I think. On a typewriter.
25 Q. And that's your signature at the bottom?

**74**

1  A. Correct.
2  Q. And is that your Social Security number at
3  the bottom?
4  A. Yes.
5  Q. Why did you write D-2?
6  A. I was in disagreement with my -- with the
7  tips over -- or the gratuities that were being paid to
8  me. The position that I had as barback, that's not a
9  tipped position.
10  Q. Now, in 2007, you weren't working at the
11  Plaza Hotel; were you?
12  A. 2007, no.
13  Q. Did you become aware sometime around when you
14  wrote this letter that the union had you classified as
15  a barback instead of a bartender?
16  A. No.
17  Q. Well, the first sentence of the letter says,
18  quote, I am writing about the fact that my job
19  classification that was kept at the union was wrong.
20  Most likely, I was recorded as a barback instead of a
21  bartender because I received a letter from Fairmont
22  stating that my job classification that I held prior
23  to the closure of the hotel will not exist, unquote.
24        What are you referring to there?
25  A. One moment. What is the question?

**75**

1        MR. McLANE: Would you read it back,
2  please.
3        (Whereupon, the last question is read
4  back.)
5  A. I was referring to a letter which was sent to
6  me by John Martin, corporate director of the Plaza, he
7  was a coordinator, indicating that I could have
8  severance pay if I wished to leave the hotel and get a
9  job at another place.
10  Q. When did you receive that letter from Mr.
11  Martin?
12  A. I think in November of -- sometime around
13  2006.
14        MR. McLANE: Mark this as D-3.
15        (Severance and Recall Rights Form is
16  received and marked as Exhibit D-3 for
17  Identification.)
18  Q. Mr. Rivera, the court reporter has handed you
19  what she's marked as Exhibit D-3, which is titled
20  Severance and Recall Rights Form, and it was produced
21  to us by you in a document production.
22        I'm showing this to you now because I'm
23  just trying to clear up my confusion about Exhibit
24  D-2. What is Exhibit D-3?
25  A. This is the money that is paid if you wish to

**76**

1  continue working at the hotel or if you wish to leave
2  and get another job, you accept one of those two
3  options.
4  Q. And this is signed by you; correct?
5  A. Yes.
6  Q. And it's dated April 29, 2005; correct?
7  A. Correct. The day the hotel closed.
8  Q. So in this form, you decide to retain your
9  recall rights for one week of severance for each week
10  at the hotel; correct?
11  A. Yes, that is correct.
12  Q. The letter that you received from Mr. Martin
13  that you are referring to in D-2, how was that offer
14  different than what you had selected back in April
15  2005?
16  A. I have no idea of how the -- the hotel knew
17  that I was going to return, that six or nine front
18  bartenders would return because -- why they sent me
19  this letter in 2006 saying that my position would not
20  exist when they knew for sure that I was going to
21  return because I took option one.
22  Q. Well, there's nothing about option one in
23  Exhibit D-3 which guarantees your return to the hotel,
24  is there?
25  A. Yes. Option one indicates that I could

**77**

1  return when the hotel reopens after the renovation.
2  Q. You could return; correct?
3  A. That I could return.
4  Q. Not that you will definitely go back to the
5  hotel; correct?
6  A. That I was going to definitely return to the
7  hotel, because I did not take the entire package, and
8  I left the door open to return as an employee of a
9  five-star, five-diamond hotel.
10  Q. I understand that you left the option open to
11  return, but leaving the option open to return and
12  actually returning are two different things, aren't
13  they?
14  A. No.
15  Q. So is it your testimony that on April 29,
16  2005, you knew with absolute certainty that the Plaza
17  Hotel would one day reopen with enough positions to
18  have you back as a bartender?
19  A. That is correct.
20  Q. And where did that information come from, who
21  told you that?
22  A. There was a meeting with the owner of the
23  hotel and Peter Wall, the president of our union,
24  that's his name, and Michael Bloomberg, the Mayor of
25  the City of New York, designating a commission,

## Page 78

1  indicating that the hotel would continue as a hotel
2  and condominium, and those employees who opted -- who
3  took option one had the right to return and hired as
4  employees with seniority, as former employees with the
5  right to return to their own position that they had
6  held previously, and be trained to work at a
7  five-star, five-diamond hotel, which would be one of
8  the most luxurious hotels in the City of New York, in
9  Manhattan.
10    Q.  I understand that the agreement between the
11  city and the owners of the Plaza and Local 6, which I
12  think is referred to as the City Recall Agreement,
13  gave you the right to recall based on seniority to the
14  hotel.  But am I correct that, in 2005, you had no
15  idea, as based on your testimony, that you asked Rajan
16  Lai what bars and restaurants would be open, exactly
17  how many bars the hotel would run or how many
18  restaurants the hotel would run; correct?
19    A.  No.
20    Q.  You knew?
21    A.  Yes.  It was going to be smaller, eight or
22  nine bartenders.  I had that information through my
23  agent, Eddie Cedeno, where the hotel indicated to him
24  that they were going to open two restaurants, front
25  bar.  They were going to have -- one would be the Rose

