110

1  Q. What was your assignment?
2  A. Front bar bartender.
3  Q. When you returned on February 11th, was Mr.
4  Flanagan already there?
5  A. Yes. He came one week before I did.
6  Q. In February of 2008 when Mr. Flanagan
7  returned, do you know what his position was?
8  A. Yes. Front bar bartender, also. But he
9  started training in the Tea Room, Palm Court.
10 Q. So when you returned in February 11, 2008,
11 the hotel hadn't opened; correct?
12 A. Yes.
13 Q. And the hotel didn't open until around March
14 1st?
15 A. Correct.
16 Q. From February 11th to March 1st, what did do
17 you?
18 A. Training at the Edwardian Room, Palm Court,
19 about wines, drinks, five-star service, and afterwards
20 we moved to the Rose Court for training, making
21 cocktails, drinks, beers, wine, whiskey, everything
22 related to what we were going to do, our job.
23 Q. And when you were going through this
24 training, it was part of this, what the Fairmont
25 called it's five-star, five-diamond program?

111

1  A. Yes.
2  Q. And it was Fairmont's goal, if you will, to
3  have a five-star, five-diamond property at the Plaza?
4  A. Correct.
5  Q. Had you heard that term five-star,
6  five-diamond in 2005 before the Plaza closed?
7  A. Yes.
8  Q. Was the Plaza a five-star, five-diamond
9  property in March 2005 when it closed?
10 A. No.
11 Q. And what is five-star, five-diamond service?
12 A. The best, the optimum, the highest
13 qualification of service to satisfy the guests and to
14 have a renowned -- to create a brand for the clients
15 to return and to have our standard of service be
16 excellent.
17 Q. And is there a particular training or test
18 that employees had to go through to obtain
19 certification, if you will, of five-star, five-diamond
20 service?
21 A. Yes.
22 Q. Prior to the hotel closing in 2005, had you
23 ever gone through that training?
24 A. Yes, continuous. But we were not five-star.
25 We were trying to meet that -- to reach that standard.

112

1  Q. And do you know whether or not there was a
2  greater commitment to obtain five-star, five-diamond
3  stature after the hotel reopened?
4  A. Yes.
5  Q. Was that obtained?
6  A. No.
7  Q. It's not a five-star, five-diamond property?
8  A. Not yet.
9  Q. But you're working towards it?
10 A. Yes.
11 Q. The training between February 11, 2008 and
12 March 1, 2008, did that involve you participating in
13 helping the servers train for the reopening?
14 A. Yes.
15 Q. When did the hotel reopen?
16 A. March 1, 2008.
17 Q. When the hotel opened on March 1, 2008, how
18 many front bars were open?
19 A. One. The Champagne Bar only. The Rose Club
20 opened in April 1st.
21 Q. On March 1, 2008, if you recall, who were the
22 bartenders at the Champagne Bar?
23 A. Liam Flanagan, Robert Kenjon, Prather Kehm,
24 Heather Businc, Eddie Meade and Scott Tegue.
25 Q. When did you become aware that -- strike

113

1  that.
2         Was the Oak Bar open?
3  A. No. It opened two months later.
4  Q. When did you become aware that the Oak Bar
5  would no longer be part of the Plaza Hotel?
6  A. During the training, I asked Brian Simpson
7  and Anthony Evangelista, the director of restaurants,
8  Champagne Bar and Rose Club, and they told me that it
9  was not part of the Plaza, that it was a private
10 company separate that was going to manage it.
11 Q. Did you talk to anybody at -- strike that.
12        Did you talk to anybody at Local 6 about
13 whether or not they would help you get a position at
14 the Oak Bar when it reopened in April or May of 2008?
15 A. Yes.
16 Q. Who did you speak to?
17 A. Eddie Cedeno.
18 Q. And what did Mr. Cedeno tell you?
19 A. That it was not possible, because it was a
20 separate -- it was an independent company. Once you
21 return with the Fairmont, you have to stay with
22 Fairmont.
23 Q. When the Oak Bar opened under this different
24 ownership, who worked at the bar?
25 A. In which bar?

114

1  Q. The Oak Bar.
2  A. Jose Mejia, Orlando Rivera, Jose Arbonna and
3  one of the runners, Jose Jiminez. He was a barback,
4  but they transferred him as a barback at the Oak Bar.
5  Q. And Jose, Orlando and Arbonna worked at the
6  Oak Bar prior to its closure; correct?
7  A. Yes.
8  Q. And they were members of the Local 6?
9  A. Correct.
10 Q. How come they got to work at the Oak Bar and
11 you didn't? That was your job they had?
12 A. Yes. Because right in line, they received
13 the same letter indicating that they were going to
14 return to the Plaza, and that their position was going
15 to be the Palm Court service bar. They were in
16 disagreement, and they waited for the Oak Bar to
17 reopen, and they decided to wait when the renovation
18 finished to return to the Oak Bar and work their job
19 there as front bar bartenders.
20 Q. So you had the same opportunity that Jose,
21 Orlando and Arbonna had to wait a couple of months and
22 then work at the Oak Bar; right?
23 A. No.
24 Q. Why not?
25 A. Because I was going to -- it was going to be

115

1  separate. We had a meeting, we went to the union to
2  speak with Michael Simo and Eddie Cedeno, and we
3  explained that if we were -- we explained to them that
4  Rajan Lai told us that we were going to be service bar
5  bartenders, and we were in disagreement, so we
6  disputed that, that we were going to return to
7  Fairmont as front bar bartenders.
8  Q. And you had more seniority than Jose, Orlando
9  and Arbonna; correct?
10 A. They were promoted -- Orlando and Jose were
11 promoted before me in '95 or '96.
12 Q. What about Jose?
13 A. Yes. They have a few months before me
14 because there were several positions opening, and I
15 wanted to work in the front bar. When they gave the
16 promotion, there was the Palm Court service bar and
17 the Edwardian Room, which the bar is inside, but it's
18 like a service bar.
19 Q. So prior to the hotel closing, were you the
20 front bar bartender at the Oak Bar?
21 A. Correct.
22 Q. And I take it that if you had your way when
23 the hotel reopened, you'd be the front bartender at
24 the Oak Bar?
25 A. Yes. But Rajan Lai told me and Anthony

116

1  Evangelista that I could not have the Oak Bar because
2  I started with the Plaza, the training, and I belonged
3  to the Fairmont. There's a conflict of interest. And
4  they were not going to accept a new employee to come
5  in transferred from the hotel because it was separate
6  already. I had to wait. I don't know what for, but
7  if I belonged to the Fairmont from the beginning, I
8  did not understand why Jose Arbonna couldn't return to
9  Fairmont. My understanding was that Fairmont, when
10 they wrote the letter, they never told us the Oak Bar
11 would be a separate vendor.
12 Q. Everybody got the same letter; right?
13 A. Yes. The letter was, I think, the same date.
14 Q. Am I right that the only reason you're not
15 working at the Oak Bar is because Jose Orlando and
16 Arbonna had more seniority and got the positions that
17 you didn't?
18 A. No.
19 Q. Are they there and you're not? How come they
20 got your job?
21 A. They wanted to return to the Plaza.
22 Q. Just like you?
23 A. Yes, but as a front bar bartender.
24 Q. Just like you?
25 A. Yes.

117

1  Q. Rajan Lai explained to them in telephone
2  calls that they made to the hotel that they were going
3  to be service bar bartenders, just like he did to you;
4  correct?
5  A. Yes. And they did not understand in a
6  restaurant like the Palm Court why were there going to
7  be so many service bar bartenders when the position
8  could be only two, not five. I mean, Jose Arbonna,
9  Orlando Rivera, Jose Mejia, myself and Liam Flanagan.
10 Q. Flanagan hadn't been the bartender at the Oak
11 Room in the hotel?
12 A. No.
13 Q. He was at the Oyster Bar?
14 A. But they told him also that he was going to
15 be Palm Court service bar.
16 Q. So all of you understood that you're going to
17 be called back as service bartenders?
18 A. Yes.
19 Q. And you were not happy with that?
20 A. No.
21 Q. Because you want -- because you had been the
22 front bartender at the Oak Bar?
23 A. Yes, correct.
24 Q. And if Rajan Lai had called you up and said,
25 Mr. Rivera, you're coming back as the front bartender

**118**

1  at the Oak Bar, you would have been very happy with
2  that?
3      A.  Yes, but he never made that offer.
4      Q.  And he didn't make it to Jose, Orlando or
5  Arbonna either?
6      A.  Neither, no.
7      Q.  Yet they wound up at your bar?
8      A.  Yes, but they knew right in line that the Oak
9  Bar was going to be separate and -- Rajan Lai knew
10 that the Oak Bar was going to be separate, and if they
11 went to the Oak Bar, they were going to lose all of
12 their benefits packet because it is a different
13 company.  They don't have the same benefits as the
14 Fairmont, traveling and better company, number three
15 in the world.
16     Q.  That was true for Jose, Orlando and Arbonna?
17     A.  Correct.
18     Q.  And they chose to go work at the Oak Bar
19 nonetheless?
20     A.  Yes.
21     Q.  And maintained a membership of Local 6;
22 correct?
23     A.  Yes, but not with the Fairmont.
24     Q.  So is it your testimony that when you had the
25 meeting with Mr. Cedeno about the Oak Bar or your

**119**

1  classification with you, Jose, Orlando and Arbonna,
2  that those three guys said we'll take the Oak Bar and
3  you said I don't want nothing to do with it?
4      A.  No.
5      Q.  Well, I'm trying to figure out why they're
6  there and you're not.
7      A.  I returned on February 11th to work with the
8  Plaza Hotel and Fairmont.
9      Q.  Right.
10     A.  And I investigated also that question, I
11 asked when would the Oak Room open because it was
12 under renovation, the floor, the construction.  It was
13 going to open in two months.  And I was told that it
14 was going to be separate and independent owner.
15     Q.  And as far as you know, Jose, Orlando and
16 Arbonna were told the same thing?
17     A.  Yes.
18     Q.  And they were recalled on -- on the same
19 recall list you were on?
20     A.  Yes.
21     Q.  And they all had more seniority than you?
22     A.  Yes.
23     Q.  Were you upset with Local 6 for not getting
24 you back into the Oak Room?
25     A.  No.

