L. FLANAGAN

director, and I know -- well, the union came in and discussed it with, actually, the general manager.
Q Who is the general manager?
A Shane Krige.
Q What did you discuss with Mr. Evangelista?
A Well, I just said -- I just, you know -- he said -- like he pawned it off to human resources, it's up to them, is what he was saying. So I said, me and Carlos are the same situation, and Evelio, I mean, what's the difference between me and him, we all do the same job, we all worked the same -- roughly the same amount of years there, did the same job. I went down, told them the situation, they said, yes, you're a front bartender; Carlos and Evelio went down and did the same thing and they said no. They actually did -- they actually said in the files it said service bartender. But the thing is, we had two managers prior to closing the hotel who came back and reopened it, so they would have seen them working as front bartenders in the

L. FLANAGAN

old hotel.
Q Which managers?
A It would have been Anthony Evangelista and Kareem, I forget his last name.
Q Did Mr. Evangelista ever tell you why the Plaza had assigned Carlos Rivera to work as a service bartender after the hotel reopened in 2008?
A No, he never gave me reason. He just said that it's a human resources decision.
Q What did you discuss with Mr. Buena about Mr. Rivera's situation?
A Well, we just in general -- the same conversation, you know, I went down, did the same thing, got the job behind the front bar, they transferred me over, and they didn't with Carlos and Evelio, and they said it's a human resources decision.
Q So you just pretty much restated what happened?
A Yes.
Q Did Mr. Bueno say anything regarding Mr. Rivera's assignment to work as a service bartender?

L. FLANAGAN

A No.
Q And Shane Krige, you stated that you were involved in a conversation with him as well?
A No. The business agent came in, Eddie Cedeno, at the time, and you know, he asked Shane Krige to transfer him over, and he said he would get back to him, and he called him back, whatever, and in the end he just said, no, they're service bartenders.
Q Why do you think -- let me withdraw that.
Did Carlos ever tell you why he believed he was assigned to work as a service bartender in 2008 by the Plaza instead of being assigned to work as a front bartender?
A Yeah. I mean, basically he said there's discrimination, he's Spanish and I was white, and he wasn't saying it of me but that's basically the way it looks like. You know, there's a -- an awful lot of people came back to the hotel -- doormen, waiters, cooks -- and we all knew each other, some of us about twenty years, and you know, they're all coming

L. FLANAGAN

back to their positions -- if someone's a doorman, he's back as a doorman, he's a cook -- then me, Carlos, Evelio, the three bartenders come back and all of a sudden I'm in the front bar and they're pushed back to the Palm Court. So everybody's asking the same question -- why.
Q You said everybody was asking the same --
A All the guys -- like, a lot of guys we all know for twenty years, they said what happened with Carlos and Evelio, why are they down there and why are you over there -- they should be over there with you, and I said, yes, they should be, but they won't give us an answer. So the assumption is because they're Spanish. I don't know what -- that's the assumption. I mean, I can't say what people are --
Q How about yourself, what do you think?
A Yeah, I can't -- I can't -- it's either that or -- I mean, I can't see another reason. I mean, I know that some of these -- some of these new hires, the bartenders, because they

L. FLANAGAN

were friends of certain managers they got the job which is good -- I mean, that's okay, but you can't just jump ahead of people that have been there for years. You can hire them after, yeah, sure.

(Whereupon, an off-the-record discussion was held.)

(Whereupon, a short break was taken.)

Q After 2008, when you returned to the hotel, the Plaza Hotel, did you ever discuss with any managers Carlos's situation -- to be specific, the fact that he used to work at the Plaza in 2005 as a front bartender and when he came back in 2008 he was assigned to work as a service bartender?

A Yeah. Anthony -- Anthony Evangelista would have been would I would have talked to.

Q Okay. And did you already -- what did you discuss?

A Yeah, I just said -- I said, how come, you know, you put me back in the front bar when I went up to human resources, how come Carlos and Evelio weren't, and he said it's a

L. FLANAGAN

human resources decision.

Q Did he say who in human resources?

A Rajan.

Q Rajan Lai?

A Yeah.

Q Who said that it was Rajan Lai's decision?

A Anthony Evangelista.

Q When did that conversation take place, approximately?

A Well, it would have been sometime in April, I presume, when we opened the Rose Club.

Q And did you observe what effect, if any, the change in position had on Carlos Rivera in 2008?

A Yeah. He was, you know -- I presume he was disappointed, probably of felt a bit kind of humiliated.

Q Did you observe like any change in how Carlos behaved at work?

A Well, he still did his job, you know, he's still quite a pleasant man, but you know, he was down about it, I would say.

L. FLANAGAN

Q He was down?

A Yeah.

Q When you say down, can you tell us what you mean by that?

A I suppose upset, despondent.

Q Why do you say that?

A By talking to him, you know. You know, he felt hardened by it, I would say.

Q Now, I'm going to draw your attention back to P5. Do you know who initiated this arbitration?

A It would have been Eddie Cedeno.

Q You're -- are you a union delegate?

A I am now.

Q What's the process, if you know, for a dispute to culminate in arbitration like the dispute in P5?

A Yeah, what happened when you have a situation like this, you would call in the business agent, and he would talk to Rajan, and if they couldn't resolve it, then they'd would go to the impartial chairman.

Q And this decision, P5, is that from

L. FLANAGAN

the impartial chairman?

A Yes.

Q When you testified at the arbitration in connection to P5, did you observe anybody else testify?

A Carlos testified, Eddie Cedeno, Emilio, Rajan Lai.

Q Did you witness Rajan Lai testify?

A Yes.

Q Do you know what Rajan Lai said as a justification for -- let me withdraw that.

What did Rajan Lai say?

A Basically the question was asked why they weren't front bartenders --

Q When you say they, who are you referring to?

A Carlos and Evelio. So Rajan's answer was that -- I believe, I'm trying to think back -- I believe he said that they weren't front bartenders, that they were service bartenders in the files in the human resources offices.

Q Did he say anything else?

Page 69

L. FLANAGAN

A No. I mean, he could have, I can't remember now exactly.
Q Have you ever socialized with Carlos Rivera outside of the Plaza?
A No.
Q Okay. I have no further questions.
MR. McLANE: Can you just make sure the witness has all the exhibits.
MR. ZAPATA: Sure.
THE WITNESS: I just have to go to the bathroom.
(Whereupon, an off-the-record discussion was held.)
MR. ZAPATA: Two more questions.
MR. McLANE: Sure.
Q When you -- when you returned to the hotel -- the Plaza Hotel in 2008, and you were initially appointed to work as a service bartender then as a front bartender shortly thereafter, did you have to serve a probationary period?
A No. The new hires did, but people who

Page 70

L. FLANAGAN

were recalled didn't.
Q That was it. Thanks.
EXAMINATION BY
MR. McLANE:
Q Mr. Flanagan, my name is Bill McLane, and I'm with the law firm of Littler Mendelson, and my firm and I represent the defendants in the matter that Mr. Rivera has brought against my clients. And just a couple things -- while I'm asking you questions, if you do need to take a break for any reason, just let me know, and we'll take a break, you don't have to tell me why but please do that. And you understand that you're under oath today --
A Yes.
Q -- and that your obligation to testify truthfully today is the same as if we were in a court of law; you understand that?
A Yes.
Q Do you know why Mr. Rivera is suing my clients?
A Yes, I believe so. I believe he believes he's discriminated against.

