L. FLANAGAN

1
2    A    Yes.
3    Q    To fight for injustices, right?
4    A    Correct.
5    Q    That's why people form unions, right?
6    A    Right.
7    Q    That's why the people are camping out in
8    Wisconsin day and night, right?
9    A    In the cold.
10   Q    Right.  So if you're talking to,
11   quote-unquote, half the people in the hotel
12   about the Hispanic guys who got put into the
13   service bar, what I can't figure out is how
14   that doesn't make its way to the arbitration.
15   Can you explain that?
16   A    I can't.
17   Q    Do you know if Mr. Cedeno can?
18   A    I don't know.  I've never discussed it
19   with him.
20   Q    You never discussed anything about
21   Mr. Rivera's race with Mr. Cedeno?
22   A    No.
23   Q    Okay.  Even if he says differently
24   then -- and if he testifies otherwise on
25   Monday he'll be a liar?

L. FLANAGAN

1
2    A    Yeah.  I never discussed his race.  To
3    the best of my knowledge, anyway, I didn't.
4    Q    Did you tell Carlos to go to human
5    resources about this complaint about racial
6    discrimination?
7    A    No.
8    Q    Are you aware that the Plaza Hotel has a
9    policy regarding discrimination in the work
10   place?
11   A    Yes.
12   Q    What is the policy?
13   A    Basically everybody got to be treated
14   the same no matter where you're from or who
15   you are.
16   Q    What happens if you're not?
17   A    I don't know.  Usually, I mean, it
18   depends on the offense, but I've never had any
19   situation there with somebody -- oh, yes, we
20   had a case before where guys in the Oak Room
21   filed suit against the hotel for
22   discrimination.
23   Q    Did you talk to them about it?
24   A    No.  Heard what went down.
25   Q    If somebody called you a name based on

L. FLANAGAN

1
2    your Irish ethnicity at the Plaza Hotel, what
3    would be the course of -- your course of
4    action, what would you do?
5    A    I'd laugh.  I mean, it's different for
6    different people --
7    Q    So tell me if somebody said -- they
8    offended you in some way, is there a -- what
9    I'm trying to figure out is what is your
10   knowledge of the policy at the Plaza Hotel if
11   somebody who you represent as a union steward
12   or union delegate comes up to you and says I
13   believe I've been discriminated against
14   because of X, Y or Z?
15   A    There is a hotline number.  They have a
16   number there, some person, like, that you can
17   call.  I don't know the number offhand --
18   Q    Is that what human resources is for, to
19   take care of those issues, is that why there's
20   a human resources department there?
21   A    Well, they have another hotline number
22   if you don't want to go to human resources.
23   Q    Did you call the hotline number about
24   Mr. Rivera?
25   A    No.

L. FLANAGAN

1
2    Q    Did you call human resources about
3    Mr. Rivera?
4    A    No.
5    Q    Did you talk to any human resources or
6    any management employee regarding Mr. Rivera's
7    seniority?
8    A    About his seniority, yes.
9    Q    And even though Mr. Rivera told you he
10   believed that his seniority had something to
11   do with his race, you never mentioned that to
12   any management employee at the hotel?
13   A    No.
14   Q    And you never mentioned it to the
15   business agent of the union, did you?
16   A    No.
17   Q    What did Francesco Marquez say to you
18   about Mr. Rivera and the racial
19   discrimination?
20        (Whereupon, an off-the-record
21        discussion was held.)
22        (Whereupon, a short break was
23        taken.)
24        (Whereupon, a portion of the
25        record was read back.)

L. FLANAGAN

1              L. FLANAGAN
2  A   He said to me, look, the two, Carlos and
3  Evelio, are in the Palm Court in the back bar
4  and all these new white guys are over here.
5  Q   Is there anything else?
6  A   That's the gist of it.
7  Q   Do you recall when that occurred?
8  A   I don't know the exact date, no.
9  Q   Okay.  Would that have been before the
10  grievance filed?
11  A   Yes.
12  Q   Okay.  Before the grievance?
13  A   Yes.
14  Q   You know, before I asked you about all
15  the other folks on the list, you said to
16  Mr. Zapata, you testified -- you said everyone
17  asked the same question, guys we knew for
18  twenty years, the assumption is because
19  they're Spanish, and that was the question
20  about why --
21  A   Why they were in --
22  Q   -- why they were in the back.  Who's
23  assumption was that, is this the seven people
24  you just listed out for me?
25  A   Yes.

L. FLANAGAN

1              L. FLANAGAN
2  Q   Was it your assumption?
3  A   Yes.
4  Q   Prior to the hotel reopening and
5  Mr. Rivera being slotted as a service
6  bartender, did you have any assumptions about
7  racial discrimination at the Plaza?
8  A   No.
9  Q   This is the first time?
10  A   Well, we had a case in the Oak Bar.
11  Q   But I want to know about your
12  assumption?
13  A   My assumption, no.
14  Q   Did you ever hear anybody ever use any
15  racial slang towards Mr. Rivera?
16  A   No.
17  Q   Did you ever hear anybody use any racial
18  slang towards anybody at the Plaza Hotel, a
19  non-customer?
20  A   No.
21  Q   Did you think -- strike that.
22      What did Aziz Zaidi say to you about
23  racial discrimination as it related to
24  Mr. Rivera?
25  A   Same situation, Carlos and Evelio should

L. FLANAGAN

1              L. FLANAGAN
2  be over there in the front bar, they have
3  seniority, they should be over there before
4  these new guys.
5  Q   What did he say about race?
6  A   He said these new white guys.
7  Q   Aziz said the white guys are in the bar,
8  where is Mr. Rivera -- something along those
9  lines?
10  A   Where Evelio and Carlos should be.
11  Q   Okay.  Fred the doorman, what did he
12  say?
13  A   He was -- he just came up to me talking
14  in passing, just general conversation, and he
15  said, how come these guys out here, and these
16  guys with seniority, these Spanish guys in the
17  Palm Court.
18  Q   So what did you say?
19  A   I says, we went to human resources, said
20  that's the way it is, they're service
21  bartenders.
22  Q   So Freddie call them these Hispanic
23  guys?
24  A   No.  He said Spanish guys.
25  Q   Spanish guys.  Is Freddie -- do you know

L. FLANAGAN

1              L. FLANAGAN
2  what Freddie's ethnic origin is?
3  A   No.  He's Hispanic but I don't know what
4  country.
5  Q   Is he still the doorman there today?
6  A   Yes.
7  Q   What did Jose the doorman say?
8  A   Same conversation as him.
9  Q   Was it the same time as Freddie?
10  A   It wouldn't be the same day, no, but
11  around the same general time, you know.
12  Whenever we started opening and everybody saw
13  the new guys behind the bar and the guys that
14  had been there for so long back at the Palm
15  Court.
16  Q   What did Orlando say?
17  A   Orlando -- same thing, he says, how come
18  these guys have seniority and you have all
19  these new guys working down at the bar.
20  Q   And Orlando is at the Palm Court, right?
21  A   No.  He's --
22  Q   Is at the Oak Bar?
23  A   Oak Bar.
24  Q   What did you say to Orlando?
25  A   I says, I told him what we did, we went

L. FLANAGAN

1  to human resources, the union came in, it had
2  to go to arbitration.
3     Q    And what did Jose say?
4     A    Jose Arbonna he said the same thing
5  basically.
6     Q    And you said the same thing to him?
7     A    Yes.
8     Q    So every time somebody asked you about
9  why the Spanish guys were in the Palm Bar, you
10  said we're dealing with it, we've filed a
11  grievance, we're going to the --
12     A    Yeah.  I went to the union, Eddie Cedeno
13  came in, and then go from there.
14     Q    But you weren't -- not saying you were
15  being dishonest with them, but you weren't
16  really accurate with them because you hadn't
17  gone to the union about the fact that these
18  were Spanish guys, that Spanish guys were at
19  the Palm Court, right?
20     A    I went to the union -- I told them about
21  the seniority rights and trying to get them in
22  the front bar position.
23     Q    But you never -- but again, you never
24  mentioned anything about the conversations

L. FLANAGAN

1  with these seven people about this, what you
2  called earlier, assumption that they weren't
3  placed back at the previous position because
4  of their Spanish origin, that never crossed
5  your mouth with respect to --
6     A    Because they initiated a conversation
7  that way, they pointed it out to me.
8     Q    But you never pointed it out to the
9  union?
10     A    No.
11     Q    Notwithstanding the fact that you had
12  all these conversations with these other
13  people, right?
14     A    Correct.
15     Q    Prior to the arbitration -- well, strike
16  that.
17        Did you have a lawyer at the
18  arbitration, you personally?
19     A    No.
20     Q    Who called you as a witness?
21     A    The union.
22     Q    Did you meet with Mr. Cedeno prior to
23  your testimony at the arbitration?
24     A    No.  When I just got there, met him that

