Page 25

1    CEDENO
2  They would ask me questions. Sometimes they
3  would come to me directly with a problem, I
4  got suspended, I got terminated. Once that
5  is done, I would do the next step, what you
6  see here. I open a case, which is then
7  followed up with a meeting with management,
8  and I try to resolve the issue.
9  Q.    Okay. If it doesn't resolve?
10 A.    If we reach an impasse, we start the
11 process for arbitrations, which is the case
12 gets filed, paperwork get drawn on and the
13 first step of that is mediation.
14 Q.    Okay.
15 A.    Mediation is where the hotel, with the
16 union, with their negotiations try to resolve
17 the issue without going to arbitration. If
18 that's achieved, it is put in the form of
19 writing, and the agreement is signed by both
20 parties; that is the end.
21       In the case when we do not reach an
22 agreement, then the case goes forward, which
23 is called the grievance board, and the
24 grievance board is made up of all the hotels,
25 New York Trades Board Council. With the

Page 26

1    CEDENO
2  union, the grievance board comes in, and the
3  panel votes whether their case has enough to
4  go forward to arbitration or not.
5        If the case passes, and the member is
6  assigned an attorney, the attorney reviews
7  the case file and could subpoena witnesses or
8  other documents he or she feels is necessary,
9  and then the case will have a date for
10 arbitration where it's heard by an
11 arbitrator. if the case is denied, that's the
12 end of the case.
13 Q.    So after the meeting that you had with
14 Rajan Lai on or around March 2008, were there
15 any other meetings?
16 A.    There was.
17 Q.    Can you please tell us when that
18 meeting took place?
19 A.    The exact date, I don't remember, but
20 it was sometime after that, the March meeting
21 where the hotel was meeting with the union to
22 discuss some of the problems that had
23 occurred, or come across during their
24 opening. And at one of those meetings, I
25 brought up the issue of Mr. Rivera and

Page 27

1    CEDENO
2  Mr. Tejada to the hotel with my boss, at the
3  time, President Michael Simo. And at that
4  time, the hotel offered, made an offer to the
5  union to be passed on to the members, to see
6  if Mr. Rivera and Mr. Tejada were interested,
7  where they offered them money either to
8  leave, and there was another offer of money
9  to stay but in their current positions where
10 they were.
11       I went back, related the offer to both
12 gentlemen, both gentlemen denied the offer.
13 They were supposed to place them at that time
14 in the front bars if they were to refuse, but
15 Mr. Lai never followed through on that. He
16 denied that.
17 Q.    So Mr. Lai agreed to reinstate
18 Mr. Rivera to the front bar?
19 A.    Mr. Rivera and Mr. Tejada, that was
20 part of the agreement, that if they refused
21 either or, to walk away totally or payment to
22 stay where they were, they were supposed to
23 be reinstated to the front bars, and he
24 denied that at the end.
25 Q.    What happened next?

Page 28

1    CEDENO
2  A.    That's when I filed the case for
3  arbitration.
4  Q.    I guess you continued to stay involved
5  in the case after that point?
6  A.    Yes.
7  Q.    In what capacity?
8  A.    Well, I was the business agent that
9  filed the case, so I have to be there with
10 them when they go to arbitration.
11 Q.    Did you go to the arbitration?
12 A.    Yes, I did.
13       MR. SALTZMAN: Mr. Fausto, can
14    we have some water.
15       MR. ZAPATA: Sure. Let's take
16    a break. Five minutes, ten minutes?
17       MR. SALTZMAN: Five minutes.
18       (Whereupon a brief recess was
19    taken.)
20 Q.    So when the case went to arbitration,
21 did Mr. Lai testify?
22 A.    Yes.
23 Q.    Were you present when he testified?
24 A.    I believe I was, yes.
25 Q.    Do you know what reason Mr. Lai stated

Page 29

1      CEDENO
2  for not allowing Mr. Rivera to work as a
3  bartender at one of the front bars?
4  A.    If I'm not wrong, he stated that they
5  were not qualified.
6  Q.    Did he state what the basis of that
7  belief was?
8  A.    At the arbitration?
9  Q.    Yes, sir.
10 A.    No, I don't think he did.  If my
11 memory recalls, that's when the arbitrator
12 questioned him directly.
13 Q.    And what did you hear?
14 A.    From who; what the arbitrator said?
15 Q.    What did Lai say?
16 A.    He just said that he felt they were
17 not qualified, and I remember the arbitrator
18 questioned him on how did he come to that
19 determination.
20        I can't remember what was his exact
21 response to that at the time.
22 Q.    Leon Flanagan, do you know who he is?
23 A.    Yes.
24 Q.    Who is he?
25 A.    He is a bartender.

Page 30

1      CEDENO
2  Q.    Was he employed at the Plaza Hotel as
3  a bartender in 2005?
4  A.    Yes.
5  Q.    Was he recalled to the Plaza in 2008?
6  A.    Yes.
7  Q.    Do you know if he was permitted to
8  work at one of the front bars at the Plaza
9  Hotel?
10 A.    He was.
11 Q.    And is it fair to say that Carlos
12 Rivera and Leon Flanagan were similarly
13 situated in 2008 in terms of their titles?
14 A.    Yes.
15 Q.    Do you know Leon Flanagan's
16 background, his ethnic background?
17 A.    He is Irish.
18 Q.    Do you know what color skin he has?
19 A.    White.
20 Q.    Do you know how old he is, like the
21 ballpark?
22 A.    I would say Leon is about my age,
23 early 40's.
24 Q.    Did you speak to anybody else from the
25 Plaza with respect to this grievance?

Page 31

1      CEDENO
2  A.    In what capacity?
3  Q.    Aside from talking to Rajan Lai about
4  the grievance issued by Mr. Rivera, did you
5  speak to anybody else that represented the
6  Plaza with respect to the grievance?
7  A.    Yes, as I stated earlier, when there
8  was a meeting between the hotel and the
9  union, with Michael Simo, there was, I'm
10 sorry, I'm trying to remember the name, I
11 know one was Guy Iveshi at the hotel, and the
12 other gentleman's name was Martin.  I
13 apologize, I can't remember Martin's last
14 name.  He was also present.
15 Q.    Do you know what Guy Iveshi's title
16 is?
17 A.    He represented the owners.
18 Q.    And Martin?
19 A.    Martin represented Fairmont, if I'm
20 not wrong.
21        MR. ZAPATA:  Let me just take
22    one minute.
23        (Whereupon a brief recess was taken.)
24 Q.    When you spoke to Rajan Lai on or
25 around March of 2008 about the grievance that

Page 32

1      CEDENO
2  was initiated by Carlos Rivera, and he told
3  you that Carlos River was not qualified, and
4  he had spoken to another manager that had
5  been at the Plaza in 2005, did he identify
6  who that other manager was?
7  A.    He did.  He did identify who that is
8  but I can't remember his name right now.
9        MR. ZAPATA:  Okay, I have no
10    further questions.
11 EXAMINATION BY
12 MR. MCLANE:
13 Q.    I have couple questions.  Mr. Cedeno,
14 my name is William McLane.  I'm an attorney
15 with the law firm Littler Mendelson, P.C.,
16 and I represent the defendants in this
17 matter.  I have a couple of questions
18 regarding your testimony today.
19        You testified that the hotel had made
20 an offer to Mr. Rivera and Mr. Tejada
21 regarding some cash payment to them, that if
22 they either left the job or stayed in the
23 position that they were in; do you recall
24 that?
25 A.    Yes.

