UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------- x

CARLOS RIVERA,

Plaintiff, Index No. 10-CIV-6611(WHP)

-against-

PLAZA ACCESSORY OWNERS, LP, et al.,

Defendants.

-------------------------------------------- x

EXAMINATION BEFORE TRIAL of the Defendant, PLAZA ACCESSORY OWNERS, LP, et al., by RAJAN LAI, taken by the Plaintiff, pursuant to Court Order, held at the offices of Barrister Reporting Service, Inc., 120 Broadway, Suite 1111, New York, New York, on May 3, 2011, at 10:10 a.m., before a Notary Public of the State of New York.

**************************************************

BARRISTER REPORTING SERVICE, INC.
120 Broadway
New York, N.Y. 10271
212-732-8066

A P P E A R A N C E S:

FAUSTO E. ZAPATA, JR., P.C.,
Attorneys for Plaintiff
277 Broadway
New York, New York 10007

BY: FAUSTO E. ZAPATA, JR., ESQ.

LITTLER MENDELSON, PC
Attorneys for Defendants
One Newark Center
Newark, New Jersey 07102

BY: JACQUELINE McCLINTOCK, ESQ.

xxxxx

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein that filing, sealing and certification, and the same, are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to by an officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

R A J A N L A I,
having been first duly sworn before a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. ZAPATA:

Q Please state your name for the record.
A Rajan Lai.
Q What is your address?
A 72 Hollow Tree Ridge Road, Darian, Connecticut, 06820.
Q Mr. Lai, my name is Fausto Zapata. I'm Carlos Rivera's attorney, representing him in an action against The Plaza Hotel, his current employer.
I brought you here today to ask some questions relating to Carlos Rivera's employment at The Plaza.
If at any point I ask you a question and you don't understand the question, stop me and ask me to rephrase it and I'll rephrase it.

Rajan Lai

I'll ask you to verbalize all your answers because the stenographer has to maintain a record of everything that's being said today.

Do you understand so far?

A Yes.

Q Is there any reason why you may not be able to proceed today?

A I don't believe so, no.

Q Are you taking any medications that may affect your ability to remember?

A No, nothing out of the ordinary, no.

Q I'll start. Mr. Lai, are you currently employed?

A Yes.

Q Where are you employed?

A Thomson Hotels.

Q In what capacity?

A I'm the vice president of human resources for the group.

Q How long have you been working there?

A I commenced working there in, it was August of 2010.

Q Can you please describe your job

Rajan Lai

duties there?

A Certainly in my capacity I'm primarily consulting on strategic human resources issues with Thomson at the corporate office here in New York at 54 Thomson Street. I assist the owner with the administration, with the planning, with the execution of all human resources issues that impact ten of the Thomson hotels all over North America.

I work very closely with all the properties on a day-to-day basis assisting in terms of recruitment, in terms of benefits, in terms of risk management, in terms of immigration issues, legal issues, public relations, the whole gamut of the human resources discipline.

Q Where did you work prior to working for Thomson?

A Immediately prior to Thomson I was with Fairmont Hotels & Resorts at The Plaza Hotel.

Q In what capacity?

A As director of human resources for The Plaza.

Rajan Lai

Q When did you begin to work at The Plaza?

A March of 2007.

Q What was your position?

A I was the director of human resources.

Q Can you please describe your duties as the director of human resources at The Plaza?

A Well, my primary duty was the oversight of the human resources for The Plaza Hotel, which is comprised of 282 rooms, a mixture of transient rooms as well as condominiums that we were selling as part of the hotel portfolio of rooms. My responsibility was the establishment of human resources.

The Plaza had been closed. It underwent an extensive renovation. I was entrusted with the responsibility of opening the hotel, of creating the human resources for the property, for hiring, for recall of Plaza employees, for administering the severance payments to those employees that were not coming back, to set the Five Star standards for the hotel, to bring in the fame

Rajan Lai

and culture into The Plaza, to ensure that The Plaza Hotel was operating from a human resource perspective in line with the standards of the Fairmont hotels, as for all its global hotels all over the world.

So, my responsibility really was to drive the human resources in the hotel, to make this an employer of choice, to make it a Five Star hotel when it re-opened.

Q Were you asked to resign from your position at The Plaza Hotel?

A We were mutually -- I left in good terms. It was a mutual understanding between myself and Fairmont that I would leave The Plaza.

Q Were you asked by The Plaza to leave your employment at any point; yes or no?

MS. McCLINTOCK: Objection.

You can answer.

A We had a mutual understanding after a period of time when The Plaza was opened that I would move on to another opportunity.

Q Whose idea was it first?

A We had been having discussions between

Rajan Lai

myself and management of the hotel and came to a point where I decided that it would be in our mutually best interest for us to part ways.

Q Who raised the idea first?

A The idea first was brought up by The Plaza.

Q Who brought it up?

A My general manager, the gentleman I reported to.

Q Who was that?

A His name is Shane Krige.

Q When did Mr. Krige raise this?

A I believe it was March of 2010.

Q Prior to working at The Plaza, where did you work?

A Prior to The Plaza, I was in Boston. I was working for Taj Hotel Resorts.

Q In what capacity?

A I was the director of resources of the Taj in Boston.

Q How long did you work there?

A I was there for approximately a year.

Q One year?

Rajan Lai

A Yes.

Q When did you start? What month and year?

A I started with the company at The Pierre Hotel. I believe I started maybe February 2005, and then from work I transferred to Boston because the company had acquired a hotel in Boston and they asked me to set up the human resources in that hotel. And that's why I moved to Boston.

Q You stopped working there when?

A March, when I came to The Plaza.

Q Prior to working for this employer, where did you work?

A Prior to this employer, prior to Taj I was with Raffles Hotels & Resorts.

Q When did you start working at Raffles Hotels & Resorts?

A I believe it was February of 2000, I think.

Q That's when you started. When did you stop working there?

A I stopped working there in 2005, when I joined the Taj.

Rajan Lai

Q February 2005?

A Approximately, that would be right.

Q Prior to working at Raffles Hotels & Resorts, where did you work?

A I was with Starwood Hotels & Resorts.

Q In what capacity did you start at Starwood?

A I was the area director of human resources for Starwood in Massachusetts.

Q What was your position at Raffles Hotels & Resorts?

A I was the regional vice president for human resources for North America.

Q When did you start working at Starwood?

A When did I start?

Q Yes.

A I started working at Starwood in 1999.

Q When did you stop working there?

A 2001, when I joined Raffles.

Q I thought you started working at Raffles in February 2000?

A It would be 2000, right. It would be 2000.

Rajan Lai

Q Did you go to college?

A Yes, sir.

Q Did you obtain a degree?

A Yes, I did.

Q What did you obtain a degree in?

A In hotel management.