## Page 79

1  Club and the other one the Champagne Bar.
2    Q.  And Mr. Cedeno told you that there would be
3  eight or nine positions for bartenders?
4    A.  That is correct.
5    Q.  And how many bartenders were at the Plaza
6  prior to its closing?
7    A.  There were about 22 or 27, including the
8  banquet.  Because there were five restaurants at the
9  Plaza, and two closed, the Trader Vics and the
10  Edwardian Room.  They closed early, first, in the
11  '90s.
12    Q.  Of those 20 or so bartenders prior to the
13  hotel closing, where did you stand in seniority?
14    A.  Allow me to clear up something.  Many of the
15  bartenders when the hotel closed took the option to
16  leave, they took the entire severance package.  Only
17  two bartenders remain, Liam and I.  So I was number
18  two in seniority after Liam Flanagan.
19    Q.  I understand that.  My question was before
20  the hotel closed, before anybody had the option to
21  take either the one-week severance or the two-week
22  severance, when there were 20 bartenders there, where
23  would you stand on the seniority list?
24    A.  I was working full-time at the Oak Bar.  I
25  was more or less on three or four in seniority.  I had

## Page 80

1  three people in front of me, two or three, who were
2  Jose Mejia, Ruben Smith, and I think Orlando Rivera.
3    Q.  Didn't Liam Flanagan have more seniority than
4  you?
5    A.  Yes, but he worked at the Oyster Bar in
6  another restaurant.
7    Q.  I understand that.  But did seniority go by
8  the bar you worked at or did seniority go by your
9  title?
10    A.  Seniority goes by the time when they hired
11  you to work.
12    Q.  Regardless of whether they hired you at the
13  Oyster Bar or Oak Bar; correct?
14    A.  Correct.
15    Q.  So my question is, didn't Liam Flanagan have
16  more seniority than you?
17    A.  Correct.
18    Q.  Did Paul who worked at the Oyster Bar have
19  more seniority than you?
20    A.  Also.  But Paul left.  He took the payment
21  severance, and he left.
22    Q.  I understand who took the payments.  My
23  question is, who had more seniority than you did prior
24  to the hotel closing?  Did Julio have more seniority
25  than you?

## Page 81

1    A.  No.  Julio was a barback.
2    Q.  What about Leo?
3    A.  Leo was also a barback at the Oyster Bar.
4    Q.  So he wasn't the same seniority list as you?
5    A.  No.  Barback assists the front bartenders in
6  the public bars.
7    Q.  Did Felipe have more seniority than you?
8    A.  Yes.  He left.
9    Q.  Did Victor have more?
10    A.  No.  He was behind me.
11    Q.  What about Ruben at the Oak Bar?
12    A.  Yes, he did have -- yes, he worked for almost
13  30 years.
14    Q.  And Sammie, did Sammie have more?
15    A.  Also.  Almost 35 years, he worked there.
16    Q.  And did Arbonna?
17    A.  I was working at the hotel when he was hired,
18  but he got a promotion almost at the same time as I.
19    Q.  What about Chuck who worked the service bar?
20    A.  He left.  He did have more seniority than I.
21    Q.  And how about Ricky?
22    A.  No.  He was promoted afterwards with Victor,
23  Hugo and Leonardo.
24    Q.  And Osvaldo?
25    A.  Osvaldo, Leonardo was the last name.

82

1   Q. Did Osvaldo have more seniority than you?
2   A. Yes. But he was not interested in working
3   the front in the public bars. He liked banquets, room
4   service and service bar at the Palm Court or the
5   Edwardian Room.
6   Q. But he had more seniority than you?
7   A. Yes.
8   Q. Just getting back to D-2, you indicate in
9   that letter that the union had your job
10  classifications as your work wrong; correct? That's
11  what you say in the first sentence; right?
12  A. Yes, I said that, but I was confused by this
13  letter saying that there's no position available for
14  me when I was supposed to return and be one of the few
15  chosen to work at the new Plaza.
16  Q. This letter is dated January 27, 2007, over a
17  year before the Plaza reopens. Is that the correct
18  date of that letter?
19  A. Yes.
20  Q. So over a year before the hotel opened, you
21  received a letter from Mr. Martin?
22  A. Correct.
23  Q. What was the purpose of Mr. Martin's letter,
24  do you know?
25  A. Indicating that I had the right to take