**120**

1      Q.  Was Jose the bartender at the Oak Room when
2  the hotel closed?
3      A.  Yes.
4      Q.  Was Arbonna the bartender at the Oak Room
5  when it closed?
6      A.  Yes.
7      Q.  Was Orlando a bartender in the Oak Room?
8      A.  Yes.  They stayed until the last day, April
9  29th of 2005.
10     Q.  And then waited out like everybody else did,
11 and when everything opened they had their jobs back?
12     A.  Yes.
13     Q.  But not you?
14     A.  No.
15     Q.  Jose, Orlando and Arbonna are all Hispanic?
16     A.  Yes.
17     Q.  Other than their seniority, did they have any
18 kind of advantage over you in getting back to the Oak
19 Bar?
20     A.  No.
21     Q.  You're all even?
22     A.  Yes.
23         MR. McLANE:  Let's take a lunch break now.
24         (Whereupon, a short lunch break is taken.)
25     Q.  Before we broke, we were talking about your

**121**

1  return to the Plaza in February of 2008, and we talked
2  about your training period between February and March
3  1st.
4          You told me the bartenders who were at the
5  Champagne Bar when it opened on March 1, 2008, and you
6  were not one of the people you listed.  On March 1,
7  2008, what were you doing at the Plaza?
8      A.  I worked for two days or one day in the
9  Champagne Bar when it opened, and they gave me a
10 demotion to the Palm Court service bar during that
11 week.
12     Q.  So it wasn't until the first week of March
13 2008 that you learned that you would be working at the
14 Palm Court service bar?
15     A.  Correct.
16     Q.  Who told you that you were being demoted from
17 the Champagne Bar to the Palm Court service bar?
18     A.  Carlos Bueno, the outlet director.  He's a
19 food and beverage director.
20     Q.  Do you know where Mr. Bueno is from?
21     A.  I think from Dominican Republic.
22     Q.  That's where you're from; right?
23     A.  Yes.
24     Q.  Did Mr. Bueno use that word "demotion" to
25 you?

**122**

1  A. No.
2  Q. What exactly did Mr. Bueno say to you around
3  March 1st?
4  A. He told me that he was moving me from the
5  Champagne Bar to the Palm Court service bar. I
6  mentioned to him that that was a demotion because I am
7  front bar bartender since the Plaza closed.
8  Q. Is there a difference between the hourly rate
9  for the service bartenders and the front bar
10 bartenders?
11 A. I think that in the old Plaza, the service
12 bar bartender made more money than the front bar
13 bartender by hourly rate, but now the new Plaza with
14 the new contract, it's the same, and you work more
15 hours, 40 instead of 35 hours.
16 Q. So the new contract negotiated between your
17 representatives of Local 6 and the Plaza Hotel lowered
18 the rate of the service bartenders?
19 A. No.
20 Q. Under the old contract, wasn't the service
21 bartender rate higher than the front bartender rate?
22 A. Yes. I think about a dollar something.
23 Q. And now, according to the subsequent
24 contract, the hourly rates are the same?
25 A. Yes.

**123**

1  Q. And that was done through negotiations
2  between your union and the Plaza; correct?
3  A. Yes, but they have a new hire, they make less
4  for the first two years, and then they catch up and
5  then they make the same.
6  Q. But you weren't the new hire, correct, you
7  were at the top rate?
8  A. Yes. The old salary.
9  Q. And when you told Mr. Bueno that this was a
10 demotion, what did he say?
11 A. That if there was any error, that he was
12 going to correct it, that he was going to look at my
13 file and find out what this was about.
14 Q. And when he told you that you were going from
15 the Champagne Bar to the service bar in the Palm
16 Court, did he explain to you why he was making that
17 change?
18 A. Yes.
19 Q. What did he say?
20 A. That he had seen my archive, my file, and he
21 had discussed with Rajan Lai, the director of human
22 resources, what my position would be, and he said that
23 I belong to Palm Court service bar. And I disputed
24 that, I was in disagreement.
25 Q. And neither Mr. Lai nor Mr. Bueno were at the

**124**

1  Plaza when it closed in 2005; correct?
2  A. No.
3  Q. Let's try it this way. Was Mr. Bueno in the
4  Plaza when it closed in 2005?
5  A. No.
6  Q. Was Mr. Lai at the Plaza when it closed in
7  2005?
8  A. Neither.
9  Q. When you were moved -- is it your testimony
10 that the first day that the Champagne Bar opened, you
11 were working there?
12 A. Yes.
13 Q. So you worked one full day at the Champagne
14 Bar?
15 A. Yes.
16 Q. And then on your next shift that's when Mr.
17 Bueno told you you would be going to the Palm?
18 A. Yes. I think I was off Sunday, Monday. And
19 when I returned on Tuesday, they said I started
20 working two hours at the Champagne Bar. And then I
21 was told by Anthony Evangelista that Carlos Bueno
22 wanted to see me. And when I went to speak with
23 Carlos Bueno, he told me that I had to move to the
24 Palm Court service bar, that that was going to be my
25 permanent position.

**125**

1  Q. And what was Mr. Evangelista's title?
2  A. Director of the restaurant, Champagne Bar and
3  Rose Club.
4  Q. And he reported to Mr. Bueno?
5  A. Correct.
6  Q. After your conversation with Mr. Bueno, did
7  you go back to finish your shift at the Champagne Bar?
8  Did you go right to the Palm Court?
9  A. I went directly to the Palm Court, and I
10 asked for permission from the manager, Susan Peterson,
11 the director of the Palm Court, that I wanted a moment
12 to speak with Rajan Lai at human resources and find
13 out what this was about.
14 Q. And did she give you the permission to speak
15 to him?
16 A. Yes.
17 Q. And did you go speak to him?
18 A. Yes.
19 Q. Where was Mr. Lai when you spoke to him?
20 A. In his office.
21 Q. Where was his office in relation to the Palm
22 Court?
23 A. Two levels below ground.
24 Q. What did you tell Mr. Lai -- strike that.
25     Was this the first conversation you had

**ROSENBERG & ASSOCIATES, INC.    (800) 662-6878**
**www.rosenbergandassociates.com**

126

1  with Mr. Lai since you returned to the Plaza on
2  February 11th?
3      A.  Either second or third conversation.
4      Q.  Was this the first conversation you had with
5  him about your being assigned to the service bar at
6  the Palm Court?
7      A.  Second.
8      Q.  When was the first conversation?
9      A.  It was during the training at the Rose Club.
10  Once he came to visit, and he had mentioned by
11  telephone that my position was going to be service
12  bar. And I reminded him that I am a front bar
13  bartender, and I would like to work here at the Rose
14  Club and Champagne Bar.
15     Q.  And that was before March 1st; correct?
16     A.  Yes.
17     Q.  And the phone call that you referred to was
18  the one you testified about earlier where he called
19  you about the hotel reopened?
20     A.  Correct.
21     Q.  In response to you, what did he say when you
22  saw him in the training?
23     A.  He said that he needed time to look at the
24  file, and he's going to make a decision.
25     Q.  And then March 1st comes along, you're

127

1  working at the Champagne Bar. Next day you come in,
2  you go see Bueno, he sends you to the Palm Court, and
3  then you go see Rajan again?
4      A.  Yes.
5      Q.  What happened, that second conversation with
6  Rajan?
7      A.  He was busy in his office, but we spoke a few
8  minutes. And he told me that the Palm Court service
9  bar would be my new position because I had different
10  sets of skills, and the new Plaza five-star,
11  five-diamond required someone with high skill --
12  required someone with high skill.
13     Q.  What did you say?
14     A.  I was in disagreement. I have experience,
15  I'm qualified, I have worked. I come from another
16  hotel, from the Carlyle, and I wanted him to
17  reconsider that decision, because I belong to the
18  front bar bartender, and I think that I am a --
19  something positive, a positive asset for the hotel.
20     Q.  What did he say?
21     A.  He was in disagreement. According to the
22  file, he said he saw that my position was front bar
23  bartender. So I requested to have a meeting as soon
24  as possible this week with Eddie Cedeno, my business
25  agent, but the meeting never took place and we stayed

128

1  in -- we left it at we'll see.
2      Q.  And why didn't the meeting with Mr. Cedeno
3  take place?
4      A.  When he came to the hotel to speak with Rajan
5  Lai and myself in his office, to speak about that I
6  have been demoted, and that I was not satisfied with
7  my new position, I've got qualifications and
8  experience, and I have worked for many years as a
9  front bar bartender, I mentioned that I had been
10  discriminated. And Rajan smiled -- he laughed in our
11  face.
12     Q.  My question was why didn't the meeting take
13  place?
14     A.  Possibly, because Rajan was busy and he would
15  cancel the meetings. On a couple of occasions, Eddie
16  Cedeno came that week, and he couldn't meet with him.
17  He had to see the general manager, Shane Krige.
18     Q.  So how soon after your meeting with Mr. Lai's
19  office that occurred on the day of your motion did you
20  have this meeting with Mr. Lai where Mr. Lai laughed?
21     A.  In March.
22     Q.  So later that month?
23     A.  Yes. At the end of the month.
24     Q.  Was that the first time that you mentioned to
25  anybody at the Plaza that you believed that this what

129

1  you called a demotion was discriminatory?
2      A.  Yes.
3      Q.  Had you mentioned it to Mr. Cedeno prior to
4  that date?
5      A.  Yes.
6      Q.  What did you tell Mr. Cedeno?
7      A.  Since the beginning, that I have worked a
8  long time at the Plaza, I am a nice person, I am
9  qualified, I have experience, and I was changed -- I
10  was demoted unfairly, and it is unfair, injustice,
11  it's an abuse of power, and that is discriminatory.
12     Q.  Do you know who made the decision to demote
13  you?
14     A.  I think it was Rajan Lai.
15     Q.  What makes you think it was Mr. Lai?
16     A.  I spoke with Eddie Cedeno and he told me
17  that. I thought it was Carlos -- the two of them were
18  in agreement that in that, there is an error with my
19  classification of working in the front as a front bar,
20  and they were able to observe me during the training
21  that I possess the skills. The ability making the
22  drinks, training, answering all of the questions of
23  the company that did the training from Fairmont
24  standard, JD Power. They call the company Richie from
25  outside. They went -- they were brought in to give a