Page 71

L. FLANAGAN

Q Do you know on what basis?
A I believe race.
Q Anything else?
A No.
Q How do you know that?
A Well, from talking to him at work.
Q When was the first time that you learned that Mr. Rivera was suing my clients?
A I think after this impartial chairman was all said and done, I think after that then he pursued a civil case.
Q What did he tell you about pursuing a legal case?
A He said he was going to hire a lawyer and look into the situation.
Q And did you know what situation he was going to look into?
A Yeah. He wanted -- you know, he felt that he was discriminated against because he wasn't given the front bartender position back.
Q And this was after he received a decision from --
A From the impartial chairman.

Page 72

L. FLANAGAN

Q -- from the impartial chairman? Just one more instruction, in everyday conversation we anticipate what the other person is going to say before they're done saying it, but it will help the court reporter if you wait until I finish my question before you answer, and I, in turn, will wait until you finish your answer before I ask my next question. It's tough to do, but we'll try because helps the court reporter to have a clean record.
Just so I'm clear, the impartial chairman ruled in Mr. Rivera's favor, correct?
A Yes. They got backpay for the money loss.
Q And how did you become aware of that?
A Well, I was at the case, but somebody came in one day and somebody told me Carlos won his case.
Q Okay. And it was after that, that he told you he was looking to hire a lawyer?
A Yes.
Q Okay. And did he tell you why he was looking to hire a lawyer?
A Again, he said he felt he was

L. FLANAGAN

discriminated against, that it was wrong what the hotel did.

Q Did he tell you he thought he was discriminated against because of his race?

A Yes.

Q What is Mr. Rivera's race?

A Hispanic.

Q Do you know where he's from?

A Puerto Rico or Dominican Republic.

Q You're not sure which?

A I'm not sure.

Q Have you ever had any discussions with Mr. Rivera's about where he was from?

A Yes. About his parents, I think one is Puerto Rican, one's Dominican or something like that.

Q Do you know where Mr. Rivera was born?

A No.

Q Do you know whether or not he's an American citizen or not?

A No.

Q What color is Mr. Rivera's skin?

A I would say light brown.

Q And you testified about the skin color

L. FLANAGAN

of some other folks earlier, and can I take it that the people that you identified as having light brown skin, they would have the same skin as Mr. Rivera?

A Yes.

Q How old is Mr. Rivera?

A Mid-forties.

Q How do you know that?

A Well, we worked in the hotel roughly around the same time, and we discussed birthdays and ages before.

Q Do you know Mr. Rivera's birthday?

A No. Birthday, no.

Q Do you know where he lives?

A New Jersey.

Q Okay. When after the impartial chairman's decision in favor of Mr. Rivera giving him backpay, was that the first time he mentioned to you that he wanted to sue the hotel for race discrimination?

A I believe so.

Q Okay. And prior to that he had never talked to you about suing the hotel about race discrimination?

L. FLANAGAN

A Not that I can remember.

Q Did you talk to anybody else after -- well, strike that.

Did you talk to Mr. Tejada after the impartial chairman's decision?

A Yes.

Q And did Mr. Tejada indicate that he was looking for a lawyer to sue the Plaza Hotel for race discrimination?

A Yes.

Q And do you know whether or not he has done so?

A No.

Q Prior to today, when was the last time you saw Mr. Rivera?

A Over ten days ago.

Q When was the last time you spoke to Mr. Rivera regarding this lawsuit?

A Few weeks ago.

Q And what was the nature of that discussion?

A No. He was just -- I got subpoenaed and he was just reminding me that it was coming up and the date.

L. FLANAGAN

Q The date of this deposition?

A Yes.

Q Did Mr. Rivera tell you that you were going to be subpoenaed before you were subpoenaed?

A No.

Q So you got the subpoena --

A At work.

Q -- it was a surprise?

A Yes.

Q You were served at work?

A Yes.

Q Okay. And you weren't expecting that?

A No, I knew down the line that I would have to come and testify.

Q And why did you know that?

A Because he said he was going to call witnesses for people who, you know, worked in the hotel before, saw him working at the front bar.

Q And have you ever spoken to Mr. Rivera's lawyer prior to today?

A One short discussion --

Q When was that?

L. FLANAGAN

A -- over the phone. It was -- it wouldn't be long after he was hired by Carlos.

Q What did you -- what did you discuss?

A It was just that I -- he was saying that he was Carlos's lawyer, introduced himself, and maybe we could have a meeting some day.

Q Anything else?

A No.

Q Did you ever have that meeting?

A No.

Q Other than Mr. Rivera's and his attorney, have you spoken to anybody else about this lawsuit?

A Yes. At the hotel.

Q Who?

A Evelio, the bartender, and a couple the waiters that work there a long time.

Q What are the waiters names?

A Larry -- you want the full name or just --

Q Yeah.

A Larry Gobin.

Q Gobin?

A Yeah. G-O-B-I-N. Francisco Marquez.

L. FLANAGAN

Q Anyone else?

A Well, Evelio Tejada.

Q Mr. Tejada is a bartender?

A Yes.

Q And Larry and --

A They're servers. Francisco.

Q They're servers. They wait tables?

A Yes. We had to change the name on that.

Q Right. And Mr. Tejada is a bartender where?

A He's in the Champagne Bar, Rose Club.

Q What did you talk to Larry about with respect to this lawsuit?

A No. We were just talking, discussion, that I got a subpoena, and he was -- you know, we were just saying what happened with Carlos and why he was suing.

Q What did Larry say?

A He just said, yeah -- I mean, he says understands what he's doing.

Q So in other words, what I'm trying to find out I guess is, did Larry find out about the lawsuit from you?

A Yes.

L. FLANAGAN

Q You would have told Larry -- well, strike that.

Did you tell Larry the reason why Mr. Rivera was suing the Plaza?

A Yes.

Q And what was the reason?

A I would say that -- it's common knowledge because we'd all worked together for years, and seniority, and then when this case came about, and then -- Carlos has to hire a lawyer, he's pursuing his case against discrimination.

Q You said that to Larry?

A Yeah.

Q What did Larry say?

A Larry said, yeah, he -- he said, oh, yeah, really -- you know, he just made an off-the-cuff remark, you know, oh, really, is he going to do that. It wasn't a big discussion --

Q And what about Francisco?

A Yeah. Francisco, I said the name thing to him, yeah.

Q What did Francisco say?

L. FLANAGAN

A He was surprised that he was doing it.

Q Did he say why he was surprised?

A No.

Q I hate to ask these questions but I feel I have to. What color is Larry's hair?

A It's light brown.

Q His eyes?

A I don't know.

Q What about Francisco's hair?

A He doesn't have any anymore.

Q Okay. And --

A He's got brown eyes.

Q You saw his eyes -- brown, okay. You said he's Spanish?