L. FLANAGAN

1  morning.
2     Q    Did he prepare you at all for the
3  arbitration proceeding?
4     A    No.
5     Q    Did he go over your testimony with you?
6     A    No.
7     Q    Did anybody?
8     A    No.
9     Q    Did you stay for the entire arbitration?
10     A    No.  I testified and I left.  I had to
11  go to work.
12     Q    But you said you heard Mr. Rajan Lai --
13     A    Rajan Lai -- the way it works is, I
14  couldn't be in the same room while the two
15  bartenders were testifying.  I had to be
16  outside.
17     Q    Okay.  So while Evelio and --
18     A    And Carlos.
19     Q    -- Carlos were testifying, you were
20  outside?
21     A    I was outside.
22     Q    But anybody else you could be inside?
23     A    I believe so, yes.  I was there when
24  Rajan was talking because he -- they asked him

L. FLANAGAN

1  questions and then they asked me, so we were
2  kind of at the same time.
3     Q    Did you hear all of Mr. Lai's testimony
4  from beginning to end?
5     A    No.
6     Q    You just came in -- a portion of it?
7     A    Yeah.
8     Q    How many times did you have
9  conversations with Mr. Rivera about his belief
10  that -- or the assumption that he was placed
11  in the Palm Court because he was Hispanic?
12     A    I can't tell.  I mean, I don't know.  A
13  few times.
14     Q    More than once?
15     A    Yes.
16     Q    More than twice?
17     A    Yes.
18     Q    More than five times?
19     A    I can't -- could be, I'm not sure.
20     Q    Where -- when he would have these
21  conversations with you, where were you
22  physically?
23     A    I would be talking in the cafeteria at
24  work, could be in the locker room.

Page 149

L. FLANAGAN

1  Q    And these conversations all occurred
2  prior to the arbitration?
3  A    And after the arbitration.
4  Q    Okay.  So if you could, were there more
5  of these conversations before the arbitration
6  or after the arbitration?
7  A    I can't tell.
8  Q    But the first time he talked to you
9  about of lawsuit was after the arbitration?
10 A    Yes.
11 Q    Have you ever seen Mr. Rivera cry?
12 A    No.
13 Q    Where is the -- strike that.
14      You testified earlier that there was a
15 period of time when you were recalled prior to
16 the Champagne Bar opening first, I believe, in
17 March 1st --
18 A    Correct.
19 Q    -- and then the -- followed by the Rose
20 Club on April -- somewhere in April?
21 A    Yeah.
22 Q    And for the period of time before the
23 Champagne Bar opened, you were getting paid
24 for a regular workweek, correct?
25

Page 150

L. FLANAGAN

1  A    Correct.
2  Q    You weren't making any drinks for
3  customers, correct?
4  A    Correct.
5  Q    You weren't really making any drinks
6  for --
7  A    The building wasn't open yet.
8  Q    So you were working and getting paid --
9  A    Hourly wage.
10 Q    -- an hourly wage just waiting till the
11 bar opened up?
12 A    Correct.
13 Q    And doing kind of make work things, you
14 know what I mean?
15 A    What we do, we were training, mock
16 training with the servers, you know, the
17 server -- we sit down and pretend we're the
18 guest and they be the servers.
19 Q    And did the servers do that for the
20 bartenders, pretend that they were customers
21 with a drink?
22 A    No, we didn't have a bar.  You see, the
23 bar was being constructed.
24 Q    So there was no physical place to
25

Page 151

L. FLANAGAN

1  actually do that?
2  A    Yeah.
3  Q    And was that true of all the people that
4  were recalled -- all the bartenders who were
5  recalled before the bars opened up you were
6  helping the servers with their training and
7  doing, quote-unquote, make work?
8  A    Yes.
9  Q    Everybody was getting paid but nobody
10 was making any drinks, right?
11 A    Correct.
12 Q    Is it true of Mr. Rivera?
13 A    Yes.
14 Q    Okay.  Then the Champagne Bar opens on
15 March 1st, right?
16 A    Correct.
17 Q    And who works at the Champagne Bar when
18 it was opened March 1st, who were the bar
19 persons?
20 A    I know I was off because Saturday is my
21 day off.  What we did in the first few weeks,
22 because we were still hiring staff, the
23 bartenders got, we call it combination job, we
24 would wait the tables and do the bar as well.
25

Page 152

L. FLANAGAN

1  So it was a mixture it -- would have been --
2  let me look at the list.  It would have been
3  Robert Kenyon, Scott Teague, Eric Smades.
4      MR. ZAPATA:  What was the last
5      one?
6      THE WITNESS:  Eric Smades.
7  Q    Those were bartenders who were also
8  waiting on tables?
9  A    Yes.
10 Q    Because there wasn't enough bar space,
11 if you will?
12 A    What we would do, we were short of
13 servers and -- yeah, there wasn't enough --
14 you know, say the bar is a one-man station but
15 you had to have three people working till the
16 Rose Club opened --
17 Q    Right.  So all the bartenders who were
18 going to work either the Champagne Bar or the
19 Rose Club were back to work in February --
20 A    Yes.
21 Q    -- correct?  In '08.  The Champagne Bar
22 opens in --
23 A    March 1st.
24 Q    -- March 1st and operates for a month or
25

L. FLANAGAN

1  so before the Rose Club Opens --
2  A    Correct.
3  Q    -- right?  So you have all the
4  bartenders for these two bars, but part of the
5  time no bars are open, right, part of the time
6  only one bar is open and then finally full
7  operation sometime in April, correct?
8  A    Correct.
9  Q    Okay.  So the bartenders are all back
10 but they need something to do, right?
11 A    Correct.
12 Q    And so one of the things they did was
13 during the preopening help servers with
14 training, correct?
15 A    Correct.
16 Q    Once the Champagne Bar opened, they
17 would either work the Champagne Bar or the
18 excess guys would go and work --
19 A    On the floor.
20 Q    -- as servers, on the floor, and then I
21 take it once the Rose Club opened all the
22 bartenders had normal shifts?
23 A    Yes.
24 Q    With just bartending duties?

L. FLANAGAN

1  A    Correct.
2  Q    What was Mr. Rivera doing in February?
3  A    In February, he training with us in the
4  Champagne Bar and Rose Club.
5  Q    Doing the same exact things you were
6  doing?
7  A    Yes.  Prior to opening.
8  Q    Prior to opening -- prior to March 1st,
9  between his recall -- which I think we saw a
10 list with his recall date on it -- according
11 to Exhibit P4, you were recalled on
12 February 4, 2008; does that sound right?
13 A    Yes.
14 Q    And according to that same document
15 Mr. Rivera was brought in a week later on
16 February 11, 2008?
17 A    Sounds correct.
18 Q    So for the month of February, is it your
19 testimony that Mr. Rivera was doing
20 essentially the same things you were doing?
21 A    Correct.
22 Q    And this was being done while
23 construction was continuing on the bars?
24 A    Yes.

L. FLANAGAN

1  Q    Come March 1st when the Champagne Bar
2  opened, you were then either tending bar or
3  working on the floor?
4  A    Yes.
5  Q    What was Mr. Rivera doing?
6  A    I would say he was back -- I'm not sure,
7  but I think he was back in the Palm Court, I
8  think.
9  Q    And what was the Palm Court doing in
10 March of '08?
11 A    It was opened for lunch, tea and dinner.
12 Q    And is it opened for lunch, tea and
13 dinner as we speak?
14 A    Closed for dinner.  It's open daytime,
15 breakfast and tea.
16 Q    And what do bartenders at the Palm Court
17 do?
18 A    They're service bartenders.  The bar is
19 in the back by the pantry, so the waiters come
20 to them and they make drinks for them.
21 Q    Is the bar in the pantry?
22 A    Yes.
23 Q    And how big is the pantry?
24 A    Probably the size of this room.