Page 33

CEDENO

1
2  Q.   Was that offer in writing?
3  A.   Yes, it was.
4  Q.   Was the portion of the offer, where
5  you testified that if they didn't accept
6  those two options, that they would be
7  returned to front bartender status, was that
8  in writing?
9  A.   No, it was not.
10 Q.   Why wasn't it; do you know?
11 A.   I don't know.
12 Q.   Just take a look at what was marked as
13 Cedeno 1. I don't know if it's still in
14 front of you or not.
15 A.   Yes.
16 Q.   And the meeting report portion, that's
17 your handwriting on the second page?
18 A.   Yes.
19 Q.   While we're at it, is the first page
20 in your handwriting, as well?
21 A.   Yes.
22 Q.   Do you know whose handwriting appears
23 on page three?
24 A.   No.
25 Q.   Is it normal to have attached to a new

Page 34

CEDENO

1
2  case report, the management's position on a
3  particular potential grievance?
4  A.   Yes.
5  Q.   Go ahead.
6  A.   Because my report gets filed away to a
7  legal department, and they make their own
8  notes and other additions, and they put it
9  into the file.
10 Q.   So once you process the new case
11 report, it's then sent on to legal for
12 review?
13 A.   Yes.
14 Q.   And if possible, legal will contact
15 someone in management at the hotel?
16 A.   That's correct.
17 Q.   Just, again, looking at the second
18 page of that. Mr. Zapata had you read
19 portions of it. Looking at this document,
20 does it look to you like it's complete? In
21 other words, does it look to you that it may
22 have been altered, some words may have taken
23 out?
24 A.   No.
25 Q.   Is it practice for you to stop writing

Page 35

CEDENO

1
2  mid writing?
3  A.   Yes.
4  Q.   You could have been interrupted?
5  A.   Could be a number of things, another
6  questions asked. Since I don't have the
7  option of someone to write notes for me...
8  Q.   Would you have taken notes of every
9  conversation you had with Mr. Rivera
10 regarding this grievance?
11 A.   Every conversation?
12 Q.   Yes.
13 A.   No.
14 Q.   Would you consider the conversation
15 where you took those notes to be a formal
16 conversation?
17 A.   That's correct.
18 Q.   Did you have any other formal
19 conversation with Mr. Mr. Rivera regarding
20 this grievance?
21 A.   When you ask "formal conversation,"
22 are you talking about in my office?
23 Q.   Whatever you consider a formal
24 conversation, I mean that conversation. We
25 agreed, where you took those notes was a

Page 36

CEDENO

1
2  formal conversation?
3  A.   That's correct.
4  Q.   Are there other types of meetings that
5  you consider formal meetings where a member
6  does not come into the office and file?
7  A.   The meeting at the hotel, at the HRA
8  Department, if there were formal meetings
9  with the HRA director, yes.
10 Q.   So I take it you do on-site visits at
11 the hotel?
12 A.   That's correct.
13 Q.   If you do an on-site visit when you're
14 talking to rank and file, that not a formal
15 meeting?
16 A.   That's correct.
17 Q.   How many formal meetings did you have
18 with Mr. Rivera regarding this grievance?
19 A.   I believe there were two.
20 Q.   Where was the second one?
21 A.   In the HRA office.
22 Q.   Who was at that one?
23 A.   Mr. Rivera, myself, Mr. Tejada and Mr.
24 Rajan.
25 Q.   And was that where an offer was made

Page 37

CEDENO

1
2 to Mr. River and Mr. Tejada?
3  A.    I'm sorry?
4  Q.    There was an offer made at the hotel
5 to accept some money in lieu of leaving their
6 position or as an option some money to stay
7 in the positions that they were recalled in?
8  A.    No.
9  Q.    What was the purpose of the second
10 formal meeting?
11  A.    The second meeting was to bring the
12 grievance to the hotel to let them know that
13 the gentlemen had filed the grievance.
14  Q.    Is that the meeting where Mr. Lai
15 indicated that the plaintiff and Mr. Tejada
16 were not qualified?
17  A.    That's correct.
18  Q.    Did you have an opportunity to read
19 the impartial chairman's position on the
20 grievance?
21  A.    Yes.
22  Q.    When was the last time you look at
23 that?
24  A.    Last Friday.
25  Q.    Would agree the impartial chairperson

Page 38

CEDENO

1
2 summarized the testimony that was given to
3 him at the deposition?
4  A.    Yes.
5  Q.    And he accurately summarized the
6 testimony?
7  A.    Yes.
8  Q.    Was there anything summarized by the
9 arbitrator that was not correct?
10  A.    Not to my recollection.
11  Q.    In your formal meeting with
12 Mr. Rivera, where you went for arbitration
13 for the new case report, you took your
14 information that the hotel had misqualified
15 his seniority because of his ethnicity.
16  A.    Mr. Rivera mentioned that, but I don't
17 know if that was in my office or if there was
18 a conversation with me at the on-site visit
19 to the hotel.
20  Q.    If he had mentioned that in a formal
21 meeting where you took notes, would that be
22 something in your mind important enough to
23 reduce to writing?
24  A.    Not necessarily.
25  Q.    And did Mr. Rivera indicate during

Page 39

CEDENO

1
2 that first formal meeting that he believed
3 that the hotel seniority position had
4 anything to do with his age?
5  A.    I'm sorry, can you restate that.
6  Q.    Same question as the last one
7 regarding his ethnicity. Let's mention age;
8 did you think that age played a role?
9  A.    I can't remember.
10  Q.    You do remember having a conversation
11 where he mentioned that the ethnicity played
12 a role in him not being placed as a front
13 bartender?
14  A.    Yes.
15  Q.    And the second meeting with the
16 plaintiff and Mr. Lai at the hotel, did you
17 take any notes at that meeting?
18  A.    Yes.
19  Q.    And were those notes produced in
20 accordance with the subpoena served at the
21 meeting?
22  A.    I don't know.
23       MR. SALTZMAN:  All notes that
24    were made by Mr. Cedeno have been
25    produced.