Q Is that a bachelor's?

A A master's.

Q A master's program?

A Yes, sir.

Q Where did you obtain your master'?

A From Cornell University.

Q Your bachelor's?

A My bachelor's is in history. I have a master's and a bachelor's in history, and I did that from India. I also have a postgraduate degree in hospitality management from India.

Q Aside from your bachelor's and master's, have you received any other training relating to your role as human resources expert?

A Yes. I have had extensive training throughout my career in all the companies

Page 13

Rajan Lai

that I've been affiliated with. I was responsible for running training, executing training. I started in New York City at the Barclay Hotel as director of training for the Barclay and the Connecticut Hotel in 1987. And I left that hotel as director of human resources after 13 years. And I was running all the training programs. And as I've grown in my career, I've been exposed to various training programs, legal as well as human resources-related, yes.

Q During your employment at The Plaza Hotel, did you ever receive any performance evaluations?

A There's no written performance evaluations.

Q Did you receive any evaluations that were communicated to you orally?

A I had discussions with my manager about my performance from time to time.

Q Can you please elaborate as to what you were told regarding your performance?

A It was all positive. It was all positive, that I was fulfilling my

Page 14

Rajan Lai

obligations and my responsibilities in my capacity as director of human resources.

Q When you were hired at The Plaza as director of human resources, what was your involvement with respect to training regarding equal employment opportunity?

A Well, I make sure that we have extensive training with regard to the equal employment opportunity laws both for the leadership as well as for the colleagues of The Plaza. I hired an attorney from a legal firm to actually do the training for the hotel. I wanted to bring in an expert who is well versed in EEOC laws to do the training. So we had an eight-hour session for all the managers in The Plaza and a four-hour session both in English. And I flew an attorney in from Florida who was bilingual who did it in Spanish for four hours for all the line employees, all the colleagues at The Plaza.

So we had an extensive training program with regard to EEOC as soon as we opened and we continued with the training as we got into the operations.

Page 15

Rajan Lai

Q If you know, do you know if any particular laws were covered in the training?

A Yes, sir. All Title 7 was covered, the entire aspect of harassment was covered, mutual respect in the work environment. We trained around that. Yes, we did an extensive four-hour training for all the line employees. Case studies, ran certain scenarios so they can recognize harassment and recognize discrimination. Reporting how to go about recording it, whose attention to bring it to. Remedial actions management was obligated to take, and in the event of any complaint of discrimination or harassment.

Q Are you familiar with Title 77?

A I am familiar with it, yes.

Q How did you become familiar with Title 7?

A Through my own understanding and through my own pursuit of this part of the law so that I'm familiar with it in my capacity as human resources manager. It's something I need to be aware of and need to monitor. I need to be able to recognize. I

Page 16

Rajan Lai

need to be able to enforce in the work environment. So, I made it a point.

In addition to that, I'm a member of the Society for Human Resources Management. I keep abreast with what's happening in our industry. I'm doing my certification as a senior professional in human resources management, in which we have to understand the laws and how to interpret them and apply them in the work environment.

Q Are you familiar with the New York City Human Rights Law?

A Yes, sir.

Q When did you become familiar with the New York City Human Rights Law?

A I've been working with the human resources in New York since 1987, and I quickly made it my duty to understand both the New York City Human Rights Law, the State Human Rights Department, and how it operates, and Equal Employment Opportunity. All the laws that it's mandated to enforce. It goes back to my start in New York City in 1987.

Q The training at The Plaza, was it

Page 17

Rajan Lai

based on Title 7?
A It included -- a big part of it was Title 7, yes.
Q How about the New York City Human Rights Law?
A Yes, it covered that. It covered Title 7. It covered the State Division of Human Rights.
MR. ZAPATA: I'm going to show you a document that I'd like to have marked for identification as P-1.
(Whereupon Trades Council version of industry-wide collective bargaining agreement is marked Plaintiff's Exhibit 1 for identification as of this date.)
Q I want you to review the document that I've just handed you that has been identified as P-1. After you're finished reviewing it, I'd like you to look up at me.
A Yes.
Q Do you recognize the document that I have just given you?
A Yes.

Page 18

Rajan Lai

Q What do you recognize this document to be?
A This is the Trade's Council's version of the industry-wide collective bargaining agreement.
Q How do you recognize this document?
A I've seen this, sir, before.
Q In what capacity did you see it?
A In my capacity as human resource director. I have a copy of the union version of the industry by collective bargaining agreement.
Q Did you become familiar with this document as your role as director of human resources at The Plaza Hotel?
A I believe I might have seen it even before I moved to The Plaza in my prior roles in New York City.
Q You said this is the union's version of the industry-wide agreement?
A Yes, sir.
Q What do you mean by that?
A There are two documents. There have always been two documents, to the best of my

Page 19

Rajan Lai

knowledge, one that the hotel association put out and one that the trades council put out.
I cross-reference both to make sure that I'm adhering to the agreement.
Q Are both of them identical?
A Pretty close, I believe, with some variations. For instance, the opening paragraph is not part of the hotel association document that I've seen.
Q Aside from that section, is it identical?
A Again, to the best of my knowledge, it is fairly close. There may be some nuances here and there. I couldn't recollect exactly what, where, but I know that there was an attempt made by both parties to come up with a single document so that both parties could look at the same document.
Q What role did this document that's been marked for identification as P-1 have with respect to the terms and conditions of employment of The Plaza Hotel employees from 2008 until the time that you stopped working there?

Page 20

Rajan Lai

A Well, I went by the industry, by the collective bargaining agreement that the hotel association had put out, and that was my -- that was the definitive document that I worked from. But I did see this document as well. It was floating in the hotel and I did see it.
Q I guess what I'm asking you is what weight did you give this document with respect to the terms and conditions of employment of The Plaza Hotel during the time you worked there as the director of human resources?
A I give it great weight. As I said, my document was the hotel association industry --
Q I guess I'm just focusing on this document. We can get to the other document later.
A I would cross-reference this document. I would use it as a cross-reference.
Q I guess my question is what weight did you give this document when it came to the terms and conditions of employment for The

Rajan Lai

Plaza hotels that were covered under this agreement?

A I gave it weight. I gave it considerable weight.

Q Did you view this as a contract?

A Yes, sir.

Q As an enforceable contract?

A Absolutely.

Q You've read this document?

A I have looked at it. I can't say I read it from cover to cover, word-for-word, but I have had occasion to look into it, yes.

Q You are familiar?

A I am familiar with it, yes.

Q Do you know if Carlos Rivera was covered under the contract that's been marked for identification as P-1?

A Yes, sir.

Q Yes, Carlos Rivera was covered, or yes, you know?

A Yes, he was covered.

MR. ZAPATA: I'm going to show you this document that I'd like to have marked for identification as P-2.