83

1   option two, if the hotel was going to be smaller and
2   that my position would not exist, that it would
3   disappear. They saw in my record and they were
4   offering -- they were making me an offer to offer
5   option two for me to leave the hotel and leave.
6   Q. This was a second attempt, if you will, to
7   have you choose option two, if you so desired; right?
8   A. Yes, but allow me to clear something up.
9   Once I signed option one --
10  Q. In 2005?
11  A. -- in 2005, I let the hotel know that I am a
12  young person capable, prepared, and I like to work
13  with good people, great people, and I was going to
14  return. I was only choosing option one. At no time
15  did they have to send me this letter again asking if I
16  wanted to take the full package and leave.
17  Q. I mean, it wasn't improper for them to do it,
18  was it?
19  A. No.
20  Q. It's possible that you would have been --
21  could have found a job, unbeknownst to the people at
22  the Plaza Hotel, that you absolutely loved and that
23  you never wanted to leave and they were going to offer
24  you an additional week severance for every year you
25  were there; correct?

84

1   A. No, that's not correct. The Plaza was number
2   one. I always dreamt of working at that hotel. It
3   offers a good location, it had good employees,
4   manager. And I wanted to return to reunite with my
5   friends and other managers who worked with me in the
6   past.
7   Q. I understand that it was your life's ambition
8   to work at the Plaza, but there was nothing wrong with
9   the hotel saying -- giving you a second chance to take
10  the number two option, was there?
11  A. No.
12  Q. I take it they didn't force you to take the
13  number two option; right?
14  A. No.
15  Q. But is it your testimony that when they
16  offered you the opportunity to take choice number two
17  the second time, sometime in late 2006 or early 2007,
18  that when they did that, you noticed that your
19  classification was incorrect?
20  A. Not really. I felt -- I was upset. I felt
21  upset.
22  Q. Mr. Rivera, I'm just trying to find out what
23  you meant on January 25, 2007 when you wrote your
24  union to tell them that the job classification they
25  had for you was wrong. Was the job classification

85

1   that the union kept for you incorrect? Why did you
2   write this letter?
3   A. To be in 100 percent understanding or in
4   agreement with the union, crystal clear that my
5   position was not barback but bartender. Bartender is
6   only one classification. A bartender was taken or
7   chosen there to work a schedule, a shift, according to
8   seniority, to work in any other five restaurants where
9   needed.
10  Q. Was what you wrote on January 25, 2007
11  accurate at the time you wrote it?
12  A. In case that the union did not have my
13  classification. That was the only purpose.
14  Q. Right. And in the fourth paragraph, you
15  write, quote, I sincerely wish you will take a close
16  look at my case and correct the mistake in the
17  processing of my job classification, unquote.
18      Am I correct that by reading this letter,
19  that you believed your job classification kept by the
20  union was incorrect?
21  A. No.
22  Q. Then why did you write that paragraph?
23  A. No. This was in answer to John Martin where
24  they said that if I wished to take -- because the
25  hotel was going to be smaller in his letter, and my

**ROSENBERG & ASSOCIATES, INC.     (800) 662-6878**
**www.rosenbergandassociates.com**

86

1  position was going to disappear, would not exist, they
2  were offering for me to take the package and leave.
3     Q. And the job classification you held before
4  the hotel closed was front bartender at the Oak Room?
5     A. Correct.
6     Q. Did the Oak Room exist when the Plaza
7  reopened?
8     A. Yes, but a different vendor. It's
9  independent from the company.
10    Q. It wasn't owned by the hotel?
11    A. No. They rented that place.
12    Q. So when Mr. Martin from the Plaza Hotel wrote
13 you to tell you that your previous job at the Plaza
14 didn't exist, he was correct, wasn't he?
15    A. No.
16    Q. How was he wrong?
17    A. John Martin was never at the Plaza. John
18 Martin was or worked for the Fairmont, and was the
19 coordinator writing all these letters, sending letters
20 to different employees, different departments,
21 bartenders, to see if they wished to leave because the
22 hotel was interested in hiring also new employees.
23    Q. Are you the front bartender at the Oak Room
24 today?
25    A. No.