130

1 complete training to all the employees. And randomly,
2 they asked a lot of random questions about the hotel's
3 history, cocktails and classical drinks and service,
4 about five-star service, five-diamond, what is
5 required or what needs to be done to achieve that
6 goal, that purpose.
7    Q.  So what about all of that made you believe
8 that Mr. Lai made the decision to demote you?
9    A.  I was told by Eddie Cedeno they had a
10 meeting, he and Carlos, I was not present, but Eddie
11 Cedeno told me that he thought it was Rajan who does
12 not want me working in the front bar.
13    Q.  And not Mr. Bueno?
14    A.  Correct.
15    Q.  And that was Mr. Cedeno's belief?
16    A.  Yes. According to the meeting that they had.
17    Q.  According to the meeting who had?
18    A.  Eddie Cedeno and Carlos Bueno.
19    Q.  And you weren't in that meeting?
20    A.  No. I was working at the Palm Court and he
21 went upstairs to tell me.
22    Q.  And what made you think that this was
23 discriminatory?
24    A.  If the hotel is closed -- if the hotel closed
25 in 2005, there were a lot of minorities working there

131

1 from Asia, blacks, whites, Arabs, different
2 nationalities, and all of the bartenders were all over
3 40 years of age. When it opened in 2008, in March,
4 they took as front bar whites, Caucasians and they
5 were young, 20 years old, lower than 30 and with a
6 little experience. For many, that was their first
7 job, they had never worked in a five-star hotel. I
8 was former employee, qualified with experience on
9 record, good reputation. I had never caused any
10 problem. I didn't see any logic to move me to the
11 service bar, Palm Court service bar.
12    Q.  Were there any bartenders who were at the
13 hotel in 2005 when it closed who did not take the
14 second option of the two-week severance pay in
15 exchange for their recall rights who were not recalled
16 to the hotel?
17    A.  Liam Flanagan.
18    Q.  He came back; right?
19    A.  Yes.
20    Q.  No. What I want to know is there were quite
21 a few bartenders who took the enhanced severance
22 package; right?
23    A.  Yes.
24    Q.  And in exchange for that, they gave up their
25 right to be recalled to the hotel; correct?

132

1    A.  Yes.
2    Q.  And then there were people like you who
3 retained their recall rights in exchange for one-week
4 severance; correct?
5    A.  Yes.
6    Q.  Were there any people like you who were not
7 recalled to the hotel?
8    A.  Orlando Rivera, Jose Mejia and Jose Arbonna.
9    Q.  Those were the only three?
10    A.  Yes.
11    Q.  They were recalled, but they just didn't come
12 back because they wanted to go back to the Oak Bar;
13 right?
14    A.  Correct.
15    Q.  So even though you had all of these,
16 according to you, these older, minority bartenders,
17 everybody who wanted to be recalled was recalled;
18 right?
19    A.  Yes, but allow me to explain to you. I spoke
20 with the general manager Nicola at the Oak Bar the
21 first week of March 2008, and I explained to him that
22 I was front bar bartender at the Oak Bar, that if
23 there was -- that if they had me on the list to work
24 at the Oak Bar, and they told me no or that they
25 couldn't. He asked me where I was working, that I

133

1 start with the Plaza. I explained to him with
2 Fairmont at the Champagne Bar. And he recognized, he
3 said we don't have you on the list, you don't belong
4 in here.
5    Q.  When you talked to Eddie Cedeno about that,
6 what did he say?
7    A.  He told me that I started with Fairmont
8 hotel, that is a separate company, I cannot transfer
9 or move to the Oak Bar front bar.
10    Q.  Unlike Jose, Orlando and Arbonna?
11    A.  Yes.
12    Q.  What's Arbonna's nationality?
13    A.  I think it's Mexican, Puerto Rican. Mother
14 from Mexico and father from Puerto Rico.
15    Q.  What's Orlando's nationality?
16    A.  He's born here. His parents are from Puerto
17 Rico.
18    Q.  What about Jose?
19    A.  From Honduras, Central America.
20    Q.  Did you believe that the Oak Bar was
21 discriminating against you by not having you work at
22 the Oak Bar?
23    A.  No.
24    Q.  When Cedeno, you and Lai met in the meeting
25 where Lai laughed, was anybody else in that meeting

134

1  besides the three of you?
2  A. No.
3  Q. After Mr. Cedeno explained to Mr. Lai your
4  belief that your demotion was discriminatory, did Mr.
5  Cedeno say anything else?
6  A. Yes. That he was going to open a case, a
7  grievance to find the truth and solve the problem.
8  Q. Did he do that?
9  A. Yes.
10 Q. When did you file the grievance?
11 A. I think after March, April.
12 Q. Were there any other meetings between Mr.
13 Cedeno and Mr. Lai or you and Mr. Lai between, at the
14 end of March and the following weeks, other than the
15 meeting where Mr. Lai laughed?
16 A. Yes. I think in the Palm Court, and Eddie
17 Cedeno was present, Michael Simo, president of the
18 regional Local 6, and Vanessa Miller, the president of
19 the union, Evelio Tejada, the bartender. We explained
20 to Rajan Lai that I was front bar bartender, and he
21 mentioned again the set of skills for the new Plaza to
22 work front bar bartender. He said my abilities were
23 different and I couldn't -- he could not give me the
24 position of front bar bartender.
25 Q. Did Mr. Simo say anything at that meeting?

135

1  A. Yes. To open a formal complaint or to file a
2  formal complaint. And I think they spoke about on
3  another occasion after that week about paying my
4  severance so that I could stay at the Palm Court
5  service bar, and I refused. I did not accept that
6  offer. And I explained to them that my position was
7  front bar bartender. And that is what I'm interested
8  in in working. I don't want to find or have any
9  problem.
10 Q. How much did they offer you severance?
11 A. I think it was the same option one, four days
12 to stay as a permanent position at the service bar.
13 Q. When you received the severance pay back in
14 2005, how much did you receive?
15 A. I think it was $22,000.
16 Q. So this offer in 2008 was the same; correct?
17 A. Yes.
18 Q. Did Ms. Miller say anything about this
19 meeting in the Palm Court with Tejada, Simo, you,
20 Cedeno and Lai?
21 A. No. Michael Simo explained -- no. She was
22 speaking with the waiters about other things,
23 discussing other things.
24 Q. At the meeting with Simo, Miller, Tejada,
25 Cedeno, did anybody mention your belief that you

136

1  believed that the Plaza was acting in a discriminatory
2  manner?
3  A. I mentioned it, and Evelio Tejada, Rajan was
4  in disagreement that the new Plaza does not
5  discriminate. They go by the book, they work by the
6  book. And he thought that they were doing the correct
7  thing. I disputed that, and I disagreed, because I
8  explained to him that, in 2005, I was a front
9  bartender with five, ten years of experience. I
10 mentioned the difference between front bar bartender.
11 One is that the front bar bartender makes more money,
12 is more prestigious, and you have interaction with the
13 guests. And that is what I like to work, and that is
14 -- I do my best, I shine more in that position.
15 Q. And the reason why the front bartenders made
16 the more money than the service bartenders is because
17 they received tips from the public; correct?
18 A. Front bar receives tips. Service bar does
19 not receive money. We only serve the waitresses and
20 waiters. The entire staff, captain or manager and the
21 bar is in the rear and it is hot. At that time when
22 it opened, there was no air conditioning because it
23 was installed in June 26th and something hot was
24 coming out of the ceiling.
25    MR. ZAPATA: Can we go off the record?

137

1     (Whereupon, a discussion is held off the
2  record.)
3  Q. Other than Mr. Cedeno and in the meetings
4  with Mr. Lai, did you discuss with anyone else your
5  belief that your transfer to the Palm Court was
6  discriminatory?
7  A. Yes.
8  Q. Who?
9  A. Liam Flanagan.
10 Q. Who else?
11 A. With Carlos Bueno.
12 Q. Who else?
13 A. Rajan Lai.
14 Q. Other than Rajan?
15 A. Those are all the people that I remember at
16 this moment.
17 Q. When did you first mention to Mr. Flanagan
18 that you believed your transfer to the Palm Court was
19 discriminatory?
20 A. The first week of March of 2008.
21 Q. Did you have any other conversations with Mr.
22 Flanagan about your belief that your transfer to the
23 Palm Court was discriminatory, other than the first
24 week of March 2008?
25 A. Yes. Let me correct you for a moment. I

**ROSENBERG & ASSOCIATES, INC.   (800) 662-6878**
www.rosenbergandassociates.com

Page 138

1  think it was a demotion with Larry Gobin, a delegate
2  from Champagne Bar, Rose Club, and I think Francisco
3  who was a waiter.
4     Q.  What's Francisco's last name?
5     A.  Marquez.
6     Q.  Anyone else?
7     A.  Several people, but I don't remember the
8  names.
9     Q.  Do you remember their titles?
10    A.  There were waiters.
11    Q.  After your first conversation with Mr.
12 Flanagan in the first week of March 2008, did you have
13 any other conversations with him regarding your belief
14 that your transfer to the Palm Court was
15 discriminatory.
16    A.  No, I did not mention the case.
17    Q.  When did you discuss with Mr. Bueno your
18 belief that your transfer was discriminatory?
19    A.  The second occasion we spoke in the bathroom
20 in the locker room. He didn't have much time, and he
21 told me that that wasn't the appropriate place to
22 speak. I mentioned that if he worked at the old Plaza
23 how could they be so sure that I am service bar
24 bartender when I have all the records indicate my
25 qualifications to work as a front bartender, and I

Page 139

1  think he got angry.
2     Q.  What do you mean you think he got angry?
3     A.  That I had mentioned to him several days
4  before about -- this was the third conversation about
5  my position, reminding him that I am a front bar
6  bartender. And he told me that he did not care where
7  I'm going to be. If there is any error or mistake, it
8  would be corrected, but that he would like to speak
9  with me, perhaps, in his office, not in the locker
10 room in front of a lot of people.
11    Q.  In the locker room, did you tell Mr. Bueno
12 your belief that your transfer to the Palm Court was
13 discriminatory?
14    A.  Yes, I did mention that.
15    Q.  What exactly did you mention to Mr. Bueno
16 about your belief that you were discriminated against?
17    A.  Because when I returned in 2008 --
18    Q.  My question is, I know the reasons, but what
19 did you say to him exactly? Did you say, Carlos, I'm
20 being discriminated against. Or, Carlos, the hotel is
21 treating me unfairly. Exactly what did you say to him
22 about discrimination?
23    A.  I mentioned to him what I said previously
24 that I was treated unfairly, but that, also, that it
25 is also discrimination. I mentioned that that day at