A Yeah.

Q Where is he from?

A Dominican Republic.

Q Now, in nineteen -- you started at the Plaza 1988, correct?

A Yeah. Actually, I started prior, in '86, and I left and came back so my new hire date would be '88.

Q And you were only there for a couple -- for a short period of time in '86?

L. FLANAGAN

A Yeah. Ten months.
Q When you started at the Plaza in 1986 -- strike that.
You're a union delegate today?
A Yes.
Q When did you become a union delegate?
A When they reopened the hotel.
Q In February 2008?
A Yes.
Q And a union delegate is like a shop steward, right?
A Yeah, same thing.
Q You're not a union officer?
A No.
Q And Mr. Cedeno is the business agent?
A Yes.
Q And he doesn't work in the hotel, right?
A No.
Q He works at the office --
A At the office. Right.
Q Who held your position as union delegate when the hotel closed in 2005?
A Would have been Jean Oliver.
Q And what happened to Jean?

L. FLANAGAN

A Jean, he retired and then he passed away.
Q Did he retire at the time the hotel closed?
A Yeah. He was at that age, sixty-five, and he took the severance, you know.
Q And am I right from your earlier testimony that quite a few people did that who were --
A Yes. Yes, a lot of people that had been there a long time.
Q Okay. Now, in 1986, when you first started to work at the Plaza, were you a member of the union?
A Yes. You have to -- you automatically have to join, after three months you're a member.
Q What's the name of the union?
A It's local 6. Hotel restaurant bartenders union.
Q So since your entire tenure at the Plaza Hotel you have been a member of local 6?
A Correct.
Q Prior to working at the Plaza, were you

L. FLANAGAN

a member of local 6?
A No.
Q Is it true today that all the bartenders at the Champagne Bar, the Rose Club, and the servers at the Palm Court -- are they all local 6 union --
A Yes.
Q -- members? Do you know whether or not the local can refuse membership to somebody?
A I don't know if they can, but what they -- generally if they hire somebody, I know they have to join the union within a certain -- they can't work in the hotel and say I don't want to be a union member. So they have to join the union.
Q Do you know if the union has any say in who becomes a member of local 6?
A No. As far as I know because I -- when the hotel closed, I worked in the Four Seasons when the Plaza closed, and the policy seems to be the same everywhere, more or less, that if you hire someone, if they weren't in the union before, you know, it's okay -- and then they just have to -- but they have to join.

L. FLANAGAN

Q Okay. And as a result of your membership in local 6, the wages you receive and the benefits you receive are negotiated between the union and the hotel, correct?
A Yes. Industry-wide agreement.
Q Right. And have you worked as a bartender where you haven't been a member of the union?
A Yes. I worked in an Irish pub.
Q Okay. Just -- is there a difference -- is it -- the question is, it better to be a member of the union of local 6 than not to be a member of local 6 if you're a bartender in New York?
A There's -- if you're going to stay for longevity you're definitely better in the union because you get medical benefits and pension, but if you're young and you want to make fast money then you work in the Irish bars.
Q So there's more -- working in the Irish bars would be more cash per hour than working at the Plaza?
A Wouldn't be more cash per hour, it would

L. FLANAGAN

be more cash money you make, you know.
Q And when you talk about cash money you make, we're talking about money that --
A Tips.
Q Tips, okay. You get tips at the Plaza, right?
A Yes.
Q Are the tips at the Irish bars better than the tips at the Plaza?
A Well, yeah. Tips in the Plaza would be credit cards and tips in the Irish club is cash.
Q And why is it better to have cash than credit card?
A Well, it's in your pocket, you know, you have it right there.
Q Right.
A Tax purposes it's -- you don't pay as much.
Q Okay. But as an overall amount, putting aside the tax ability of it, from just a gross standpoint, is it better to work in the Irish pub?
A No. Hotel is better.



L. FLANAGAN

Q And the union -- you have a pension plan with the union?
A Yes.
Q And how would you describe that -- is it a good plan, a bad plan, a fair plan?
A Compared to other plans, it's not great, but, you know, it's good. I mean, for someone -- like a bartender all my life, it's good to have a pension. I mean, most of the bartenders that I know, they don't have anything to fall back on.
Q And is that pension something that you contribute to out of your paycheck each week?
A It comes from your union dues. You pay dues every week.
Q You're not part of a 401K plan, are you?
A You have that as well.
Q You can have that?
A You can have that. What they do is -- it just came out the last five years, and you can deduct a percentage out of your paycheck, ten, fifteen, or even twenty-five percent, but they only take out fifteen thousand a year maximum.



L. FLANAGAN

Q Max, okay. But if you don't choose to do the 401K plan, you're still a part --
A You have still have a pension, yeah.
Q And you established that the 401K has been in operation at the Plaza for -- or with the union for the last five years, so the folks who retired back when the Plaza closed in 2005, those folk's would not have been --
A They -- no.
Q So they chose to retire as far as you know based on their pension with the union plan?
A The pension with the union, obviously Social Security as well.
Q Right.
A The pension work is that you have to -- like, you get one credit for every thousand -- for every year but you have to work a thousand hours a year to get the credit and if it's up to twenty-five credits.
Q And do you know what the age limit is for the folks collecting the pension at the union, what the earliest age you could be to collect the pension?



L. FLANAGAN

A The newest agreement was you have to be fifty-five and twenty-five years in the union and you get partial --
Q And then that would increase the older you are and then the more --
A Yes, exactly.
Q And the years would decrease, I suppose -- in other words, if I'm sixty-five and I retire, I don't need the twenty-five years --
A Yes, yes.
Q And besides the pension, any other benefits that are better being in the local 6 than just being a bartender at the Irish pubs?
A Yeah. You have the medical, you have the dental.
Q Anything else that you consider a benefit?
A I consider -- like if you're there over -- if you're vested, if you're there five years in the union, like, they can provide -- if you're buying a house, you know, a mortgage or a lawyer, closing fees, stuff like that.
Q I take it in the Irish pubs there wasn't


L. FLANAGAN

a union delegate hanging around?
A No.
Q What's your role as a union delegate?
A Say, just like we have a schedule, you know, seniority people have their own schedule, you know, if we have rules and overtime, and you just enforce -- like, our managers change quite a bit, you know, they come for a year and a half and then they leave to go somewhere else. So sometimes people come in from different countries and they don't know, you know, that it's a union or, you know, they try to enforce their way of doing things.
Q So as a union delegate are you there to answer questions for the rank and file or employees that were inquiring --
A Yes.
Q -- about union issues?
A Yeah.
Q And are you there also as an advocate for them should they have issues with management?
A Yes.