L. FLANAGAN

1  Q    This conference room we're at here on
2  the 11th floor at 120 Broadway.  And in that
3  space -- which is not insignificant -- there
4  is a liquor cabinet?
5  A    In that space there is a service bar.  I
6  would say it would be see this -- the length
7  of this (indicating).
8  Q    The length of the side board?
9  A    Cabinet or whatever you call did.  A
10 little shorter.
11         (Whereupon, an off-the-record
12         conversation was held.)
13 Q    Okay.  So we'll call that -- refer to it
14 as a credenza.  And you said it's not quite as
15 long as this credenza?
16 A    I would say it's as far as this white
17 light or whatever it is.
18 Q    So I measured that with my -- exactly
19 one foot -- inch foot -- about eight feet;
20 would you agree with that?
21 A    Yeah.
22 Q    And would you agree that this room is
23 approximately twenty-four feet wide -- does
24 that sound plausible to you?

L. FLANAGAN

1
2  A    It's probably a bit -- a little narrower
3  than this room.
4  Q    And so in the pantry, that you called
5  it, at the Palm Court there's a service bar
6  about eight feet long -- what else is in the
7  pantry?
8  A    If you go into the front of the bar, and
9  then at the back there's refrigerators for
10  beer, wine, a glass machine for washing
11  glasses.  And at the front you have all racks
12  with different types of glasses where you keep
13  the teas for the afternoon tea -- like a
14  storage space as well.
15  Q    And that's where -- so for typical tea
16  service, how many bartenders would be at the
17  service bar?
18  A    One.
19  Q    And for typical lunch service?
20  A    One.  It's a one-man station.
21  Q    So in that room there's one bartender --
22  who else is in the pantry doing service?
23  A    Doing service, we'd have the stewarding
24  guy come in, he would be the guy who'd take
25  out all the pots and the dirty glasses and

L. FLANAGAN

1
2  stuff.
3  Q    So he's in and out?
4  A    In and out.  And the servers as well.
5  Q    And they're in and out?
6  A    Yes.
7  Q    But the only person permanently
8  stationed in the pantry is the bartender?
9  A    Yes.
10  Q    Have you ever -- have you ever worked in
11  the pantry?
12  A    Yes.
13  Q    Is it horrible to work in the pantry?
14  A    Yes.
15  Q    How come?
16  A    It's hot.  It's a tight space.  It's,
17  you know, hard to work.  Plus, you know,
18  you're doing the -- they have the -- you're
19  doing the hot water for the tea, you know, and
20  you know, it's very busy so you're burning
21  yourself sometimes with the teapots.
22  Q    But you said it's tight, and there's
23  five of us in this room which is about the
24  same size -- do you feel tight in this room?
25  A    No, but I mean, in the room you've got

L. FLANAGAN

1
2  to understand that there's a lot of racks of
3  glasses around you and other supplies.
4  Q    So it's a different space than behind
5  the bar?
6  A    Yes.
7  Q    Now, when -- in February, when you came
8  back with Mr. Rivera, you were both making
9  your regular hourly rate for the hours you
10  work, correct?
11  A    Correct.
12  Q    And then when you went to -- when the
13  Champagne Bar opened up on March 1st, how was
14  your hourly -- how was your hourly rate
15  affected?
16  A    It wasn't.  It was the same.
17  Q    It was the same.  But you were getting
18  tips, right?
19  A    Yes.
20  Q    Were you getting tips from the time that
21  you were helping the servers?
22  A    When we opened you're talking about,
23  right?
24  Q    Right.  When the Champagne Bar opened on
25  March 1st --

L. FLANAGAN

1
2  A    What happened was, say this is the
3  Champagne Bar, the bartenders, because we
4  didn't have enough servers, we took the first
5  four tables closest to the bar, so we served
6  them ourselves.
7  Q    And you got the tips for that?
8  A    Correct.
9  Q    Okay.  And Mr. Rivera at the time was
10  working where?
11  A    The Palm Court.
12  Q    Palm Court -- and there would be no tips
13  at the Palm Court?
14  A    No.
15  Q    But if you were a bartender at the Palm
16  Court your hourly rate absent tips would the
17  same whether you were --
18  A    Yes, the same.
19  Q    Because of your seniority, correct?
20  A    Correct.
21  Q    So the only difference between the Palm
22  Court and then the Champagne Bar and the Rose
23  Club was the division of the tips?
24  A    Yes -- also the procedure, working the
25  front bar, talking to people and meeting

L. FLANAGAN

1                L. FLANAGAN
2  people. But yeah, monetary, it would be the
3  tips, yeah.
4     Q   Not many customers coming into the
5  service bar at the Palm Court?
6     A   No, no.
7     Q   So you don't have to pretend to be nice,
8  right?
9     A   No, we don't service.
10    Q   How long did you work in the pantry?
11    A   When it reopened?
12    Q   Well, at any time.
13    A   Well, when it -- when I started working
14  the hotel first I was a service bartender for
15  over a year.
16    Q   You worked in the pantry?
17    A   In the service -- not the Palm Court --
18  the room service.
19    Q   Is the set up for the service bartenders
20  for room service greatly -- vastly different
21  from the conditions --
22    A   Well, it's eliminated -- it's eliminated
23  now, the service bar from the old hotel. It's
24  no such thing anymore. But it was a huge bar,
25  it was like a wine cellar.

L. FLANAGAN

1                L. FLANAGAN
2    Q   At the old service bar?
3    A   Yeah. Because, you know, we had an
4  eight hundred room hotel, so -- so there was a
5  lot of stuff we had in there, a lot of space.
6  It's a nice bar. It was boring at night, you
7  know, sitting there and waiting.
8    Q   Were you ever assigned to work the
9  service bar at the Palm Court?
10    A   Yes.
11    Q   When?
12    A   When I started working, that would be
13  '88 or '89. You know, my station was room
14  service. With Palm Court, if somebody's out
15  sick or -- I would come in and do it.
16    Q   You would fill in?
17    A   But that's a different bar as well now
18  because the space has changed.
19    Q   Right. But just talking about -- so
20  since the reopening you haven't worked at
21  the --
22    A   I have.
23    Q   -- Palm Court service? You have?
24    A   If call me at home, someone call sick,
25  you know, would you mind coming in and doing

L. FLANAGAN

1                L. FLANAGAN
2  afternoon tea a few hours earlier, that kind
3  of a deal.
4    Q   Have you ever said no?
5    A   Yes.
6    Q   Because why?
7    A   I been in the middle of doing something
8  or something.
9    Q   Other commitments?
10    A   Yeah.
11    Q   But if you had the time and you needed
12  the extra money, you would --
13    A   Nine times out of ten, yeah, I would.
14    Q   Did you ever see Mr. Rivera wearing a
15  wet towel on his head?
16    A   No.
17    Q   No?
18    A   No.
19    Q   Did Mr. Rivera ever tell you that he
20  felt like he was going to faint while he was
21  at work?
22    A   No.
23    Q   Do you know Mr. Rivera to be kind of a
24  weak guy, kind of a whiner or complainer?
25    A   No.

L. FLANAGAN

1                L. FLANAGAN
2    Q   Did you ever know Mr. Rivera not to be
3  able to take a joke or --
4    A   Not in my presence, no.
5    Q   Is he unable to defend himself as far as
6  you know?
7    A   I don't think so. I mean, I've never
8  seen where he had to defend himself.
9    Q   Would the word wimp be a word you think
10  of Mr. Rivera?
11    A   No.
12    Q   Mr. Rivera ever tell you that he was
13  depressed?
14    A   He didn't use the word depressed, but he
15  said down, yeah.
16    Q   When did he say he was down?
17    A   One of our conversations at work in the
18  locker room or cafeteria, wherever it was.
19    Q   Did he say what he was down about?
20    A   About the situation at work, what
21  happened.
22    Q   Was it before or after the arbitration?
23    A   Before.
24    Q   Okay. Did he ever tell you that he was
25  down after the arbitration?

L. FLANAGAN

1
2  A    No.  Not that I can recall.
3  Q    Is it your understanding that as a
4  result of the arbitration Mr. Rivera was
5  placed back as a front bartender?
6  A    No.  Because he was placed back before
7  the arbitration.
8  Q    He was?
9  A    Yes.  Because the Palm Court closed down
10  and they were sent over with the seniority
11  rights to bump the new guys.  So when
12  arbitration came along he was already behind
13  the front bar.
14  Q    I see.
15  A    But before the Palm Court closed, it was
16  in process.
17  Q    Right.  So what he needed the
18  arbitration for was to get the difference of
19  the money between what he earned as a service
20  bartender and what he would have earned had he
21  been a front bartender from day one?
22  A    Correct.
23  Q    And that would have been really from
24  March 1st --
25  A    Yeah, to whenever the case was.