Page 40

CEDENO

1
2       MR. MCLANE:  Okay.
3  Q.    At the meeting with Mr. Lai, was the
4 issue of Mr. Rivera's ethnicity raised?
5  A.    Yes.
6  Q.    And in what context?
7  A.    I mentioned it.
8  Q.    To whom?
9  A.    To Mr. Lai.
10  Q.    What did you say exactly to Mr. Lai?
11  A.    I said Mr. Lai, this appears to be
12 discrimination of some sort on the surface.
13  Q.    What else?
14  A.    Because I personally saw the
15 bartenders that he hired, and I looked at
16 Mr. Rivera and Mr. Tejada and they had
17 mentioned it to me, and I said this appears
18 on the surface that you discriminated because
19 of their race.
20  Q.    What did Mr. Lai said?
21  A.    He laughed and he said it had nothing
22 to do with that.
23  Q.    Who was present?
24  A.    Mr. Rivera, Mr. Tejada, myself and Mr.
25 Lai.

Page 41

1            CEDENO
2  Q.    And did you respond to Mr. Lai's
3  response to the raised issue?
4  A.    Yes, I told him he better be careful
5  what he is doing. It does appear good on the
6  surface.
7  Q.    What was the basis of your belief that
8  this appeared to be somehow discriminatory?
9  A.    I looked, we looked at Mr. Flanagan,
10 who was a white male, who was a recall
11 member, he is not held back in any way, shape
12 or form from requesting a front bar position.
13 Then we have two other bartenders, who are of
14 Hispanic origin, who made the same request
15 and are denied, and looked at who is
16 currently there, and they are all white or
17 female. They are all male or female
18 ethnicity (sic), I'm sorry.
19 Q.    And these conversations occurred
20 before the arbitration?
21 A.    That's correct.
22 Q.    Was this issue of Mr. Rivera's
23 ethnicity raised at the arbitration?
24 A.    I didn't.
25 Q.    Why not?

Page 42

1            CEDENO
2  A.    At the time we were dealing with the
3  contract.
4  Q.    Contract violation of his seniority
5  had something to do with his ethnicity?
6  A.    Can you rephrase.
7  Q.    You said you were dealing with the
8  contract issue of his seniority; in other
9  words, his seniority was breached by the
10 hotel?
11 A.    Correct.
12 Q.    Did Mr. Rivera indicate to you that he
13 believed that that breach had something to do
14 with his ethnicity?
15 A.    Yes.
16 Q.    Do you know why?
17 A.    Because my issue was based on the
18 seniority and that was clearly my issue on
19 the case.
20 Q.    When Mr. Flanagan was recalled to the
21 hotel, is it your understanding that he was
22 recalled as a service bartender in the Palm
23 Court?
24 A.    All the bartenders were recalled under
25 the same title.

Page 43

1            CEDENO
2  Q.    Did Mr. Flanagan come to you to
3  complain that he was being recalled as a
4  service bartender?
5  A.    No.
6  Q.    Do you know if he ever complained to
7  anyone about being a service bartender?
8  A.    Not to my knowledge.
9
10
11
12 Q.    Mr. Cedeno, Mr. Zapata handed to you
13 what is previously marked as P 4; have you
14 seen this document before?
15 A.    What is this document?
16 Q.    This is the list of the bartenders at
17 the Plaza prior to its closing.
18 A.    Oh, I'm sorry. This is the list of
19 the bartenders.
20 Q.    And looks like a date on the bottom
21 left, assuming it's an American date,
22 November 6, 2008?
23 A.    Yes, that's correct.
24 Q.    Can we mark this as Cedeno 3.
25       (Whereupon, the aforementioned List of

Page 44

1            CEDENO
2  bartenders was marked Cedeno Exhibit 3, as of
3  this date by the reporter.)
4  Q.    The court reporter just handed you
5  what she has marked as Cedeno Exhibit 3; have
6  you ever seen this document before?
7  A.    Yes.
8  Q.    What is this document?
9  A.    This is the list of the members, the
10 bartenders and barbacks prior to the closing.
11 Q.    And under the heading titled
12 "Department," there are several different
13 departments there, would you agree?
14 A.    That's correct.
15 Q.    And Mr. Rivera is listed as private
16 dining department; do you see that?
17 A.    Yes.
18 Q.    Is that accurate?
19 A.    No.
20 Q.    Do you know who composed this
21 document?
22 A.    The hotel did.
23 Q.    When would you have first seen this
24 list?
25 A.    I saw this in conversations prior to

Page 45

1    CEDENO
2  the hotel reopening.
3  Q.   And what did you do to inform the
4  hotel that that list was incorrect?
5  A.   Incorrect as far as what?
6  Q.   Well, is this list correct?
7  A.   As far as where the department is?
8  Q.   As far as anything.
9  A.   No, this his is not correct.
10 Q.   What did you do to inform the hotel
11 that this list was incorrect?
12 A.   Nothing.
13 Q.   Prior to today, when was the last time
14 you spoke to Mr. Rivera?
15 A.   I believe, if I'm not accurate,
16 Mr. Rivera called me sometime in January, and
17 I didn't speak to him. I heard his voice
18 message that told me that I was possibly
19 going to be subpoenaed for his case.
20 Q.   Had you ever had any conversation with
21 him about this case?
22 A.   As far as when?
23 Q.   As far as any time?
24 A.   No.
25 Q.   Do you know what this case is about?

Page 46

1    CEDENO
2  A.   Briefly.
3  Q.   What's your brief understanding of
4  this matter?
5  A.   That Mr. Rivera is suing the hotel.
6  Q.   Do you know why?
7  A.   I believe it's on the basis of
8  discrimination.
9  Q.   Do you know anything else about that?
10 A.   No.
11 Q.   As a result of the impartial
12 chairman's decision of the arbitration, was
13 Mr. Rivera made whole of economic losses as
14 far as being misplaced from the hotel?
15 A.   Yes, as far as the arbitration.
16 Q.   Do you know at the time of the
17 arbitration whether Mr. Rivera had been
18 placed back as a front barback?
19 A.   I'm sorry.
20 Q.   Bad question. Prior to the
21 arbitration, do you know if Mr. Rivera had
22 been placed back in the Rose Room or
23 Champagne Bar?
24 A.   Not to my knowledge.
25      MR. SALTZMAN: Any other

Page 47

1    CEDENO
2  questions about anything. You want to
3  take five minutes to see, because this
4  is it. My e-mail stated let's go on
5  with the business of the union,
6  because as far as this case, he will
7  not come back for any other
8  deposition.
9       Is that on the record?
10      THE REPORTER: Yes.
11 EXAMINATION BY
12 MR. ZAPATA:
13 Q.   About how old is Ebelio Tejada?
14 A.   I have no idea. You want me to guess?
15 Q.   If you had to guess, how old he was...
16 A.   I would say Ebelio is about my age, in
17 his early 40's, in his early 40's.
18 Q.   Do you know if Rajan Lai still works
19 at the Plaza Hotel?
20 A.   He does not.
21 Q.   Do you know where he works?
22 A.   The last I heard he is in Canada
23 somewhere.
24 Q.   When did you hear that?
25 A.   Maybe a week or two before he left the