Rajan Lai

(Whereupon side agreement is marked Plaintiff's Exhibit 2 for identification as of this date.)

Q Do you recognize the document that I have just given you?

A Yes, I do.

Q What do you recognize this document to be?

A This is a side agreement that was negotiated between The Plaza and the Trades Council that governed the terms and conditions of the new Plaza.

Q Can you nail it down to time frame for the record?

A When this was negotiated?

Q That wasn't a good question.

MR. ZAPATA: Strike that.

Q You said it was for the new Plaza?

A Yes, sir.

Q What do you mean by that?

A The Plaza closed in April of 2005 and didn't reopen until March of 2008. So it was opening as a new hotel, and part of that opening entailed both the management and

Rajan Lai

ownership of The Plaza and the Trades Council sitting around the table. And from my knowledge is it was broken by the mayor, and an agreement was reached with regard to the terms and conditions of the opening of the new hotel.

The old hotel was much larger in terms of rooms. There was structural changes to the building, and consequently was a whole new hotel that was going to be reopening.

Q This contract addressed what part of the reopening?

A This contract addresses the terms and conditions of new hotel with regard to classifications, with regard to wages. I believe there is a portion here that might even address the recall process, so all the agreements that were going to be prevalent in the new hotel.

The foundation remains the industry-wide agreement, but this was an enhanced agreement on 13th of April 2005, which both parties agreed to that would govern the opening of the new hotel.

Rajan Lai

Q Thank you. I'm going to show you this document that I'd like to have marked for identification as P-3.

(Whereupon letter from Rajan Lai to Carlos Rivera dated January 25, 2008, is marked Plaintiff's Exhibit 3 for identification as of this date.)

Q Do you recognize the document I have just given you?

A Yes, I do.

Q What do you recognize this document to be?

A This is the letter I sent to Mr. Carlos Rivera indicating that he would be recalled to the new Plaza effective February 11, 2008, to the position of a bartender, and I asked him to confirm his intention whether he intends returning by February 11. Otherwise I would assume that he's not interested in coming back. And that he would be trained and expected to meet the new standards for the Five Star, Five Diamond hotel.

Q Thanks. When did you send that letter

Rajan Lai

out?

A It's dated January 25, 2008.

Q That was around the time that you sent it out?

A Yes, sir.

Q I'm going to show you this document I'd like to have marked for identification as P-4.

(Whereupon document is marked Plaintiff's Exhibit 4 for identification as of this date.)

Q Do you recognize the document that I have just given you?

A I don't recognize this particular document, but I've seen this document in certain instances.

Q Without looking at what is manually written into this document, you stated that you're familiar with the content of the preprinted material, correct?

A I have seen it in certain instances, yes.

Q You're familiar with the language?

A I've read it in the past, yes.

Rajan Lai

Q You stated you read it in the past. When did you read it?

A I read it in the context of employees bringing it to me and showing me that they were still retaining their recall rights, and those instances when they brought me the document I took a look at it.

Q Which employees?

A Several of the employees who came back to The Plaza.

Q So The Plaza employees?

A Yes, sir.

Q What was your understanding of the recall rights that bartenders like Carlos Rivera enjoyed when The Plaza was re-opened in early 2008?

A Specifically to the bartenders, like all classifications, those Plaza employees who retained their recall rights would be called back to their prior classification if it still existed in the new Plaza, and if there was an opening for them in that particular classification.

Q When you say classification, what do

Rajan Lai

you mean?

A The industry-wide agreement documents all the different roles in a hotel by job classification. So, for instance, a bartender would be a job classification, and within bartenders you would have public bartenders and service bartenders, similar that you would have waiters and waitresses and bellmen and doormen. These are all classification, job classifications in a hotel as per the industry by agreement.

Q Just to be clear, a bartender is a classification?

A Yes, sir.

Q An independent classification?

A It's an independent classification. Front bartenders and service bartenders are two independent classifications within schedule A of the industry-wide agreement.

Q Mr. Rivera's classification was bartender, as far as you know?

A A service bartender. A private dining room bartender, which is akin to a service bartender.

Rajan Lai

Q Why did your letter dated January 25, 2008, which has been marked as P-3, why did it say bartender and not service bartender or private dining bartender?

A We didn't have a private dining bartender. That classification was no longer in existence at The Plaza. We did have a bartender in The Palm Court Restaurant, and we had bartenders in The Rose Club and in The Champagne Bar.

Q I guess my question is how come the letter which is identified as P-3 does not identify Mr. Rivera's classification as being service bartender, like you just testified?

A Because he was The Palm Court bartender, and that was my understanding, that he was coming back to work in The Palm Court Restaurant as a bartender.

Q What kind of bar was The Palm Court?

A The Palm Court was a bar that was again adjacent to the restaurant. So, all the liquor, all the drinks for The Palm Court Restaurant would be coming out of The Palm Court Bar.

Rajan Lai

Q How did you come to believe that Carlos Rivera was a service bartender at The Plaza Hotel prior to its closing in 2005?

A So, he was a private dining bartender. His classification that he was given by the company reflected him as a private dining bartender. From my understanding -- I wasn't part of The Plaza prior to its closing, but it was my understanding that it was a bar for private dining, which is room service orders would come out of this bar. And Mr. Rivera was classified as a private dining bartender.

Q Do you know who Liam Flannagan is?

A Yes, sir.

Q Do you know what his job classification was?

A I believe it was an Oyster Bar bartender.

Q Oyster Bar?

A Yes, sir.

Q What did you believe that Liam Flanagan's job classification was at The Plaza in 2005 at the time that he was rehired in 2008?

Rajan Lai

A Can you repeat that question?

MS. McCLINTOCK: Objection.

Q What did you believe that Liam Flanagan's job classification was at the old Plaza when you hired him in 2008?

MS. McCLINTOCK: Objection. Objection to form.

A His clarification reflected that of an Oyster Bar bartender.

Q Where did you get that information?

A From the documentation that was given to me.

Q What document?

A It was a document given to me that was prepared by the human resources department prior to the closure of The Plaza, where all the employees were classified as per the job classification.

MR. ZAPATA: I show you this document I'd like to have marked for identification as P-5.

(Whereupon document is marked Plaintiff's Exhibit 5 for identification as of this date.)

Rajan Lai

Q Do you know who David C. Jones is?

A I know of him. I never met him.

Q What do you know about him?

A That he was working at The Plaza, the human resources department.

Q Do you know in what capacity?

A It says human resources manager.

Q Was there a human resources manager at The Plaza when you worked there?

A We had changed it. We had an assistant director of human resources and human resource coordinator and a director for training. It was changed.

Q Do you know what David C. Jones' job duties were when he was employed as a human resource manager at The Plaza Hotel?

A No, sir.