87

1     Q. Why not?
2     A. As I explained, when I returned, I asked that
3  question to Anthony Evangelista and Brian Simpson,
4  assistant to the restaurant, director at the Champagne
5  Bar and Rose Club, and they told me that it is
6  separate, no employee can return there. And I tried.
7  If I worked in the old bar, previously, because why
8  wouldn't I -- why couldn't I return there?
9     Q. Who is your employer today?
10    A. Fairmont, Plaza Hotel.
11    Q. Who employees the bartenders at the Oak Bar?
12    A. There are three associates. I don't remember
13 the name of the -- the names of the owners.
14    Q. But it's not the Fairmont, is it?
15    A. No.
16    Q. It's not the Plaza Hotel, is it?
17    A. No.
18    Q. So when Mr. Martin writes you a letter and
19 says that your former position is no longer available
20 and he's from Fairmont, and Fairmont doesn't control
21 the Oak Room, he's right, isn't he?
22    A. No.
23    Q. How come?
24    A. Mr. Martin was never at the Plaza, according
25 to my knowledge, and he did not know how many

88

1  positions -- bartender positions would be available.
2     Q. That's not my question. Listen to my
3  question, Mr. Rivera.
4        Who works at the Oak Room Bar now that
5  worked there before it closed?
6     A. Orlando Rivera and Jose Mejia.
7     Q. And they are barbacks?
8     A. No. Bartenders.
9     Q. And they work there today?
10    A. Correct.
11    Q. Do they work for the Fairmont Hotel?
12    A. No. It is separate and independent.
13    Q. So is it your contention that you wanted to
14 work at the Oak Room, but that the new owners of the
15 Oak Room wouldn't let you work there?
16    A. No.
17    Q. What's your contention?
18    A. When the Plaza closed in 2005, all of these
19 restaurants belonged to one owner. Fairmont was the
20 company that managed it. When we returned in 2008, I
21 belonged still to Fairmont. So the position that they
22 were supposed -- that they had to give me or to assign
23 me were the new restaurant, Champagne Bar and Rose
24 Club, which are available now. Those belong to
25 Fairmont.

89

1     Q. So Mr. Martin was correct when he told you
2  that he couldn't offer you a job as the bartender at
3  the Oak Room, because he didn't control who worked at
4  the Oak Room?
5     A. No. He's incorrect. I disagree. Because I
6  signed this on April 29th that I would return to
7  Fairmont, whether it be in the new Champagne Bar or
8  the Edwardian Room, any other restaurant by
9  classification as bartender was to return with
10 Fairmont in the available position in front bar,
11 wherever it was available.
12    Q. I think we're in agreement on that. And
13 you're referring -- when you say "this," you're
14 referring to D-3; correct?
15    A. Correct.
16    Q. Because that recall rights form doesn't say
17 you retain your recall rights to return to any
18 particular bar, does it?
19    A. Yes. Front bar.
20    Q. Show me where it says that.
21    A. It doesn't say that, but if that's the
22 position, all the bartenders returned to their
23 original position, front bar. Liam is front bar,
24 Evelio, front bar, the new hire were going to be in
25 the front bar. Everything is front position. The

**ROSENBERG & ASSOCIATES, INC.    (800) 662-6878**
www.rosenbergandassociates.com

90

1  only service bar bartender is in the back hall pantry
2  in the rear, in the back of the house.
3  Q.  But you'll agree with me that Exhibit D-3
4  does not indicate that you will return to any
5  particular position; is that correct? It says you
6  just maintain your recall rights.
7  A.  No. I'm in disagreement.
8  Q.  Just show me where, what words on D-3
9  indicate to you that you will return to a particular
10  front bar position at the hotel. Show me the words.
11  A.  Not on this sheet. It's not on this sheet.
12  Q.  That's what I was asking about, this sheet.
13  A.  When we left, there was a meeting with the
14  president of our union, president of Fairmont or the
15  person in charge with the general manager at that
16  time, Gary Swaeiker. That was the general manager at
17  the time, in 2005, indicating that the Plaza would
18  open, and that the employees who did not take option
19  two would return, and they are trying to hire or to
20  retain the best, and I think that I'm included in that
21  pick.
22  Q.  And D-3, the severance and recall rights
23  form, was part of the city hall agreement; right?
24  A.  No.
25  Q.  It was part of what, the collective

91

1  bargaining agreement?
2  A.  Yes.
3  Q.  To your knowledge, what did the city hall
4  agreement do? What was its function?
5  A.  The agreement was signed to retain the hotel
6  as a condominium, to keep it, and also, in some
7  options, changed to, became a five-star, five-diamond,
8  work 40 hours of work. And it was almost similar to
9  CBS in some things and other things they're different,
10  few things.
11  Q.  Is it your testimony that the collective
12  bargaining agreement between Local 6 and the Plaza
13  Hotel contained a provision that anticipated the hotel
14  closure that would lead to employees having option one
15  and option two on D-3; is that your testimony?
16  A.  No. The city agreement is something which
17  was assigned after this happened?
18  Q.  After option one and option two?
19  A.  Yes.
20  Q.  So somewhere there's a document, whether it
21  be the collective bargaining agreement or the city
22  hall agreement, that indicates exactly what recall
23  rights are?
24  A.  Of course.
25  Q.  And you weren't recalled -- and you were