Page 140

1  that meeting.
2     Q.  In the locker room?
3     A.  Yes.
4     Q.  Did you have any other conversations after
5  the locker room meeting with Mr. Bueno where you told
6  him your belief that your transfer was discriminatory?
7     A.  No.
8     Q.  Larry Gobin was the union delegate to Local
9  6?
10    A.  Yes, at the Champagne Bar and Rose Club.
11    Q.  When was the first time you told Mr. Gobin
12 your belief that your transfer to the Palm Court was
13 discriminatory?
14    A.  In March.
15    Q.  And where did that meeting take place?
16    A.  The Champagne Bar. I went to pick up -- I
17 was visiting, looking for a soda or something missing
18 in the back bar, and I met with him and I explained to
19 him briefly.
20    Q.  Did you tell him that specifically because he
21 was your union delegate or just because he happened to
22 be in the room when you thought about it?
23    A.  Yes, because I always felt from the first day
24 that it was discrimination.
25    Q.  And how many conversations did you have with

Page 141

1  Mr. Gobin about this belief?
2     A.  Possibly, some other, but I don't recall
3  because we work in separate rooms and they're far.
4     Q.  And how many conversations did you have with
5  Francisco or the other waiters about this issue?
6     A.  Francisco was present when I spoke with Larry
7  Gobin.
8     Q.  When you told Flanagan, Bueno, Gobin,
9  Francisco and some of the unnamed waiters that you
10 were being discriminated against, did you tell them,
11 any of them, what the basis of the discrimination was?
12 In other words, by what characteristic you were being
13 discriminated against?
14    A.  No. Didn't discuss in detail.
15    Q.  You just said discrimination?
16    A.  Yes.
17    Q.  Other than filing the grievance regarding
18 your transfer to the Palm Court, did you make any
19 other complaints about the fact that you believed you
20 were discriminated against?
21    A.  Yes.
22    Q.  What was that?
23    A.  I filed at the EEOC, Equal Opportunity
24 Employment, here in Newark, and that was in December
25 of 2008.

142

1  Q. Why did you wait until December of 2008 if
2  you thought in the first week of March that you were
3  discriminated against?
4  A. That all of the hearings started in October
5  of 2008. My case went to arbitration.
6  Q. When did your case go to arbitration?
7  A. October 10, 2008. Rajan did not assist or
8  did not show up at that first hearing, and it was
9  cancelled.
10  Q. Was it rescheduled?
11  A. Yes.
12  Q. For when?
13  A. The end of October.
14  Q. Did it take place then?
15  A. Yes. Three were held. November and the last
16  one in December.
17  Q. And it was after it was done you filed the
18  EEOC charge?
19  A. No. At the end of the year in December.
20  Q. You filed the EEOC charge in December?
21  A. Yes.
22  Q. After all the hearings were done?
23  A. The last one almost finished on December
24  17th. In that week, I was here filing in Newark and
25  it was transferred to Manhattan because I work in

143

1  Manhattan.
2  Q. Why did you file the EEOC charge?
3  A. Because I felt from the first day that it was
4  discrimination.
5  Q. Did you tell that to the judge during the
6  arbitration?
7  A. That subject was mentioned, but he asked me
8  if I was filling out the report, the human rights
9  report or the labor department or some other agency
10  about the charges of discrimination.
11  Q. What did you say?
12  A. No.
13  Q. Was that true?
14  A. Yes.
15  Q. Did you ever make any calls to Fairmont's
16  human resources hotline to complain about your belief
17  that your transfer was discriminatory?
18  A. No.
19  Q. Why not?
20  A. I was going to make a call, but I didn't get
21  to make it based on the results on the answers from
22  Carlos Bueno and Rajan Lai, different attitudes. And
23  I thought that the hotline was part of the hotel.
24  It's not going to find any solution -- any
25  satisfactory solution for me to solve the problem.

144

1  Q. Well, you weren't getting any satisfaction
2  from Lai or Bueno; correct?
3  A. No.
4  Q. So why didn't you try someone else?
5  A. I tried the union.
6  Q. But the union never mentioned your belief
7  that your transfer was discriminatory at the
8  arbitration; did they?
9  A. Yes.
10  Q. They did or they didn't?
11  A. Yes, they did. Eddie Cedeno mentioned it.
12  Q. At the arbitration?
13  A. Yes.
14  Q. In his testimony?
15  A. Yes, correct.
16  Q. So the transcript of the arbitration will
17  reflect that?
18  A. It was mentioned. I don't think that it is
19  there written, because that is not the job of the
20  arbitrator.
21  Q. Between the end of March, early April 2008
22  when you filed the grievance and December 2008 on the
23  last day of the arbitration hearing, did you work that
24  entire time at the Palm Court service bar?
25  A. Correct.

145

1  Q. I think there was testimony from Mr. Flanagan
2  that you were back working at the Rose Club and/or
3  Champagne Bar prior to your arbitration. Was he
4  incorrect?
5  A. Yes.
6      MR. ZAPATA: That's a confusing question
7  to me. Prior to the arbitration, the decision, the
8  arbitration hearings?
9  Q. I'll clarify that. Mr. Flanagan testified
10  that you were returned to the Champagne Bar or Rose
11  Club prior to the arbitrator ruling in your favor.
12  A. I think so.
13  Q. When did you start working at the Rose Club
14  and/or Champagne Bar?
15  A. January 4, 2009.
16  Q. So after the arbitration, but before the
17  award?
18  A. Exactly.
19  Q. And do you know why it was that you were
20  transferred back to the Champagne Bar and Rose Club?
21  A. Yes. Because the Palm Court closed on
22  December 31, 2008, and all the employees from the Palm
23  Court bumped the newer employees of the Champagne Bar
24  or Rose Club.
25  Q. So the only thing left for the arbitrator to

146

1  do was to award you backpay?
2    A.  Correct, yes.
3    Q.  Because even if, which he did, he ruled in
4  your favor, your reinstatement to the Champagne Bar
5  and Rose Club had already occurred?
6    A.  Yes.
7    Q.  Why didn't you withdraw your EEOC charge at
8  that time?
9    A.  I left it, because I needed justice to be
10 done. The way in which it was handled was
11 inappropriate. I think there was mishandling from the
12 managers. My case, I've always believed that it's
13 simple. I never thought that it was going to go to
14 arbitration. A simple phone call from Peter Ward or a
15 meeting with Carlos Bueno or Rajan Lai could have seen
16 my file and seen that I am capable of working in the
17 front bar. They never gave me the opportunity and
18 they refused from the beginning.
19   Q.  Well, they didn't refuse from the beginning
20 because the first day you worked at the Champagne Bar;
21 right?
22   A.  Yes. But when the Palm Court closed down on
23 December 31, 2008, they made the correct decision of
24 moving all of the employees to the Champagne Bar, Rose
25 Club. When I returned working for the Plaza 17 years,

147

1  why was not the entire decision made when I explained
2  from the beginning and other people recognized, like
3  Liam Flanagan and Larry Gobin, you cannot place Carlos
4  in the Palm Court, that's a demotion, it is a lower
5  position. It's unacceptable to me.
6    Q.  And according to your testimony, when you and
7  Mr. Cedeno, and even in the meetings with Mr. Simo,
8  Rajan Lai and Carlos Bueno's position was that your
9  skills were not sufficient to have you as front
10 bartender; correct?
11   A.  Yes.
12   Q.  In any of these meetings, did Mr. Lai say
13 that he believed that you had not been a front
14 bartender at the Oak Room prior to the hotel closing?
15   A.  Not in front of me.
16   Q.  So the dispute was, as you saw it, that Lai
17 was saying you didn't have the skills and you thought
18 you did have the skills?
19   A.  At the beginning, yes.
20   Q.  And Bueno didn't think you had the skills,
21 but you thought you had the skills?
22   A.  Carlos Bueno never mentioned skills.
23   Q.  Carlos Bueno was the guy who ran the bars;
24 right?
25   A.  Yes. He was the food and beverage director.

148

1    Q.  You don't know whether or not Carlos Bueno
2  ever had a meeting with Rajan Lai in which Bueno told
3  Lai that you didn't have the skills to work in a
4  five-star, five-diamond facility; do you?
5    A.  They never mentioned that to me.
6    Q.  Who was the head of the food and beverage
7  department when the hotel closed?
8    A.  Thomas Norbert.
9    Q.  And so it was Mr. Bueno who replaced Mr.
10 Norbert?
11   A.  Bueno never worked at the Plaza in 2005.
12 When I was there, I never saw him.
13   Q.  But when the hotel closed, Norberg was the
14 food and beverage director?
15   A.  Yes, correct.
16   Q.  And when the hotel opened, Bueno was the food
17 and beverage director?
18   A.  Yes.
19   Q.  So Bueno took Norberg's position?
20   A.  Correct.
21   Q.  And as far as you know, in Norberg's opinion,
22 you had the skills to be a front bartender; correct?
23   A.  Yes. He promoted me. I worked in his -- he
24 got married, and he invited me to his wedding at that
25 time.

149

1    Q.  So it's possible that Carlos Bueno had a
2  different opinion than Mr. Norberg about whether or
3  not you had the skills to work in a five-star,
4  five-diamond facility; correct?
5    A.  No, I don't agree.
6    Q.  Why is it not possible that Mr. Bueno could
7  have had a different opinion about how good of a
8  bartender you are?
9    A.  He couldn't have a bad opinion, because since
10 the date, February 11th of 2008, he was able to
11 observe me during the training serving the owner and
12 preparing cocktails and training, and he gave me a lot
13 of compliments that I made many quality drinks,
14 delicious.
15   Q.  And that was in September of 2008?
16   A.  No. In February of 2008. We started
17 February 11, 2008 until March.
18   Q.  In February 2008, did Mr. Bueno tell you that
19 he believed you were a five-star, five-diamond
20 bartender?
21   A.  I don't recall if he told me that.
22   Q.  Do you know if he ever told you that?
23   A.  He mentioned about my cocktails at the Rose
24 Club during the training he was present and he was
25 tasting and drinking.