L. FLANAGAN

Q And am I correct that you would be the first person someone would go to if they had -- or should go to if they had an issue with management that they needed to be resolved?
A Yes. If -- a lot -- most of it's done verbally, you know, minor issues then we work it out among ourselves, but if they had to write somebody up or whatever, I would have to be there as a witness.
Q Right. So in other words, if they're going into for a disciplinary meeting with the --
A Yeah, we need a delegate. So --
Q Right. So when you were the union delegate, Mr. Rivera came to you and said I have an issue with seniority?
A We discussed it. But what happens is that when it becomes a mid -- like a serious issue, you bring in the business agent because I would have talked to Anthony Evangelista about it, and he would say, well, it's human resources decision, and then we'd call a business agent and he would come in to square



L. FLANAGAN

things out.
Q You did talk to Mr. Evangelista about it, right?
A Yes.
Q And he did go -- had a conversation with someone at human resources?
A That's what he told me, right.
Q And you weren't in that?
A No.
Q You weren't a part of that --
A He just came back -- I had a discussion with him, he says, listen, I'm going to talk to human resources, I'll get back to you. He came back to me and says this is what they said.
Q And he said that Mr. Rivera --
A And Evelio are going to stay in the service bar.
Q Stay in the service bar. And again, you weren't there to see whether or not Mr. Rajan --
A I wasn't in the meeting, no.
Q -- whether or not anybody consulted a list that had been -- you weren't in the room



L. FLANAGAN

when Mr. Evangelista met with Mr. Lai, correct?
A Correct.
Q And you're not aware during that meeting whether or not either Mr. Evangelista or Lai looked at or conferred with a list regarding seniority that had been provided to them by the union?
A Correct. I don't know what they discussed.
Q Do you know whether or not the union keeps a list of seniority?
A I'm not sure. I believe so. They do, because when we got laid off and we had meetings they had lists of peoples seniority.
Q Take a look at P4 which was previously marked, titled, Plaza Bartender Seniority List.
A Yeah, I got it.
Q Do you know who made that list?
A No.
Q On the -- on the upper right-hand side of that there's a -- if you turn the document around it would be on the lower right-hand

side, it says, Union 00196, do you know what that means?
A I haven't a clue.
Q So you don't know whether or not your union produced this list to Mr. Zapata in response to a subpoena?
A Correct.
Q You don't --
A I don't know.
Q Now, what was Mr. Lai's position back in 2005 when the hotel closed?
A He wasn't there.
Q He wasn't there?
A He didn't work there.
Q Mr. Evangelista did?
A Correct.
Q And then Mr. Evangelista I think according to your testimony has his own business -- or had?
A Him and -- we had one of the chefs and another manager, they opened up their own restaurant in the meatpacking district, restaurant and bar, and a -- it went under, you know, so the hotel was reopened, so he

came back to work there.
Q So Evangelista opens the bar after the Plaza closes?
A Correct.
Q And then when the Plaza reopens he comes back?
A Yes.
Q And according to your testimony, he brought some of the people who worked with him down --
A Yeah.
Q Called the Gin Mill?
A Gin -- Gin Lane.
Q The Gin Lane, okay. So Mr. Lai had never seen Mr. Rivera behind the bar at the Plaza Hotel, as far as you know, back in 2005?
A Correct.
Q Okay. So it's possible then that if a bartender comes to Mr. Lai and says I was the front bartender at the Oak Room in 2005, Mr. Lai would either have to take his word for it or look at perhaps a document like the seniority list, correct?
A Correct.

Q Now, take a look again at what we marked as P1. It's the -- it says March 2005 on the top of it. It's the first exhibit.
A Yes. This one, right?
Q Yes. Marked P1?
A Yeah.
Q Okay. Do you know whose handwriting appears on this document?
A No.
Q All right. Under the service bar, who is the Evelio?
A That's Evelio Tejada.
Q Now, Rubin --
A Smith.
Q Rubin Smith didn't come back when the hotel opened, did he?
A No.
Q And do you know whether or not he accepted the no recall right two weeks severance?
A Yeah. He retired --
Q Jose, do you know whether he accepted the two week severance?
A Yes. He worked in another hotel and he

was happy enough there so he stayed.
Q Sammie, did he accept the --
A He retired, yeah.
Q And Carlos we know came back, right?
A Uh-huh.
Q Arbonna?
A Arbonna. That's Jose. He's back working in the Oak Bar.
Q Okay. Orlando?
A He's back in the Oak Bar as well.
Q So Carlos Arbonna and Orlando all were taking the one week --
A Yes.
Q -- severance package?
A Yeah.
Q And Victor?
A Victor, no. He's working in the Essex House now.
Q Do you know if whether or not Victor took the two weeks --
A He would have, yeah.
Q And again, if you took the two weeks severance you were off the seniority?
A Yeah. You were --

L. FLANAGAN

Q You --
A You were finished with the hotel --
Q I mean, you weren't --
A You had -- what you had, you had the option as well of taking one week and the option, you know, when you came back taking the second week. Some guys did that, they kept it open and then, you know, three years down the line when we opened, they said I'm happy where I am now and they just collected the --
Q So I see. So if I chose to take the one week severance with the recall right, then when I do get recalled I can say, you know what, give me the second week?
A Correct.
Q And then I won't bother you, I wont come back --
A Yes.
Q -- I'm happy with whatever I'm doing --
A Yes.
Q -- whether it's I'm retired or working at a new place?
A Correct.

L. FLANAGAN

Q So I'm sorry -- Victor, he took the two weeks?
A Yes.
Q And he's working at the Essex House --
A Yes.
Q -- seems very happy?
A Yes.
Q Felipe -- do you know what Felipe did?
A He retired.
Q So he took the two weeks?
A Yes.
Q And Leo?
A He's in the Hilton now, so he took two weeks as well.
Q And Liam is you, so you took the one week --
A Correct.
Q -- and came back? And in the meantime you were working at the --
A Four Seasons.
Q -- Four Seasons? Much better at the Plaza, right?
A Yeah --
Q You don't have to -- I'll withdraw the

L. FLANAGAN

question.
A I was part time at the Four Seasons, you see.
Q And Yvenel?
A Yvenel, he took the two weeks.
Q And Paul?
A He retired.
Q Took the two weeks?
A Uh-huh.
Q Julio?
A He took two weeks.
Q And Wahid?
A He -- yeah, he moved to Florida. He took two weeks.
Q And now a bartender is a bartender is a bartender -- if you were a service bartender, you make drinks, right?
A Correct.
Q And if you work in the front bar, you make drinks, right?
A Uh-huh.
Q Yes?
A Correct.
Q And the only difference is one is you're

L. FLANAGAN

doing the room service or the restaurant and the other is you're doing the bar crowd, correct?
A Correct.
Q And is there a difference in hourly pay for the people who are service bartenders?
A In the contract there is. In the -- the hourly pay in the old hotel is the service bartender would get a dollar fifty more an hour because he wouldn't be making tips. So now when we reopened or came back we all get the same pay, we all get the higher rate because he eliminated the bar-back position so we're doing that job now, so we're all in the same rate.
Q Whether you're a service bartender or a front bartender you make --
A Same rate, yes.
Q Now -- but is there an impact on your compensation?
A I -- how do you mean?
Q Well, if you're a service bartender, are you sharing the tips from the front bars?
A No, no, no, no. That's the main reason,