L. FLANAGAN

1
2  Q    -- to whenever he came back to being a
3  front bartender at --
4  A    Correct.
5  Q    Which was before the arbitration?
6  A    Yes.
7  Q    Okay.  And is it your understanding that
8  he was paid for all that money?
9  A    Yes.
10  Q    Which would probably explain why he
11  wasn't down or never complained to you about
12  being down after the arbitration but did
13  before so, correct?
14  A    I don't know.
15  Q    Does Mr. Rivera look much larger to you
16  now than he did back before the arbitration?
17  A    He's put on a few pounds, yeah.  I
18  wouldn't say huge, but he's put on a few
19  pounds, yeah.
20  Q    Did Mr. Rivera ever share to you any of
21  his -- whether or not he's seen a psychiatrist
22  or psychologist or anything like that?
23  A    He said he was going to go see somebody.
24  Q    When did he say that?
25  A    Sometime after the arbitration.

L. FLANAGAN

1
2  Q    After the arbitration?
3  A    Yes.  I believe, I mean --
4  Q    Did he tell you anything about why he
5  was going to see somebody?
6  A    Yeah.  He said he was, you know -- he
7  was feeling down and fed up.
8  Q    And what -- fed up?
9  A    Yeah.
10  Q    Do you know what he's fed up about?
11  A    About work, about what happened in his
12  situation.
13  Q    But it was all fixed, wasn't it?
14  A    Well, as far as the monetary system they
15  was, but as far as he's concerned, he figures
16  he's discriminated against.
17  Q    Did you think he was discriminated
18  against?
19  A    Yeah, it looked that way to me.
20  Q    How come?
21  A    Just because of the fact of, I mean, why
22  send me back to the front bar and I have the
23  rights and he worked the same amount of time
24  and they didn't send him back.
25  Q    And you thought that was because he was

L. FLANAGAN

1
2  Hispanic?
3  A    Yes.
4  Q    And --
5  A    I mean, we were never given any -- we
6  were never told any other reason.  We aren't
7  told that reason either but that was the
8  assumption of everybody who had been there.
9  Q    So what was the basis of your
10  assumption, why would you assume this
11  discriminatory intent or motive in placing
12  Mr. Rivera at the Palm Court service bar when
13  I think you testified earlier that you never
14  heard anybody use any racial epithets or any
15  derogatory terms?
16  A    Because of the outcome of what happened
17  with me when I went down to get my spot, my
18  rightful place in the Champagne Bar and the
19  Rose Club, and they said, yes, go across, and
20  Carlos and Evelio never got it.  And then we
21  started working, everybody on the bartender
22  list, they were all white.  Everybody said to
23  me, what's going on with the, you know -- the
24  Spanish guys.  I mean, I don't know if it's
25  true or not, but that's the assumption.  I

Page 169

L. FLANAGAN

1  mean, that's what it looks like.
2  Q    What happened to the black guys?  Where
3  there any black guys?
4        (Whereupon, an off-the-record
5        discussion was held.)
6        (Whereupon, a short break was
7        taken.)
8  Q    I'm sorry -- there were no black guys at
9  the bar?
10 A    Yeah.  Bartenders, no.
11 Q    And there weren't any before the hotel
12 closed, right?
13 A    Yes, there was.
14 Q    There was -- what happened to him?
15 A    Retired.
16 Q    Okay.  So when the hotel reopened in
17 April 2008, when everything was -- who were
18 the Palm Court service bartenders?
19 A    It was Carlos and Evelio.
20 Q    Anybody else?
21 A    There was a girl, Jamiyia.  She was
22 there a little while.
23 Q    What was her last name?
24 A    She's should be on one of the sheets

Page 170

L. FLANAGAN

1  here.
2  Q    Is that Westcott?
3  A    Yes.
4  Q    Was she Hispanic?
5  A    I would say African American.  She
6  was -- started as a server, actually.
7  Q    Now, when you went -- when you went to
8  human resources about your seniority, I think
9  you testified earlier that they told you that
10 they would look into it, and if you were right
11 you would get put back, correct?
12 A    Uh-huh.
13 Q    Is that a yes?
14 A    Yes.
15 Q    And do you know whether they looked into
16 it?
17 A    Well, I told the manager to the Palm
18 Court first and he said he went down to talk
19 to the human resources director, and he came
20 back up, and he said, if it's correct what you
21 said, you will be transferred over.  So then I
22 went down and talked to Rajan about it, and he
23 said, yes, you're going to go to Champagne
24 Bar, Rose Club.

Page 171

L. FLANAGAN

1  Q    And that manager was Anthony
2  Evangelista?
3  A    No.  His name was Bjorn.  He was --
4  Q    Oh, Bjorn.  And Bjorn wasn't there when
5  the hotel closed, correct?
6  A    No.
7  Q    Okay.  But Evangelista was?
8  A    Yes.  He was there prior -- I think, you
9  know -- I mean, I can't -- the day we closed
10 he probably wasn't there because a lot of
11 managers left when they saw the writing on the
12 wall, you know, the last few weeks.
13 Q    Talking about Evangelista?
14 A    I'm sorry?
15 Q    You're talking about Evangelista?
16 A    Yes, yes.  The last couple weeks we
17 didn't have managers.
18 Q    Okay.  He was out opening up his own
19 place downtown.  So you spoke to Bjorn?
20 A    Bjorn.
21 Q    Was Evangelista there when you spoke to
22 Bjorn, I mean, was he back at the hotel?
23 A    Yes, he was back at the hotel.  He would
24 have been -- he would have been the Rose Club,

Page 172

L. FLANAGAN

1  Champagne Bar manager, and Bjorn would have
2  been the Palm Court.
3  Q    Why didn't you just say to Bjorn, go ask
4  Anthony, he knows I was here?
5  A    Actually, I said it to Kareem.  Kareem
6  was another manager that was there before, and
7  he came back as a -- as a sales person.  I
8  says -- he says, I know you're front bar.  He
9  never got back to me on it.
10 Q    So when Kareem didn't get back to talk
11 to you, is that when you went to Bjorn?
12 A    Yes.  I probably mentioned it to both of
13 them at the same time.
14 Q    Did you ever it to Evangelista?
15 A    No.
16 Q    Why not?
17 A    Well, I did -- when I -- when I went to
18 Bjorn, first I went to human resources, I just
19 said it to Anthony that I went to human
20 resources about my situation.  Like
21 technically, we were back a week, and the Palm
22 Court manager, he was the first manager there
23 so I notified him first.
24 Q    When you say you were back a week, you

Page 173

L. FLANAGAN

1  were back a week after the Champagne Club
2  opened or after the --
3  A    No. I was back a week -- I was the only
4  bartender in the hotel for the first week.
5  Q    Right. You were back on February 4th
6  and then Mr. Rivera was there February 11th?
7  A    Correct.
8  Q    And so -- so during that week you're
9  doing nothing?
10  A    We're doing orientation for two days,
11  and then we're doing mock services as well at
12  the Palm Court --
13  Q    But you saw a list somewhere that said
14  where you're going to be assigned; is that
15  right -- in other words, how did you know you
16  were being put as a service bartender?
17  A    I came back the first week -- just
18  seniority in the Palm Court, and then they
19  brought in the second wave of people to do
20  orientation, and they said these guys are
21  going to be in the Rose Club, Champagne Bar,
22  and I said I'm supposed to be front bar, and
23  it snowballed from there.
24  Q    So when you first came back, you weren't

Page 174

L. FLANAGAN

1  scheduled to go back into the Rose Club or the
2  Champagne Bar?
3  A    Correct.
4  Q    So guys like you -- I think you -- how
5  you referred to yourself later, white -- were
6  not always -- were not all put out to be in
7  the Rose Club or the Champagne Bar?
8  A    There was nobody back yet. It was only
9  me --
10  Q    I understand that. But you -- but the
11  way the assignments were as far as you
12  understood it, you were going to be working
13  just like Mr. Rivera at the Palm Court service
14  bar, right?
15  A    Correct.
16  Q    So the three of you, as far as you
17  know -- you, Evelio, and Mr. Rivera -- were
18  going to the Palm Court, right?
19  A    Correct.
20  Q    And then when you had someone look into
21  it, somebody said, oops, we made a mistake,
22  we'll put you in the Champagne Bar and the
23  Rose Club, right?
24  A    Yes.