Page 48

1    CEDENO
2  hotel.
3  Q.   Do you know where he is employed by
4  any chance?
5  A.   No, I do not.
6  Q.   You just testified that when you had
7  the second meeting with Mr. Rajan Lai
8  regarding Mr. Carlos Rivera's grievance, that
9  you raised the possibility that there may
10 have been discrimination, you said Rajan Lai
11 laughed; what position did Rajan Lai hold
12 when you had that conversation?
13 A.   He was the human resource director for
14 the hotel.
15 Q.   Can you please tell us on or around
16 when this conversation took place?
17 A.   Sometime after Mr. Rivera's and Mr.
18 Tejada's office meeting sometime in March.
19 Q.   Do you know if there was ever any
20 investigation on the part of the Plaza in
21 connection with what you said regarding
22 discrimination?
23 A.   Not to my knowledge.
24 Q.   Why did you say that you believe that
25 it appeared to be discriminatory that

Page 49

1  CEDENO
2  Mr. Rivera was not permitted to work at the
3  front bar?
4       MR. MCLANE: Objection; asked
5       and answered.
6       MR. SALTZMAN: You can answer.
7  A.   I said it appeared because no one
8  actually made the statement, no one said I
9  didn't hire or I didn't move Mr. Tejada or
10 Mr. Rivera to the front bar because they're
11 Hispanic, so that's why I said appears.
12 Q.   What's the basis?
13      MR. MCLANE: Objection.
14      MR. SALTZMAN: You can answer.
15 A.   It did appear when I looked at
16 Mr. Flanagan, and then I looked at who was at
17 the front bar ethnicity, I couldn't see any
18 other legitimate reason, and they, Mr. Rivera
19 and Mr. Tejada, had raised that, and
20 personally I had to agree, but I didn't have
21 any proof professionally, so I just moved on
22 the seniority issue.
23      MR. ZAPATA: I have no further
24      questions.
25      MR. MCLANE: I have one more.

Page 50

1  CEDENO
2       (CONTINUED ON THE NEXT PAGE.)
3
4  EXAMINATION BY
5  MR. MCLANE:
6  Q.   Do you know who made the decision to
7  return Mr. Rivera to the Palm Court?
8       MR. ZAPATA: To the where?
9       MR. MCLANE: To the Palm Court.
10 A.   No, I do not.
11      MR. SALTZMAN: Thank you. Such
12      deposition is closed and witness is
13      discharged.
14      As we closed, Mr. Cedeno
15      informed me that one of his answers
16      would require a little amplification
17      so that the record is complete.
18      In furtherance to give this
19      testimony today, and since we were
20      still here, the attorneys and the
21      court reporter, we're taking time to
22      respond fully to one of the questions.
23      Mr. Cedeno, would you like to
24      amplify one of your answers?
25      MR. CEDENO: Sure. I was asked

Page 51

1  CEDENO
2  by the hotel's attorney the accuracy
3  of the document Cedeno 3, and I was
4  asked if this document was correct or
5  not, and I stated it wasn't. It
6  wasn't as far as it listed the
7  departmental seniority.
8       The reason it was not important
9  and was not mentioned at the meeting
10 when we recalled the classifications
11 is we don't go by the department
12 seniority, we go by the job
13 classification seniority. So going
14 back to fix the department seniority,
15 it doesn't matter. All that mattered
16 was the classification.
17      MR. SALTZMAN: Take a moment to
18      see if anyone wants to follow up with
19      a question.
20      MR. ZAPATA: Just to be clear,
21      the meeting where you first saw the
22      document that's been identified as
23      Cedeno Number 3, what was the purpose
24      of that meeting?
25      MR. MCLANE: Objection. I'm

Page 52

1  CEDENO
2  not sure if it's ever been stated that
3  he saw that at a particular meeting
4  for the first time.
5       MR. ZAPATA: I'll strike that.
6  All right, no further questions.
7       MR. SALTZMAN: Thank you
8  everybody. Now I believe it's closed
9  and we're going to leave.
10      (Whereupon, at 11:43 a.m., the
11 examination of this witness was
12 concluded.)
13
   _____
14      EDWARD CEDENO
15
16
17 Subscribed and sworn to before me
18 this _____ day of _____ 2011.
19
20 _____
      NOTARY PUBLIC
21
22
23
24
25

Page 53

```
 1              CEDENO
 2            E X H I B I T S
 3
 4  CEDENO     EXHIBITS:              PAGE
 5  EXHIBIT    EXHIBIT
 6  1          Case Produce            11
 7  2          Industrywide Collective
 8             Bartending Agreement    12
 9  3          List of Bartenders      43
10
11
12             I N D E X
13  EXAMINATION BY           PAGE
14  MR. ZAPATA               4, 47
15  MR. MCLANE               32, 50
16
17
18
19
20
21
22
23
24
25
```

Page 54

```
 1              CEDENO
 2         C E R T I F I C A T E
 3
 4  STATE OF NEW YORK  )
                       : SS.:
 5  COUNTY OF KINGS    )
 6
 7       I, VANESSA HARRIS, a Notary Public for and
 8  within the State of New York, do hereby certify:
 9       That the witness whose examination is
10  hereinbefore set forth was duly sworn and that such
11  examination is a true record of the testimony given
12  by that witness.
13       I further certify that I am not related to
14  any of the parties to this action by blood or by
15  marriage and that I am in no way interested in the
16  outcome of this matter.
17       IN WITNESS WHEREOF, I have hereunto set my
18  hand this    day of March, 2011.
19
20       _____
21            VANESSA HARRIS
22
23
24
25
```

Page 55

```
 1   CEDENO
 2   ERRATA SHEET
     PAGE/LINE          CORRECTION
 3   _____   _____
 4   _____   _____
 5   _____   _____
 6   _____   _____
 7   _____   _____
 8   _____   _____
 9   _____   _____
10   _____   _____
11   _____   _____
12   _____   _____
13   _____   _____
14   _____   _____
15   _____   _____
16   _____   _____
17   _____   _____
18   _____   _____
19   _____   _____
20   _____   _____
21   _____   _____
22   _____   _____
23   _____   _____
24   _____   _____
25   ---------  ----------
```

Exhibit "D"