Q Have you ever seen the document that I've just given you that's been marked for identification as P-5?

A I might have seen it.

Q You're familiar with this document?

A I believe I saw it before. Yes, I believe I have seen it.

Rajan Lai

Q When do you believe you've seen it?

A When I was at The Plaza.

Q Do you know when you saw it?

A I don't recall specifically.

Q But you did see this when you were employed at The Plaza?

A I did see it, yes, sir.

MR. ZAPATA: I'm going to show you this document that I would like to have marked for identification as P-6.

(Whereupon seniority list of bartenders is marked Plaintiff's Exhibit 6 for identification as of this date.)

Q Do you recognize the document I have just given you?

A Yes, I do.

Q What do you recognize the document to be?

A This is my response to a subpoena from the attorney for the Trades Council requesting a current seniority list of the bartenders at The Plaza.

MR. ZAPATA: Let's take a

Rajan Lai

five-minute break.

(Whereupon, a discussion was held off the record.)

Q I want to you look at the second page of the document I have just given you that has been marked for identification as P-6. Do you recognize the names on that list?

A Yes, I do.

Q Liam Flanagan, are you familiar with Liam Flanagan?

A I am familiar with him, yes.

Q Do you know him?

A I know him, yes.

Q Can you estimate about how old he is?

A I wouldn't have any idea. I wouldn't have an idea.

Q No idea?

A I can roughly approximate his age. I can't tell you his date of birth.

Q Not his date of birth. Can you approximate about how old he is, roughly?

A I mean, if I had to make a guess --

Q Don't guess. Do you know what color his skin is, Liam Flanagan? What color is

Rajan Lai

his complexion?

A What color is his complexion?

Q Or do you know what his ethnic background is?

A I believe his name is an Irish name so I'm assuming he would be of Irish origin.

Q Have you ever spoken to him?

A I've spoken to him, yes.

Q Does he have an accent?

A Not that I can recognize. He might have a slight Irish lilt to his voice.

Q He has an Irish accent?

A I mean, he speaks regularly. I didn't notice any accent, no.

Q Carlos Rivera, do you know what his ethnic background is, by any chance?

A I would put him as a Hispanic.

Q Do you know about how old he is?

A I wouldn't know unless I saw the date of birth.

Q By looking at him, you can't approximate about how old he is?

A That's purely a conjecture. I have no way of knowing.

Rajan Lai

Q Ebelio Tejada, can you describe what he looks like?

A He's very presentable. I put him about maybe 5'5" or thereabouts in height. Dark hair. Dark eyes.

Q Do you know what his ethnic background is?

A I would put him perhaps as Hispanic as well.

Q Robert Kenyon, are you familiar with him?

A Unless I see the photograph, it would be hard for me to place him.

Q Do you recognize the name?

A I recognize the name, yes.

Q Why do you recognize the name?

A Because I hired him. He worked at The Plaza.

Q Did you fire him?

A I don't recall.

Q How about Prather Rehm. Did you hire her?

A Yes, sir.

Q How about Heather Buesing. Did you

Rajan Lai

hire her?

A Yes, I did.

Q Laura Schweitzer, did you hire her?

A Yes.

Q Sean O'Toole, did you hire him?

A Yes.

Q Miguel Aranda, did you hire him?

A Yes.

Q Derek Michalak, did you hire him?

A Yes.

Q Did you interview them?

A Yes.

Q Just so the record is clear, you interviewed Robert Kenyon, yes or no?

A The protocol is that I would interview. We hired collectively. I wasn't exclusively doing the hiring.

Q Who was involved in the hiring?

A The food and beverage the director of the restaurants.

Q Can you give me the name?

A Carlos Bueno and the director of beverages, Anthony Evangelista. Along with, in certain instances, it was my assistant

Rajan Lai

director of human resources that was involved as well.

Q What is the name?

A Marta Reus.

Q She was your assistant director, you said?

A Yes.

Q Can you explain to us what the process was for hiring new employees when The Plaza re-opened in 2088?

A Sure. We had a fairly comprehensive strategy to recruit the most suitable candidates for the new Plaza, so we advertised. We used Time Out magazine. In fact, I had a company that I sought some guidance from in terms of what would be the best avenues by which to put the message out that The Plaza was reopening and we were consequently looking to fill some positions.

And then certainly, human resource recruiting side, we listed on Craigslist, and as we got applicants we would screen them. And I would then -- either my assistant would ask them to -- for the manager to take a look

Rajan Lai

at, and then the manager would give his or her input in terms of who would be in their opinion best qualified for the job. And based on the manager's recommendations and our own interpretation of the resumes, we would schedule candidates to come in and meet with us for interviews.

Q Meet with us?

A Yes.

Q Who is us?

A Human resources. Marta Reus, myself the food and beverage manager in the case of food and beverage stuff. Front office manager in the case of front office stuff. So on and so forth.

And based on the collective interviews, we would then make a final determination as to who would be best qualified for the job.

Q You said qualified. What did you consider to be qualified at the time that you were hiring bartenders to work at the new Plaza in 2008?

A By qualified, I was also looking at

Rajan Lai

who would be the most suitable for a role, who would have the bartending knowledge that we were looking for, who would be able to adhere to the Five Star standards that we were striving to accomplish with The Plaza. Who would have the interpersonal abilities to be able to be sufficiently extroverted to interact with the clientele. Who would be conscientious and responsible employees. Who would have the mental ability to grasp the standard operating procedures for the hotel. Who would have good ability to communicate at all levels, because that's a critical role in the bartending profession.

There was a whole host of issues that we would look at to decide who would be the most suitable for the role.

Q How much weight was prior experience given with respect to hiring the new employees to work as bartenders at The Plaza when you hired new employees in 2008?

A Only so much as the knowledge. When we talk about prior experience, one is really looking for their knowledge of bartending, so

Rajan Lai

that was certainly a criteria that we were looking for. That is whether the person came from an establishment that would give this person the practical knowledge of working in an establishment such as The Plaza.

Q Where did you obtain the list on page two of the document that's been marked for identification as P-6?

A From my computer. We had a human resource information system where we kept all employee data. It's a company-wide human resource information system. So, data for all 30,000 employees of the company are maintained in that database, and each hotel has access to their employees.

Q Does that database contain the work histories of employees that had worked at The Plaza Hotel prior to its closure in 2005?

A I don't believe so, no. It was uploaded when we re-opened The Plaza.

Q Did you obtain any information relating to employees from the human resource department relating to employees that had been working at The Plaza prior to 2005?

Rajan Lai

A Yes, I did.

Q What kind of information did you receive?

A I received the recall file in terms of who was employed at The Plaza, the job classification, the hire date, the last wages, the hours that they worked in that particular classification. Based on that, I recalled the employees that were on the recall list. And subsequently we brought all the personnel files via storage.