92

1  recalled; right?
2  A.  Yes.
3      MR. McLANE: Mark this as D-4.
4      (August 10, 2007 Letter is received and
5  marked as Exhibit D-4 for Identification.)
6      MR. McLANE: Off the record.
7      (Whereupon, a short break is taken.)
8  Q.  I'm going to hand you what the court reporter
9  has marked as Exhibit D-4, which is an August 10, 2007
10  letter from Kenny Okutani to Michael Simo at the New
11  York Hotel and Motel Trades Council. This is another
12  document that you produced to us in response to a
13  request.
14      Who is Kenny Okutani?
15  A.  That is the director of sales -- sales
16  director for international marketing for the Asian,
17  Japanese market.
18  Q.  And he was that in February 14, 2005;
19  correct?
20  A.  Yes.
21  Q.  And in August 10, 2007, he wasn't in that
22  position; was he?
23  A.  No.
24  Q.  Do you know why Mr. Okutani wrote this
25  letter?

93

1  A.  On my behalf, because they were giving me --
2  they were giving me another position. Wait a second.
3  When I returned to the Plaza in 2008, I was offered
4  the position of service bar bartender in the Palm
5  Court.
6  Q.  But what does that have to do with the letter
7  that was written eight months earlier -- six months
8  earlier in 2007?
9  A.  Related to this one, Michael Simo, to clear
10  up my job classification, indicating that I am a front
11  bar bartender, just in case the union has me as
12  barback in their file. It wasn't very clear to
13  indicate -- to have them clarify.
14  Q.  And that's similar to the letter you wrote to
15  Peter Ward at Local 6 in January 2007; right?
16  A.  Yes.
17  Q.  So you had some concern that the union had
18  your classification wrong, so you contacted Mr.
19  Okutani to write a letter on your behalf?
20  A.  It didn't have to do with any concern, but
21  based on the letter that I had received from John
22  Martin, all of this began since November 6th of that
23  year when I received the letter.
24  Q.  November 6, 2006?
25  A.  Exactly. There were many letters written by

94

1   the union and by the hotel when it was going to
2   reopen. There was a lot of uncertainty and there was
3   no -- there wasn't a certain date of when it was going
4   to reopen. And that cost -- triggered a lot of
5   letters amongst the employees, the union and the hotel
6   to clarify when it was going to reopen and who was
7   going to return.
8        Q.  So the hotel was sending letters to the union
9   and the employees updating them on the hotel opening?
10       A.  The hotel did not know when it was going to
11  reopen.
12       Q.  Did the union know when the hotel was going
13  to reopen?
14       A.  No, neither.
15       Q.  Did you know when the hotel was going to
16  reopen?
17       A.  There was a lot of communication. It was
18  calculated that it was going to be either 2008 or
19  2009. And when they reopened in 2008, there was a lot
20  of construction. They didn't finish the condominiums.
21  The construction finished in August, almost, of 2009.
22       Q.  Did ask you Mr. Okutani to write this letter?
23       A.  Yes.
24       Q.  How did you contact Mr. Okutani about writing
25  this letter?

95

1        A.  He's a friend of mine. I know where he lives
2   in Manhattan. We used to meet with him and family
3   members. He remembers me in the Oak Bar where he
4   always did many meetings. And I used to tend to him
5   at the bar.
6        Q.  Was he a personal friend of yours?
7        A.  Yes.
8        Q.  So why did you ask Mr. Okutani to write this
9   letter to Mr. Simo?
10       A.  To clarify about Mr. John Martin once and for
11  all when, if my position was going to be available
12  when the hotel reopens after the renovation.
13       Q.  And what position was that?
14       A.  Front bar bartender.
15       Q.  But Mr. Okutani recommended you for the Oak
16  Bar, service bar, or wherever your liquor skills are
17  required; correct?
18       A.  Yes. He wrote it like that, but he knew that
19  my position was front bar where I worked in the Oak
20  Bar, Oyster Bar, and also, in the dining room, room
21  service and the guest rooms or in banquets, wherever I
22  was needed. And also, many birthdays, weddings,
23  banquets, private functions required the services of
24  the most qualified person they had.
25       Q.  Were you concerned that you were not going to