**150**

1  Q. But you never had any conversations with Mr.
2  Bueno about whether or not he believed you were a good
3  enough bartender to be five-star, five-diamond?
4  A. The first day that I spoke with him, which
5  when that was sent to the Palm Court, I mentioned my
6  abilities and I wanted an opportunity to work to prove
7  that I am capable of doing the job of bartender to be
8  five-diamond, five-star in the best restaurant, in the
9  Plaza.
10  Q. And for about three weeks prior to that, you
11  were in training for just that; correct?
12  A. Correct.
13  Q. And Mr. Bueno was observing you train;
14  correct?
15  A. Yes. He was present.
16  Q. And, again, you don't know whether or not he
17  took his opinions of his observations of you during
18  that period and told Mr. Lai or other people that,
19  perhaps, you didn't have what it took to be a
20  five-star, five-diamond; right?
21  A. I cannot speculate.
22  MR. McLANE: Let's mark this D-5.
23  (Equal Employment Opportunity Commission
24  Intake Questionnaire is received and marked as Exhibit
25  D-5 for Identification.)

**151**

1  Q. I'm going to hand you what the court
2  reporter's marked as Exhibit D-5, which is an Equal
3  Employment Opportunity Commission Intake
4  Questionnaire, and it's stamped dated November 14,
5  2008. Is that your handwriting that appears on D-5?
6  A. Yes.
7  Q. On November 14, 2008, your arbitration hadn't
8  concluded; had it?
9  A. Correct, it had not yet concluded.
10  Q. Did anybody help you fill out D-5?
11  A. No.
12  Q. At the time you filled out D-5 in November
13  2008, were you represented by an attorney?
14  A. No.
15  Q. Was everything that you wrote on D-5 at the
16  time you wrote it true?
17  A. Yes.
18  Q. During Mr. Flanagan's testimony which you
19  were present at, there were a lot of questions from
20  your attorney to Mr. Flanagan about the color of
21  people's skin and their hair color and their eye
22  color. What color are you?
23  A. What are you referring to the eyes, the skin?
24  Q. What color is your skin?
25  A. White, Hispanic. In Puerto Rico, I was

**152**

1  darker because of the sun, but here I'm lighter.
2  Q. Aren't we all. And, as a matter of fact, on
3  D-5 you checked off that you were white; correct?
4  A. Yes.
5  Q. When the arbitrator ruled in your favor, how
6  much money did you receive in backpay?
7  A. It was $23,700 or something like that,
8  $23,734.
9  MR. McLANE: Mark that as D-6.
10  (Copy of paycheck is received and marked
11  as Exhibit D-6 for Identification.)
12  Q. Mr. Rivera, is D-6 a copy of the backpay
13  check as a result of the arbitrator's award?
14  A. Yes. I would like to correct my previous
15  answer. The amount was $22,644.59.
16  Q. You were pretty close. Did that amount cover
17  the backpay in your mind?
18  A. No.
19  Q. Why not?
20  A. Recalculated, I was imagining all of the cash
21  that's received, private parties which are paid cash.
22  This was based on Liam's paycheck, which is one of the
23  -- credit card charges and, perhaps, some hours that
24  he worked overtime -- that he could have worked
25  overtime.

**153**

1  Q. Who's "he"?
2  A. Liam Flanagan.
3  Q. What does Liam Flanagan have to do with your
4  backpay check?
5  A. Liam Flanagan is one of the most senior
6  bartenders with more time who always works a lot of
7  overtime and he's available to work when needed at any
8  time.
9  MR. ZAPATA: Off the record.)
10  (Whereupon, a discussion is held off the
11  record.)
12  Q. Who came up with the amount $22,644.59?
13  A. This was calculated. We did an accounting of
14  the hotel of Rajan Lai, Eddie Cedeno and a lawyer from
15  the union who represented me, Joseph Farelli.
16  Q. And were you involved in that?
17  A. No, but I accepted the payment and to return
18  to the front. The conclusion of this situation, the
19  hearings, took a long time.
20  Q. So you accepted this check?
21  A. Yes.
22  Q. And you didn't make any complaints to the
23  union or this lawyer about the fact that you thought
24  it should have been more?
25  A. In the beginning, but the check was already

154

1 made out and it was accepted. I thought it was going
2 to be $32,000.
3    Q. And you thought it was going to be $32,000
4 based on Liam Flanagan's paychecks?
5    A. Yes. And based on all the private parties
6 and functions that are done which are paid cash, and
7 also working at the Rose Club a lot, there's a lot of
8 cash payments and tips.
9    Q. Did you tell anybody at Fairmont that you
10 believed this check should have been $32,000?
11    A. No. I only asked why was it not paid in
12 statements. And since this was something that was
13 back owed to me, why so much taxes taken out.
14    Q. According to the EEOC intake form, you
15 believe that were you discriminated against on the
16 basis of your age and your national origin. What is
17 your national origin?
18    A. Hispanic from Dominican Republic.
19    Q. During your tenure at the Plaza Hotel, did
20 you ever hear anybody make any derogatory comments
21 about Dominicans?
22    A. No.
23    Q. Did you ever hear anybody at the Plaza Hotel
24 make any comments about your age?
25    A. No. But when we returned, all the other

155

1 bartenders at the front bar were younger than I.
2    Q. And that's in large part because all the
3 bartenders that were older than you when the hotel
4 closed took the severance; right?
5    A. Yes.
6    Q. When you returned to the Plaza in February
7 2008, did you receive the new Fairmont employee
8 manual?
9    A. Yes.
10    Q. Do you recall signing your acknowledgment of
11 that fact?
12    A. Yes.
13    Q. And did you read the handbook, the policy
14 manual?
15    A. Yes.
16       MR. McLANE: Let's take a two-minute
17 break.
18       (Whereupon a short break is taken.)
19    Q. Who is Myoung A. Nam?
20    A. She worked in human resources at the Plaza,
21 assistant.
22       MR. McLANE: Mark this.
23       (February 3, 2005 Letter is received and
24 marked as Exhibit D-7 for Identification.)
25    Q. Mr. Rivera, the court reporter has handed you

156

1 what she's marked as Exhibit D-7, which is a February
2 3, 2005 letter from Ms. Nam. Do you know why Ms. Nam
3 wrote this letter?
4    A. Yes. It was written by Ms. Nam. The
5 purpose, I don't recall.
6    Q. Did ask you anybody at the Plaza to write you
7 a letter to use after the hotel closed?
8    A. When it closed, I think so. David Jones. I
9 have several letters like this.
10    Q. And do you recall asking Ms. Nam to write you
11 this letter?
12    A. Yes.
13    Q. Did you see this letter after -- strike that.
14       When Ms. Nam wrote this letter, did she
15 hand it to you?
16    A. In an envelope, I think.
17    Q. Was the purpose of this letter for you to
18 give to prospective employers after the hotel closed?
19    A. I don't remember if it was for that or if it
20 was for banking, verifying that I worked at the Plaza.
21    Q. In this letter, Ms. Nam says that you were
22 employed as a bartender in the room service
23 department. Do you know why she said that?
24    A. Yes, that is an error. It wasn't room
25 service. All bartenders -- there's only one

157

1 classification belongs to one department, which is
2 beverage department. We fill out positions in the
3 five restaurants wherever needed in banquets, at room
4 service, at the condominiums, the guests rooms and
5 banquets for private parties.
6    Q. So is what you're testifying that a bartender
7 is a bartender?
8    A. Yes, but I don't see that here. It says
9 front bar bartender where I worked at the Oak Bar when
10 we closed down in 2005. Don't know -- she maybe wrote
11 another letter correcting this one, because I could
12 find that out. I could find out those mistakes which
13 are written here. Or it doesn't say front bar
14 bartender, and it mentions room service.
15    Q. Do you recall ever having a discussion with
16 Ms. Nam about her referring to you as a room service
17 bartender?
18    A. On one occasion, I did do it.
19    Q. What did you say to her?
20    A. It was to correct another letter they gave me
21 which said private dining room or the amount that I
22 made per hour was not correct.
23    Q. So it seems like there was some bit of
24 confusion not only in 2005, but based on your letters
25 to Mr. Simo and to Mr. Ward about exactly what your

**158**

1  position was at the Plaza in 2005; correct?
2  A. A few errors, some errors.
3  Q. Despite filing the charge with the EEOC in
4  which you alleged that Plaza at Fairmont discriminated
5  against you on the basis of your national origin and
6  age, the EEOC never determined that you were
7  discriminated against; did they?
8  A. EEOC, yes.
9  Q. EEOC made a determination that you were
10 discriminated against?
11 A. Yes.
12 Q. Where is that document?
13 A. I don't know if we have it here but an
14 investigation was conducted and they called the hotel,
15 human resources and myself on the telephone.
16 Q. And what did they say?
17 A. To ask several questions about this case that
18 one of the private investigators was assigned to find
19 out the whole truth about this case.
20 Q. Right. Do you recall getting a letter from
21 the EEOC saying you're correct, Mr. Rivera, our
22 private investigator has determined that you were
23 discriminated against by the Plaza?
24 A. I think I received a letter with the right to
25 sue.

**159**

1  Q. And did that letter say that the EEOC found
2  that you were discriminated against?
3  A. Yes, it said something like that.
4       MR. McLANE: Let's mark this.
5       (Notice of Right to Sue is received and
6  marked as Exhibit D-8 for Identification.)
7  Q. Mr. Rivera, the court reporter has handed you
8  what is marked as Exhibit D-8, which is the Right to
9  Sue Notice from the EEOC. Would you agree with me
10 that this Notice of a Right to Sue does not make a
11 determination that you were discriminated against at
12 the Plaza Hotel?
13 A. I missed the question. Can you repeat it?
14      MR. McLANE: Can you read it back, please?
15 A. My opinion, in general, is that I understood
16 that this is a right to sue of finalization from EEOC.
17      MR. McLANE: Mark this as D-9, please.
18      (Second Amended Complaint is received and
19 marked as Exhibit D-9 for Identification.)
20 Q. Mr. Rivera, the court reporter has handed you
21 what she's marked as Exhibit D-9, which is the second
22 amended complaint that was filed on your behalf in
23 this matter. Did you have an opportunity to review
24 D-9 prior to its being filed on your behalf?
25 A. Yes.