L. FLANAGAN

the front bar is a tip job, you know, you make -- you make a lot more money.
Q So if I'm -- if I'm starting as a new bartender at the Plaza Hotel, what is my hourly rate?
A Your hourly rate would be sixteen an hour.
Q And do you know what the top rate is?
A Yeah. Twenty-six.
Q And that's based on seniority?
A Yes -- what they've done now is that when they reopened the hotel they negotiated it so for a new hire for the first two years he would get seventy-five percent of the top rate, for the next two after that it's eighty-five, and then the fifth year he gets the full amount.
Q Okay. And that was renegotiated -- or negotiated after the hotel reopened?
A Yeah, they -- what they do is they call it -- because the mayor got involved so they call it a citywide agreement or a city hall agreement so it's some kind of different contract but --

L. FLANAGAN

Q Okay. But -- so if I'm making my -- the sixteen bucks an hour and I'm working in the Oyster Bar, I'm getting sixteen dollars an hour for every hour I work -- what else am I getting?
A It depends on the business, whatever, tips. You know, if you're busy, you're going to make the money. If it's slow, you just -- you make less. It depends --
Q I'll make -- not going to make less than like sixteen bucks?
A Yes. It's definitely more.
Q And if I'm in the service bar --
A That's your flat rate.
Q Sixteen bucks an hour?
A Yeah.
Q And I'm making drinks for the guests in the hotel rooms?
A Yes, but the -- yes, but the waiter's interacting with the guests so he gets the tips.
Q Right.
A So you give him the drink, he brings it to the guest.

L. FLANAGAN

Q And he gets the tip?
A Yes.
Q And do the service bartenders make drinks for the restaurant?
A Yeah. Like the Palm Court -- Palm Court would have its own service bar just for that -- just for that place itself.
Q Got you. And are you telling me that the waiters don't share the tips with the service bartenders?
A They don't.
Q Are they supposed to?
A Most hotels do, but people are set in their ways, they're there for a long time.
Q Is that a negotiated agreement?
A No. It's individual hotels, but you can -- if you wanted to fight the situation you could, and technically most hotels, they give like ten percent of the tips, like if it's a cocktail bar or a service bar, but at the Plaza we never did.
Q And is that true of the Palm Court too that --
A Yes.

L. FLANAGAN

Q -- the Palm Court service bar doesn't get any tips --
A No.
Q -- from the waiters? But not that's negotiated?
A No.
Q It's just the --
A The way it is, yeah --
Q Now, looking at the P1 which is the March 2005 schedule, what happened to Chuck?
A Chuck, he got a job in the Ritz-Carlton, and he just took the second week then, you know. He kept it open until -- he's happy --
Q But eventually he took the two weeks?
A Yeah.
Q Okay. And he didn't come back?
A No.
Q And Ricky?
A Ricky actually is the bartender in banquets right now in the hotel, but that's a private concession as well.
Q I'll ask you more questions about that in a second. So he's back?
A Uh-huh.

L. FLANAGAN

Q And Evelio came back, right?
A Correct.
Q And whose Osvaldo?
A Osvaldo was a service bartender in the Palm Court and he took the two weeks.
Q Took the two weeks. And now -- now we have people who are bar-backs here, but you're telling me now there's no bar-back positions?
A Yes. So what happened there is guys took the two weeks, and like Jorge and Jose, the third name down, they gave them jobs as food runners, so basically it's the same hourly rate.
Q So they got their two weeks and then they have a new job position?
A They got the one week and then --
Q The one week, all right. But those jobs are eliminated?
A Yes.
Q You're now doing that work?
A Correct. I didn't have to do that in the Irish bars.
Q You did or didn't?
A I didn't. We had --

L. FLANAGAN

Q And of course you shared your tips with those people?
A Yes, yes. Gave them fifteen percent.
Q Do you know what happen to Angelo, Andre, and Trinidad?
A Actually, Andre is in banquets as well. He got a promotion to banquet bartender.
Q And Trinidad?
A He's -- actually, he's working in the Hilton down here somewhere as a bartender. He's at Hilton around here.
Q So he would have taken two weeks?
A Yeah.
Q And Jose -- Jose, I'm sorry, you said -- Angelo?
A Angelo is gone. He took the two weeks.
Q All right. So out of this list -- now, is this everybody who was a bartender in March 2005 that you recall -- is this the complete list?
A It may not be the complete list. It could be short a few guys there. I'm not sure.
Q Anybody sticking out in your head as

L. FLANAGAN

missing?
A Well, there's no -- there's -- I suppose the schedule for the banquet bartenders isn't up there. So that week there might have been no banquets, you see.
Q Okay. So let's talk about the banquet bartenders and what -- what is banquets as appears on the schedule?
A Yeah. Banquets is like, we have a landmark ballroom and a terrace room which can can hold like five hundred people for dinner, so what would happen is people would have a wedding or a company Christmas party and they would need bartenders to work the party, so what they would do is we had five full-time bartenders so sometimes Christmastime -- we had a lot of small rooms as well for small functions -- so you would have five full-time bartenders, banquet, and then the service bartenders would go in as extras if you had enough bartenders upstairs. And the hotel would charge a hundred and twenty dollars per bartender, and the bartenders would get sixty and the hotel would get sixty.

L. FLANAGAN

Q And where would these bartenders come from, the banquet bartenders, were they guys who --
A They're permanently in the hotel.
Q So they're the Oak Bar, Oyster Bar guys?
A No. What it was is we had banquet bartenders, five full-time bartenders, okay, and when you needed the extra guys you would take the service bartender guys because they weren't making tips so they would get the banquet party first.
Q Okay. So if I'm a full-time banquet bartender and through some quirk the hotel is not scheduled a wedding or a party for two weeks, what am I doing?
A You see -- well, it's not on here. The way it was worked in the hotel with the bartenders and the waiters and banquets, the banquet waiters would get a -- tips, right, say it's twelve percent of what the sales was, the bartenders never got that, we got a hundred and twenty dollars, but you were guaranteed thirty-five hours a week work. So what they would do is like if it was quiet in

L. FLANAGAN

banquets and there's only work for two or three guys, they would put one guy on the schedule two to ten, and then he would relieve all the bartenders for their break.

Q So you were guaranteed some hours --

A Yes.

Q -- at the -- I guess at the union rate?

A Yes. You were guaranteed thirty-five hours a week. But a lot of guys they wouldn't take -- in the summertime instead they'd just take off, you know. Usually the banquet guys are the senior guys, they're there thirty, forty years, so they're just -- you know, it's easier work and you're just waiting for the pension to come through. So -- you know, they're guaranteed thirty-five hours a week, but a lot of them wouldn't take it, for -- they wouldn't mind taking the extra day off.

Q It's not as if they were -- if they didn't come in, they wouldn't get paid?

A They wouldn't get paid.

Q Right. But they were guaranteed --

A But if they're forced, they were

L. FLANAGAN

guaranteed --

Q Right. They would put them somewhere, they'd --

A Yeah, yeah.

Q -- throw them behind the Oak Bar or behind --

A Service bar.

Q Yeah. Someplace so they can do something.

A Yeah.

Q But their primary job was to work the banquets --

A Private functions.

Q Okay. And during 2005 and before that, had you ever worked in banquets?