Page 175

L. FLANAGAN

1  Q    And then when Mr. Rivera had someone
2  look into it, they said, no, you're in the
3  right place?
4  A    Yes.
5  Q    And somebody got that wrong, right?
6  A    I believe so, yes.
7  Q    And in comes the calvary with their
8  white hats and their union buttons and they
9  kind of make the union take care of it,
10  right --
11  A    Took them a year but they got there.
12  Q    Well, Mr. Rivera, according to your
13  testimony, came back before the arbitration
14  even occurred, right?
15  A    Back to the Rose Club, Champagne Bar?
16  Q    Yeah.
17  A    Yeah, because the layoffs and the Palm
18  Court closed.
19  Q    So it took less than a year?
20  A    But -- yeah, but technically speaking,
21  why did they put them back there then in the
22  Champagne Bar and the Rose Club if he wasn't a
23  front bartender. And when you went to check on

Page 176

L. FLANAGAN

1  your issue, somebody apparently checked into
2  it and said that's right --
3  A    Yes.
4  Q    -- Flanagan is a front bartender, put
5  him back?
6  A    Correct.
7  Q    They consulted some document or some
8  database or some issue, correct?
9  A    I believe so.
10  Q    And as far as you know they consulted
11  the same database or list when Mr. Rivera
12  checked, right?
13  A    Yes.
14  Q    I think you said earlier Rajan Lai
15  wasn't there when the hotel closed, correct?
16  A    Correct. But Anthony Evangelista and
17  Kareem were there, they could have verified
18  with them.
19  Q    Or they could have verified with their
20  union, right?
21  A    Yes.
22  Q    The people that entered into the
23  agreement, correct?
24  A    Yes.

Page 177

L. FLANAGAN

1
2  Q    If the union had the information wrong,
3  as far as Mr. Lai knows they represent the
4  employee, right?  Right?
5  A    Yes.
6  Q    I'm sorry if I asked this, but have
7  you talked to Mr. Evangelista about this
8  assumption that Mr. Rivera was placed in
9  the --
10  A    Service bar.
11  Q    -- service bar in the Palm Court, just
12  like you were, because he was Hispanic?
13  A    No.  I talked to him about the seniority
14  rights.
15  Q    And when you first learned that you were
16  being put back as a bartender at the service
17  bar at the Palm Court, did you think it was
18  because you were Irish?
19  A    No.
20  Q    Did you think somebody made a mistake?
21  A    When they put me in the Palm Court?
22  Q    Yeah.
23  A    It's a presumption on my part but I
24  think it was strategically done.
25  Q    Why?

Page 178

L. FLANAGAN

1
2  A    Because basically I think Anthony
3  Evangelista wanted to bring his own people in.
4  Q    So you think this --
5  A    I can't say it's true or not, but that's
6  an assumption.
7  Q    Your assumption is that -- or your
8  belief is that Anthony Evangelista
9  orchestrated this whole thing to get his Gin
10  Room cohorts up to the Plaza Hotel, right?
11  A    For me especially, yes.  I never got
12  along with the manager.
13  Q    What's -- what's the name of the
14  steakhouse at the hotel?
15  A    Steak house?
16  Q    What's CPS 1?
17  A    Yeah, that was the old Edwardian Room.
18  It was a private concession, Smith Wollensky
19  ran a steakhouse out of it.  Central Park
20  South 1.
21  Q    Is it there a way to get into Central
22  Park South 1 from the hotel?
23  A    You have -- private entrance, you mean?
24  Q    Yes.
25  A    No.  You have to come in there.

Page 179

L. FLANAGAN

1
2  Q    So you have to leave Central Park South
3  1 to get in -- go outside into the air --
4  A    To access the hotel, yeah.
5  Q    -- to access the hotel.  But there was
6  some kind of relationship between Central Park
7  South 1 and the hotel?
8  A    No.
9  Q    Mr. Rivera ever tell you that he thought
10  his seniority issues had something to do with
11  his age?
12  A    No.
13  Q    When you testified at the arbitration
14  hearing you were under oath, correct?
15  A    Correct.
16  Q    Just like you are today, correct?
17  A    Yes.
18  Q    You said earlier when Mr. Zapata was
19  asking you questions that you had worked with
20  Mr. Rivera when he would fill in --
21  A    Yes.
22  Q    -- remember that testimony?  What was he
23  filling in for?
24  A    We call it vacation relief.
25  Q    And where was he coming from?

Page 180

L. FLANAGAN

1
2  A    Like from the service bar.  He would
3  work, say, in the Oyster Bar with me, or say
4  somebody in the Oak Bar went on vacation, he
5  work there as well.
6  Q    This is before the hotel closed, right?
7  A    Yeah, long time before.
8  Q    Once Mr. Rivera became a full-time front
9  bartender, did you work with him?
10  A    No.
11  Q    Thank you, Mr. Flanagan.  That's all I
12  have.  I appreciate it.  You can go to work
13  now.
14  EXAMINATION BY
15  MR. ZAPATA:
16  Q    Just have a couple questions.  When did
17  you first become a delegate?
18  A    When the hotel reopened.
19  Q    And --
20  A    2008.
21  Q    2008 -- what month, if you remember?
22  A    When I became a delegate -- so we opened
23  March -- probably be May or June.
24  Q    May or June.  When you became a delegate
25  in May or June of 2008, did you receive any

Page 181

L. FLANAGAN

1  training from the union?
2  A   No.
3  Q   When the hotel reopened in 2008, did you
4  receive any equal employment opportunity
5  training?
6  A   How do you mean?
7  Q   I mean -- I'll restate it.  Did you
8  receive -- when the hotel reopened in two
9  thousand -- withdrawn.
10     When the hotel opened in 2008, did you
11  receive any training regarding employment
12  discrimination?
13  A   No.
14  Q   Now, in 2008, were there other people at
15  the hotel that could have confirmed for Rajan
16  Lai that Carlos Rivera had worked at the Plaza
17  prior to 2005 as a front bartender?
18  A   Yes.
19  Q   Can you please tell us who?
20  A   On management side it would have been
21  Anthony Evangelista and Kareem, I don't know
22  his last name, he's room service manager, and
23  then any of the servers or waiters that were
24  recalls would have known.

Page 182

L. FLANAGAN

1  Q   If you could ballpark number, people
2  that you believe could have corroborated that
3  Carlos Rivera had worked as a front bartender
4  at the Plaza Hotel prior to 2005?
5  A   I could -- within the food and beverage
6  side of it alone, at least eighteen people.
7  Q   Do you know if Rajan Lai spoke to any of
8  those eighteen people?
9  A   No.
10  Q   How much walking space would you say is
11  inside the pantry where the Palm Court --
12  A   The pantry or the bar -- the whole
13  thing?
14  Q   The bar.
15  A   The bar, yeah, like what I said, there's
16  about eight feet.
17  Q   Walking space, I'm talking about.  Just
18  walking.  Not, you know, space where there's a
19  fridge --
20  A   Oh, yeah, yeah, yeah.  About four.
21  Q   Four feet?
22  A   Four, five feet.
23  Q   Four feet wide, four feet long --
24  A   Less than four feet wide.

Page 183

L. FLANAGAN

1  Q   So less than four feet wide --
2  A   It would be probably six feet long.
3  Q   And about six feet long?
4  A   Yeah.
5  Q   Is there air conditioning in that room?
6  A   There is now.
7  Q   There is now?
8  A   In the beginning there wasn't.  For
9  six months we were trying to get it in.
10  Q   And would it get hot back there?
11  A   Yes.
12  Q   Were you involved in representing the
13  union in connection with the grievance that
14  culminated in the arbitration that's referred
15  to in Exhibit P5?
16  A   Yes.
17  Q   You were involved in the presentation of
18  the case?
19  A   No, not the presentation.  I was like, I
20  suppose, the number one witness, as you would
21  say, you know, because I was the guy -- the
22  three of us came back together and I was the
23  guy that went to the front bar.
24  Q   So would it be fair to say that your

Page 184

L. FLANAGAN

1  involvement with the arbitration that's
2  referred to in P5 was simply as a witness?
3  A   Correct.
4  Q   So it's fair to say you were not
5  involved in the strategy or the planning --
6  A   No.
7  Q   I have no further questions.
8     MR. McLANE:  Unfortunately now I
9  have a couple more.
10  EXAMINATION BY
11  MR. McLANE:
12  Q   The same eighteen people that could have
13  corroborated that Mr. Rivera was a front
14  bartender could have also have corroborated
15  that you were a front bartender, correct?
16  A   Yes.
17  Q   And yet you chose to go to HR, correct?
18  A   Yes.
19  Q   And the issue with the heat in the
20  pantry, was that an issue you worked on as a
21  union delegate?
22  A   The delegates in the Palm Court did
23  that.
24  Q   So that was an issue that the union took