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------------X
     CARLOS RIVERA,
 4
                                       Plaintiff,
 5
 6          -against-    Civil Action No:
                         1:10-cv-06661(WHP)
 7
 8   PLAZA ACCESSORY OWNER LP, EL-AD
     PROPERTIES NY LLC, CPS 1 REALTY LP LLC,
 9   AND FHR (N.Y.) LLC,
10                                    Defendants.
     ------------------------------------------X
11
12
13
14
15       EXAMINATION BEFORE TRIAL of ANTHONY
16   EVANGELISTA taken by the Plaintiffs, held
17   at the offices of Fausto E. Zapata, Jr.,
18   P.C., on June 20, 2011, at 9:00 p.m.,
19   before a Notary Public of the State of New
20   York.
21   ******************************************
22        BARRISTER REPORTING SERVICE, INC.
23                  120 Broadway
24             New York, N.Y. 10271
25                212-732-8066
```

Page 2

1
2  APPEARANCES:
3
4  THE LAW OFFICES OF FAUSTO E. ZAPATA, JR., P.C.
5      Attorneys for Plaintiff
       277 Broadway
6      Suite 501
       New York, New York 10007
7
   BY: FAUSTO E. ZAPATA, JR., ESQ.
8      (212)766-9870
       Fz@fzapatalaw.com
9
10
   LITTLER MENDELSON
11     Attorneys for Defendants
       One Newark Center
12     1085 Raymond Boulevard, 8th floor
       Newark, New Jersey 07102
13
   BY: WILLIAM McLANE, ESQ.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2          STIPULATIONS
3  IT IS HEREBY STIPULATED AND AGREED by and between the
4  attorneys for the respective parties hereto, that:
5  All right provided by the C.P.L.R., and Part 221 of
6  the Uniform Rules for the Conduct of Depositions,
7  including the right to object to any question, except
8  as to form, or to move to strike any testimony at
9  this examination is reserved; and in addition, the
10 failure to object to any question or to move to
11 strike any testimony at this examination shall not be
12 a bar or waiver to make such motion at, and is
13 reserved for, the trial of this action.
14 This deposition may be sworn to by the witness being
15 examined before a Notary Public other than the Notary
16 Public before whom this examination was begun, but
17 the failure to do so or return the original of this
18 examination to counsel, shall not be deemed a waiver
19 of the rights provided by Rule 3116 of the C.P.L.R.,
20 and shall be controlled thereby.
21 The filing of the original of this deposition is
22 waived.
23 IT IS FURTHER STIPULATED, that a copy of this
24 examination shall be furnished to the attorney for
25 the witness being examined without charge.

Page 4

1              A. Evangelista
2  ANTHONY EVANGELISTA,
3      Having been first duly sworn before
4      a Notary Public of the State of New
5      York, was examined and testified as
6      follows:
7
8  EXAMINATION BY
9  MR. ZAPATA:
10 Q.     Please state your name for the
11 record.
12 A.     Anthony Evangelista.
13 Q.     Where do you reside?
14 A.     8 Yong An Dong Li, Jian Guo Men Wai
15 Avenue, Chaoyang District, Beijing, China
16 100022.
17 Q.     Good morning, Mr. Evangelista.
18 A.     Good morning.
19 Q.     Can you please state your full name
20 for the record?
21 A.     Anthony Frank Evangelista.
22 Q.     Mr. Evangelista, where are you
23 currently employed?
24 A.     I am employed in Beijing, China.
25 Q.     Who is your employer?

Page 5

1              A. Evangelista
2  A.     Fairmont Hotels and Resorts.
3  Q.     How long have you worked with
4  Fairmont Hotels and Resorts?
5  A.     About four years and two and a half
6  years right out of school so about six and
7  a half years altogether.
8  Q.     What year did you start working with
9  Fairmont Hotels?
10 A.     My first job out of school which was
11 in 2001. January of 2001.
12 Q.     In what capacity were you hired?
13 A.     I was a management trainee.
14 Q.     Did you work continuously or has
15 there been --
16        MR. McLANE: Object to the
17     form. You can answer.
18 A.     No. I left Fairmont and then did
19 other things and then came back to
20 Fairmont.
21 Q.     When did you come back to Fairmont?
22 A.     Let me see. I think it was October
23 of 2007.
24 Q.     When you worked at the Fairmont
25 between 2001 and approximately 2003, 2004

Page 6

1      A. Evangelista
2  did you have the same position throughout
3  that timeframe?
4  A.      No.
5  Q.      Your first time as management
6  trainee your title changed, correct?
7  A.      Right, that's correct.
8  Q.      It changed to what?
9  A.      Then I was promoted to assistant
10 stewarding manager.
11 Q.      Can you please describe the duties
12 that you performed as a stewarding manager?
13 Did you say assistant steward manager?
14 A.      Assistant steward, yes. I was 22
15 years old.
16 Q.      Can you describe the duties that you
17 performed while you worked as an assistant
18 steward manager?
19 A.      Yes. I was responsible for getting
20 equipment such as silverware, knives,
21 forks, other silver-type products. I was
22 responsible for garbage removal; I was
23 responsible for banquet events as far as
24 cleanup and setup. Things like this.
25 Basically I was in charge of mostly

Page 7

1      A. Evangelista
2  dishwashers, garbage men and silver
3  polishers.
4  Q.      What department did you work in?
5  A.      Food and beverage.
6  Q.      Did you hold any other titles while
7  you were employed at the Plaza -- I mean,
8  strike that. While you were employed with
9  Fairmont between 2001 and approximately
10 2003, 2004 did you hold any other titles
11 aside from what you've told us?
12 A.      Yes.
13 Q.      What other title did you hold?
14 A.      I did stewarding for about a year,
15 and then I was moved into the Oak Bar and
16 Oak Room and I was an assistant manager
17 there as well.
18 Q.      Can you please tell me the timeframe
19 when you worked at the Oak Bar/Oak Room?
20 A.      I was thinking it was between 2002
21 to 2003.
22 Q.      Can you please describe the duties
23 that you performed when you worked there?
24 A.      Sure. I was a floor manager so my
25 basic role, my only role, was to be on the

Page 8

1      A. Evangelista
2  floor and kind of direct traffic and make
3  sure people had drinks in their hands, make
4  sure tables were clean, make sure the flow
5  of the outlet was going well and just a
6  contact on the floor in case anyone needed
7  anything.
8  Q.      Do you know who Carlos Rivera is?
9  A.      Yes.
10 Q.      When did you first meet Carlos
11 Rivera?
12 A.      The exact date I couldn't tell you
13 but probably some point around then when I
14 went into the Oak Bar.
15 Q.      What position did Mr. Rivera hold
16 during the time that you worked at the Oak
17 Bar between 2002 and 2003?
18 A.      Well, I can't -- I know that he was
19 -- in the Oak Bar he was a bartender. He
20 was tending bar. I don't know the exact
21 job classification because I didn't do
22 anything administratively. I didn't do
23 payroll and I didn't do schedules so I
24 don't know but on the floor he was tending
25 bar.

Page 9

1      A. Evangelista
2  Q.      That was on a consistent basis?
3          MR. McLANE: Objection to
4      the form. You can answer.
5  A.      I believe so.
6  Q.      Now, just so that we're clear for
7  the record, between 2001 when you started
8  working at Fairmont and 2003, 2004 when you
9  continued to work at the Fairmont what work
10 location did you work at?
11 A.      The Plaza Hotel, 59th Street and
12 Fifth Avenue.
13 Q.      Now, you said that you started to
14 work again with the Plaza in late 2007,
15 correct?
16 A.      Yes.
17 Q.      In what capacity did you work at the
18 Plaza at that time?
19 A.      My role was beverage director or my
20 title was beverage director.
21 Q.      Can you please describe the duties
22 you performed as beverage director?
23 A.      Sure. I was responsible for two
24 areas: The Rose Club and the Champagne Bar.
25 My duties were mostly operational. Making

3 (Pages 6 to 9)

Page 10