But once the hotel opened, then we brought all the personnel files back to the property.

Q Did you ever review Carlos Rivera's personnel file?

A I probably did, sir. I would think I would have done it.

Q When you rehired Carlos Rivera, as indicated in the January 25, 2008, letter that has been marked for identification as P-3, what was your intention with respect to what position Carlos Rivera would be assigned?

Rajan Lai

A That he would be assigned as a bartender in The Palm Court.

Q That was the intention at the time that he was extended an offer?

A Yes.

Q I'm going to show you this document that I would like to have marked for identification as P-7.

(Whereupon Champagne Bar schedule is marked Plaintiff's Exhibit 7 for identification as of this date.)

Q Do you recognize the document that I have just given you that's been marked for identification as P-7?

A This is a Champagne Bar schedule.

Q The Champagne Bar, what kind of bar was that?

A As the name applies, it was primarily serving champagne, high-end champagne that is sold by the glass and by the bottle. It's at the lobby of the new Plaza.

Q Do you know when this document was put together?

A It would have been put together

Rajan Lai

contractually. We have to put the work schedules up a week before the actual workweek, so this is dated January 11. So it should have gone up latest by the 4th of January.

Q In this document, was Carlos Rivera listed as one of the bartenders at The Champagne Bar and Rose Club?

A Yes.

Q Why is that?

A Because The Palm Court wasn't open at that time. We had recalled bartenders in that special department, but it was still under construction. And the first bar to open was The Champagne Bar.

Q When did The Palm Court open?

A March 1, 2008.

Q Was that the first bar to open, The Champagne Bar?

A Yes, I believe so.

Q What was the second bar to open?

A I think The Rose Club and The Palm Court opened pretty much at the same time, if my memory is correct.

Rajan Lai

Q Which one?

A The Rose Club and The Palm Court.

Q What kind of training did the bartenders receive when they were rehired in 2008?

A They received -- Fairmont had beverage training program. I think it was called FAME. I'm not sure what the acronym represents, but I know that they were trained in mixology, how to make drinks and the different versions of various cocktails. How to pour, how to serve. I'm assuming -- I never went through the training, but part of my -- I was responsible for ensuring that the training did take place and worked with the food and beverage director, called the training service to The Plaza and have them do the training for the bartenders.

Q When did The Champagne Bar open?

A I don't recall the exact date when it opened, but I would venture it would be March 1.

Q The Champagne Bar opened on March 1?

A Yes, because that's when we actually

Page 45

Rajan Lai

opened. We had an inauguration on March 1.
Q When did the training for the newly hired and the rehired bartenders take place?
A I know there were a few training programs that were done. I don't know exactly when that were done, but I would again venture to say that they were done prior to the opening in February. The whole idea was to bring the staff on board to give us at least six weeks to train, so we were carrying significant payroll, but we were not sufficiently open for business. But that was part of the preopening strategy and preopening cost that we had to absorb to train all the staff, because again, the whole push was to open the hotel, was a Five Star, Five Diamond hotel.
Q Was there a probationary period for rehired employees?
A There was, according to the site agreement, yes.
Q How long was the probation period?
A Again, I forget exactly, but I think somehow 180 days seems to stay in my mind,

Page 46

Rajan Lai

that they had to be certified within 180 days.
Q Certified, what do you mean?
A Certified in Five Star service. That was the precondition for the recall that everybody would have to reach the new service standards of.
Q What about for the newly hired employees? Did they have a probationary period of the same duration?
A No, I think that was lengthier.
Q Theirs was lengthier?
A Yes, sir.
Q As far as you know, did Carlos Rivera pass his probation?
A He passed the service standard certification, I believe, if my memory is correct, yes.
Q Was there any difference in the training that bartenders received and the private dining bartenders that were recalled to work?
MS. McCLINTOCK: Object to form.

Page 47

Rajan Lai

A I don't know, sir. I didn't sit through the actual training.
Q Did seniority play any role in The Plaza's determination as to who would work The Champagne Bar or who would work at The Palm Court or The Rose Club?
A Seniority played -- within the classification, there would be seniority. Now, the opposition vis-a-vis The Rose Club and The Champagne Bar was that it was an interchangeable bar, in the sense that staff would bartend between the two bars.
Q The Rose Club and --
A The Champagne Bar.
Q How many job classifications existed for a bartender in 2008?
A There was a Palm Court bartender and there was a Rose Club bartender and a Champagne Bar bartender.
Q Were these job classifications identified anywhere in writing?
A Well, the schedules. On their work schedule.
Q Did the collective bargaining

Page 48

Rajan Lai

agreement have the classifications that you just identified?
A Not -- they're not memorialized in the collective bargaining agreement because that is in-house. That is unique to The Plaza. The collective bargaining agreement has basic classification for the bartender and service bartender are the two classifications.
Q But at the time that The Plaza reopened in 2009, there was only one job classification for bartenders; is that right?
A There was a classification of a bartender.
Q One classification for bartenders; is that right?
A There was a classification for a bartender, yes. Yes.
Q You stated that seniority played a role with respect to assignments?
A Within that room, yes.
Q I don't understand what you mean "within that room"?
A So, for instance, if I'm the bartender at The Rose Club, that's where I work, that's

Rajan Lai

my bar. If I'm a senior man, then I have first right to work the shift of my choice, first right for taking days off of the week. If there was a layoff, based on my seniority, I wouldn't be laid off. Based on my seniority.

Q The job classification for bartenders was limited to each bar; is that your testimony?

A Yes, unique to the room.

Q To the room?

A To the room. To the bar. For instance, the bar.

Q Your understanding of how job classifications applied to the specific bars, is that memorialized anywhere in the collective bargaining agreement or the industry-wide agreement; yes or no?

MS. McCLINTOCK: Objection to form.

A No.

Q When positions became available in early 2008 for the bartender position, were there any job postings at the work site?

Rajan Lai

MS. McCLINTOCK: Objection to form.

A Say that again.

MR. ZAPATA: I'll ask it again.

Q Whenever vacancies arose at The Plaza, was it The Plaza's practice to post job openings?

A Yes, sir.

Q Where would these job openings be posted?

A We have a notice board outside human resources. On that notice board, we would post all the positions.

Q With respect to the individuals that were hired in early 2008 to work as bartenders at The Plaza Hotel, were those positions posted outside the human resources office?

A Once we opened the doors, yes. Once we got established, yes.

Q How long would these openings be posted for?

A Until they were filled. Or until the job was taken off. Or in some instances we

Rajan Lai

would open the job, and then maybe for a number of reasons close it up for a month or so.

Q When did you first meet Carlos Rivera?

A When he reported to The Plaza.

Q Can you give us a year for the record?

A 2008.

Q Around what month?

A January.