96

1   be called back to the Plaza when it reopened?
2        A.  No, never.
3        Q.  So if you weren't concerned about that and
4   you knew, according to your testimony, that you were
5   definitely coming back to the hotel as far back as
6   April of 2005, why would you need Mr. Okutani to write
7   a letter to your union recommending you for a job that
8   you were going to have definitely?
9        A.  In case of a doubt to be clear once and for
10  all that there be no mistake, and that I return to my
11  position that belongs to me, which I would like to
12  return to, front bar bartender.
13       Q.  But that's not what Mr. Okutani writes in his
14  letter, is it? He says, just take him back, take him
15  back at the Oak Bar, take him back at the service bar,
16  take him back wherever, just take him back; right?
17       A.  Yes, but the main intention was front bar
18  bartender. Okutani never saw me in the service bar
19  and any other outlet. He always saw me in the Oyster
20  Bar or in the Oak Bar as a front bar bartender or in
21  banquets, meetings room or different weddings where
22  Michael Douglas was married, Eddie Murphy and Donald
23  Trump. And I was -- I worked in those weddings. I
24  was invited by Michael Douglas to his wedding because
25  I served him a lot in the room. They stayed for two

97

1   weeks.
2        Q.  If you had no doubt you were coming back to
3   the Plaza, why did you need Mr. Okutani to write you a
4   letter?
5        A.  Because we are human and we make mistakes,
6   and I wanted to be sure that I was going to return to
7   my position, that there would be no mistake.
8        Q.  So you weren't 100 percent sure?
9        A.  I was very sure that I was going to return.
10       Q.  But not so sure as to not have Mr. Okutani
11  write a letter saying take Carlos back no matter where
12  you put him?
13       A.  My answer is positive I am sure that I was
14  going to return and that I would be a front bar
15  bartender.
16       Q.  That's why I can't figure out if you were so
17  certain, why you needed Michael Douglas or Donald
18  Trump or anybody to write you a letter if you knew you
19  were coming back?
20       A.  Friends always help. They do a favor, if
21  they're available, when needed.
22       Q.  But why did you need your celebrity friends
23  to do you a favor if you were coming back and there
24  was no doubt about it in your mind, why did you need a
25  favor?

98

1  A. I needed a favor because John Martin made a
2  mistake and was sending me a letter in November of
3  2006 indicating that my position did not exist, and
4  that if I wanted -- if I wished to take option two and
5  leave the hotel, and when the hotel reopened in 2008
6  Oak Bar, paid many bartenders full package payment
7  severance, double payment, triple payment for them to
8  leave, and they hired new employees because they were
9  going to save money in the long-term.
10  Q. So can I assume then from the dates of these
11  letters that when you wrote Mr. Ward at Local 6 on
12  January 25, 2007 about your -- Mr. Martin's letter and
13  the incorrect job classification, that Mr. Ward did
14  not correct the problem, which is why you had to have
15  Mr. Okutani write a letter some eight months later?
16  You went over Mr. Ward's head; right? You went to the
17  Hotel and Motel Trades Council?
18  A. Because Mr. Simo is the regional president of
19  the Hotel and Motel Trades Local 6.
20  Q. And he's above Mr. Ward; right?
21  A. He's an assistant. The president is Peter
22  Ward. Mr. Simo was in charge when the Plaza was going
23  to close, doing a lot of meetings with Fairmont, all
24  of the Plaza employees arranging any inconvenience or
25  any problem that arose. That was the reason why I

99

1  wrote him.
2  Q. You wrote to Mr. Simo in August 2007 because
3  Mr. Ward didn't get it write when you wrote him in
4  January; right?
5  A. Just in case that he did not have it, just to
6  ensure that someone who worked with him took care of
7  this problem, handled this problem, because Peter Ward
8  is always very busy.
9  Q. Did you follow up with Mr. Ward after January
10  25, 2007 to see whether or not he corrected what you
11  call this mistake in your letter?
12  A. It was not necessary, because I returned on
13  February 11th to the Plaza as the front bar bartender.
14  Q. You returned on February 11th, a year later?
15  A. Yes.
16  Q. In the meantime, in the period between when
17  you wrote this letter January 25, 2007, you felt it
18  necessary to have your friends write Mr. Simo a letter
19  about the very same subject some eight months later.
20  So my question is, after you wrote the letter in
21  January 25, 2007, did you have some indication that
22  Mr. Ward had not followed up on your request that
23  required you to have to write a second letter and go
24  over Mr. Ward's head?
25  A. So what is the question?

100

1  MR. McLANE: Could you read it back,
2  please?
3  A. Mr. Ward followed up several letters --
4  several letters were written to me and all the
5  employees indicating that not to leave our jobs, that
6  they would inform us -- there were many confusions of
7  when the hotel would reopen, to please continue in our
8  jobs until they inform us when the hotel would reopen
9  with certainty.
10  Q. But that didn't really help you because you
11  were more concerned not whether the hotel would reopen
12  because you knew definitely it would, but you were
13  concerned what your job classification was at the time
14  you left; right?
15  A. No.
16  Q. You had no concern about that?
17  A. No.
18  Q. But then I'm unclear about why you wrote
19  anybody about your job classification.
20  A. I wrote because I was concerned about the
21  letter from John Martin indicating that my position
22  was going to disappear, would not exist.
23  Q. And that's why you wrote Mr. Ward?
24  A. Correct.
25  Q. And then Mr. Ward never wrote you a letter