**160**

1  Q. Could you turn to Page 2 of the complaint,
2  Paragraph 7. It alleges that you were hired by the
3  Plaza in 1988. How old were you when you were hired
4  by the Plaza?
5  A. I'm 47 right now, so it was 23 years ago.
6  Q. So were you born in 1962?
7  A. Yes.
8  Q. And sometime in 1988, you turned 26?
9  A. Yes.
10 Q. And if you turn to Page 7 of the complaint,
11 please, Paragraph 62 and 63 refer to the enhanced
12 severance benefit package that was offered to you when
13 the hotel closed. There was nothing discriminatory
14 about the fact that employees were given that enhanced
15 severance option, was there?
16 A. No.
17 Q. And Paragraph 65 refers to a 60-day training
18 program that had to be completed after the hotel
19 reopened. Was that training program -- did that
20 training program exist because the union and the hotel
21 had negotiated it?
22 A. No.
23 Q. Do you know why it existed?
24 A. Because we were trying to achieve or reach
25 the level of five-star, five-diamond, to be the best

**161**

1  of the best, the cream of the cream.
2  Q. Do you recall Mr. Cedeno testifying at his
3  deposition that this was a negotiated agreement
4  between the union and the hotel?
5  A. No.
6  Q. Paragraph 74 on Page 8 states that after the
7  hotel renovations were completed in 2008, that you
8  were assigned to work as a full-time service bartender
9  in the Palm Court. But I am correct that your
10 testimony was that you did spend one day working at
11 the Champagne Bar?
12 A. Yes.
13 Q. Paragraph 75 reiterates your testimony
14 earlier of your belief that being assigned to the Palm
15 Court was a demotion.
16 A. Yes.
17 Q. I know I asked you about Mr. Bueno, but did
18 anybody at the Plaza Hotel tell you that this was a
19 demotion?
20 A. Yes.
21 Q. Who?
22 A. The union, Eddie Cedeno.
23 Q. Is Eddie Cedeno employed by the Plaza Hotel?
24 A. No, but he is from the union.
25 Q. Is Eddie -- he's not a representative of the

**Page 162**

1  Plaza Hotel, is he?
2      A. No.
3      Q. So my question is, did anybody at the Plaza
4  Hotel or at the Fairmont Hotel tell you that you were
5  being demoted?
6      A. Antonio Evangelista.
7      Q. What did Evangelista say about that?
8      A. I was going to be assigned to the Palm Court
9  service bar, and I mentioned that that was a demotion,
10 you are demoting me.
11     Q. I know that you've mentioned that, but did
12 Mr. Evangelista tell you that you were being demoted?
13     A. Obviously, yes.
14     Q. Because he told you you were going to the
15 service bar?
16     A. Yes.
17     Q. The arbitrator when he ruled in your favor
18 didn't find that you were discriminated against, did
19 he?
20     A. No. He didn't have to do it, because I was
21 -- that was not his job.
22     Q. That issue was not before him; correct?
23     A. It was. It was mentioned a lot by me in
24 testimony, Eddie Cedeno and Joseph Farelli, the
25 attorney who represented me.

**Page 163**

1      Q. But it wasn't his job to make a determination
2  about whether or not you were discriminated; correct?
3      A. Exactly.
4      Q. His job was to look at the collective
5  bargaining agreement to see whether or not it had been
6  violated; correct?
7      A. Yes.
8      Q. And as a result of that, the hotel didn't
9  have to offer any evidence that you weren't
10 discriminated against because that was not the issue;
11 correct?
12     A. Yes.
13         MR. McLANE: Off the record.
14         (Whereupon, a discussion is held off the
15 record.)
16     Q. Turn to Page 17, please, Paragraph E, about
17 halfway down. You asked the court to award you
18 damages to compensate you for physical injury, mental
19 anguish, humiliation, embarrassment and emotional
20 injury. As a result of your allegations against Plaza
21 Hotel, what physical injury did you suffer?
22     A. Depression, mental.
23     Q. What physical injuries?
24     A. Headache, stomach, loss of memory, loss of
25 concentration, lack of sexual desire.

**Page 164**

1      Q. Anything else?
2      A. Sometimes I don't feel with a desire to do
3  things. I'm a happy person, enthusiastic, and I feel
4  without energy, fatigued.
5      Q. Since you commenced this lawsuit, have you
6  been counseled or disciplined by the hotel as a result
7  of your lack of energy?
8      A. No.
9      Q. Have you forgotten how to make drinks?
10     A. Not completely, because I study this always
11 all the time, and it's something that you do for a
12 long time, you don't forget easily.
13     Q. As a result of this depression and loss of
14 memory and energy, do you feel you're unfit to be a
15 bartender at a five-star, five-diamond facility?
16     A. I think I am capable. I always push myself,
17 I'm a perfectionist. I think to do it to put forth
18 the maximum effort and compete.
19     Q. What were you depressed about?
20     A. Low self esteem, low humiliation of, in 2008,
21 I was given another position, embarrassed, I felt
22 embarrassed, all of my friends -- all regular friends
23 would come to the Plaza and ask where is Carlos
24 working. I was given another position. I felt very
25 embarrassed and anguish.

**Page 165**

1      Q. Then I take it you had an arbitration about
2  where you should have been placed; correct?
3      A. Yes, but the arbitration is not like a
4  federal court. There, I did not have a trial, a fair
5  trial.
6      Q. The arbitration wasn't fair?
7      A. Not in the sense that it took too long.
8  April 2009, I was given the decision when this was
9  very simple to solve. It didn't have to go to
10 arbitration.
11     Q. At the arbitration, you had an opportunity to
12 testify and tell your story; correct?
13     A. Yes.
14     Q. And the union paid attorneys to represent
15 you; didn't they?
16     A. Yes.
17     Q. And it was Carlos Rivera against the Plaza
18 Hotel; right?
19     A. Yes. But in some ways, the judges at the
20 hotel did not want for this discrimination case to be
21 solved, and it was treated superficially. This should
22 have been solved there once and for all for the
23 benefit of all parties involved, myself and the hotel.
24     Q. You went up against the Plaza Hotel, and the
25 Plaza Hotel was represented by its attorneys; correct?

**166**

1    A.  Correct.
2    Q.  You won, you beat the Plaza Hotel. You knew
3  that you should have been assigned to a front
4  bartender position at the Champagne Bar and the Rose
5  Club, the hotel said you were wrong, and you won, you
6  beat them. Why did that depress you? You beat the
7  man. How come you weren't doing handstands? How come
8  you weren't telling all your friends at the Plaza, I
9  won, I went up against the behemoth, I went up against
10 the corporate powers, I beat them, I'm Carlos Rivera,
11 I'm right. Why weren't you proud about that? Why
12 wasn't that a source of pride and great source for
13 you? Why weren't you wearing that on your back? I'm
14 confused.
15   A.  Because it's not about that. The entire
16 nightmare that I went through, it was hell for eight
17 months, humiliation. A restaurant opens and it's
18 closed in less than eight months. Two or three
19 companies are paid more than a quarter of a million
20 dollars to train us, liquor vendors, to become a
21 five-star JD Powers, Richie, and I returned to the
22 Plaza, and I'm going to be assigned to this position,
23 service bar bartender. Don't you think that this is
24 an injustice, abuse, discrimination? This could have
25 -- this was a symptom of discrimination that could

**167**

1  have been resolved if it had been in good faith with
2  the Plaza or with Plaza and my lawyer, the way it's
3  done in the state or federal court.
4    Q.  You had a dispute with the hotel, you paid
5  your union dues, your union represented you, and the
6  problem was solved; right?
7    A.  Yes. I am proud of having convinced -- of
8  belonging to the union, but sometimes the union
9  sacrifices the rights of one employee to satisfy the
10 whole of the group.
11   Q.  Do you believe that the Plaza Hotel closed
12 the Palm Court to get back at you?
13   A.  No. It was because of financial crisis. It
14 wasn't generating money. But that is not the issue
15 that I am here for today testifying. It was
16 discrimination.
17   Q.  Is it your belief that people who make drinks
18 for people who have tea at the Plaza should somehow
19 feel humiliated and unworthy because they serve drinks
20 to people that drink tea?
21   A.  For me, it was an embarrassment, it was
22 humiliation. I am capable -- I'm not accustomed to,
23 and I explained my case from the beginning, from day
24 one when the hotel opened, and nothing was done in
25 that respect.

**168**

1    Q.  Is it your belief that you're that much
2  better than people who work in service bars, that it's
3  so beneath you, that to do that job would put you into
4  a state of depression?
5    A.  Yes. It's about Liam Flanagan returned to
6  the hotel. Liam Flanagan worked with me many years at
7  the Plaza at the Oyster Bar and we are very good
8  co-workers. Liam Flanagan when he asked -- he was
9  given the position at the Palm Court. Liam Flanagan
10 was welcomed at the Rose Club, Champagne Bar. When I
11 asked to be given the same position or opportunity.
12 And Liam spoke on my behalf. I was never given that
13 opportunity.
14   Q.  And that's why your union came to your
15 rescue; right?
16   A.  Yes. But there's no logic or is it legal or
17 any law that explains that I was demoted to the Palm
18 Court service bar. Simply, it was discriminatory, the
19 highest form of discrimination. I feel that I was
20 betrayed, cheated. This was very illegal. I should
21 have been treated more fairly from the beginning. In
22 conversation with Shane Krige in his office in
23 December of 2008, I explained that situation, and
24 nothing was done in that respect.
25   Q.  From January 4, 2009 to this day, you have

**169**

1  been the front bartender at the Rose Club and
2  Champagne Bar; correct?
3    A.  That's correct.
4    Q.  Are you humiliated by that?
5    A.  My humiliation is from 2008, since I came, I
6  had all that anguish and abuse.
7    Q.  Do you have any sense that the other
8  employees at the Plaza Hotel consider you their hero?
9    A.  No, never. Very few have expressed that or
10 referred to me in that manner.
11   Q.  Other than what you've testified about today,
12 and other than what's contained in your second amended
13 complaint, is there anything else that you believe my
14 clients did that was discriminatory?
15   A.  Everything is written here.
16   Q.  Anything other than that and anything other
17 than what you've testified about at this deposition do
18 you believe that my clients did that was
19 discriminatory?
20   A.  Yes. But when I spoke with Carlos Bueno, he
21 never paid attention, he never did anything, Rajan
22 Lai, Anthony Evangelista. Karim Adelhamid, he was a
23 manager of room service in the dining room, and also,
24 was manager at the Plaza 2003 or 2004 at the old Plaza
25 Hotel. Carol Sukaki (ph.), she's the director of