A I did, yeah. When I was a service bartender I worked banquets.

Q And -- and Carlos worked banquets, right?

A Correct.

Q And if he was a front bartender, why was he working the banquet?

A No. He would work that back in the service bar. We would -- even when you were a

L. FLANAGAN

front bartender, say from Thanksgiving onto Christmas, say if you worked -- Carlos would be a day bartender, they might ask him to work sometimes at the night because they're short, you know.

Q So Carlos worked as a service bartender at some point?

A Yes. That's how you -- this is how it starts out. You come into the hotel, right, you start as a bar-back or a service bartender, then you move up as guys retire, you know, leave, and if a slot becomes open, whoever is the senior service bartender would move into the front bartender position.

Q Okay.

A Like a ladder.

Q Then once you're a front bartender position it's unlikely that you'll be doing any banquet work?

A On like -- on occasion, yes, when it's really busy at Christmastime and they're stuck, but it's very rare, yeah, because you're making tips, and the service bar guys don't make it, so, you know, they're entitled

L. FLANAGAN

to the banquet first.

Q And you're aware that Mr. Rivera worked banquets?

A Yes.

Q Okay. And you were there?

A Yes.

Q Mr. Lai wasn't there, wouldn't have known --

A He would not --

Q -- unless, of course, somebody had provided him with the list, right?

A Say that --

Q Unless somebody provided him with a list and said where Mr. Rivera had worked?

A Yeah, correct.

Q So looking at P1 again, and excluding the bar-backs --

A Yeah, P1. Yeah.

Q -- I count nineteen bartenders --

A Uh-huh.

Q -- and it looks like, based on your testimony -- I actually count eighteen bartenders -- and based on your testimony, it looks like twelve of them essentially took the

Page 113

L. FLANAGAN

two weeks and retired?
A Yes.
Q So when the hotel reopened I guess they needed to hire a bunch of new bartenders; didn't they?
A Correct.
Q And if we look at P2 --
A Yeah.
Q -- if you exclude the server assistants and the runners, it looks like we're talking about seventeen bartenders?
A No. We're talking about eight.
Q Right. Eight because we had servers --
A Yeah.
Q One, two -- and what do -- the servers are the waiters?
A Correct.
Q Now, I'm confused about P2 because you testified that you started back at the Plaza when it reopened in February of '08?
A Uh-huh.
Q This schedule is for January of '08 -- why is that?
A I can't tell you. I believe it was

Page 114

L. FLANAGAN

February we were called back to work. Because we didn't open till March 1st, the Champagne Bar, so anything prior to March 1st would have been a training schedule, but this --
Q So you don't know why this -- there's January dates in there?
A No.
Q And is it true today that at the Champagne Bar and the Rose Club there are eight bartenders?
A It's -- yes.
Q What's the server assistant?
A It's a busboy.
Q Okay. And runners are --
A Yeah, you see, when they changed the hotel, they put the kitchen in basement so they needed these guys to bring the food up -- it's three floors up so they've got to bring the elevators up.
Q Now, Mr. Zapata asked you a lot of questions about people's hair color and eye color based on P2, and he started with, I guess, Prather Remm --
A Yes.

Page 115

L. FLANAGAN

Q -- and you said she has blond hair?
A Yes.
Q Is that natural blond hair?
A Yeah, she's like -- I want to say it was natural. I mean, I don't know for sure.
Q You don't know whether she --
A Whether she dyed it or not -- no, I don't know.
Q Same with Heather --
A She was definitely natural blond. She's like Norwegian descent.
Q And then Sean O'Toole has brown hair?
A Yes.
Q And then you said Miguel Aranda has brown eyes?
A I would say so, yeah. I mean, he's brown-skinned.
Q Without looking at Mr. Rivera, what color are his eyes?
A I would say brown.
Q Why would you say that?
A Generalization mostly, Spanish guys are brown.
Q You a baseball fan?

Page 116

L. FLANAGAN

A Yeah.
Q Yankees?
A Yes.
Q And you live in Queens?
A I lived in the Bronx when I came out here first.
Q Who is the third baseman?
A Alex Rodriguez.
Q What color are his eyes?
A I don't know.
Q They're light green -- would that surprise you since he's Hispanic?
A Yeah. Maybe contact lenses.
Q Do you know who the actress Cameron Diaz is --
A Yes.
Q -- Something About Mary?
A Yeah. Hair is blond, yeah.
Q She has blond hair -- would it surprise you that her father is Cuban?
A No.
Q Do you know who Christina Aguilera is?
A Yes.
Q What color is her hair?

Page 117

L. FLANAGAN

A Depends when you see her.
Q Do you know what her ethnicity is?
A I think her mother is Irish.
Q What about Shakira, do you know who she is?
A No.
Q But as far as you know, most Hispanic people have brown eyes?
A Well, the guys I work with, they've brown eyes.
Q And when you testified earlier that they had brown eyes, you were testifying it -- testifying it based on your knowledge of looking into their eyes or just generalizations about their ethnicity?
A Well, the guys I see every day and I work with, that would be based on --
Q On actual knowledge?
A Yes.
Q You worked with Mr. Rivera for years, you didn't know his color, you guessed.
A Generalization. I mean, I would say they're brown. Let me see them. Am I right.
Q Are they?

Page 118

L. FLANAGAN

A To me, they are.
Q Okay. So --
A When I used to look into men's eyes --
Q What I'm trying to figure out is when you testified earlier about the color of people's hair and eyes, were you basing it on your actual looking at their eyes or based on the generalizations that Hispanics tend to have brown hair and brown eyes?
A I'm basing on the fact that the guys I work with, I see them every day so I -- I never seen a guy with blue eyes or green eyes. It would jump out at me if they --
Q The only reason I'm asking you that is because I asked you Mr. Rivera's eyes without looking at them and you -- it seems like you had to guess based on a generalization, and you work with him a lot, right?
A Yeah, but I mean, I'm not looking into his eyes all the time. Kind of a strange.
Q But you are looking at Heather Buesing's eyes and Prather Remm's eyes?
A Yes. I would say they're blue.
Q Do you remember the date that the

Page 119

L. FLANAGAN

impartial arbitrator came out with the award in favor of Mr. Rivera?
A No, I don't.
Q But you do remember that was the first time he said anything about suing the company based on his race, right?
A Yeah. As far as I remember, it was always we were talking about the arbitration case, the arbitration case, and then when that came through, later on he said he was going to pursue.
Q Do you know why Mr. Rivera didn't pursue the race during the arbitration case?
A No.
Q Did he talk to you about it --
A No.
Q -- as a union delegate? When he came to you to have you talk to Evangelista about seniority --
A He didn't --
Q Hold on. Let me finish the question. When he came to you to ask you to talk to Evangelista about the seniority issue, did he tell you then he thought it was about his

Page 120

L. FLANAGAN

race?
A No, he didn't ask me, actually. I went down to Evangelista on my own accord.
Q Okay. You went -- you went to follow-up so --
A Yeah --
Q -- so Mr. Rivera -- let me just -- Mr. Rivera never came to you prior to the arbitration to complain about his seniority?
A Yes, he did.
Q Okay. When he came to you to complain about his placement at the hotel upon his recall, did he tell you prior to the arbitration that it had anything to do with his race?
A Yes.
Q And when was the first time he mentioned that to you?
A The date -- I can't tell what date it was.
Q How soon before the arbitration?
A Months because it takes a long time to process the arbitration case. I mean, he was in the Palm Court for at least I would say a

L. FLANAGAN

year before the case came through so within that time a few times --

Q Before the arbitration?