Page 185

L. FLANAGAN

1
2  on behalf of the --
3  A    Yes.
4  Q    And as a result of that, the air
5  conditioning was in place?
6  A    Yeah.  There was construction, they were
7  getting things together, you know, putting
8  things away.
9  Q    So the fact that there was no air
10 conditioning in that space had to do with the
11 construction issues?
12 A    I would say so.  Or getting people to
13 pay money and put it in.
14       (page break for jurat)
15
16
17
18
19
20
21
22
23
24
25

Page 186

L. FLANAGAN

1
2  Q    Any indication that the fact that there
3  was no air conditioning in that space had
4  anything to do with anybody -- the race of the
5  people who worked in that space?
6  A    No.
7  Q    That's all I have.  Thanks.
8       MR. ZAPATA:  I have no
9  questions.  Thank you, Mr. Flanagan.
10      (Time noted: 1:54 P.M.)
11
12  _____
13       LIAM FLANAGAN
14
       Signed and subscribed to
15  before me, this_____day
of _____ 2011.
16
17  _____
       Notary Public
18
19
20
21
22
23
24
25

Page 187

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| LIAM FLANAGAN | MR. ZAPATA | 4, 180 |
| LIAM FLANAGAN | MR. McLANE | 70, 184 |

EXHIBITS

PLAINTIFF'S
| FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Bartender and bar-back schedule for the Plaza | 16 |
| 2 | Rose Club and Champagne Bar schedule | 37 |
| 3 | Housekeeping department weekly schedule | 48 |
| 4 | Plaza bartender seniority list | 56 |
| 5 | Packet of documents | 58 |

Page 188

C E R T I F I C A T E

I, LAURA A. PENA, a Notary
Public within and for the State of New York,
do hereby certify:
   THAT LIAM FLANAGAN, the witness whose
deposition is hereinbefore set forth, was duly
sworn by me and that such deposition is a true
record of the testimony given by such witness.
   I further certify that I am not
related to any of the parties to this action
by blood or marriage, and that I am in no way
interested in the outcome of this matter.
   IN WITNESS WHEREOF, I have hereunto
set my hand this ____ day of _____, 2011.

_____
LAURA A. PENA

ERRATA SHEET
PAGE/LINE          CORRECTION

Exhibit "C"

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   --------------------------------------- x

4   CARLOS RIVERA,

5

                        Plaintiff,      Civil Action No.

6                                   1:10-cv-06661 (WHP)

7               -against-

8   PLAZA ACCESSORY OWNER LP, ELAD PROPERTIES NY LLC,

    CPS 1 REALTY LLP LLC,

9

10                      Defendants.

11  --------------------------------------- x

12

13

14          DEPOSITION of a Non-Party witness,

15  EDWARD CEDENO, taken by the Respective Parties,

16  pursuant to Order, held at the offices of Barrister

17  Reporting Service, 120 Broadway, Suite 1111, New

18  York, New York 10271, on  March 7, 2011, at 10:10

19  a.m., before a Notary Public of the State of New

20  York.

21

22  *********************************************

            BARRISTER REPORTING SERVICE, INC.

23               120 Broadway

              New York, N.Y. 10271

24               212-732-8066

25

Page 1

1  2  UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
2  3  ------------------------------------ x
3  4  CARLOS RIVERA,
4  5
              Plaintiff,     Civil Action No.
5  6                    1:10-cv-06661 (WHP)
6  7        -against-
7  8  PLAZA ACCESSORY OWNER LP, ELAD PROPERTIES NY LLC,
       CPS 1 REALTY LLP LLC,
8  9
9  10           Defendants.
10 11  ------------------------------------ x
11 12
12 13
13 14        DEPOSITION of a Non-Party witness,
14 15  EDWARD CEDENO, taken by the Respective Parties,
15 16  pursuant to Order, held at the offices of Barrister
16 17  Reporting Service, 120 Broadway, Suite 1111, New
17 18  York, New York 10271, on  March 7, 2011, at 10:10
18 19  a.m., before a Notary Public of the State of New
19 20  York.
20 21
21 22  ************************************************
22 23        BARRISTER REPORTING SERVICE, INC.
              120 Broadway
              New York, N.Y. 10271
23 24           212-732-8066
24
25 25

Page 2

1  2  A P P E A R A N C E S:
2  3
       LAW OFFICE OF FAUSTO ZAPATA JR. P.C.
3  4     Attorney for the Plaintiff
          CARLOS RIVERA
4  5     277 Broadway, Suite 501
          New York, New York 10007
5  6
       BY:  FAUSTO ZAPATA
6  7     212-766-9870
7  8
8  9  LITTLER MENDELSON, P.C.
       Attorney for Defendants
9  10   One Newark Center, Eighth Floor
          Newark, NJ 07102-5311
10 11
       BY:  WILLIAM P. MCLANE
11 12   973-848-4709
12 13
13 14  PITTA & GIBLIN, LLP
       Attorneys for the Non-Party
14 15   EDWARD CEDENO
          120 Broadway, 28th Floor
15 16   New York, New York 10271
16 17  BY:  BARRY N. SALTZMAN, ESQ.
       212-652-3827
17 18
18 19
19 20  ALSO PRESENT: CARLOS RIVERA
20 21
21 22
22 23
23 24
24
25 25

Page 3

1  2        S T I P U L A T I O N S
2  3
3  4        IT IS HEREBY STIPULATED AND AGREED by and
4  5  between the attorneys for the respective parties
5  6  herein, that filing, sealing and certification, and
6  7  the same are, hereby waived.
7  8
8  9        IT IS FURTHER STIPULATED AND AGREED that all
9  10  objections except as to the form of the question,
10 11  shall be reserved to the time of the trial.
11 12
12 13        IT IS FURTHER STIPULATED AND AGREED that the
13 14  within deposition may be signed and sworn to by an
14 15  officer authorized to administer an oath, with the
15 16  same force and effect as if signed and sworn to
16 17  before the Court.
17 18
18 19
19 20            xxxxx
20 21
21 22
22 23
23 24
24
25 25

Page 4

1              CEDENO
2  E D W A R D   C E D E N O, having been first duly
3  sworn before a Notary Public of the State of New
4  York, was examined and testified as follows:
5  EXAMINATION BY
6  MR. ZAPATA:
7  Q.     What is your name?
8  A.     Edward Cedeno.
9  Q.     What is your address?
10 A.     709 Eighth Avenue, New York, New York
11 10036.
12 Q.     Mr. Cedeno, my name is Fausto Zapata.
13 I'm Carlos Rivera's attorney.  I'm
14 representing him in this lawsuit against
15 Plaza Accessory Owner LP, Elad Properties NY
16 LLC, CPS 1 Realty LP LLC, and FHR (NY) LLC,
17 relating to his employment.  I brought you
18 here today to answer some questions regarding
19 your interaction with Carlos Rivera and the
20 Plaza.
21     If I ask you any question you don't
22 understand, I'm going to ask you to please
23 stop me and ask me to rephrase it and I will.
24     Are you taking any medication that may
25 affect your ability to participate in this

Page 5

1           CEDENO
2 deposition?
3 A.    No.
4 Q.    Mr. Cedeno, can you please tell us
5 where you are currently employed.
6 A.    Local 6.
7 Q.    And what is Local 6?
8 A.    It's the union for the hotels and
9 motels and clubs.
10 Q.    And in what capacity do you work
11 there?
12 A.    I'm a vice president/business agent.
13 Q.    How long have you held the position of
14 vice president/business agent?
15 A.    Nine years now.
16 Q.    Can you describe the duties that you
17 perform as a vice president/business agent
18 for Local 6?
19 A.    My duties range from contract
20 negotiations, grievance handling and
21 supervision of the other business agents.
22 Q.    How many business agents do you
23 currently supervise?
24 A.    Three.
25 Q.    Can you please tell us if you have

Page 6

1           CEDENO
2 held any other positions other than the
3 VP/business agent position at Local 6?
4 A.    No.
5 Q.    Prior to holding the VP/business agent
6 position at Local 6, where did you work?
7 A.    The Plaza Hotel.
8 Q.    In what capacity?
9 A.    I was a waiter.
10 Q.    When did you stop working at the Plaza
11 Hotel?
12 A.    July 2002.
13 Q.    When did you start working at the
14 Plaza Hotel?
15 A.    September 26, 1985.
16 Q.    And when you started working at the
17 Plaza September 26, 1985, what position did
18 you hold?
19 A.    Busboy.
20 Q.    After working as a busboy, did your
21 title change at any point?
22 A.    Yes, 1991, I believe I was promoted to
23 a waiter.
24 Q.    Did your position change from that
25 point forward?