```
 1              A. Evangelista
 2   sure that we had liquor, making sure that
 3   we had a good cocktail and wine program,
 4   running the floor, day-to-day operations,
 5   scheduling. Things of that nature. Being
 6   on the floor and being the face of the two
 7   bar areas.
 8   Q.    Were you involved at all with
 9   respect to the hiring of the bartenders
10   that were appointed to work at the Rose
11   Club or the Champagne Bar in 2007, 2008?
12   A.    I made recommendations for people
13   that I thought would be good bartenders and
14   then they went through the interview
15   process with my boss and then HR. They did
16   the regular interviewing process so some
17   people made it and some people didn't.
18   Q.    Were you familiar with the
19   collective bargaining agreement at -- let
20   me ask it again.
21   A.    I'm not familiar with all the
22   details of it. I know it's very, very long
23   and involved but I was aware of it and
24   having worked in a union hotel before I did
25   know about it, yes.
```

Page 11

```
 1              A. Evangelista
 2   Q.    What was your understanding with
 3   respect to the individuals that had worked
 4   at the Plaza Hotel prior to its closing in
 5   2005 that were being recalled to work at
 6   the Plaza when it reopened?
 7   A.    Can you repeat that again.
 8   Q.    What was your understanding as to
 9   what rights, if any, the individuals that
10   were recalled to work at the Plaza who had
11   already been there in 2005 -- what was your
12   understanding as to what rights, if any,
13   these individuals had with respect to their
14   recall rights?
15         MR. McLANE: I'm going to
16      object to the form. Go ahead.
17   Q.    I'll ask it again, Anthony. It
18   wasn't a good question. Did the
19   individuals that had recall rights that
20   were hired by the Plaza to return to work
21   in 2007 and 2008, were you familiar at all
22   with any of the recall rights that these
23   individuals had?
24         MR. McLANE: Let me just
25      object first to the extent that
```

Page 12

```
 1              A. Evangelista
 2      there were any recall rights for
 3      anybody in 2007 but you can go
 4      ahead and answer, Anthony.
 5   A.    Recall rights, not really. Not
 6   specifically. I just assumed that they
 7   would have the same rights as they had when
 8   they left or when the hotel closed down.
 9   Q.    Let's talk about before the hotel
10   closed down. What role, if any, did
11   seniority play with respect to the
12   bartenders?
13   A.    Well, I wasn't there when the hotel
14   closed, but what I know about is seniority
15   played a role in the scheduling. Mostly
16   scheduling and bidding for the slots and
17   schedule.
18   Q.    Can you please elaborate?
19   A.    Sure. Well, a manager would make a
20   schedule depending on business needs and
21   then that would be bided out to the
22   colleagues according to seniority. So if
23   person X had the longest tenure then they
24   would look at the schedule and pretty much
25   pick what shift they wanted to pick or what
```

Page 13

```
 1              A. Evangelista
 2   shift they wanted to have and then they
 3   would go down the list. The person with
 4   the least seniority would really not have
 5   much of a choice and would have to do
 6   whatever wasn't taken at that point.
 7   Q.    Now, just so that we're clear for
 8   the record, this is -- you're talking about
 9   the timeframe between 2001 and 2003 or '4,
10   correct?
11   A.    Well, yes. But I just want to make
12   clear I really wasn't involved
13   administratively. I wasn't allowed to
14   begin in any type of responsibility in that
15   way because I was too junior and too young.
16   For me what really mattered was on the
17   floor. I didn't have any idea why people
18   were placed where. I knew seniority and I
19   knew it was a big thing but that was not
20   something that I got involved with at all.
21   My main role was to direct the outlets once
22   everyone was there. So I didn't have any
23   admin duties.
24   Q.    Now, were you familiar with the
25   measures that the Plaza Hotel took with
```

4 (Pages 10 to 13)

Page 14

1  A. Evangelista
2  resect to recruiting candidates to work at
3  the Plaza as bartenders for I guess
4  beginning in 2008?
5  A.     Was I familiar with the measures.
6  Yes, I think there might have been some ads
7  placed. There were a lot of referrals like
8  I know this person; I know that person.
9  Things like that. Normal recruiting
10 measures I would call them.
11 Q.     When the hotel reopened in 2008 who
12 were the bartenders that worked under your
13 supervision if you remember?
14 A.     I remember a few people off the top
15 of my head. There was Laura, Heather, Rob,
16 there was Scott. That's all I remember off
17 the top of my head.
18 Q.     Did you ever have any conversations
19 with Carlos Rivera regarding his assignment
20 when the hotel reopened in 2008?
21 A.     Not that I remember, no.
22 Q.     Did you ever have any conversations
23 -- strike that. Do you know where Carlos
24 Rivera was assigned to work when the hotel
25 reopened?

Page 15

1  A. Evangelista
2  A.     He was assigned to work in the Palm
3  Court which was not one of my areas that
4  was under my supervision.
5  Q.     Did you ever have any conversations
6  with Liam Flanagan regarding Carlos Rivera
7  working at the Palm Court?
8  A.     No. I had a conversation with Liam
9  Flanagan about Liam working in the Palm
10 Court.
11 Q.     What was discussed?
12 A.     I think he made a reference as to
13 why he was working in the Palm Courts. I
14 had told him I'm not quite sure. I'm not
15 really responsible for these decisions, but
16 I could certainly bring it up to my boss
17 who was Carlos Bueno and see what we can
18 do.
19 Q.     Did you ever have any conversations
20 with Rajan Lai regarding Carlos Rivera
21 working at the Palm Court?
22 A.     No, not that I remember. Again,
23 Carlos was assigned to the Palm Court so
24 for me I was focused on the Rose Club and
25 the Champagne Bar. Any conversations I

Page 16

1  A. Evangelista
2  would have assumed that he had them with
3  his manager in the Palm Court and not with
4  me.
5  Q.     Did you have any conversations with
6  Rajan Lai regarding appointing Carlos
7  Rivera to work at one of your bars that you
8  were in charge of?
9  A.     No, I don't remember to be honest.
10 Q.     One more second. Let me find
11 something. Now, Robert Canyon, did he work
12 for you?
13 A.     Yes.
14 Q.     So he worked with you at which bar?
15 A.     He worked in the Rose Club and the
16 Champagne Bar.
17 Q.     Just so that we're clear for the
18 record, we're talking about beginning in
19 2008?
20 A.     Yes.
21 Q.     Did you know Robert Canyon prior to
22 2008?
23 A.     Yes.
24 Q.     How did you know him?
25 A.     Rob worked at Gin Lane which was a

Page 17

1  A. Evangelista
2  restaurant that I managed.
3  Q.     How long did you know him prior to
4  2008?
5  A.     About a year. About a year and a
6  half.
7  Q.     Was he a new employee in 2008 at the
8  Plaza?
9  A.     At the Plaza, yeah, he was a new
10 employee. Absolutely.
11 Q.     Were you familiar with his work
12 experience prior to him working at the
13 Plaza?
14 A.     Yes.
15        MR. McLANE: Other than what
16    he's already testified to?
17        MR. ZAPATA: Yes.
18        MR. McLANE: Other than what
19    you've already testified to that
20    year and a half or so.
21        MR. ZAPATA: All he said was
22    that he had known him for a year
23    and a half prior to. What I asked
24    him was, was he familiar with his
25    work experience.