Q Was that the first time you met him?

A Yes, sir.

Q Did Carlos ever complain to you about his job assignment in early 2008 after you rehired him or recalled him?

A Once in the cafeteria, I had gone to -- I forget, I must have gone to get something to drink, and Carlos was in the cafeteria and he mentioned to me that he working in The Palm Court. And that was the extent of my conversation with him.

Q He just came up to you and said I'm working at The Palm Court?

A He said he's working at The Palm Court and I think he might have said why is he

Rajan Lai

working at The Palm Court, something to that effect, and I explained to him that his classification was that of a private dining bartender when The Plaza closed and that position was not available. However, he was asked to come back, he's exercising his recall rights, and that's why he was recalled, and that's why he was in The Palm Court.

Q How did he respond?

A That was the extent of it.

Q Did you speak to Carlos ever again about his dissatisfaction?

A Not until the arbitration.

Q When did you have that conversation with Carlos in the cafeteria?

A I don't recall the exact date, but it was early 2008.

Q Did you ever have any conversations with Eddie Cedeno?

A I did have a conversation with Eddie Cedeno.

Q Just for the record can you tell us who Eddie Cedeno is?

Rajan Lai

A In 2008 he was the vice president of Local 6.
Q Do you know what union Carlos Rivera was in?
A Yes.
Q What union was that?
A Local 6.
Q Did you ever have any conversations with Eddie Cedeno regarding Carlos Rivera's dissatisfaction at being assigned to work at the Palm Court after being recalled in 2008?
A To my recollection, I did have a conversation with Eddie Cedeno regarding Carlos Rivera's position at The Plaza. I do recall, yes.
Q What did Eddie Cedeno say to you?
A Eddie Cedeno took the position that all the bartenders in The Plaza -- I had conversations with Eddie Cedeno because of Oak Room bartenders on the recall list. There was the Oyster Room bartenders on the recall list and there were private Dominican Republic bartenders on the recall list. So, my conversations were with regard to which

Rajan Lai

bartenders would be recalled to which positions, because we didn't have --
Q I guess you're going beyond the question. My question was just did you have any conversations with Eddie Cedeno regarding Carlos Rivera's assignment to The Palm Court when he was recalled by The Plaza in 2008?
MS. McCLINTOCK: I object and ask that you let the witness complete his answer. I don't think that was the same question that was pending.
MR. ZAPATA: Can you read that back?
MS. McCLINTOCK: I will again state that you let the witness finish his answer.
MR. ZAPATA: Off the record.
(Whereupon, a discussion was held off the record.)
Q Do you want the reporter to read back the last question?
A Sure.
MR. ZAPATA: Can you please read it back.

Rajan Lai

(Whereupon, the reporter read back the testimony.)
A Yes.
Q Did you please tell us about the conversation?
A I do recall having a conversation with Eddie Cedeno where Eddie asked me why Carlos was not in The Rose Club or The Champagne Bar.
Q What did you say?
A And I said that he was in The Palm Court based on his classification prior to The Plaza closing. where he was a private dining bartender. And based on that classification. he was recalled. We don't have a private dining bartender anymore. But he was recalled to The Palm Court bartender role.
Q What did Eddie Cedeno say in response to that?
A I do recall having a conversation with Mr. Cedeno regarding the possibility of offering Mr. Rivera an enhanced severance package since his prior classification was no

Rajan Lai

longer in existence, and I told him I would have to go to the ownership to discuss it with them to get their permission before I could put something on the table.
Q Did Eddie Cedeno ever tell that you it appeared to be discriminatory that Carlos Rivera was not assigned to work at either The Champagne Bar or The Rose Club?
A No.
Q What was the discrimination complaint procedure at The Plaza that was in effect in early 2008?
A We had a zero tolerance policy with regard to any form of discrimination or any form of harassment. We took this extremely seriously. And we made it very clear to all the colleagues in the building in the hotel part of the building that we controlled that if there was any instance of any perceived or alleged discrimination to bring it to the attention of human resources immediately.
Q You would be one of those individuals?
A Yes, we had a handbook. We had a separate policy.

Rajan Lai

Q What was the actual procedure?

A The actual procedure is that they would come to human resources if they ever believed that they were subjected to any form of discrimination or harassment. They would come to HR, they would file a complaint. HR would do an investigation. HR would try to keep it confidential as much as humanly possible and get to the bottom of the complaint and to make a determination if there was any form of discrimination or harassment that actually took place, and then take action based on that.

Q Did you ever conduct any investigations relating to complaints of discrimination during your tenure at The Plaza Hotel?

A Several.

Q Can you tell us about the first one?

A There was an instance very early on. I think this was the first one, where we had created a new department in The Plaza which was butlers. We were offering butler service on every floor. And we had hired initially

Rajan Lai

probably close to 30 butlers in the hotel. And one of the butlers came to me with a photograph where they had taken in the cafeteria of the group, and in that photograph one of the butlers had changed the pictures in the sense that he was -- he altered the pictures, which smacked of discrimination. He put horn, a devil on one picture. He was alluding to I believe somebody's sexual orientation, and he had changed it to reflect that. Made a male very feminine-looking.

He had taken a lady and he had put a dot on her forehead, which is a culture in the Indian culture for a woman to put a dot on her forehead. So, that was brought to me as a form of harassment immediately. And I think that would probably be the first instance where I was asked to investigate a claim of harassment.

Q Did you find that there was discriminatory conduct?

A In this instance?

Q Yes.

Rajan Lai

A Yes, sir.

Q What happened to that person who violated the policy?

A He was suspended.

Q How about the second investigation?

A It's hard for me to be precise as to what the second investigation was. It was a claim of discrimination raised by an engineer where he claimed that his manager had indulged in certain conversations with him that he construed to be discriminatory, and most of it was sort of in the engineering shop talking about motorcycles and beer and issues such as those. And he claimed that there was some discrimination intended or something to that effect. So, that was another charge that I had to look into.

Q What did you find?

A No, there was no validity. The union was involved. There was no basis to determine that there was any discrimination there.

Q The first case that you just identified, where you said you found that

Rajan Lai

somebody had engaged in discrimination, whose attention was this complaint brought to?

MS. McCLINTOCK: Object to form.

A It was brought to my attention by one of the butlers who was in the photograph, who took offense to the fact that she was portrayed in this particular way in this picture.

Q What was her background?

A I think she was Hispanic.

Q Carlos filed a grievance in connection with his assignment in The Palm Court; is that right?

A Grievance with the union?

Q Yes.

A Yes, sir.

Q Was that grievance brought to your attention?

A Yes, through the grievance process.

Q When was it brought to your attention?