101

1  that satisfied your concern about whether or not your
2  job would exist; correct?
3  A. Several letters were written from them to us
4  indicating when they would see a certain date when the
5  hotel would reopen. It was under renovation, $450
6  million or $400 million, and that it would take more
7  than two years or three not to leave our jobs until
8  the Plaza Hotel was open, that in case we did it we
9  would be out of work.
10  Q. Did you ever receive a letter from Mr. Ward
11  along the lines of, Dear Mr. Rivera, we received your
12  letter of January 25, 2007. We are looking into this
13  issue with the hotel to correct any mistakes that may
14  exist about your classifications.
15  Did you ever receive a letter like that
16  from Mr. Ward?
17  A. Not that I remember, but telephone calls from
18  Michael Simo and Eddie Cedeno indicating that the
19  hotel still is not going to open, it's still under
20  renovation, to continue in my job.
21  Q. There are no trick questions here. I'm not
22  trying to trick you into anything. I'm just trying to
23  find out what happened and why you wrote these
24  letters. So if I can just give you advice not to over
25  think this.

102

1    Would you agree with me that your January
2  25, 2007 letter makes no mention at all about when the
3  hotel's going to reopen, if it's going to reopen,
4  what's happening with the hotel? In this letter, you
5  ask him at the very end if he would contact the
6  Fairmont to correct the mistake and make the change
7  with Fairmont Hotel. Would you agree with me that
8  there's nothing in this letter about when the hotel is
9  going to open?
10   A.  That is correct.
11   Q.  So I'm not sure why you just can't admit that
12  in this letter you're asking Mr. Ward to help you with
13  some error about your job classification. Can you do
14  that? Is that a problem for you?
15   A.  My decision was based -- we have to go back
16  to John Martin, 2006, when he wrote that my position
17  would not exist, that created the confusion. I'm
18  being offered payment to leave and not return, and if
19  there was any classification in my job indicating that
20  I'm not going to return through the union, I wanted to
21  be clear on that.
22   Q.  I see. So you wanted to come back to the
23  Plaza Hotel, Martin sends you a letter in November,
24  and now you're confused because he's offering you an
25  enhanced severance, and you have some doubt whether or

103

1  not your position is going to exist; correct?
2   A.  Exactly.
3   Q.  So you write to Ward to say, hey, is my
4  position going to exist, and what is the position
5  that's going exist; correct?
6   A.  Correct.
7   Q.  All right. So that's D-2, your January 25th
8  letter. Did Mr. Ward contact you and say, Carlos, we
9  looked into it, don't worry about it, it's all been
10  cleared up?
11   A.  There was a meeting on 44th at the
12  headquarters and 8th Avenue with Peter Ward, and he
13  was indicating when they were going to reopen or
14  clarifying the doubts if others had other jobs and
15  they were happy, that they could stay in those jobs
16  and not return and take the second payment severance
17  package.
18   Q.  Mr. Rivera, would you agree with me that
19  there are two separate issues here, one issue is
20  whether or not the hotel is going to reopen and when;
21  correct?
22   A.  Correct.
23   Q.  And then there was a second issue that
24  related to you, which was your classification at the
25  time you left; correct?

104

1   A.  No.
2   Q.  So you were never concerned about your
3  classification?
4   A.  No. I knew that I was going to return. The
5  purpose of these letters was to ensure that I was
6  going to return to my position. I never met John
7  Martin nor did I see him at the Plaza. I didn't know
8  who he was. I don't know where he was writing that
9  letter from or who was asking him or making him write
10  that letter, to write me that letter.
11   Q.  But he wrote you the letter?
12   A.  Of course, yes.
13   Q.  And the letter created some doubt in your
14  mind about whether or not somebody had information
15  that was correct or incorrect; right?
16   A.  Incorrect.
17   Q.  I'm incorrect or --
18   A.  The letter to John Martin?
19   Q.  It was incorrect?
20   A.  Of course.
21   Q.  And you asked Peter Ward to correct your
22  position; correct?
23   A.  Yes.
24   Q.  And that's a different issue than when the
25  hotel's going reopen; right? That had nothing to do