**170**

1 housekeeping. I've spoken to six or seven managers,
2 and none of them did something to change the
3 situation. My personal opinion is discrimination.
4  Q. That's why you filed the lawsuit; correct?
5  A. Right.
6  Q. Anything other than what you've testified
7 about today and what's contained in the second amended
8 complaint do you believe that my clients did that was
9 unfair to you?
10  A. I would have to read all of this again.
11  Q. Go ahead. Take your time.
12  A. Okay.
13  Q. Does that contain everything you believe my
14 clients did that was unfair?
15  A. Yes. And also the hotel did not speak the
16 truth when the Oak Bar opened that they would belong
17 to the Plaza. They could have let us know.
18  Q. When should they have let you know about it?
19  A. I found that out in March of 2009 after I was
20 transferred to the -- demoted to the Palm Court.
21  Q. Do you mean March of 2008?
22  A. Correct.
23  Q. And when should they have told you that the
24 Oak Bar was not going to be part of the Plaza?
25  A. Before returning. If I belonged to the front

**171**

1 bar because the Oyster Bar disappeared, the Edwardian
2 Room has not opened, it is used as a banquet meeting
3 room.
4  Q. Anything else?
5  A. No.
6  Q. Other than your belief you should have been
7 paid $32,000 instead of almost $23,000 by the
8 arbitrator, what other economic losses do you have as
9 a result of your alleged discrimination?
10  A. No, none.
11  Q. Who's Dr. Hannon?
12  A. Psychiatrist from my union clinic.
13  Q. When did you first start seeing Dr. Hannon?
14  A. November of 2009, if I'm not mistaken.
15  Q. Why did you start seeing Dr. Hannon?
16  A. I felt I was in a state of -- I felt low self
17 esteem, depression.
18  Q. When did you file the lawsuit in this case?
19  A. As soon as I received the Right to Sue
20 Notice, May or June?
21  Q. 2009?
22  A. Yes.
23  Q. When did you hire an attorney to represent
24 you in this matter? Was it during the time that your
25 EEOC charge was pending?

**172**

1  A. No.
2  Q. Was it before the Right to Sue letter was
3 issued?
4  A. No.
5  Q. It was after that?
6  A. Yes.
7  Q. Are you sure? Would it refresh your
8 recollection if I showed you letters that your
9 attorney wrote to the EEOC prior to the Right to Sue
10 letter?
11  A. I was requesting --
12  Q. You have to listen to what you're being
13 asked.
14  A. Could you please repeat the question?
15  Q. Sure. Do you have any recollection of hiring
16 an attorney prior to the Right to Sue letter being
17 issued?
18  A. I don't remember exactly.
19  Q. Are you still seeing Dr. Hannon?
20  A. Yes.
21  Q. When was the last time you saw him?
22  A. Last month. I have an appointment for this
23 week coming, and on Monday.
24  Q. How often do you see him?
25  A. Every six weeks.

**173**

1  Q. What kind of doctor is Dr. Hannon?
2  A. Psychiatrist.
3  Q. Has he prescribed you any medication?
4  A. Yes.
5  Q. What?
6  A. Sertraline.
7  Q. Anything else?
8  A. No, not so far.
9  Q. Has he diagnosed you?
10  A. Yes.
11  Q. What's the diagnosis?
12  A. Stress disorder, like post stress disorder,
13 emotional.
14  Q. Do you have a brother?
15  A. Yes.
16  Q. Did your brother try to kill himself?
17  A. Yes.
18  Q. Did that cause you stress?
19  A. At that time, yes.
20  Q. Did you discuss that with Dr. Hannon?
21  A. Yes.
22  Q. When did your brother try to kill himself?
23  A. That happened in Puerto Rico, so a year or
24 two ago.
25  Q. Are you still depressed?

174

1  A. Yes.
2  Q. How does that depression manifest itself
3  today?
4  A. Sometimes lack of energy, headaches,
5  excitedness. Sometimes I feel like -- I feel no
6  energy to go out with my friends. Sometimes I feel
7  like either I have too much appetite, desire to eat,
8  and sometimes I don't eat much and I lose weight or do
9  other activities, like go to the movies, or sometimes
10  I keep to myself, I don't have the desire to go out, I
11  stay home.
12  Q. And this all started when?
13  A. Since March of 2008.
14  Q. Who is Gerald J. Bryant?
15  A. A psychologist, psychiatrist. It's an
16  independent doctor I went to to try to improve as soon
17  as possible because I felt -- I needed to seek a
18  second opinion or someone better than the one from the
19  union and somebody who would see me more frequently.
20  Q. Did you read the report that Dr. Bryant wrote
21  on your behalf?
22  A. Yes.
23  Q. Mr. Bryant wrote that over the course of 2010
24  that you had a daily depressed mood, insomnia,
25  disruption of appetite, feelings of worthlessness,

175

1  disruptions of memory, feelings of helplessness and
2  hopelessness, and that you were withdrawn from
3  interpersonal relationships. He said those symptoms
4  are severe enough to adversely affect all aspects of
5  your life. Can you do your job as a bartender
6  properly?
7  A. I am trying as best as I can.
8  Q. Can you or can't you?
9  A. I do the maximum effort.
10  Q. And no one has told you that you're slipping
11  or doing a poor job, have they?
12  A. No. There have been several evaluations
13  lately. They have not -- lately, they have not done
14  any until now, but I have problems with sleep,
15  insomnia and fatigue, and I have seen another private
16  doctor to see if he would prescribe medication for
17  sleep. Sometimes I don't -- I'm not sleepy, I don't
18  sleep at all, and headaches.
19  Q. Can you still do your job as a bartender
20  properly?
21  A. My answer is yes.
22  Q. How do you get to work?
23  A. I use a train, mass transit. Sometimes I
24  drive, but I don't like to drive much because it gives
25  me sometimes anxiety, the traffic. I am a passive

176

1  person. Sometimes in the morning rush hour, everybody
2  is in a rush, and I don't want to find myself involved
3  in that.
4  Q. How many sick days do you get a year as a
5  bartender at the Plaza?
6  A. I think eight.
7  Q. How many sick days did you use in 2010?
8  A. I don't recall. Not many.
9  Q. Do you have pretty good attendance at work?
10  A. Yes, because we're short in personnel, the
11  managers -- if I want to work overtime for Liam or
12  Evelio, there are a few employees who always working
13  overtime.
14  Q. Who is Miguel Ramirez?
15  A. I'm sorry. Is the last name Ramirez or
16  Concepcion?
17  Q. Ramirez.
18  A. I think he's a delegate from housekeeping.
19  Q. Was he a front bartender?
20  A. There was a front bar bartender whose name
21  was Miguel early when the Plaza closed down -- I mean,
22  the Palm Court in 2008, he worked a few months, and we
23  bumped him. I met him.
24  Q. Do you know where he came from, where he had
25  worked prior?

177

1  A. I think at a private restaurant. He's
2  Hispanic from Mexico.
3  Q. Is that all you know about his experience
4  prior to working at the Plaza?
5  A. Yes. He told me that he worked at a
6  restaurant. I worked three or four nights with him at
7  the -- before he was laid off at the Rose Club in
8  2009?
9  Q. Who's Robert Kenjon?
10  A. He was one of the new employees that they
11  hired in 2008, February 11th. He was given front
12  bartender with the same seniority as myself. His name
13  came out in the hearing because he had, like, more
14  seniority or date of hiring than myself and Liam.
15  Q. Did you get a new seniority date when the
16  hotel reopened?
17  A. Yes. They gave once and it was wrong because
18  they had me as third in seniority, and I am second
19  after Liam Flanagan. Evelio is third and Heather was
20  number four.
21  Q. When you were listed as three, who was ahead
22  of you?
23  A. I think they made a mistake. Evelio Tejada.
24  But I notified them and they corrected it on the
25  schedule.

178

1  Q. Did Mr. Bueno ever treat you
2  unprofessionally?
3  A. No. Only a simple argument, which I asked
4  him in the locker room, and he used the word I don't
5  care where you've worked. If there is any error, it
6  will be fixed, but your position right now is service
7  bar. I disagree. I've always treated him with
8  respect, but he is a good person. In other words, we
9  finished the conversation right there, but if he is
10 the position with the maximum authority and doesn't
11 carry, I have no one else to speak with, just to go
12 out and fill out and go to the arbitration.
13 Q. Did Mr. Lai ever treat you unprofessionally?
14 A. No.
15 Q. Did anybody at the Plaza ever treat you
16 unprofessionally?
17 A. Not that I remember, no.
18 Q. Would you agree with me that the Plaza Hotel
19 wants all its employees to live up to the standards of
20 five-star, five-diamond?
21 A. Yes.
22     MR. McLANE: That's all I have for now.
23 Thank you, Mr. Rivera.
24     EXAMINATION
25 BY MR. ZAPATA:

179

1     MR. ZAPATA: I'd like to have this
2  document marked as P-1.
3     (November 29, 2006 letter is received and
4  marked as Exhibit P-1 for Identification.)
5  Q. I want you to look at the document I've just
6  given you. It's been marked as P-1 for
7  Identification. After you're finished reviewing it,
8  look up at me.
9     Do you recognize the document?
10 A. Yes.
11 Q. What do you recognize that document to be?
12 A. A letter that was sent to me by John Martin,
13 a corporate director of employee relations, on
14 November 29, 2006.
15 Q. You testified earlier about a document that
16 you received from John Martin, and you testified that
17 you drafted the letter that was marked for
18 Identification as D-2 and D-4 in response. Is that
19 the document that you were referring to?
20 A. Yes.
21 Q. What did you understand that letter that's
22 been marked as P-1 to mean?
23 A. That the hotel had in its classification --
24 the position they had in my classification was going
25 to disappear.