A Yes.

Q Before you testified at the arbitration?

A Yes.

Q And I take it then that when I read the transcript of the testimony, you'll testify that Mr. Rivera made some issues about his seniority being because of his race, right?

A No.

Q It didn't come up?

A No.

Q Why not?

A Basically he was there -- actually, it was kind of null and void because what happened was he was going to arbitration to fight for his seniority, and what happened was the Palm Court restaurant closed down and all the waiters over there and the bartenders bumped the new hires so they all got laid off and they came to work at Rose Club and Champagne Bar, so by the time we went to arbitration he was already behind the front



L. FLANAGAN

bar, it was just a matter of the compensation of the money he lost.

Q Right. But the reason he wasn't given the seniority is because -- I think you said it was the scuttlebutt around the hotel was because of his race, right?

A Correct.

Q So why didn't that come up at the arbitration?

A I don't know.

Q Well --

A I wasn't asked about it.

Q When you went to Mr. Cedeno, the business agent, you told him that Mr. Rivera thought it was about his race, right?

A No, I didn't. When I discussed it with Eddie, he just gave me the subpoena, and what we talked about beforehand was all about seniority and about getting his position back, and the race never came up --

Q But according to your testimony, Mr. Rivera did mention it to you prior to the arbitration, right?

A Yes. But I never had a discussion with



L. FLANAGAN

Eddie Cedeno about it.

Q Why not?

A It never came up. We were just discussing about his schedule and his seniority.

Q Well, hold on a second. You're the union delegate, one of the rank and file comes to the union delegate and says I believe that the reason that they're throwing me as a -- in the service bar is because I'm Hispanic, you don't think that warrants telling --

A No --

Q Hold on -- don't you think that warrants telling the business agent of your local?

A What he believes or what happened?

Q No. I want to know what happened. If -- I'm the one asking you if one of your members -- you're a union delegate, right?

A Correct.

Q If one of your members comes up and says I've been discriminated against because of my race, you put that in your back pocket and walk away?

A Okay. I'm going to go through step by



L. FLANAGAN

step for you.

Q Okay.

A We opened up the hotel -- we opened the hotel, Carlos and Evelio are put in the Palm Court, I'm behind the front bar, now everybody in the hotel is asking why these two guys who were there for so long with seniority aren't behind the front bar, we went to Anthony Evangelista, we went to human resources, and they said its in his file that they're service bars, we called in the business agent to discuss it with him and we discussed it about the seniority and about where they should be working. After that, then nobody budged, we went to arbitration.

Q Okay. I --

A When this happened, then as Carlos was still working in the Palm Court and we're waiting to start, to proceed, he talked to me about -- he said, I think it's discrimination, you know, me and Evelio should be behind the front bar and we're not.

MR. McLANE: Can you just read that last -- sort of last bit back.

L. FLANAGAN

(Whereupon, a portion of the testimony was read back.)

Q When what happened?

A After we went to -- after we proceeded with the arbitration case. After we went to human resources and they denied him the front bar position --

Q Right.

A -- and then when we had to file the grievance --

Q Right.

A -- then Carlos starts talking about --

Q So sometime between after the grievance was filed and the arbitration is the first time he mentions to you that he thinks this is discrimination?

A Yes.

Q And then you told Mr. Cedeno?

A No, I didn't tell Mr. Cedeno.

Q Why not?

A Because we filed already. We filed the case already for seniority rights. The union -- the union trials, they -- they fight for your rights as a hotel worker, and then

L. FLANAGAN

this case comes along afterwards because they won that case. This is his decision.

Q I'm trying to figure out whether it comes along after or comes along beforehand. It seems to me from your testimony is that Mr. Rivera tells you after the grievance is filed but before the arbitration that he believes that this has something to do with his race -- those are rights, aren't they?

A Right.

Q Okay. So I think what I'm hearing is that he's telling you that he believes his seniority has been changed because of his ethnicity, right?

A Correct.

Q And he has a grievance about his seniority, right?

A Correct.

Q How come you didn't tell anybody that he said something about his race?

A How do you mean tell anybody?

Q Well, did you tell Mr. Cedeno that your rank and file member came to you and told you, hold on a second, this seniority thing may

L. FLANAGAN

not -- may be more than just a screw up, it might have to do with my race?

A Carlos was already after talking to them himself.

Q Talking to who?

A Eddie Cedeno.

Q So Carlos told Eddie before the mediation -- before the --

A Well, he called him in about this, but he went on later on, I presume, and told him --

Q You presume or you know?

A I presume.

Q Were you ever in a conversation where Mr. Rivera told Mr. Cedeno about his belief that his seniority was somehow disturbed because of his ethnicity or race?

A No.

Q Other than Carlos telling you that he believed that his seniority problem had something to do with his race, did anybody else come talk to you about the issue?

A Yeah. Half the hotel.

Q All right. Do -- what half?

L. FLANAGAN

A Okay --

Q Let's do it this way: Give me all the names of everybody who came up to you before the arbitration and said that they believe that Mr. Rivera was discriminated against because of his race?

A Okay. Larry Gobin, Francesco Marquez, Aziz Zaidi, the doorman Freddie -- Freddie, I don't know the last name.

Q Freddie the doorman?

A Yes.

Q Who else?

A Jose the doorman as well.

Q Who else?

A Bartenders from the Oak Car, Carlos -- Orlando Rivera.

Q Hold on. Which of the bartenders at the Oak Bar?

A Orlando Rivera.

Q Who else?

A Jose Arbonna.

Q Who else?

A I mean, these are the conversations I remember. I mean, there's other people said

Page 129

L. FLANAGAN

it to me as well but I can't remember where and when.
Q Tell me what you remember? Is that all the people you remember?
A Yes.
Q So you remember having conversations with seven people?
A Yeah. Other people were coming up to me saying what's going on.
Q What kind of other people?
A People that work there. Cooks in the cafeteria.
Q What were the cooks in the cafeteria saying about Carlos?
A They wanted know what -- what was happening, what's the progress with the case and --
Q What case?
A The seniority case.
Q What I want to know is, how many people came to you and said to you --
A Yes. These people.
Q These seven people?
A Yes.

Page 130

L. FLANAGAN

Q Was that -- the cooks say that?
A They were asking about the case. I can't remember exactly.
Q Okay. So I take it there are more than fourteen people who work at the Plaza --
A Yeah.
Q -- so it's not half?
A Yeah, it's not half. A lot more people -- it's common knowledge what was going on.
Q So tell me what you remember about your conversation with Larry Gobin about Mr. Rivera and race discrimination?
A You know, he came to me because we work together every day, and he said what's going on with Carlos and Evelio, I heard they're pissed off, what's going on, I said, yeah, he said, why aren't they over here with you working, I said, human resources said they're service bartenders, he said, well, we've worked together for years, all of us, and they're front bartenders, he goes, they're the only two Spanish guys in the department now.
Q What was the department?

Page 131

L. FLANAGAN

A The bartenders, in other words.
Q And prior to them being the only two bartenders in the -- Hispanic bartenders in the department, how many bartenders -- Hispanic bartenders in the department were there?
MR. ZAPATA: Objection as to form.
MR. McLANE: Yeah.
Q Did you understand that question? Let me try it this way: So after -- after the hotel reopened, the only two bartenders of Hispanic origin at the Plaza were Evelio and Carlos?
A Correct.
Q Prior to that, were they more?
A In the old hotel in two oh five?
Q Yes.
A Correct, yes.
Q Was Orlando Hispanic?
A Yes.
Q Did he come back as a bartender?
A Yes.
Q So somebody was wrong, like, in the --

Page 132

L. FLANAGAN

Larry Gobin --
A No, no.
Q Who was right?
A The Oak Bar is separate to the hotel now.
Q I understand.
A Now, what I'm talking about is that when we reopened the Rose Bar and the Champagne Bar, all the other bartenders on that bit were white. Carlos and Evelio were the two guys that were sent to the Palm Court.
Q All right. So the Oak Bar still exists, correct?
A Correct.
Q Orlando work there?
A Yes.
Q Do you know whether he came back there as a result of union citywide agreement?
A Yes. He --
Q So we have one Hispanic bartender prior to the closure who now works in the same exact place he worked when the hotel reopened, right, just works for a different boss?
A Different company.

L. FLANAGAN

Q Different company, but -- it's still local 6, right?
A Yes, yes.
Q Came back as a result of recall rights?
A Correct.
Q Okay. What happened to Arbonna?
A He's back at work.
Q At the Oak Bar?
A Yes.
Q So another Hispanic bartender face of the Oak Bar is still a face of the Oak Bar --
A Correct.
Q -- after the reopening. Rubin is he Hispanic?
A No. He would be -- he's from Saint Thomas.
Q Jose M, Hispanic?
A Yes.
Q He's not back because he took the retirement?
A Yes.
Q Felipe, Hispanic?
A Yes.
Q Only reason he's not back is he took the

L. FLANAGAN

retirement, right?
A Correct.
Q Yvenel, is that a Spanish name?
A Haitian.
Q Haitian, okay. The only reason he's not back is because he took the retirement, right?
A Yeah. He's in another hotel.
Q Right. But he's not back --
A Yeah.
Q -- where he was? Julio, Spanish?
A Yes.
Q Not back because he had took the retirement or took the two weeks, right?
A Correct.
Q So it seems to me, correct me if I'm wrong, that the reason why there are two Hispanic bartenders at the bar is because all the other Hispanic bartenders decided not to come back, right?
A Say that again.
Q The only reason why it's Carlos and Evelio is because everybody else decided to take the two weeks severance pay?
A Like they wouldn't be working there?

L. FLANAGAN

Q Yeah. In other words, if Carlos would have taken the two weeks severance, he wouldn't be back, right?
A Correct.
Q Then there would only be one Hispanic, right?
A Yes.
Q If Evelio would have taken it, there would be zero, right?
A Correct.
Q Do you know if there was anything discriminatory about the way that the union and the company negotiated the severance package?
A No.
Q Okay. As far as you know, it was evenly handed out to everybody?
A Yeah, same for everyone.
Q So regardless if your last name was Ramirez or your last name was Smith you got the same package?
A Yes. It just depended on how many years you were in.
Q Right. But that has nothing to do with

L. FLANAGAN

your nationality, right?
A Correct.
Q So when -- when Larry said to you, well, they're the only two guys in the department, what did you say?
A I said, you're correct, yeah.
Q And it was correct, right?
A They're the only two guys that weren't in the Rose Club and Champagne Bar -- that's what he meant.
Q I see. They were the service bartenders?
A Yes. We had all these new guys come in, and you know, it's a union hotel, seniority is a big thing, and everybody's looking around saying why aren't these guys working behind the front bar, and he comes to me and says, why aren't these guys -- two Spanish guys are sent to the back of the house.
Q And that's why you have the union, right?
A Correct.
Q To fight for those kind of issues, right?

L. FLANAGAN

A Yes.
Q To fight for injustices, right?
A Correct.
Q That's why people form unions, right?
A Right.
Q That's why the people are camping out in Wisconsin day and night, right?
A In the cold.
Q Right. So if you're talking to, quote-unquote, half the people in the hotel about the Hispanic guys who got put into the service bar, what I can't figure out is how that doesn't make its way to the arbitration. Can you explain that?
A I can't.
Q Do you know if Mr. Cedeno can?
A I don't know. I've never discussed it with him.
Q You never discussed anything about Mr. Rivera's race with Mr. Cedeno?
A No.
Q Okay. Even if he says differently then -- and if he testifies otherwise on Monday he'll be a liar?

L. FLANAGAN

A Yeah. I never discussed his race. To the best of my knowledge, anyway, I didn't.
Q Did you tell Carlos to go to human resources about this complaint about racial discrimination?
A No.
Q Are you aware that the Plaza Hotel has a policy regarding discrimination in the work place?
A Yes.
Q What is the policy?
A Basically everybody got to be treated the same no matter where you're from or who you are.
Q What happens if you're not?
A I don't know. Usually, I mean, it depends on the offense, but I've never had any situation there with somebody -- oh, yes, we had a case before where guys in the Oak Room filed suit against the hotel for discrimination.
Q Did you talk to them about it?
A No. Heard what went down.
Q If somebody called you a name based on

L. FLANAGAN

your Irish ethnicity at the Plaza Hotel, what would be the course of -- your course of action, what would you do?
A I'd laugh. I mean, it's different for different people --
Q So tell me if somebody said -- they offended you in some way, is there a -- what I'm trying to figure out is what is your knowledge of the policy at the Plaza Hotel if somebody who you represent as a union steward or union delegate comes up to you and says I believe I've been discriminated against because of X, Y or Z?
A There is a hotline number. They have a number there, some person, like, that you can call. I don't know the number offhand --
Q Is that what human resources is for, to take care of those issues, is that why there's a human resources department there?
A Well, they have another hotline number if you don't want to go to human resources.
Q Did you call the hotline number about Mr. Rivera?
A No.

L. FLANAGAN

Q Did you call human resources about Mr. Rivera?
A No.
Q Did you talk to any human resources or any management employee regarding Mr. Rivera's seniority?
A About his seniority, yes.
Q And even though Mr. Rivera told you he believed that his seniority had something to do with his race, you never mentioned that to any management employee at the hotel?
A No.
Q And you never mentioned it to the business agent of the union, did you?
A No.
Q What did Francesco Marquez say to you about Mr. Rivera and the racial discrimination?

(Whereupon, an off-the-record discussion was held.)

(Whereupon, a short break was taken.)

(Whereupon, a portion of the record was read back.)