Page 7

1           CEDENO
2 A.    I don't understand.
3 Q.    After being promoted to waiter, did
4 you continue to work as a waiter until the
5 date that you stopped working at the Plaza
6 Hotel?
7 A.    That's correct.
8 Q.    Now, do you know Carlos Rivera?
9 A.    Yes.
10 Q.    How do you know Carlos River?
11 A.    I worked with him at the Plaza Hotel.
12 Q.    When did you first meet Carlos, if you
13 remember?
14 A.    I can't remember.  I believe it was
15 sometime between 1991 -- I'm not sure if I
16 met him before I left in 1987.
17 Q.    Before you left?
18 A.    Yes, in 1997 I joined the Marine
19 Corps, and I came back in 1991 under the
20 Native Soldier Act of 1942.
21 Q.    Okay, you might have met him either in
22 the late 80's or early 90's?
23 A.    Yes.
24 Q.    Can you describe the relationship that
25 you had with Mr. Rivera during the time that

Page 8

1           CEDENO
2 you met at the Plaza Hotel?
3 A.    Mr. Rivera, when I came back in 1991,
4 worked as a barback, and, also, would fill in
5 as a bartender in the Oak Room, which is the
6 work that I worked in.  I worked in the Oak
7 Room some time, I believe, between 1994 and
8 1996.  Mr. Rivera was a steady bartender in
9 the Oak Room bar.
10 Q.    And how would you describe the
11 relationship that you had with Mr. Rivera
12 during the time that you worked at the Plaza
13 Hotel.
14 A.    Strictly work.  Just coworkers.
15 Q    The Plaza closed for renovations in
16 2005; is that right?
17       MR. MCLANE:  Objection to form.
18       You can answer.
19 A.    I'm not sure.  I can't remember
20 exactly for sure.  I believe it was in '85, I
21 mean 2005, I'm sorry.
22 Q.    Just to be clear, what happened in
23 2005?
24 A.    I believe the Plaza Hotel had closed
25 for renovations.

Page 9

CEDENO

1       CEDENO
2  Q.    Was the union involved in any
3  negotiations with the Plaza Hotel in 2005 in
4  connection with the Plaza closing for
5  renovation?
6  A.    Yes.
7  Q.    Can you describe the type of
8  negotiations that the union was involved in?
9  A.    I was not directly involved, but it
10 had to do with the workers that were there
11 and what would happen to them and the hotel
12 as a whole when they reopened.
13 Q.    What is your knowledge based on what
14 the subject of the bargaining was?
15 A.    I don't understand your question.
16 Q.    You just stated that there were some
17 decisions regarding the workers and what
18 would happen to them as a whole in 2005,
19 correct?
20 A.    That's correct.
21 Q.    And where did you get this
22 information?
23 A.    From our meetings, our staff meetings
24 that are held at the union.
25 Q.    What was your involvement with the

Page 10

1       CEDENO
2  staff meeting that was held at the union
3  relating to what would happen to those Plaza
4  workers as a whole after 2005?
5  A.    There was a series of stuff.  There
6  was a whole campaign that we ran, because the
7  hotel, at the time the owner wanted to close
8  it and convert it into a condominium.  We
9  tried to stop that and reserve as many as
10 jobs as we could.  In order to do that,
11 everybody had a different role to play as far
12 as different events that occurred at that
13 time and mobilizing events for that.
14 Q.    What was your role?
15 A.    I was one of the business agents, I
16 had to make sure whatever events occurred
17 that members of my local was informed, and,
18 also, participate in those events.
19 Q.    What was your understanding as to what
20 was supposed to happen to the Plaza workers
21 after the hotel closed in 2005?
22 A.    That their jobs were still there
23 meaning that a classification which will
24 still exist needed to be recalled by
25 seniority back to their jobs.

Page 11

1       CEDENO
2  Q.    What do you mean when you say
3  classifications?
4  A.    There are different classifications,
5  classifications are your job titles;
6  bartender, server, room attendant, minibar
7  attendant, doorman, bellmen et cetera.
8  Q.    I'm going to show you this document
9  that I have marked for identification as P1,
10 that I'll have marked as Cedeno 1.
11     (Whereupon, the aforementioned Case
12 Produce was marked as Cedeno 1, as of this
13 date by the reporter.)
14 Q.    I'm going to ask you to review the
15 document that I have just given you marked as
16 Cedeno 1.  When you're finished reviewing it,
17 just let me know.  Do you recognize the
18 document that I have just given you?
19 A.    Yes.
20 Q.    What do you recognize this document to
21 be?
22 A.    This is a document that I produce.
23 It's called a Case Produce.  It's when I open
24 up a case.  It's a form of document that I do
25 to open a case.

Page 12

1       CEDENO
2  Q.    And what case did this involve?
3  A.    Mr. Rivera's case as far as the hotel
4  violating his seniority to be recalled to be
5  placed back as a bartender.
6  Q.    When you say, "As far as the hotel
7  violating his seniority," what do you mean by
8  that?
9  A.    The bartenders were called by their
10 classification seniority.  Being that there
11 are, when the hotel opened up it was two more
12 bars that was open, the Rose Bar and the
13 Champagne Bar, by seniority the bartenders
14 have the right to choose which bar they work
15 in.  The hotel violated that with Mr. Rivera.
16 They did not allow him to choose, Mr. Lai,
17 first name is Rajan.
18 Q.    Do you know what section of the union
19 contract was violated?
20 A.    Not offhand, I can't quote the
21 section.
22 Q.    I'm going to show you this document
23 that I would like to have marked for
24 identification as Cedeno Number 2.
25     (Whereupon, the aforementioned

CEDENO

1           CEDENO
2 Industrywide Collective Bartending Agreement
3 was marked Cedeno 2, as of this date by the
4 reporter.)
5 Q.    Do you recognize the document that I
6 have just given you?  This has been marked
7 for identification as Cedeno 2.
8 A.    Yes.
9 Q.    What do you recognize that document to
10 be?
11 A.    That's our Industrywide Collective
12 Bartending Agreement.
13 Q.    Is this the contract that was violated
14 with respect to Mr. Rivera, if you know?
15 A.    I have to look at this first.
16 Q.    Take a look at it.  In particular, I'd
17 like you to look at Page 7.
18          MR. SALTZMAN:  Let him know
19     when you're ready.
20 A.    I'm ready.
21 Q.    Do you know, is this the contract that
22 was violated with respect to Mr. Rivera's
23 seniority rights?
24 A.    This is not it.
25 Q.    Do you know which one it is?

1           CEDENO
2 A.    I do not believe you are going to find
3 it in any other written agreement.  We are
4 talking about an issue of practice in the
5 department.
6 Q.    Can you please elaborate.
7 A.    Sure.  Besides the contract, in every
8 hotel, in every department there is
9 established practice that they have there.
10 For example, you won't see it mentioned here,
11 there's shift seniority.  Shift seniority is
12 if I work in the a.m. and you work in the
13 p.m., and we might have a practice where we
14 get laid off by shift seniority versus the
15 contract for department seniority, that is
16 not into the contract, because with respect
17 to hired in that classification, I could be
18 less used as a bartender.
19     For instance, in the a.m. shift and
20 the p.m. shift, you could have more years of
21 service as a bartender in the hotel, but
22 there is a layoff and it only involves the
23 p.m., you would be laid off and I will
24 continue in my shift.
25 Q.    Let's talk about the practice as

1           CEDENO
2 related to Carlos River's grievance, if at
3 all?
4 A.    It's related, because the bartenders
5 in the Plaza Hotel worked under one
6 seniority, and depending on where you were in
7 the seniority dictated where you could choose
8 to go to work whether it's the Oyster Bar,
9 Palm Court or the Oak Room bar, his
10 seniority gave him the right to, if they are
11 available, if he is in line in seniority for
12 them.
13 Q.    How many classifications were there in
14 2008 at the Plaza Hotel for bartenders?
15 A.    Just one.
16 Q.    So there was no service bartender
17 title at that time?
18 A.    No, that was something the hotel
19 argued.  Because if you looked at the
20 agreement that was done with hotel, the hotel
21 chose just for pay services.  All bartenders
22 would be paid at the bartender service rate
23 of pay, which is a higher rate of pay.
24 Q.    What do you mean?
25 A.    When they negotiated the contract for

1           CEDENO
2 the Plaza's reopening, there were certain pay
3 rates that were negotiated, depending on what
4 the hotel wanted to do, how it wanted to
5 operate.  So one of the agreements that was
6 reached, was as any bartender would be
7 recalled back would be paid at the service
8 bartender rate of pay.
9 Q.    This was a higher rate?
10 A.    That's correct.
11 Q.    You said that the hotel tried to
12 argue, something like that?
13 A.    Mr. Lai, Mr. Rajan Lai, at the time.
14 Q.    When did you bring the grievance up to
15 him?
16 A.    It was sometime in March of 2008.  I
17 can't remember the exact date.
18 Q.    What did Mr. Lai argue?
19 A.    That Mr. Rivera, along with
20 Mr. Tejada, Mr. Ebelio Tejada were service
21 bartenders.
22 Q.    He argued they were service bartenders
23 at the Plaza in 2008?
24 A.    That's correct.  No, I'm sorry it's
25 not correct.  He argued that that was their

CEDENO

1
2 title, and because of such, that's why he
3 placed them in the Palm Court, that they did
4 that alone, that they weren't qualified.
5 Q.    He argued that that was their title in
6 2005?
7 A.    That's correct.
8 Q.    How many bartender classifications did
9 the Plaza Hotel have in 2005 for bartending
10 positions?
11 A.    I don't know offhand, I would have to
12 look at the document, the recall list to be
13 able to see that.
14 Q.    And as far as you know, Mr. Rivera was
15 a service bartender at the Plaza in 2005?
16 A.    No.
17 Q.    What position did he hold?
18 A.    He was a bartender.
19 Q.    Do you know where he worked?
20 A.    In the Oak Bar.
21 Q.    I want to return to Cedeno Number 1.
22 I want to draw your attention to that in the
23 middle of the page.  It says contact, can you
24 please refer to what that refers to.
25 A.    That is the first contact that I had

CEDENO

1
2 with the member.  So 3/13 at 9:30 Mr. Rivera
3 came to my office according to this document.
4 Q.    Turn to the next page.  Can you please
5 tell us what the meeting report section
6 discusses?
7 A.    That is my conversation with
8 Mr. Rivera, and he was accompanied by
9 Mr. Ebelio Tejada, he was the other bartender
10 also in the grievance.
11 Q.    Can you just read the handwritten
12 section on the top.  I can't read that very
13 well, starting with --
14 A.    Sure.  Where it says Joseph Jimenez?
15 Q.    Yes, start there.
16 A.    "Barback is being told he is a runner,
17 but he is a barback."
18 Q.    How about the one just under that?
19 A.    "Palm Court bartender is being made to
20 set up glasses for servers and make
21 (inaudible) for servers, now the servers have
22 to," and I guess I didn't finish.
23 Q.    Turn to the next page.  Can you tell
24 us what those notes represent?
25 A.    They're not mine, so I don't know.

CEDENO

1
2 Q.    Is that part of this document?
3 A.    No, that was added on.
4 Q.    It was added on.  All right, so let's
5 talk about that first meeting that you had
6 with Mr. Lai in March of 2008.  Can you tell
7 us how it came about?
8        MCLANE:  I'm going to object to
9 the form.
10 Q.    You can answer.
11 A.    That meeting comes about from the
12 grievance, Mr. Rivera coming to me with
13 Mr. Tejada, so I have to follow up with a
14 meeting at the hotel when that occurs.
15 Q.    Did you schedule a meeting?
16 A.    Yes.
17 Q.    Tell us what was discussed?
18 A.    Why Mr. Rivera and Mr. Tejada were
19 placed in the back of the Palm Court in the
20 service bar and not allowed to work in the
21 front bars.
22 Q.    What exactly did you say to Mr. Lai?
23 A.    Just that, "Why did you not allow them
24 to work in the front bars?"
25 Q.    What did Mr. Lai say?

CEDENO

1
2 A.    He said to me, "Because they were
3 service bartenders and they were not
4 qualified to work in the front bars."
5 Q.    What did you say in response?
6 A.    How did he come to that assumption
7 that they were not qualified, and that no one
8 was recalled back as a service bartender;
9 that was just an issue of pay.
10 Q.    What did he say?
11 A.    He said he just felt they were not
12 qualified and that's why he placed them
13 there.
14 Q.    Did he give any reasons as to why he
15 believed that Mr. Rivera was not qualified?
16 A.    He gave a reason, but I don't know if
17 it was particular to Mr. Rivera or
18 Mr. Tejada, and he mentioned something about
19 he spoke to one of the managers that was
20 there prior to the closing of the hotel.
21 Q.    Okay.
22 A.    That was the reason he gave.
23 Q.    So his basis for believing that
24 Mr. Rivera was not qualified was a
25 conversation that he had with somebody else?

1          CEDENO
2  A.    That's correct.
3  Q.    And he left it at that?
4  A.    Yes.
5  Q.    What did you do in response to
6  Mr. Lai's position?
7  A.    What did I do?
8  Q.    Yes.
9  A.    I argued back that that's not what
10 they did.  I have personally worked with
11 Mr. Rivera, and he was a bartender in the
12 front bar, that I also witnessed Mr. Tejada
13 occasionally working as a bartender while I
14 was there.
15      I also argued, that under the
16 agreement that the union reached with the
17 hotel, that they were supposed to be trained
18 and then evaluated, and then if there was any
19 dispute that that should have been brought up
20 with us and that had not been done.
21 Q.    So he determined that Mr. Rivera was
22 not qualified prior to the training?
23 A.    That's correct.
24 Q.    And he determined that Mr. Rivera was
25 not qualified prior to Mr. Rivera being

1          CEDENO
2  evaluated after training?
3  A.    That's correct.  To my knowledge, he
4  didn't use anything in his training to make a
5  decision on either Mr. Rivera or Mr. Tejada.
6  Q.    Just to be clear, there were training
7  materials; is that what you're saying?
8  A.    They were trained by the hotel, so
9  they went through formal training.  If I'm
10 not wrong, I believe they went through a week
11 or two weeks' worth of training just for
12 their positions.
13 Q.    And do you know who ended up getting
14 the front bar positions on or around
15 March 2008?
16 A.    There was a gentleman by the name of
17 Leon Flanagan, who was a recalled bartender.
18 He did get one of them, and then all the
19 other positions filled were all new hires.
20 Q.    Did you meet any of the new hires?
21 A.    I don't understand.
22 Q.    On or around March of 2008, did you
23 have occasion to meet with any of the front
24 bartenders that were new employees?
25 A.    Yes.

1          CEDENO
2  Q.    Who?
3  A.    I can't recall the names, I'm sorry.
4  Q.    About how many?
5  A.    I would say about between three and
6  five of them.
7  Q.    If you can, spell out what was the
8  average age, if you had to estimates, of each
9  of these new workers?
10 A.    Mid 20's, maybe early 30's at the
11 oldest.
12 Q.    Did you ever come to learn whether or
13 not they had any experience as bartenders?
14 A.    No, I never went into that detail.
15 Q.    Did you ever have to represent any of
16 these individuals in any work-related
17 matters?
18 A.    The new employees?
19 Q.    Yes, sir.
20 A.    Not that I recall.
21 Q.    Do you know who Robert Kenyan
22 (phonetic) is?
23 A.    The name rings a bell.
24 Q.    I'm going to back up a little.  I'm
25 going to ask you about your union.  How big

1          CEDENO
2  is your union, Local 6?
3  A.    We have grown the last few years.  We
4  were 25,000.  I would say we're way above
5  that now close to 30,000, if not more.
6  Q.    How many people do you represent in
7  the capacity as a business agent?
8  A.    Me, myself?
9  Q.    Yes, sir.
10 A.    Between three to five thousand.
11 Q.    How many grievances do you file a year
12 on average?
13 A.    When you say "file," in what capacity?
14 Q.    I guess, let's start with the
15 grievance process, what is the grievance
16 process as you know it?
17 A.    In what aspect?
18 Q.    Your involvement.
19 A.    But as far as what comes to me
20 directly?
21 Q.    Let's say a grievance comes to you
22 directly.
23 A.    Members will either approach me by way
24 of making an appointment to come to my
25 office, or interactions with me in the hotel.