```
                                        Page 18
 1              A. Evangelista
 2          MR. McLANE: I think his
 3      testimony is that he worked at Gin
 4      Lane but he can answer.
 5   A.    At the time, yes. I think if I
 6   remember correctly he worked at Jean
 7   Georges or a very prominent bar or
 8   something like that. I had read his resume
 9   obviously and that's why we hired him at
10   Gin Lane. I would have known his
11   background at that point. I don't remember
12   it now.
13   Q.    How about Prather Rehm? Do you know
14   who she is?
15   A.    Yes.
16   Q.    Who is she?
17   A.    She's a girl who worked in the
18   Champagne Bar at the Rose Club.
19   Q.    Under your supervision?
20   A.    Yes.
21   Q.    Prior to 2008 did you know Prather
22   Rehm?
23   A.    No, I did not.
24   Q.    Were you familiar with her work
25   experience at the time that she was hired?
```

```
                                        Page 19
 1              A. Evangelista
 2   A.    Yes, although I don't remember it
 3   now.
 4   Q.    Prather Rehm, she was a new
 5   employee, correct?
 6   A.    Yes.
 7   Q.    Heather Buesing, did you know her
 8   prior to 2008?
 9   A.    No.
10   Q.    Where did she work in 2008?
11   A.    In the Champagne Bar at the Rose
12   Club.
13   Q.    Were you familiar with her work
14   experience prior to her working at the Rose
15   Club or the Champagne Bar?
16   A.    Yes, through her resume.
17   Q.    Do you remember what was on her
18   resume?
19   A.    I don't remember it now, no.
20   Q.    Hold on for a second. How about
21   Shawn O'Toole? Do you know who Shawn
22   O'Toole is?
23   A.    Yes.
24   Q.    Who is he?
25   A.    He was a bartender in the Champagne
```

```
                                        Page 20
 1              A. Evangelista
 2   Bar at the Rose Club.
 3   Q.    Under your supervision?
 4   A.    Yes.
 5   Q.    Did you know him prior to 2008?
 6   A.    No.
 7   Q.    Were you familiar with his work
 8   experience when he was hired to work at the
 9   Champagne Bar and the Rose Club?
10   A.    Yes, through his resume.
11   Q.    Do you have any independent
12   recollection of what was on his resume?
13   A.    Today I do not, no.
14   Q.    How about Laura Switzer? Do you
15   know who she is?
16   A.    Yes.
17   Q.    Who is she?
18   A.    She is a bartender for the Rose Club
19   and Champagne Bar.
20   Q.    Did you know her prior to 2008?
21   A.    No.
22   Q.    Were you familiar with her work
23   experience at the time that she was hired?
24   A.    Through her resume, yes.
25   Q.    Did you ever have any disciplinary
```

```
                                        Page 21
 1              A. Evangelista
 2   problems with Robert Canyon?
 3   A.    Yes.
 4   Q.    What happened?
 5   A.    The specifics I don't remember.
 6   It's all on file. Specifically I don't
 7   remember but he was -- I do remember there
 8   were some write-ups or documentation done
 9   on him which I imagine are in his file.
10   Q.    How about his day-to-day work
11   performance? How would you characterize
12   it?
13   A.    I was disappointed in Rob.
14   Q.    How about Prather Rehm? Did you
15   have any disciplinary problems with her?
16   A.    Yes.
17   Q.    Can you please elaborate?
18   A.    Again, I don't remember the
19   specifics but her work ethic was not up to
20   par with a five-star hotel and the
21   documentation was made and it's in her
22   file.
23   Q.    Do you know whatever happened to
24   Robert Canyon?
25   A.    I think I believe when I left -- no,
```

6 (Pages 18 to 21)

Page 22

A. Evangelista

1
2  I don't remember.  I think he was
3  terminated by my boss Carlos Bueno.
4  Q.    How about Prather Rehm?
5  A.    I believe she was terminated as
6  well.
7  Q.    Mr. Evangelista, when was the last
8  time you worked at the Plaza Hotel?
9  A.    The last time I worked at the Plaza
10 Hotel, January 2010.
11 Q.    When was the last time you were in
12 New York?
13 A.    December 2010.  December 14th or
14 around that time.
15 Q.    You haven't been back in New York
16 recently?
17 A.    I wish I could but no.
18        MR. ZAPATA:  That's strange.
19        MR. McLANE:  Do you want to
20    apologize to me --
21        MR. ZAPATA:  I'm sorry,
22    Bill.
23 Q.    Give me a few more minutes.  I think
24 I'm almost done.
25 A.    No problem.

Page 23

A. Evangelista

1
2  Q.    Did you ever tell Carlos Rivera that
3  he was being demoted on or around 2008?
4  A.    No.
5  Q.    Mr. Evangelista, how many
6  classifications of bartender were there in
7  2008 at the Plaza Hotel?
8  A.    I think -- I believe there was one.
9  Q.    Did you ever have any conversations
10 regarding Carlos Rivera's classification
11 with Nancy Bravo?
12 A.    I don't think so, no.
13 Q.    I have no further questions.
14        MR. McLANE:  I have a few.
15 EXAMINATION BY
16 MR. McLANE:
17 Q.    Anthony, during your employment at
18 the hotel did you ever have any
19 responsibility with respect to the recall
20 provisions of the collective bargaining
21 agreement?
22 A.    No.
23 Q.    Did you ever have any authority or
24 responsibility with recall provisions with
25 the city hall agreement?

Page 24

A. Evangelista

1
2  A.    No.
3  Q.    During your first tenure at the
4  Plaza this period of time we're talking
5  about between 2001 and around 2004 when you
6  were working -- specifically when you were
7  working on the floor of the Oak Bar did you
8  have any responsibility with the
9  classification of the employees working
10 behind the bar?
11 A.    No.
12 Q.    Did you have any reason to know the
13 classifications of the employees behind the
14 bar?
15 A.    No.
16 Q.    Did you ever ask anybody about what
17 classifications the employees who worked
18 behind the bar were?
19 A.    No.
20 Q.    Were you familiar with the
21 classification of private-room dining?
22 A.    Not really, no.
23 Q.    Were you familiar with any
24 classifications other than bartender with
25 respect to the Oak Bar if you even knew

Page 25

A. Evangelista

1
2  that title?
3  A.    From my knowledge, no, I didn't.
4  Q.    Who -- strike that.  Are you aware
5  that Mr. Rivera had been written up at the
6  Plaza Hotel?
7  A.    No.  I haven't personally been
8  involved in any write-ups for him so I
9  wouldn't know.
10 Q.    Did you ever supervise Mr. Rivera?
11 A.    Yes, I did.
12 Q.    When was that?
13 A.    Well, at some point he did
14 eventually work in the Rose Club and the
15 Champagne Bar along with Liam Flanagan as
16 well.  That's when I supervised him.
17 Q.    Do you know the circumstances upon
18 which Mr. Rivera wound up working under
19 your supervision?
20 A.    No.
21 Q.    Mr. Zapata gave you a list of names
22 of the bartenders who worked in the Rose
23 Club and the Champagne Bar.  Did you hire
24 any of those bartenders yourself?
25 A.    Myself, no.

## Page 26

1  A. Evangelista
2  Q. Other than the disciplinary problems
3  with respect to Mr. Prather in your
4  estimation was he a good bartender?
5  A. Which person are we talking about?
6  Prather Rehm?
7  Q. No. I'm talking about -- I think I
8  got his name wrong.
9  A. Robert Canyon?
10 Q. Yes, Canyon. I'm sorry.
11 A. Yes. He was a very good bartender
12 but he didn't have the discipline to work
13 in a five-star hotel.
14 Q. That came to light after he was
15 hired at the Plaza?
16 A. Yes, absolutely.
17 Q. Are you -- strike that. You were
18 not at the Plaza Hotel when it closed in
19 2005?
20 A. I was not.
21 Q. Am I correct that up until the time
22 that you left the hotel you were making the
23 schedule for the bartenders in the Rose
24 Club and the Champagne Bar?
25 A. No, I was moved. I did make the

## Page 27

1  A. Evangelista
2  schedules -- the last year or the last
3  eight months of my employment I was
4  promoted to in-room dining director so I
5  moved positions.
6  Q. While you were the director who did
7  you report directly to?
8  A. Carlos Bueno.
9  Q. That's all I have. Thanks.
10       MR. ZAPATA: Bill, before we
11    get off did you get my letter
12    regarding the resume?
13       MR. McLANE: No.
14       MR. ZAPATA: I sent it to
15    you via overnight FedEx. It's a
16    letter asking for the resumes of
17    the individuals that were hired. I
18    belive my office sent it to you via
19    e-mail as well on Friday. You
20    should have received the letter on
21    Friday. It was sent to you on
22    Thursday night FedEx. You should
23    have gotten it Friday FedEx.
24       MR. McLANE: Is it contained
25    in the letter where you have the

## Page 28

1  A. Evangelista
2  proficiency?
3       MR. ZAPATA: Well, I'm
4    asking for more documents.
5       MR. McLANE: No. I'm saying
6    did you also send a proficiency
7    letter? I got a correspondence
8    from you so I think it was on
9    Friday.
10      MR. ZAPATA: Yeah, that's
11   it.
12      MR. McLANE: We do have that
13   letter.
14      MR. ZAPATA: What I'm asking
15   for is the resumes from the Bueno
16   deposition.
17      MR. McLANE: Okay. The
18   resumes for the people that you
19   just identified?
20      MR. ZAPATA: Yeah.
21      MR. McLANE: We'll see what
22   we can dig up.
23      MR. ZAPATA:
24   Mr. Evangelista, thank you very
25   much for your cooperation.

## Page 29

1
2       THE WITNESS: Thank you.
3       MR. ZAPATA: All right.
4    Have a good night.
5       (Time noted: 9:40 p.m.)
6
7  ----------------------
8         ANTHONY EVANGELISTA
9  Subscribed and Sworn to before me
10 This        day of        2011
11
12 --------------------------------
13       NOTARY PUBLIC

8 (Pages 26 to 29)

Page 30

```
 1
 2  EXAMINATIONS:
 3    EXAMINATION BY           4    8
 4    MR. ZAPATA
 5    EXAMINATION BY          23   15
 6    MR. McLANE
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 32

```
 2              ERRATA SHEET
 3   PAGE/LINE        CORRECTION
 4   _____          _____
 5   _____          _____
 6   _____          _____
 7   _____          _____
 8   _____          _____
 9   _____          _____
10   _____          _____
11   _____          _____
12   _____          _____
13   _____          _____
14   _____          _____
15   _____          _____
16   _____          _____
17   _____          _____
18   _____          _____
19   _____          _____
20   _____          _____
21   _____          _____
22   _____          _____
23   _____          _____
24   _____          _____
25
```

Page 31

```
 1
 2           C E R T I F I C A T E
 3      I, LESLIE CHRISTIAN, hereby certify
 4   that the Examination Before Trial of
 5   ANTHONY EVANGELISTA was held before me on
 6   the 20th day of June, 2011; that said
 7   witness was duly sworn before the
 8   commencement of his testimony; that the
 9   testimony was taken stenographically by
10   myself and then transcribed by myself; that
11   the party was represented by counsel as
12   appears herein;
13      That the within transcript is a true
14   record of the Examination Before Trial of
15   said witness;
16      That I am not connected by blood or
17   marriage with any of the parties; that I am
18   not interested directly or indirectly in
19   the outcome of this matter; that I am not
20   in the employ of any of the counsel.
21      IN WITNESS WHEREOF, I have hereunto set
22   my hand this      day of        ,2011
23
24         --------------------
25            LESLIE CHRISTIAN
```

Exhibit "E"

```
                                                                  1
 2      UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
 3      ------------------------------------------------x
        CARLOS RIVERA,
 4
                              Plaintiff,     Index No.
 5                                           10-CIV-6611(WHP)
 6           -against-
 7      PLAZA ACCESSORY OWNERS, LP, et al.,
 8                            Defendants.
        ------------------------------------------------x
 9
10           EXAMINATION BEFORE TRIAL of the Defendant,
11      PLAZA ACCESSORY OWNERS, LP, et al., by RAJAN
12      LAI, taken by the Plaintiff, pursuant to Court
13      Order, held at the offices of Barrister
14      Reporting Service, Inc., 120 Broadway, Suite
15      1111, New York, New York, on May 3, 2011, at
16      10:10 a.m., before a Notary Public of the State
17      of New York.
18
19
20
21
22      *************************************************
23              BARRISTER REPORTING SERVICE, INC.
                         120 Broadway
24                   New York, N.Y. 10271
                         212-732-8066
25
```