A Typically when the grievances are filed. I think within ten days of the filing notices go out to all the parties that a

Rajan Lai

grievance has been filed.
Q Do you know when Carlos filed his grievance?
A I would have to look at the actual grievance to find out. It had to have been in 2008.
Q If you know, about how long does a union member have to bring forward a grievance before the statute of limitations kicks in?
A Well, according to the letter of industry-wide agreement, it's ten days.
Q Is it fair to say that Carlos probably brought his grievance forward in early 2008 -- is that fair to say?
MS. McCLINTOCK: Object to form.
A No, it wasn't early in 2008. It was towards the end, I would say. Mid to end of 2008. I would say the latter part of 2008.
Q Are you guessing?
A I'm just trying to piece the chronology because I remember when the arbitrator wrote the decision. That was

Rajan Lai

early in 2009. So, it had to have been towards the latter part of 2008.
Q What, if anything, did you do after you learned that Carlos Rivera filed a grievance?
A I had to respond to the grievance.
Q What did you understand the complaint in the grievance to be?
A It should be listed other than the actual notice of the grievance. I went by what was listed in the grievance.
Q Do you remember what the nature of Carlos Rivera's complaint was in his grievance?
A Yes, the nature of the grievance was that he was -- it was around the recall to a service bartender classification.
Q I'm sorry?
A To a service bartender classification. Again, I have to read the actual notice of grievance, but that was the grievance, that he should not have been recalled to The Palm Court, that he should have been recalled to The Rose Club or The Champagne Bar.

Rajan Lai

Q I'm going to show you this document I would like to have marked for identification as P-8.
(Whereupon arbitration decision document is marked Plaintiff's Exhibit 8 for identification as of this date.)
Q Do you recognize the document I have just given you?
A Yes, I do.
Q What do you recognize it to be?
A This is the decision made by Arbitrator Shriftman, who heard the grievance -- pardon me, Ira Drogin, D-R-O-G-I-N, is the arbitrator.
Q How do you recognize that document?
A Because I was mailed a copy. I received a copy.
Q When did you receive a copy?
A Soon after the decision was made. That's the practice.
Q For the record, if you can give us a ballpark date.
A It's dated August 28, 2009, so I must have received it probably by, you know, a

Rajan Lai

week after.
Q To be clear, did you just say that it's dated August 28?
A August 28, 2009, is what the date is of this.
Q Where is it?
A On the top right-hand corner.
Q And that says what?
A August 28, 2009. Oh, pardon me, April 28, 2009.
Q Do you know what this document that has been identified as P-8 addresses?
A It addresses the grievance and the arbitrator's findings based on the evidence that was presented.
Q Do you know what the arbitrator's finding was?
A The arbitrator's finding was that Mr. Rivera should be made whole and that his seniority rights had been violated and he should be offered based on seniority a position in The Rose Club.
Q That's what happened?
A Yes. In fact --

Rajan Lai

Q There is no question pending.

MS. McCLINTOCK: I object. I ask that you let the witness complete his answer.

MR. ZAPATA: There was no question pending.

MS. McCLINTOCK: You cut him off before you answered. Did you want to complete your answer to that question?

MR. ZAPATA: I think his answer was complete. You'll have an opportunity to ask him questions when I'm done.

Q Did you ever have any conversations with Mr. Evangelista regarding Carlos Rivera's assignment to The Palm Court in early 2008?

A Yes. I believe I did, yes.

Q Can you please tell us what the substance of those conversations were.

A The substance was that Mr. Rivera would be assigned as a Palm Court bartender.

Q Were you ever made aware by

Rajan Lai

Mr. Evangelista of any complaints that Mr. Rivera had made regarding his assignment to The Palm Court?

A No.

Q How about Mr. Bueno. Did you have any conversations with Mr. Bueno regarding Carlos Rivera's assignment to The Palm Court in 2008?

A It would have been on the same lines that I had with Mr. Evangelista.

Q Did Mr. Bueno bring to your attention any complaints that Carlos Rivera had made regarding his assignment to The Palm Court?

A Not that I can recall.

(Whereupon, a discussion was held off the record.)

MR. ZAPATA: I'm going to show you this document that I would like to have marked for identification as P-9.

(Whereupon document is marked Plaintiff's Exhibit 9 for identification as of this date.)

Q Do you recognize the document that I have just given you that has been marked for

Rajan Lai

identification as P-9?

MS. McCLINTOCK: Can you wait for the witness to finish reading it?

A I've seen this document, yes.

Q How do you recognize the document?

A I recall having seen it before.

Q When did you first see it, if you remember?

A It's dated February 9, 2008, so it must have been sometime then.

MR. ZAPATA: I'm going to show you this document that I'm going to have marked for identification as P-10.

(Whereupon document is marked Plaintiff's Exhibit 10 for identification as of this date.)

Q Do you recognize the document that I have just given you?

A It's the same document you showed me. It has a different date with no signature.

Q Do you recognize that one?

A I don't, no.

MR. ZAPATA: I'm going to show

Rajan Lai

you this document I'd like to have marked for identification as P-11.

(Whereupon employee action form is marked Plaintiff's Exhibit 11 for identification as of this date.)

Q Do you recognize the document that I've just given you that's been marked for identification as P-11?

A Yes.

Q What do you recognize this document to be?

A This is an Employee Action Form. We call it an Employee Action Form in The Plaza.

Q How do you recognize this?

A Because we used it in the hotel.

Q Is that your signature at the bottom of the page?

A Yes, it is.

Q Why did you sign this document?

A To put Mr. Rivera on the payroll.

MR. ZAPATA: I'm going to show you this document. I'd like to have this document marked as P-12.

(Whereupon document is marked

Rajan Lai

Plaintiff's Exhibit 12 for identification as of this date.)

Q Do you recognize this document?

A I've seen similar documents, yes.

Q Are you familiar with this document?

A Not this particular document, but I know of documents --

Q The form?

A Yes, that's correct, the form.

Q This form was used by The Plaza in 2008; isn't that right?

A That's right.

Q Do you know what the purpose of using this form was?

A The purpose of the form was to account for a cash bank. Cash was given to certain classifications in the hotel.

Q What classifications?

A Front desk agents, bartenders. It could have been food and beverage service. I'm not sure whether we gave them a bank or they made their own change from their own resources.

Q Did the bartenders that worked at The

Rajan Lai

Palm Court in 2008 handle money; yes or no?

MS. McCLINTOCK: Object to form. It may not be a yes or no answer.

A I wouldn't know.

Q Have you ever been to The Palm Court?

A Yes.

Q Are you familiar with The Palm Court?

A Yes.

Q Are you familiar with the bar at The Palm Court?

A Yes.

Q Is there a cash register there?

A No, the cash register was not in the bar area. It was in the -- there were two service areas. There was another service area, but there is a cash register there.

Q I'm going to ask that you just answer my questions.

A Certainly.

Q The bartenders assigned to work at The Palm Court, were they required to stay in the bartender station for most of their shift?

MS. McCLINTOCK: Object to

Rajan Lai

form.

A I wouldn't know exactly if they were allowed to move out of the station or stay within the station. That was discretionary, up to the management.

Q Were there any managers that worked at The Plaza around 2008 that had been working at The Plaza prior to its closure in 2005?

A Yes, there were some who had been recalled, yes, who had worked at The Plaza, pardon me, before.

Q Can you tell me?

A Cynthia Scherer. She is director of sales marketing.

Q Is there an individual named Karim?

A Yes.

Q Spell that.

A K-A-R-I-M A-B-D-E-L H-A-M-I-D.

Q What was his position?

A He was director of room dining and subsequently he transferred to sales and marketing.

Q Did you ever have any conversations with Karim regarding Carlos Rivera's position

Rajan Lai

at The Plaza prior to its closure in 2005?

A Yes, I think I did have a conversation with Karim.

Q Can you please tell us about it.

A I asked him if he had any recollection of where Mr. Rivera was prior to closing.

Q What did he say?

A Private dining. As a private dining bartender.

Q That's what he told you?

A Yes, sir.

Q When did he tell you that?

A It must have been 2008.

Q Do you remember when in 2008?

A I wouldn't know the exact date.

Q Was it the first half of 2008?

A I would probably think so, yes.

Q What sparked the conversation?

A I think when Mr. Cedeno raised the issue that Mr. Rivera should be working in The Rose Club or Champagne Bar, and some of these letters that I had received, so...

Q Aside from speaking to Karim, did you speak to anybody else in an effort to

Rajan Lai

ascertain what Carlos Rivera's position was at The Plaza Hotel prior to 2005?

A Yes, I spoke to the pay master. She was in the old Plaza. So I did speak to her.

Q Why did you speak to her?

A Because that would reflect which department his wages have been charged to.

Q Did you make any other efforts aside from what you've already told us?

A I believe I spoke to Evangelista, who was also one of the managers that worked at the old Plaza.

Q What did he say?

A My memory -- to the best of my memory, he said he was in the private room, private dining, but they did work beyond private dining. They would be called out if they had large functions and banquets, for instance. They would assist in other functions as well.

Q Did you ever look at the old work schedules?

A I didn't have them.

Q When you say you didn't have them, do you know that The Plaza didn't have them or

Rajan Lai

you just didn't have them?

A They were not on the property.

Q Were they in storage?

A No.

Q Could you have obtained them?

A No.

Q Did you ask the union?

A I might have asked the union if they had any evidence, yes. We did have conversations in terms of seniority positions, and the union didn't have any information.

Q Evangelista told you that Carlos Rivera worked in private dining, but he also worked at the observing bar?

MS. McCLINTOCK: Object to form.

A That there was a practice in the old Plaza where if they had large functions in various outlets they would draw from other departments is what he said, yes.

Q Did you attempt to communicate with any other former employees of the human resources department in an effort to

Rajan Lai

ascertain what Carlos Rivera's was prior to 2005?

A I did try to contact the director of human resources at the old Plaza. I was never able to get through to him. He never returned my calls. I do remember having conversations with the gentleman who had signed the letter, the human resource manager.

Q When you say the letter, are you referring to this individual --

A That's right.

MR. ZAPATA: Let the record reflect that he's referring to --

Q Actually, tell us what you're referring to.

A I do recall having a conversation with David Jones in terms of discussing some labor-related issues with him, yes.

Q Did you ask him about Carlos Rivera?

A You know, I can't recall the gist of the conversation as to whether I spoke specifically about Carlos or Carlos and some other people. I honestly don't recall.

Rajan Lai

Q You did speak about Carlos, though?

A I did make contact with David Jones. I don't recall in what context I made contact with him.

Q When was the first time you saw this letter again, and I'm referring to P-5?

A I don't recall the precise date when I saw it. I don't recall the exact date.

Q Did Carlos or the union ever bring to your attention any complaints regarding the work environment that Carlos was asked to work in when he was assigned to work in The Palm Court?

A The union? I don't recall the union -- having any discussions with the union, no.

Q Did Carlos ever complain to you that it was too hot in The Palm Court bar?

A I don't recall specifically Carlos complaining, but I do recall that it was hot. There was a malfunction of the air conditioning system.

Q When you say there was a malfunction in the air conditioning system, can you

Rajan Lai

please elaborate?

A To the best of my understanding, there was a problem with the air conditioning and there was a period of time where the air conditioning wasn't working, but we alleviated that by bringing in portable fans. We might have even brought in portable air conditioner, I'm not sure, but it was an electrical malfunction.

Q Do you know who Nancy Bravo is?

A Yes.

Q Who is she?

A She is a pay master.

Q Did you ever ask her about Carlos Rivera's position at The Plaza prior to 2005?

A Yes. I mentioned that, yes.

Q What did she tell you?

A That his wages were being charged in room dining.

Q Did she tell you that he worked at the observing bar?

A No.

MR. ZAPATA: Off the record.

(Whereupon, a discussion was

Rajan Lai

held off the record.)

Q Do you know if Carlos ever filed a charge of discrimination with the Equal Employment Opportunity Commission?

A Yes.

Q When did you first learn?

A When I was served with the charge.

Q What did you do in response to being served?

A I put in a position statement.

Q Did you draft it?

A I drafted it along with legal counsel.

Q When was the first time that you actually saw Carlos Rivera work in the capacity of a bartender?

A When he came back to The Plaza.

Q When?

A In 2008.

Q When in 2008?

A He was recalled in January 2008 and the hotel opened in March 2008. So I would work around with him. I would speak to Mr. Rivera at The Palm Court, and that's where I saw him.

Rajan Lai

Q Are we talking about March 2008?

MS. McCLINTOCK: Object to form. Asked and answered.

A March is when the hotel officially opened to the public.

Q It's around March?

A Yes.

MR. ZAPATA: I have no further questions. Thanks.

MS. McCLINTOCK: I don't have anything.

(Time noted: 12:26 p.m.)

________________________

RAJAN LAI

Subscribed and sworn to before me

this day of , 2011

______________________________

Notary Public

E X H I B I T S

| PLAINTIFF'S FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Trades Council version of industry-wide collective bargaining agreement | 17 |
| 2 | Side agreement | 22 |
| 3 | Letter from Rajan Lai to Carlos Rivera | 24 |
| 4 | Document | 25 |
| 5 | Document | 30 |
| 6 | Seniority list of bartenders | 32 |
| 7 | Champagne Bar schedule | 42 |
| 8 | Arbitration decision | 63 |
| 9 | Document | 66 |
| 10 | Document | 67 |
| 11 | Employee Action Form | 68 |
| 12 | Document | 68 |