105

1  with when the hotel was going to reopen, that had to
2  do with what happens when the hotel opened; right?
3   A.  Exactly. Peter had a meeting with us where
4  he indicated to us that they were going to tell us
5  when the hotel would reopen, that it was still not
6  going to open, to continue in our job.
7   Q.  I understand that. I heard that 15 times.
8  That's about when the hotel is going to open, and he's
9  saying to you we don't know when it's going open, so
10  don't quit your job because you may be out of work for
11  awhile until the hotel opens. I understand that's one
12  issue. That's over here.
13       Over here is a second issue. It's a
14  Carlos Rivera issue, not everybody issue, it's a
15  Carlos Rivera issue. I'm confused as Carlos Rivera
16  because I have this letter from Mr. Martin indicating
17  that my position that I held prior to the hotel
18  closing that is not going to exist when the hotel
19  opens; correct?
20   A.  Yes.
21   Q.  That's two separate issues; correct?
22   A.  No.
23   Q.  How are they the same?
24   A.  When John Martin wrote me this letter, what
25  we expressed previously, that was if we are basing on

**106**

1  Exhibit D-3, on April 29th, I'm going to return to the
2  hotel when it reopens. I don't know why you're not
3  understanding me. Because, to me, it is clear that I
4  am going to return to the hotel. John Martin
5  indicates that I have the door open to take option two
6  for the payment severance and leave, and I disagreed.
7     Q. And you disagreed because you knew you were
8  coming back, but Martin's letter puts some doubt in
9  your head about whether they were going to recall you?
10    A. Exactly.
11    Q. And that's a different issue than when you're
12  going to go back. When the hotel opens, nobody knows;
13  right? You just testified the union is having
14  meetings all the time, they're saying don't leave your
15  job, we're not going to tell you to quit your job
16  because we don't know when the hotel is going to open;
17  right?
18    A. Yes, but the -- yes, but the owner, Mr. Isaac
19  Tschuba (ph.), knew when the hotel was going to open,
20  and then he pushed them to open in 2008, even though
21  the hotel wasn't ready. They were under construction.
22  And there was a lot of pressure for them to open as
23  soon as possible. So this is related to this. It's
24  the same communication to me. I don't know why you're
25  having difficulty with this.

**107**

1       MR. McLANE: Let's take a break.
2       (Whereupon, a short break is taken.)
3     Q. Mr. Rivera, would you agree with me that
4  there are two separate issues with respect to the
5  reopening of the Plaza Hotel, one being the timing
6  when it would open, and another being what your
7  position would be when it reopened?
8     A. Yes.
9     Q. And your January 25, 2007 letter to Mr. Ward,
10  did that have to do with what your position would be
11  when the hotel reopened?
12    A. Yes.
13    Q. And is that also your subject of Kenny
14  Okutani's letter of August of the same year?
15    A. Yes.
16    Q. Did you receive a response from Mr. Simo in
17  respect to Mr. Okutani's August 2007 letter about
18  whether or not the issue of your classification had
19  been settled?
20    A. Yes. It was from Eddie Cedeno in February.
21    Q. In February of 2008?
22    A. Yes.
23    Q. And what did Mr. Cedeno say?
24    A. That my position was correct, front bar. I
25  worked in the front of the bar.

**108**

1     Q. So whatever doubts you had about your
2  position being wrong, whether it be at the Fairmont or
3  at the union, that was cleared up by Mr. Cedeno by
4  February of 2008?
5     A. Yes.
6     Q. And that's before you returned to the Plaza;
7  correct?
8     A. Correct.
9     Q. As you testified earlier you received a
10  telephone call from Mr. Lai telling you to report to
11  the Edwardian Room for training; correct?
12    A. No. I called him. He sent me a letter.
13    Q. He sent you a letter saying to come back.
14  You called him and asked him questions about what bars
15  would be open, things of that nature; correct?
16    A. Exactly.
17    Q. And then he told you he would talk to you
18  about where you would be placed in person?
19    A. No. When I returned, we were doing training,
20  we were busy.
21    Q. Listen to the question carefully. On your
22  telephone call with Mr. Lai, did he tell you where you
23  would be working when you returned to work on February
24  11th?
25    A. Yes.

**109**

1     Q. What did he tell you?
2     A. That I was going to work in the Palm Court
3  service bar.
4     Q. And you told him that that was incorrect?
5     A. Exactly.
6     Q. And he said to you, okay, we'll talk about it
7  in person when you arrive?
8     A. Yes.
9     Q. Did you have a conversation when you arrived
10  with Mr. Lai about that issue?
11    A. Yes.
12    Q. Tell me about that conversation.
13    A. It was in March of 2008. The hotel opened on
14  March 1st, and I worked only one day or two at the
15  Champagne Bar. And Carlos Bueno approached me and
16  told me that I was going to work at the Champagne Bar,
17  that Rajan said I belonged at the Champagne Bar.
18    Q. And that was around March 1st?
19    A. Yes.
20    Q. When you came back to work on February 11th,
21  was there a list of assignments for the returning
22  bartenders?
23    A. Yes.
24    Q. Were you on that list?
25    A. Yes.