180

1  Q. Were there any classifications that were
2  eliminated when the hotel reopened in 2008?
3  A. The Oyster Bar.
4  Q. What do you understand job classification to
5  mean?
6     MR. McLANE: Objection. Asked and
7  answered.
8  A. The position that you hold, the department,
9  the job that you had to do.
10 Q. Is it the position?
11 A. Yes. In this case, front bar bartender.
12 Q. Were there any positions that were eliminated
13 in 2008 that you know of?
14 A. Yes. The Oyster Bar, Edwardian Room, the
15 service bartender.
16 Q. Those are not positions.
17    MR. McLANE: Objection. Argumentative.
18 Q. You just testified that it was position. The
19 Oyster Bar is not a position; is it?
20    MR. McLANE: Object to the form.
21 A. No. It's a restaurant.
22 Q. So your understanding of job classification
23 is, I guess, a job classification would be Oyster Bar?
24    MR. McLANE: Objection. Asked and
25 answered.

181

1  A. Front bar bartender.
2  Q. I'll ask you again, because it seems like
3  your answer has changed.
4     Were there any positions or job
5  classifications that were eliminated in 2008?
6     MR. McLANE: Objection to form.
7  A. My position as front bar bartender in this
8  case, I was demoted to Palm Court service bar.
9  Q. Now, you testified that there were some
10 individuals that worked at the Plaza in 2005 as front
11 bartenders, but in 2008 they came back and they worked
12 at the Oak Bar instead of going back to work at the
13 Plaza Fairmont; correct?
14 A. Yes, correct.
15 Q. I believe you testified that those
16 individuals still earn about the same amount of money
17 per hour; correct?
18    MR. McLANE: Objection to form and asked
19 and answered.
20 A. Yes, correct. From union -- they belong to
21 Local 6.
22 Q. Do you know if they lost any benefits as a
23 result of going from the Fairmont Plaza to work at
24 just that Oak Bar?
25 A. Yes, I think so. The traveling package from

**182**

1  Fairmont was more prestigious, working at a more
2  elegant, bigger hotel, we get more public and probably
3  more money, you make probably more money at Fairmont.
4  The hotel is a better quality, better service.
5      Q.  What's the travel package?  Could you
6  elaborate?
7      A.  Special package for the employees where you
8  can travel to any Fairmont around the world and stay
9  for free without paying.  You only pay 50 percent
10 discount on beverages.
11     Q.  You also testified about training.  Were you
12 involved in helping train any of the new front
13 bartenders in early 2008?
14     A.  Yes.
15     Q.  Can you please elaborate?
16     A.  When we started and we finished the training,
17 we opened in March 2008, I was more familiar, had more
18 experience with some cocktails to make like Classical
19 Manhattan, Bloody Mary, Bloody Bull, Bloody Caesar or
20 Bloody Alexander or Louisiana Purchase, Moscow Mule.
21 Many employees of the new hires heard about that for
22 the first time and would ask me if I could help them
23 or help them make them.  They were not very familiar
24 or they had no knowledge of the drink.
25     Q.  Who asked you to help them?

**183**

1      A.  Prather Kehm, Robert Kenjon on how to make
2  the Bloody Bull.  Sometimes you don't have the
3  ingredients.  I would say, I'll help you, I'll do it.
4      Q.  Anybody else other than Prather and Robert?
5      A.  Other bartenders, Scott Tegue.  I think Eddie
6  was making Singapore Sling.  It has a lot of
7  ingredients.
8      Q.  You testified before that you didn't really
9  hear anybody make any discriminatory remarks outright,
10 but did you see anything that made you think that you
11 were being subjected to discrimination?
12     A.  Yes.
13     Q.  Can you please elaborate?
14     A.  When we closed down the hotel in 2005, a lot
15 of minorities worked there, black, whites, Asians,
16 older than 40 years old, very qualified.  The hotel
17 reopened in 2008, and brought younger personnel in
18 their early 20s, 30s with very little experience or
19 for many that was their first job in a luxury hotel.
20 And they were all white.  And I was a former employee,
21 experienced, I know the job.  Also, another girl,
22 Camilla Wescott, Hispanic, she was also demoted to the
23 Palm Court.  She took the training with us at the Rose
24 Club with Robert Kenjon, Scott Tegue, Heather Businc,
25 Liam Flanagan, Evelio Tejada and myself, but she was

**184**

1  demoted to the Palm Court because of her color, I
2  think.  She's black from Puerto Rico.  Her father is
3  from Jamaica, but she is of black color.
4      Q.  How many hours a week did you work in 2005
5  per week?
6      A.  Thirty-five.
7      Q.  D-7 indicates that you worked 40 hours a week
8  in 2005.  Is that accurate?
9      A.  Probably including the hour break, but it's
10 35 regular hours only.
11         MR. ZAPATA:  I'm going to show you this
12 document I'd like to have marked for Identification as
13 P-2.
14         (April 26, 2005 Letter is received and
15 marked as Exhibit P-2 for Identification.)
16     Q.  Please review that document.  After you
17 finished reviewing it, please look up at me.
18     A.  Yes.
19     Q.  Do you recognize the document I've just given
20 you?
21     A.  Yes.
22     Q.  What do you recognize that document to be?
23     A.  A letter which David Jones gave to me, the
24 human resources director, when the hotel was closing
25 in 2005, before closing.

**185**

1      Q.  Did you ask him for this letter?
2      A.  Yes.  To try to find a job.
3      Q.  Is this letter accurate?
4      A.  Yes, it is correct.
5      Q.  When did Robert Kenjon start working at the
6  Plaza, if you remember?
7      A.  February 11, 2008.  He started the training
8  with me in the Edwardian Room, Palm Court and Rose
9  Club.
10     Q.  As far as you know, he didn't work for the
11 Plaza prior to February 11, 2008?
12     A.  Yes, that is correct.
13     Q.  Do you know who Mr. Evangelista is?
14     A.  Yes.  He's the director of -- he's the
15 manager of the Champagne Bar and Rose Club when we
16 opened in 2008.
17     Q.  Did he work at the Plaza before 2008?
18     A.  Yes, he did work.
19     Q.  As far as you know, when did Mr. Evangelista
20 start working at the Plaza?
21     A.  When the hotel opened on March 11, 2008.  He
22 was there at the hotel when I arrived.
23     Q.  And in 2005, did Evangelista still work at
24 the hotel?
25     A.  No.  Before, I think, in '96, '98 for a year

**186**

1  or two.
2  Q. Did you know him in 2005?
3  A. And he recognized me when I arrived at the
4  Plaza. I sometimes serve him and his girlfriend
5  drinks at the Oak Bar or the Oak Room where I was
6  front bar bartender at the old Plaza.
7  Q. How often would you serve him and his
8  girlfriend drinks?
9  A. He would come weekly or twice per week.
10 Q. And was Mr. Evangelista still a director in
11 2008?
12 A. Yes.
13 Q. And was he aware that you were no longer
14 working as a front bartender?
15 A. Yes.
16 Q. How do you know?
17 A. I'm sorry, in 2008?
18 Q. I'll ask it again. How do you know that
19 Evangelista learned that you were taken from the front
20 bar position and moved to the service bar position?
21 A. Yes, because he gave me the news -- the
22 notice in March of 2008 that I was going to be demoted
23 to the service bar at the Palm Court.
24 Q. Did you say anything to him?
25 A. Yes. I mentioned that we know each other for

**187**

1  a long time, that if he can explain on my behalf to
2  Rajan or Carlos, whoever made that decision, and said
3  it's a mistake, it's a big error, that I don't deserve
4  this, to go back -- that doing this is an injustice to
5  me to the Palm Court.
6  Q. What did he say?
7  A. He answered that it wasn't his decision, that
8  he was told by Rajan Lai and Carlos Bueno that to tell
9  me that that would be my new position, permanent
10 position full-time.
11     MR. McLANE: I'm going to have to take a
12 break and then come back.
13     (Whereupon, a short break is taken.)
14 Q. Did you ever mention to Rajan Lai that
15 Evangelista knew that you had worked as a front
16 bartender prior to 2005?
17 A. Yes.
18 Q. Can you elaborate?
19 A. When I spoke with him, I mentioned that, and
20 I mentioned to him that I had worked together with
21 Anthony Evangelista and Karim Adelhamid, and that the
22 regional vice president knew me, the general manager
23 from Boston of the Plaza.
24 Q. When did that conversation take place?
25 A. It was at the end of March or April.

**188**

1  Q. What's your wife's name?
2  A. Hiroko Kidaya.
3  Q. Have you discussed this case with her?
4  A. Yes.
5  Q. I want to show you this document. Please
6  review that document. I want you to review that
7  document. After you're finish reviewing it, please
8  look up at me.
9  A. Yes.
10 Q. Do you recognize that?
11 A. Yes.
12 Q. What do you recognize that to be?
13 A. This is a book Cocktails in New York is the
14 title of it. It was prepared in 2004 at the Plaza and
15 they took of picture of me preparing a Bloody Mary.
16     MR. McLANE: Was this produced in
17 discovery?
18     MR. ZAPATA: Yes. You can't really see it
19 that well.
20     MR. McLANE: Who produced this? Did you
21 produce it or did we produce it? Who produced it?
22     MR. ZAPATA: I gave it to you. I didn't
23 copy the whole book.
24     MR. McLANE: That's fine. I thought it
25 was familiar, but I didn't see any Bates numbers on

**189**

1  it.
2      MR. ZAPATA: I didn't put the number on it
3  because the copy was so shotty.
4  Q. I want you to turn to the third page.
5  A. Yes, this is a picture --
6  Q. On Page 32 where it says 32 on the bottom, is
7  that you?
8  A. Yes. 2004.
9  Q. Did you show this picture to Rajan Lai?
10 A. Yes. During the hearing in arbitration in
11 2008, and at the office it was shown that I worked at
12 the Oak Bar, Oak Room.
13 Q. Did you show this to anybody else to prove
14 that you had worked as a front bartender in early
15 2008?
16 A. The union, Eddie Cedeno, Michael Simo, and I
17 think Carlos Bueno saw it, also.
18 Q. When did you show it to Carlos Bueno?
19 A. After I returned to the Plaza in 2009, on one
20 day, only I brought the book and I told them look,
21 something funny, there's a book with a picture of me
22 in 2004 at the Oak Bar at the Plaza.
23     MR. ZAPATA: I have no further questions.
24             EXAMINATION
25 BY MR. McLANE: