Page 81

```
1
2           C E R T I F I C A T E
3       I, VILMA TORRES, hereby certify that the
4  Examination Before Trial of RAJAN LAI was held
5  before me on the 3rd day of May, 2011, that said
6  witness was duly sworn before the commencement of
7  the testimony; that the testimony was taken
8  stenographically by myself and then transcribed by
9  myself; that the party was represented by counsel as
10 appears herein;
11      That the within transcript is a true record
12 of the Examination Before Trial of said witness;
13      That I am not connected by blood or marriage
14 with any of the parties; that I am not interested
15 directly or indirectly in the outcome of this
16 matter; that I am not in the employ of any of the
17 counsel.
18      IN WITNESS WHEREOF, I have hereunto set my
19 hand this      day of          , 2011.
20
21      - - - - - - - - - - -
             VILMA TORRES
22
23
24
25
```

Page 82

```
1
2        ERRATA SHEET
3  PAGE/LINE        CORRECTION
4  _____  _____
5  _____  _____
6  _____  _____
7  _____  _____
8  _____  _____
9  _____  _____
10 _____  _____
11 _____  _____
12 _____  _____
13 _____  _____
14 _____  _____
15 _____  _____
16 _____  _____
17 _____  _____
18 _____  _____
19 _____  _____
20 _____  _____
21 _____  _____
22 _____  _____
23 _____  _____
24
25
```

Rajan Lai

Exhibit "F"

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------x

CARLOS RIVERA,                                            :

                   Plaintiff,                         :

                            Case No.

           -against-        10 CIV. 06661 :

PLAZA ACCESSORY OWNER LP, EL-AD PROPERTIES        :

NY LLC, CPS 1 REALTY LP, LLC and FHR (NY)

LLC,                                                     :

               Defendants.                        :

-----------------------------------------------x

        DEPOSITION of a Non-Party Witness, NANCY
BRAVO, taken by the Plaintiff, pursuant to
Subpoena, held at the offices of Barrister
Reporting Service, Inc., 120 Broadway, Suite
1111, New York, New York, on June 1, 2011, at
10:20 a.m., before a Notary Public of the State
of New York.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

BARRISTER REPORTING SERVICE, INC.

120 Broadway

New York, N.Y. 10271

212-732-8066

Page 1

```
1      UNITED STATES DISTRICT COURT
2      SOUTHERN DISTRICT OF NEW YORK
       ----------------------------------------x
3      CARLOS RIVERA,                          :
4              Plaintiff,              :
                                        Case No.
5          -against-        10 CIV. 06661 :
6      PLAZA ACCESSORY OWNER LP, EL-AD PROPERTIES  :
       NY LLC, CPS 1 REALTY LP, LLC and FHR (NY)
7      LLC,                                    :
8              Defendants.             :
       ----------------------------------------x
9
10             DEPOSITION of a Non-Party Witness, NANCY
11     BRAVO, taken by the Plaintiff, pursuant to
12     Subpoena, held at the offices of Barrister
13     Reporting Service, Inc., 120 Broadway, Suite
14     1111, New York, New York, on June 1, 2011, at
15     10:20 a.m., before a Notary Public of the State
16     of New York.
17
18
19
20     ******************************************
21        BARRISTER REPORTING SERVICE, INC.
22                120 Broadway
23              New York, N.Y. 10271
24                212-732-8066
```

Page 2

```
1   1
2   2    A P P E A R A N C E S :
3   3          THE LAW OFFICES OF FAUSTO E. ZAPATA, JR.,
             P.C.
4   4              Attorneys for Plaintiff
                   277 Broadway
5   5              Suite 501
                   New York, New York 10007
6   6
         BY:  FAUSTO E. ZAPATA, JR., ESQ.
7   7
8   8    LITTLER MENDELSON, P.C.
             Attorneys for Defendants
9   9            One Newark Center
                 8th Floor
10  10           Newark, New Jersey 07102-5311
11  11   BY:  WILLIAM P. MC LANE, ESQ.
12  12
13  13               xxxxx
14  14
15  15
16  16
17  17
18  18
19  19
20  20
21  21
22  22
23  23
24  24
    25
```

Page 3

```
1   1
2   2              S T I P U L A T I O N S
3   3        IT IS HEREBY STIPULATED AND AGREED by and
4   4    between the attorneys for the respective parties
5   5    herein, that filing, sealing and certification, be
6   6    and the same are, hereby waived.
7   7        IT IS FURTHER STIPULATED AND AGREED that
8   8    all objections except as to the form of the
9   9    question, shall be reserved to the time of the
10  10   trial.
11  11        IT IS FURTHER STIPULATED AND AGREED that
12  12   the within deposition may be signed and sworn to
13  13   by an officer authorized to administer an oath,
14  14   with the same force and effect as if signed and
15  15   sworn to before the Court.
16  16               xxxxx
17  17
18  18
19  19
20  20
21  21
22  22
23  23
24  24
25
```

Page 4

```
1   1
2   2    N A N C Y   B R A V O ,
3   3        having been first duly sworn before a
4   4        Notary Public of the State of New
5   5        York, was examined and testified as
6   6        follows:
7   7
8   8    EXAMINATION BY
9   9    MR. ZAPATA:
10  10   Q.    Please state your name for the record.
11  11   A.    Nancy Bravo.
12  12   Q.    What is your address?
13  13   A.    75 LaSalle Street, Apartment 13-F, New
14  14   York, New York 10027.
15  15   Q.    Good morning.
16  16   A.    Good morning.
17  17   Q.    My name is Fausto Zapata.  I'm Carlos
18  18   Rivera's attorney.  I'm representing him in a
19  19   lawsuit against The Plaza.
20  20        I brought you here today to ask you
21  21   some questions because your name came up at
22  22   another deposition.  I'll ask you some
23  23   questions.  If I ask you any questions that
24  24   you don't understand or it's unclear, I want
25  25   you to stop me and ask me to rephrase it and
```

Page 5

1   2   I will.

2   3   A.   Okay.

3   4   Q.   If you need to take a break at any

4   5   point, let me know and I'll give you an

5   6   opportunity to take a break.  Since we're

6   7   asking you questions it's important that your

7   8   memory be clear.

8   9        Have you taken any medications today

9   10   that may affect your memory?

10   11   A.   No.

11   12   Q.   Are you currently employed?

12   13   A.   No.

13   14   Q.   When was the last time you were

14   15   employed?

15   16   A.   The last day I worked was Friday,

16   17   April 15th.

17   18   Q.   Where did you work at that time?

18   19   A.   At The Plaza Hotel.  CPS 1 is the name

19   20   for the IRS, but it's also The Plaza Hotel.

20   21   A lot of people get confused.

21   22   Q.   When you say April 15th, are you

22   23   talking about this year?

23   24   A.   Yes.

24   25   Q.   2011?

Page 6

1   2   A.   Yes.

2   3   Q.   What position did you hold at that

3   4   time?

4   5   A.   Payroll manager.

5   6   Q.   Can you please describe your job

6   7   duties as a payroll manager as of April of

7   8   2011?

8   9   A.   First of all, to maintain accuracy at

9   10   all times.  We had a union/nonunion payroll,

10   11   and I was responsible for making sure that

11   12   everything that was submitted to me was

12   13   correct.  Not actually process it, but make

13   14   sure all the managers submitted the work

14   15   correctly, and then at that point I ran a

15   16   report, eyeballed everything, made sure

16   17   everything looked correct and went on with

17   18   the payroll, and anything in between, let's

18   19   say, which happens frequently, there was a

19   20   last minute entry, most of the time it was a

20   21   union, because we do have a union property,

21   22   that would be a reconciled item, and that had

22   23   to be approved by the controller because it's

23   24   outside the normal routine of the payroll.

24   25   Q.   You just testified that you were

Page 7

1   2   responsible for making sure that everything

2   3   that was submitted to you was correct.  When

3   4   you say everything that was submitted to you,

4   5   what are you referring to?

5   6   A.   Hours, personal days off, vacation

6   7   days, sick days, personal days.  The hours

7   8   itself was a responsibility of the managers.

8   9   If they submitted 40 hours regular and 50

9   10   hours overtime, it was approved.  It was not

10   11   something that I would call every manager and

11   12   say this is not correct.  Are you sure?  I

12   13   depended on the managers to be my eyes into

13   14   their world because they maintained

14   15   schedules, all paperwork concerning time off.

15   16   So, once they submitted the payroll and I

16   17   closed the payroll, it was a matter of me

17   18   eyeballing everything, making sure everything

18   19   was correct, and I would see hours were

19   20   submitted, personal days off were submitted,

20   21   everything was fine.

21   22   Q.   Who was your direct supervisor in May

22   23   of 2005?

23   24   A.   There were two of them.  The assistant

24   25   controller, his name is Leonard Apostal, and

Page 8

1   2   the controller was Jim Harvey.  When I hear

2   3   immediate supervisor, some people take it to

3   4   be Leonard and some people take it to be Jim.

4   5   That's why I mentioned both names.

5   6   Q.   Do you know who Carlos Rivera is?

6   7   A.   Yes.

7   8   Q.   How do you know him?

8   9   A.   Well, from the old Plaza or the new

9   10   Plaza?

10   11   Q.   Well, how do you know him?

11   12   A.   We met at The Plaza.  He started, I

12   13   believe, before me.  I believe he started

13   14   either in '88 or '89, 1988 or 1989.  I

14   15   started in 1990.  It was a group of employees

15   16   who started at the same time, and you get to

16   17   know each other after awhile.  There's always

17   18   a division between union and nonunion, but

18   19   after awhile you speak to people, become

19   20   friendly.

20   21   Q.   Do you know who Rajan Lai is?

21   22   A.   Yes.

22   23   Q.   How do you know him?

23   24   A.   He was the prior director of Human

24   25   Resources.  He's no longer employed at The

Page 9

```
1   2   Plaza.
2   3   Q.    Do you know on or around when he
3   4   started as the director of Human Resources?
4   5   A.    Rajan Lai was part of the preopening
5   6   team when The Plaza was closed and then El-Ad
6   7   Properties was bringing them on board.
7   8   Probably August or September of 2007 he came
8   9   on board after the general manager and I
9   10  believe the other employee was a director of
10  11  revenue, because at that time there was no
11  12  employee data for him to work with. Even
12  13  though I was maintaining it, there was no
13  14  employee data for him to work with.
14  15  Q.    What do you mean by there was no
15  16  employee data?
16  17  A.    At that point the only employees were
17  18  the recall employees, the employees that were
18  19  waiting to come back or deciding whether or
19  20  not the severance was to be paid, and it
20  21  wasn't until there was enough data for him to
21  22  work with that El-Ad Properties decided to
22  23  bring in the director of HR to handle that
23  24  and pull it off of my lap.
24  25  Q.    What do you mean by pull it off of my
```

Page 10

```
1   2   lap?
2   3   A.    I was on El-Ad's payroll.
3   4   Q.    But were you doing duties for The
4   5   Plaza?
5   6   A.    Yes.
6   7   Q.    During Rajan Lai's employment at The
7   8   Plaza did you have any type of interaction
8   9   with him on a professional level?
9   10  A.    Yes.
10  11  Q.    Can you please describe the type of
11  12  interaction you had with him on a
12  13  professional level?
13  14  A.    Basically working with the employee
14  15  data, any new hires, any issues that came up
15  16  with employees that require a check to be
16  17  paid was submitted to me. If I had any
17  18  questions, I would go to Rajan for further
18  19  explanation. I don't think he's familiar
19  20  with the union contract. I'm not sure, but
20  21  anything that I felt needed further
21  22  clarification I went back to Rajan for the
22  23  simple reason was we opened the hotel again
23  24  and I didn't want there to be any issues in
24  25  the beginning. Everybody is coming back, and
```

Page 11

```
1   2   I wanted the transition to be as smooth as
2   3   possible. There was a lot of interaction
3   4   with Rajan.
4   5   Q.    Did you ever discuss Carlos Rivera
5   6   with Rajan Lai?
6   7   A.    Yes.
7   8   Q.    Can you please tell us what you
8   9   discussed with Mr. Lai about Mr. Rivera?
9   10  A.    Rajan asked me if I knew the
10  11  circumstances of his employment at The Plaza,
11  12  and I told him I did, because we all knew
12  13  each other, but I did mention to Rajan that
13  14  when the severance was prepared, Carlos
14  15  Rivera had a job title of room service
15  16  bartender. It was either room service
16  17  bartender or private dining. I don't
17  18  remember the exact job classification. His
18  19  severance was paid on that job
19  20  classification. I did mention to him even
20  21  though he had the title of private dining
21  22  bartender, he worked in other outlets. He
22  23  was reassigned wherever he was needed.
23  24  Q.    In or around 2005 before The Plaza
24  25  closed, did you know where Carlos Rivera
```

Page 12

```
1   2   routinely worked?
2   3   A.    Yes.
3   4   Q.    Where?
4   5   A.    In the Oak Room.
5   6   Q.    How do you know that?
6   7   A.    Well, I'm there. At that point I was
7   8   there 15 years. I know the employees and I
8   9   recognize the uniforms.
9   10  Q.    What do you mean?
10  11  A.    There was a uniform extended to
11  12  whatever outlet the employee worked. The
12  13  Palm Court had their own uniform. The Oak
13  14  Room had their own uniform, and the Oyster
14  15  Bar had their own uniform. You can spot them
15  16  a mile away; oh, he's Oak Room, he's Palm
16  17  Court.
17  18  Q.    What uniform did you mostly see Carlos
18  19  Rivera wearing?
19  20  A.    The Oak Room uniform was white and I
20  21  believe it had gold stripes.
21  22  Q.    Was that the Oak Room?
22  23  A.    Yes.
23  24  Q.    Let's narrow it down in terms of time
24  25  frame. In 2005 which uniform did you see
```

Page 13

```
1    2   Carlos Rivera wear?
2    3   A.    The Oak Room.
3    4   Q.    Did you have any other conversations
4    5   with Rajan Lai with respect to Carlos
5    6   Rivera's classification?
6    7   A.    Yes.
7    8   Q.    Could you tell us?
8    9   A.    He basically wanted to know what I
9   10   knew about Carlos, and I said that although
10  11   he was categorized as room service bartender,
11  12   and I realized he was in the Oak Room, but it
12  13   was up to the manager to make sure that his
13  14   job classification was changed, which
14  15   required paperwork, and a lot of people don't
15  16   like doing paperwork.  What's unfortunate is
16  17   when the paperwork wasn't done and The Plaza
17  18   closed, everything was done so fast.  We
18  19   based the severance based on the active job
19  20   classification.  The reason Carlos became I
20  21   guess the next one in line to go to the Oak
21  22   Room was because there were two deaths in
22  23   that department.  One was John Murphy.  He
23  24   was a Oak Room bartender, and the other one,
24  25   I don't remember his name, but he was called
```

Page 14

```
1    2   Kiddie.  He was from Thailand.  So, they
2    3   needed a permanent bartender at that time.  I
3    4   don't know when the deaths occurred, but
4    5   that's what created the opening in the Oak
5    6   Room.
6    7   Q.    Was that pre2005?
7    8   A.    Yes.  It may have been 2005, the early
8    9   part of 2005.  I don't remember the exact
9   10   dates, but it was two deaths, John Murphy and
10  11   the other employee named Kiddie.
11  12   Q.    The paperwork was never submitted for
12  13   the classification of Mr. Rivera?
13  14   A.    No.  That was something that was
14  15   determined by the department manager and what
15  16   he had to do.  I would sometimes see an
16  17   employee working in the outlet, and I would
17  18   say to the manager if that's permanent, you
18  19   must do paperwork, and then HR would be
19  20   notified, and it would be up to the
20  21   department manager and HR to take that route.
21  22   Q.    Did you ever do this, identify to the
22  23   manager that Mr. Rivera was working out of
23  24   his classification?  Did you ever highlight
24  25   that to anybody?
```

Page 15

```
1    2   A.    Yes.  At this point I tried valiantly
2    3   to remember who the manager was, but I go
3    4   blank.
4    5   Q.    Do you remember what he looks like?
5    6   A.    There might be an employee that might
6    7   know.  His name is Anthony Evangelista.  I'm
7    8   not sure how long he stayed at The Plaza
8    9   prior to the closing, but he's working in one
9   10   of the Fairmonts, either Fairmont Beijing or
10  11   Fairmont Singapore.  He's in one of those
11  12   properties.
12  13   Q.    Do you know who Kenny Okutani is?
13  14   A.    It sounds familiar.  Is that an
14  15   employee in sales?
15  16   Q.    If you don't know, don't worry about
16  17   it.
17  18   A.    It sounds familiar, but I don't
18  19   remember.
19  20   Q.    Do you know who Myoung Nam is?
20  21   A.    Myoung, yes.
21  22   Q.    Who is she?
22  23   A.    Myoung was the HR coordinator.
23  24   Q.    What does that mean?
24  25   A.    She handled the administrative duties
```

Page 16

```
1    2   in the Human Resources Department.
2    3   Q.    Did you have any interactions with
3    4   her?
4    5   A.    Yes.
5    6   Q.    Can you describe the interactions that
6    7   you had with her?
7    8   A.    Myoung would submit paperwork to me,
8    9   and by paperwork I mean new hires, any check
9   10   request, anything that would require
10  11   follow-up with payroll she would bring up the
11  12   paperwork.
12  13   Q.    Did job classifications effect
13  14   payroll?
14  15   A.    No.  In the payroll world I just need
15  16   a name, hours and a rate.
16  17   Q.    Is the rate determined by
17  18   classification?
18  19   A.    Yes.
19  20   Q.    How about David C. Jones, do you know
20  21   who he is?
21  22   A.    Yes.
22  23   Q.    Who is he?
23  24   A.    David Jones, I believe his final title
24  25   when The Plaza closed was -- I think it was
```

Page 17

1 2 employment manager. He also worked in Human
2 3 Resources.
3 4 Q. Do you know what his job duties were
4 5 when he worked in Human Resources in or
5 6 around 2005?
6 7 MR. MC LANE: Objection to the
7 8 form.
8 9 A. David Jone was responsible for firing
9 10 employees, part of the hiring process, not
10 11 the ultimate hire, of handling benefit
11 12 payments, if I remember correctly, like 401K,
12 13 Workers' Comp., and at that time he paid the
13 14 union payments; dues, 401Ks and benefits.
14 15 Q. Now, the records when The Plaza
15 16 reopened in 2008 with regard to job
16 17 classifications, in your opinion were they
17 18 accurate?
18 19 A. Yes.
19 20 Q. Was Carlos Rivera's job classification
20 21 accurate?
21 22 A. For the most part. It was accurate to
22 23 the part that -- it was as accurate as the
23 24 last paperwork that was submitted, which was
24 25 private dining bartender. If you were to

Page 18

1 2 request the severance listing, it would say
2 3 private dining bartender.
3 4 Q. So, you're saying it was accurate even
4 5 though he worked at the Oak Bar?
5 6 MR. MC LANE: Objection. Asked
6 7 and answered.
7 8 A. It's in the Oak Room, the Oak Bar.
8 9 It's the same.
9 10 What was the question?
10 11 Q. You're saying even though Carlos
11 12 Rivera worked in the Oak Room at the Oak Bar
12 13 in 2005 his job classification was accurate?
13 14 MR. MC LANE: Objection to form.
14 15 A. Yes. The reason I say yes is because
15 16 you might have a bartender that says private
16 17 dining bartender or Palm Court bartender, but
17 18 every bartender was double-coded.
18 19 Q. What does that mean?
19 20 A. That means they assume the job
20 21 classification and the rate to work in
21 22 another outlet. So, when the payroll is
22 23 processed and reports are generated, they
23 24 show a bartender in the Palm Court although
24 25 his main job classification is the Oak Room

Page 19

1 2 or somebody could be in the Oyster Bar that
2 3 was primarily set to be in the Palm Court.
3 4 Because it was double-coded the manager
4 5 chooses that job classification. When the
5 6 payroll is submitted, you can have a Oak Room
6 7 bartender working in the Palm Court for one
7 8 week, probably for vacation coverage or any
8 9 number of reasons, but like I said, it was up
9 10 to the manager. If they saw that the change
10 11 was going to be permanent, it was up to them
11 12 to prepare paperwork for the simple reason
12 13 when you have a union property, everything
13 14 has to be to the letter. You can't fluctuate
14 15 with a job classification.
15 16 Q. Are you familiar with the pay stubs
16 17 that the workers at The Plaza would receive?
17 18 A. Yes.
18 19 Q. Do you know if in 2008 the pay stubs
19 20 indicated the classification?
20 21 A. No.
21 22 Q. They did not?
22 23 A. No, because it was from Ceridian, and
23 24 Ceridian didn't have job classification.
24 25 Ceridian was a payroll company.

Page 20

1 2 Q. You just testified as to
2 3 double-coding. You said bartenders very
3 4 often had double-coding. Did that ever
4 5 create any problems?
5 6 A. Not in my world where I just needed
6 7 hours, rate and a name, but when it comes to
7 8 reporting, that's when it was critical that
8 9 if you have a bartender, the bartender should
9 10 be coded correctly. The manager when he
10 11 would prepare the payroll, as the employees
11 12 are processed there's a drop down and it
12 13 would show Palm Court, Oyster Bar, Oak Room.
13 14 Wherever they worked the prior day, that is
14 15 what was chosen.
15 16 Q. Are you saying for reporting purposes?
16 17 A. That was used for reporting purposes,
17 18 but not for me. I just needed hours and rate
18 19 and a name.
19 20 Q. Can you describe the relationship that
20 21 you had with Rajan Lai?
21 22 MR. MC LANE: Objection to the
22 23 form.
23 24 A. Professional. Nothing out of the
24 25 ordinary. Like we didn't go for drinks after

Page 21

1   2   work or anything.

2   3   Q.    Why did your employment come to an end

3   4   at The Plaza?

4   5   A.    I was having issues at The Plaza

5   6   stemming from when I started in December of

6   7   2007.  When I returned back -- The Plaza

7   8   closed April 30th.  I was asked by El-Ad

8   9   Properties to stay on board because they

9   10  needed someone that was familiar with the

10  11  union to handle the union severance payments.

11  12  It was a huge payment.  If I remember

12  13  correctly, it was way over $1 million, and it

13  14  had to be correct.  Once that was done there

14  15  was a lot of union issues pending, and unless

15  16  you were familiar with the union it would be

16  17  very hard for El-Ad Properties.  So, they

17  18  kept me on board, and it just grew from

18  19  there.

19  20  Q.    So, how did your employment come to an

20  21  end?

21  22  A.    At El-Ad?

22  23  Q.    Yes.

23  24  A.    Well, the preopening team were hired I

24  25  believe in the summer of 2007, and once they

Page 22

1   2   came on board, which I believe is the general

2   3   manager, the director, Rajan Lai, and I

3   4   believe one or two employees for sales, I was

4   5   asked do I want to be payroll manager, and I

5   6   said sure.

6   7   Q.    Did you resign or did you get

7   8   terminated?

8   9   A.    From El-Ad Properties?

9   10  Q.    Yes.

10  11  A.    I don't know.  It was a

11  12  resignation/termination, because I finished

12  13  from El-Ad Properties and I started at The

13  14  Plaza.  So, I don't know what that is called.

14  15  Q.    When did you stop working at The

15  16  Plaza?

16  17  A.    April 15th.

17  18  Q.    Why did you stop working at The Plaza

18  19  on April 15th?

19  20  A.    Without getting into too much, because

20  21  I don't want to defer from Carlos' case here,

21  22  I honestly felt my position was not taken

22  23  very seriously with the new management team.

23  24  I thought that by my being the one who

24  25  handled everything when The Plaza closed;

Page 23

1   2   working with El-Ad Properties, with the

2   3   audits and vendors that still had to be paid,

3   4   dealing with the Department of Labor when all

4   5   the employees were unemployed, it was

5   6   extensive work with the Department of Labor,

6   7   I thought that would be seen as a major

7   8   benefit, and I honestly never thought it was.

8   9       MR. ZAPATA:  I have no further

9   10  questions.

10  11      MR. MC LANE:  I have nothing.

11  12  Thank you.

12  13      (Time noted:  10:50 a.m.)

13  14

14  15

15  16

16  17  ---------------------------

17  18      NANCY BRAVO

18  19

19  20  Subscribed and sworn to before me

20  21  this    day of        2011.

21  22

22  23  ---------------------------

23  24      Notary Public

24  25

Page 24

1   1

2   2       C E R T I F I C A T E

3   3   I, CAROLYN PALADINO, hereby certify

4   4   that the Deposition of NANCY BRAVO was held

5   5   before me on the 1st day of June, 2011; that

6   6   said witness was duly sworn before the

7   7   commencement of her testimony; that the

8   8   testimony was taken stenographically by

9   9   myself and then transcribed by myself;

10  10      That the within transcript is a true

11  11  record of the Deposition of said witness;

12  12      That I am not connected by blood or

13  13  marriage with any of the parties; that I am

14  14  not interested directly or indirectly in the

15  15  outcome of this matter; that I am not in the

16  16  employ of any of the counsel.

17  17      IN WITNESS WHEREOF, I have hereunto set

18  18  my hand this    day of        , 2011.

19  19

20  20  ---------------------------

21  21      CAROLYN PALADINO

22  22

23  23

24  24

25

Page 25

**ERRATA SHEET**

PAGE/LINE                     CORRECTION

1  2  _____  _____
2  3  _____  _____
3  4  _____  _____
4  5  _____  _____
5  6  _____  _____
6  7  _____  _____
7  8  _____  _____
8  9  _____  _____
9  10 _____  _____
10 11 _____  _____
11 12 _____  _____
12 13 _____  _____
13 14 _____  _____
14 15 _____  _____
15 16 _____  _____
16 17 _____  _____
17 18 _____  _____
18 19 _____  _____
19 20 _____  _____
20 21 _____  _____
21 22 _____  _____
22 23 _____  _____
23 24 _____  _____
24 25

# Exhibit "G"

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------------------ x

     CARLOS RIVERA,

4
                         Plaintiff,

5
             -against-

6
     PLAZA ACCESSORY OWNER LP, ELAD PROPERTIES

7    NY LLC, CPC Q REALTY LLP, LLC,

8                        Defendants.

     ------------------------------------------------x

9

10           TELEPHONIC EXAMINATION BEFORE TRIAL of the

11   Defendant, PLAZA ACCESSORY OWNER LP, by MARTA

12   REUS, taken by the Plaintiff, pursuant to Order,

13   held at the Law Offices of Fausto E. Zapata,

14   Jr., 277 Broadway, New York, New York on July

15   14, 2011, at 9:00 a.m., before a Notary Public

16   of the State of New York.

17

18

19

20

21

22   ******************************************************

23           BARRISTER REPORTING SERVICE, INC.

             120 Broadway

24        New York, N.Y. 10271

             212-732-8066

25

Page 1

1  2    UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF NEW YORK
2  3    ------------------------------------ x
         CARLOS RIVERA,
3  4
                    Plaintiff,
4  5
            -against-
5  6
         PLAZA ACCESSORY OWNER LP, ELAD PROPERTIES
6  7    NY LLC, CPC Q REALTY LLP, LLC,
7  8                Defendants.
         ------------------------------------x
8  9
9  10        TELEPHONIC EXAMINATION BEFORE TRIAL of the
10 11   Defendant, PLAZA ACCESSORY OWNER LP, by MARTA
11 12   REUS, taken by the Plaintiff, pursuant to Order,
12 13   held at the Law Offices of Fausto E. Zapata,
13 14   Jr., 277 Broadway, New York, New York on July
14 15   14, 2011, at 9:00 a.m., before a Notary Public
15 16   of the State of New York.
16 17
17 18
18 19
19 20
20 21
21 22   ***************************************************
22 23        BARRISTER REPORTING SERVICE, INC.
                    120 Broadway
23 24           New York, N.Y. 10271
                    212-732-8066
24 25

Page 2

1
2  A P P E A R A N C E S :
3
4    LAW OFFICES OF FAUSTO E. ZAPATA, JR
        Attorneys for Plaintiff
5       277 Broadway, Suite 501
        New York, New York 10007
6
     BY:  FAUSTO E. ZAPATA, JR., ESQ.
7            and
        CRAIG HANLON, ESQ.
8
9
10
11   LITTLER MENDELSON, P.C.  (Via Telephone)
        Attorneys for Defendants
12      One Newark Center, 8th Floor
        Newark, New Jersey 07107
13
     BY:  BILL McLANE, ESQ.
14
15
16
17
18
19
20
21
22              xxxxx
23
24
25

Page 3

1                    Reus
2
3         S T I P U L A T I O N S
4
5       IT IS HEREBY STIPULATED AND AGREED by and
6    between the attorneys for the respective parties
7    herein, that filing, sealing and certification,
8    and the same are, hereby waived.
9
10       IT IS FURTHER STIPULATED AND AGREED that all
11   objections except as to the form of the question,
12   shall be reserved to the time of the trial.
13
14       IT IS FURTHER STIPULATED AND AGREED that the
15   within deposition may be signed and sworn to by an
16   officer authorized to administer an oath, with the
17   same force and effect as if signed and sworn to
18   before the Court.
19
20
21              xxxxx
22
23
24
25

Page 4

1                    Reus
2  M A R T A   R E U S ,
3      having been first duly sworn before a Notary
4      Public of the State of New York, was examined
5      and testified telephonically, as follows:
6
7  EXAMINATION BY
8  MR. ZAPATA, JR.:
9  Q     What is your name?
10 A     Marta Reus.
11 Q     What is your address?
12 A     P.O. Box 114304 Abu Dhabi, UAE.
13 Q     Good evening, for you Marta, right?
14 A     Yes.
15 Q     I am the attorney representing Carlos
16 Rivera in his lawsuit against the Plaza
17 Hotel.  And I am going to ask you some
18 questions relating to your employment while
19 you were at the Plaza.
20       Before we get into that, I wanted to
21 ask you a couple of questions.  Have you
22 taken any medications today that might affect
23 your ability to recall events?
24 A     No.
25 Q     Is there any other reason why you may

1          Reus
2 not be able to recall events today that's
3 caused by some medical condition of any kind?
4 A    No.
5          MR. MC LANE:  Let me say for
6      the record that Marta is expecting a
7      child any moment now and she would not
8      be able to finish the deposition if
9      she goes into labor.
10          THE WITNESS:  That's a good
11      point, thank you.  Let's cross our
12      fingers.
13 Q    Let's get through this fast then.
14 Marta, who is your employer right now?
15 A    Well, I work for Fairmont Hotel.
16 Legally the employer is Hotel and Properties
17 LLC.
18 Q    How long have you worked with this
19 employer?
20 A    Since February, 2009 and then prior to
21 that I was with Fairmont at the Plaza.
22 Q    How long did you work with Fairmont at
23 the Plaza?
24 A    About a year and-a-half, just over a
25 year and-a-half, from July of 2007 until

1          Reus
2 February of 2009.
3 Q    Where did you work before that?
4 A    At the Fairmont, C-O-P-L-E-Y, Plaza in
5 Boston.
6 Q    When did you start working there?
7 A    September, 2005.
8 Q    When did you stop working there?
9 A    July, 2007.
10 Q    Before that, where did you work?
11 A    At the Fairmont Royal York in Toronto.
12 Q    When did you start working there?
13 A    January, 2004.
14 Q    When did you stop?
15 A    September, 2005.
16 Q    Before that where did you work?
17 A    Fairmont Empress in Victoria, British
18 Columbia.
19 Q    When did you start working there?
20 A    May, 2002.
21 Q    When did you stop?
22 A    January, 2004.
23 Q    Where did you work before that?
24 A    I have been at the Hotel Toronto
25 Centre.

1          Reus
2 Q    When did you start?
3 A    February, 2001.
4 Q    When did you stop?
5 A    May, 2002.
6 Q    Can you please describe your
7 educational background?
8 A    I have a bachelor of commerce degree
9 minoring in human resources from Ryerson
10 University in Toronto, R-Y-E-R-S-O-N.
11 Q    When did you graduate?
12 A    2002.
13 Q    What position did you hold during the
14 time that you worked at the Fairmont in New
15 York, the Plaza?
16 A    Assistant director of human resources.
17 Q    Can you please describe the duties
18 that you performed as assistant director of
19 human resources at the Plaza?
20 A    My main responsibilities were sort of
21 implementing and management of the Fairmont
22 Hotel, operational procedures as it pertains
23 to human resources, leadership in
24 establishing procedures total wide as it
25 comes to our standards in human resources,

1          Reus
2 then recruitment was my main function sort of
3 as it was the preopening.
4      I also sort of administratively
5 assisted Rajan Lai, the director of human
6 resources with some of the supports with the
7 recalls, colleagues that were coming back to
8 us and then in general, sort of
9 administration of letters going out to
10 colleagues, for example, that decided to take
11 severance, sending out checks, things like
12 that.
13 Q    Who did you report to?
14 A    I reported to Rajan Lai who was the
15 director.
16 Q    How many people worked in the human
17 resources department?
18 A    Four.
19 Q    What are the names of all of the
20 individuals?
21 A    Jane Yrenaya was the director of
22 learning and development and Ingrid Dominguez
23 was the human resources coordinator.
24 Q    Then you and Rajan?
25 A    That's right.

Page 9

Reus

1
2 Q     Who was responsible for conducting
3 investigations regarding complaints of
4 discrimination?
5 A     Rajan Lai the director.
6 Q     Were you involved in any
7 investigations regarding complaints of
8 discrimination?
9 A     No.
10 Q     Rajan Lai pretty much did it all by
11 himself?
12 A     He did.  I mean he would ask me to
13 pull files for people, but I didn't know what
14 it was pertaining to.  If he asked me to pull
15 up files, then I would go into the file, then
16 he would ask me for copies of employment
17 letters, I would get files, particularly if
18 the colleague has a history with the hotel
19 and there is a file.  My role was
20 administrative.
21 Q     Your office, during the time you were
22 there, had access to files for employees that
23 worked at the Plaza prior to 2005?
24 A     We had access to files for employees
25 that were sort of active in turning back.  We

Page 10

Reus

1
2 didn't actually have -- we would have to
3 request it to have the file, we didn't have
4 all of the files in the office.
5 Q     You had all of the files for
6 everybody, that's when you pulled?
7 A     That's right, all of our actual
8 employees we had in the office.
9 Q     You stated that you were involved in
10 recalling colleagues; is that right?
11 A     Right.
12 Q     Can you please describe what your role
13 was in that respect?
14 A     Preparing mail, letters for others to
15 recall them back to former positions or
16 offering severance.  We had a situation that
17 severance was offered before I even got
18 there.  It was letters sort of inviting them
19 back for certain dates for orientation or
20 letters to invite them into the hotel to meet
21 with Rajan for whatever reason, various
22 reasons.
23     Tracking, like once the letters went
24 out for the recall colleagues, we would sort
25 of track them, that the colleagues received

Page 11

Reus

1
2 the letters, then obviously in some cases
3 some follow ups.  I was responsible for the
4 tracking of all of this basically.
5 Q     What about when they finally were
6 reinstated after being recalled, did you have
7 any involvement at that point?
8 A     My involvement at that point was more
9 operationally.  If they had challenges with
10 overtime or something like that, then I would
11 be more operationally responsible in nature.
12     Certainly then we would look at sort
13 of the collective agreement to interpret the
14 hours that they worked, as an example.  With
15 the sort of recall process, very much Rajan
16 was the one in charge because he knew
17 obviously the story behind and had all of the
18 documents behind the situation.
19 Q     What do you mean by that he had all of
20 the documents?
21 A     Well like seniority, he was a master
22 keeper of all of those documents, my role was
23 much more operational.  Once they came back
24 to work, then any challenges that came up
25 during the course of the hotel operation, I

Page 12

Reus

1
2 would sometimes handle it.  If it was
3 something more serious, it would generally go
4 to him.  Anything with a business agent was
5 dealt with by Rajan.
6 Q     I want you to take a look at the
7 document that's been marked for
8 identification as P11.  After you find and
9 review it, please let me know?
10 A     P11, yes, the employee action form.
11 Q     Can you please describe for us first,
12 do you recognize this document?
13     MR. MC LANE:  Give me one
14     second to find it myself.
15 Q     Did you have an opportunity to review
16 the document?
17 A     Yes.
18 Q     Do you recognize what this document
19 is?
20 A     It is a standard employee action form
21 that we use in Fairmont.
22 Q     How do you recognize it?
23 A     I used the same form in my current
24 hotel.
25 Q     I want you to look at the bottom where

Reus

1   Reus
2   it says approvals.  Do you know whose
3   signature is next to where it says general
4   manager?
5   A    The signature appears to be Shayne
6   Creek, the general manager for the Plaza.
7   Q    The signature on the bottom next to
8   director of human resources, do you know
9   whose signature that is?
10  A    It appears like it is Rajan Lai.
11  Q    Are you familiar with Rajan Lai's
12  signature?
13  A    Yes, I have seen it in various
14  locations.
15  Q    How did you come to see his signature
16  on numerous occasions?
17  A    Well, within the course of our duties
18  in the office we are involved in looking at
19  the employee files and obviously, these forms
20  would be in their files.  You could see if he
21  was signed off on any letters that are issued
22  from human resources or most of the letters
23  that are issued from human resources, you see
24  it during your day to day duties.
25  Q    This document, is it a document that

1   Reus
2   the Plaza maintained in the ordinary course
3   of business?
4   A    Within human resources, yes.
5   Q    Where were these documents stored?
6   A    In the confidential employee file.
7   Q    Looking at this document, can you tell
8   us what information is being conveyed on this
9   document?
10  A    The information is the named
11  individual would be on this form, Carlos
12  Rivera, there would be employee numbers, et
13  cetera.  He is moving into a position of a
14  bartender in the department of Champagne Bar
15  at a rate of 23.40 something -- I can't quite
16  make out that salary level.
17  Q    Do you know, it says department
18  number, it says 0530, do you know what that
19  means?
20  A    Department number typically
21  corresponds to the department that's written
22  out.  I cannot confirm that would be the
23  number for the Champagne Bar because I don't
24  remember, but that's what it would normally
25  mean.

1   Reus
2   Q    Just so I am clear, it says
3   department, the Champagne Bar is a
4   department; is that right?
5   A    That's correct.
6   Q    The title was bartender; is that
7   right?
8   A    That's right.
9        (Whereupon the record was read
10       back by the reporter.)
11  Q    I want you to take a look at the
12  document that's been marked for
13  identification as P8.  Do you recognize the
14  document that's been identified as P8?
15  A    Yes, it looks like a recall letter
16  that we used, a form letter.
17  Q    The signature at the bottom, do you
18  recognize that signature?
19  A    It looks like the signature of Rajan
20  Lai.
21  Q    These are the letters that went out
22  to, I guess, individuals being recalled?
23  A    Yes.
24  Q    It says here there is a training
25  period.  Were you familiar with what the

1   Reus
2   training period consisted of?
3        MR. MC LANE:  Where are you
4        reading?
5   Q    It says right at the bottom training
6   period, this training period will introduce
7   you to the New Plaza five star --
8        MR. MC LANE:  Got it.
9   A    We did.  We have a five star training
10  program.  Off the top of my head, to be
11  honest I don't recall what the length of time
12  was.  Our typical orientation is two days.
13  Then the actual five star training for each
14  of the employees would have been a number of
15  weeks, but I don't recall exactly how many to
16  be honest.
17  Q    Do you know what the purpose of the
18  training is?
19  A    Certainly to introduce the colleagues
20  to the standards of the Plaza, the position
21  that they are moving into, the standard
22  operating procedures, Fairmont philosophy and
23  service levels, certain standards.
24  Q    What would happen if somebody did not
25  satisfactorily complete the training period?

Page 17

```
1              Reus
2 A    Well it depends on the situation.  Off
3 the top of my head, I think we had everybody
4 that was successful.  They would get
5 retrained until they were at the
6 satisfactorily level.  Obviously some
7 colleagues have probation periods in which
8 case, if they didn't meet the standards they
9 would be offered, it depends, offered the
10 recall employees -- I am not sure what the
11 exact standard was, but there were different
12 procedures.
13        The new hired colleagues went through
14 the same procedure or the same training I
15 should say, and they had sort of different
16 consequences so I am not sure to be able to
17 comment on the details.
18 Q    You said that there were different
19 consequences for the individuals recalled and
20 the new hires; is that right?
21 A    Yes.
22 Q    What were the consequences for
23 individuals that were recalled that did not
24 satisfactorily complete the training period?
25 A    From what I recall, they had a number
```

Page 18

```
1              Reus
2 of sort of retraining available to them.
3 Q    How about new employees?
4 A    I think they had a number of -- well I
5 think actually the standard was a little bit
6 higher, to be honest, for them.
7 Q    I want you to take a look at the
8 document marked for identification as P2.
9    Bill, do you have it?
10    MR. MC LANE:  Hold on.
11 Q    Do you recognize the document that's
12 been marked for identification as P2?
13 A    I have seen it before, yes.
14 Q    What do you recognize this document to
15 be?
16 A    It was the agreement that the Plaza
17 had with the union in regards to the
18 recalling of the employees, the formerly
19 employed employees.
20 Q    How do you recognize it?
21 A    I have seen it before.
22 Q    When?
23 A    During the course of my employment at
24 the Plaza.
25 Q    Have you ever read this document?
```

Page 19

```
1              Reus
2 A    I have.
3 Q    Would it be fair to say that you are
4 familiar with it?
5 A    Yes.
6 Q    What is your understanding as to what
7 obligations exist for the Plaza in this
8 agreement?
9    MR. MC LANE:  All the
10 obligations?
11 Q    Strike that question.
12 A    I am sorry.
13 Q    I said strike that question.  Forget
14 that question.  The question I have is --
15    MR. MC LANE:  I don't know, for
16 the document that's labeled P15, have
17 we identified the handwriting on this
18 document yet?
19    MR. ZAPATA, JR.:  P15, what are
20 you talking about, P what?
21    MR. MC LANE:  I am looking at
22 P2, the copy that I have.
23    MR. ZAPATA, JR.:  It is my
24 copy, it is a number of pages, it
25 says.
```

Page 20

```
1              Reus
2    THE WITNESS:  I have a marked
3 up version, then I have P2, it is an
4 agreement.
5    MR. MC LANE:  If you go down
6 to, there is a heading that says after
7 the signatures, there is an employee
8 severance recall right from there to
9 the bottom of the document that I
10 have.  There is a lot of handwriting
11 on that.  P11, P12, P13, P14, then the
12 last page P15, it is all handwriting.
13    MR. ZAPATA, JR.:  I didn't get
14 my question out.  She already
15 identified it.  My question to her --
16    MR. MC LANE:  I understand you
17 are asking her about the obligations.
18 I am trying to figure out what we have
19 established, where this handwriting
20 comes from, whether this is the final
21 document.
22    Obviously it is signed, but are
23 you asking questions about the signed
24 portion of it or about the marked
25 version?
```

Page 21

1                    Reus
2            MR. ZAPATA, JR.:  No, I am
3        going to ask her just generally.
4   Q      I wanted to ask you what is your
5   understanding as to the recall rights, the
6   Plaza Hotel employees that accepted the
7   severance package?  Was it just a regular
8   severance package, what is your understanding
9   of their recall rights?
10  A      Off the top of my head, I think once
11  they accepted the severance I think they
12  waived their recall rights, if I remember
13  correctly.
14  Q      Let's say they had a right to go back
15  to the Plaza, what is your understanding as
16  to what rights they had, if any?
17  A      For colleagues that didn't accept the
18  severance that had a right to go back?
19  Q      Yes.
20  A      Well my understanding is that they
21  could go or they would be called back to
22  their positions in the department prior to
23  the Plaza closing.  For example, I know a lot
24  of banqueting staff had to wait until the
25  banqueting operation opened.

Page 22

1                    Reus
2          The Palm Court staff were called back
3   to the Palm Court, housekeeping to
4   housekeeping.  If there was a department that
5   did not exist in the former Plaza, then there
6   would be no recalls for that department.
7   They were entitled to go back to their
8   department basically.
9   Q      Does seniority play into this in any
10  way?
11  A      Well certainly once they are recalled
12  back, they are recalled back based on
13  seniority.
14  Q      How about once they are back at the
15  Plaza, what impact, if any, would seniority
16  have with respect to the positions that the
17  individuals would be offered?
18  A      Well I think it has to do with the
19  seniority.  It has to do with where they were
20  on their schedules in the department.  I
21  don't recall that seniority said what
22  departments they went into.
23          They were recalled back into their
24  previous departments, the Palm Court server
25  was called back into the Palm Court, the

Page 23

1                    Reus
2   seniority would say where they went back into
3   the Palm Court.
4   Q      How many seniority lists existed for
5   the bartender title?
6   A      I am sorry, how many?
7   Q      How many seniority lists existed for
8   the bartender title during the time that you
9   worked at the Plaza in New York?
10          MR. MC LANE:  Objection to
11      form.  You can answer.
12  A      Well we only had one seniority list,
13  it was for all positions.  Is that what you
14  mean?
15  Q      I am talking about just bartenders,
16  was there a seniority list that identified
17  bartenders?
18  A      Yes, of course, it identified all
19  positions.
20  Q      I am sorry?
21  A      There was a seniority list that
22  identified all positions in the Plaza,
23  bartenders being some of the positions of
24  course.
25  Q      How many classifications were there

Page 24

1                    Reus
2   for bartender?
3   A      I mean I don't recall.  Normally in a
4   hotel we have sort of the house bartender
5   staff, they are called service bartenders,
6   the titles can be different.
7   Q      I am asking about that particular
8   hotel during the time that you worked there.
9   Do you recall?
10  A      There would have been, I see on the
11  list that there would have been more than
12  one.
13  Q      What list are you talking about?
14  A      Well for example, under P13 and 14
15  which is some recall lists, basically I think
16  that were forwarded, I guess one of them is a
17  recall list, the other one isn't.
18  Q      Which one is the recall list?
19  A      14, P14.
20  Q      Let's talk about P14 for the record.
21  Do you recognize the document that's been
22  identified as P14?
23  A      It is a recall list, yes.
24  Q      How do you recognize it?
25  A      Well the first four columns were the

Page 25

1          Reus
2 same four columns, or seemingly the same four
3 columns that we used internally for the
4 purposes of recalling employees.
5 Q      Are you familiar with this document?
6          MR. MC LANE:  Objection to
7      form.  You can answer.
8 A      This specific document, I mean I am
9 familiar with it as I received it yesterday.
10 But the first four columns are something I am
11 familiar with from it being a recall list
12 basically, the same type of set up that we
13 would have seen as a recall list.  The fifth
14 column is not one we would have used
15 internally.
16      I should add that it is in my time
17 here, it is not language that we used while I
18 was there.
19 Q      Was there a procedure that was in
20 place when vacancies would come up at one of
21 the bars for the bartender position, was
22 there a procedure with respect to vacancies
23 that would come up at the bars within the
24 Plaza for, I guess, existing employees to
25 apply?

Page 26

1          Reus
2 A      Basically the Fairmont procedure for
3 internal applicants -- are you speaking about
4 new positions that would become available?
5 Q      Vacancies?
6 A      Obviously to the bartender positions
7 that were in the previous Plaza, we would
8 have recalled employees.  For the new
9 vacancies we would go through a normal
10 recruitment process meaning externally.  We
11 would post the position internally if there
12 was someone eligible.  The criteria for that
13 is you need to work in your current position
14 for a period of six months.  It is Fairmont
15 procedure.  Then of course we would look
16 externally for the positions and you go
17 through the normal recruitment process that
18 was actually very much your responsibility.
19 Q      If there was a vacancy at one of the
20 bars and several existing bartenders put in
21 for the vacant position, would seniority play
22 a role?
23          MR. MC LANE:  Can you read that
24      back?
25          (Whereupon the record was read

Page 27

1          Reus
2      back by the reporter.)
3          MR. MC LANE:  Objection to
4      form.  You can answer.
5 A      I mean generally speaking it would, of
6 course.
7 Q      How?
8 A      If the person is eligible for the
9 position, if you have two candidates
10 internally applying for a position, you would
11 look at obviously the experience, make sure
12 that we have an internal structured interview
13 process they would go into.  Interviews with
14 the department heads, if everything is equal,
15 then we would select a more senior person.
16 Q      Was there an obligation pursuant to
17 the collective bargaining agreements between
18 the union and the employer?  When I say
19 employer, I am referring to the Plaza with
20 respect to allowing the most senior person,
21 i.e, the bartender to have the first shot at
22 any vacant positions in the bartender title?
23 A      You would normally have that, in the
24 opening sort of recall environment.  Again,
25 colleagues were recalled to their current

Page 28

1          Reus
2 position or to their previous positions, then
3 the new positions were opened on the market
4 or for external candidates.  I don't know if
5 I answered your question.
6      Typically, yes, in that environment it
7 was sort of, in the opening we were recalling
8 our former employees or the Plaza's former
9 employees to their preexisting positions.
10 And the new positions as far as new units,
11 new outlets were open to the market.  Once
12 the colleagues proved themselves, they were
13 obviously moving forward, then the normal
14 recruitment started.  It was a unique process
15 with the recalled colleagues for the first
16 few months.
17 Q      Do you know who Liam Flanagan is?
18 A      I know the name.  I recognize the
19 name.  I don't know.  I don't remember him
20 specifically.
21 Q      I want to draw your attention to the
22 document identified as P7.  Please let us
23 know after both of you have found the
24 document.
25 A      P7, yes.

```
1                Reus
2         MR. MC LANE:  Hold on.
3  Q    Do you recognize the document that's
4  been identified as P7?
5  A    To the extent of receiving it
6  yesterday, I mean, it looks like an
7  employment letter, but I have never seen it
8  before other than when it arrived yesterday.
9  Q    Do you know who David C. Jones is?
10 A    No.
11 Q    You were involved in the hiring of
12 bartenders for the Plaza when it reopened on
13 or around early 2008?
14 A    Yes.
15 Q    Can you please describe the efforts
16 that were made to recruit bartenders?
17 A    Certainly, when requisitions are
18 posted, it could be newspaper ads, it could
19 be online, obviously the Fairmont website
20 would be used.  We have an internal -- we
21 have a talent scout, it is an internal
22 referral program so existing employees of the
23 hotel can refer new people that they know for
24 employment at the hotel.
25      It is a way to advertise internally,
```

```
1                Reus
2  basically.  There is a financial reward for
3  them if the person is hired.  That's for one
4  of the employees to get new candidates, once
5  they come in they are screened for experience
6  basically.
7       In the case of bartenders, I would
8  screen their CVs, look for bartending
9  experience.  The people that did have
10 bartending experience I would then forward on
11 to the department managers depending on the
12 department.  I guess in this case for the
13 bars, it would be to the beverage manager,
14 Anthony Evangelista, Carlos Bueno would
15 obviously interview them the first screening
16 interview was actually done by the department
17 managers, the food and beverage managers.
18      If that interview went successfully,
19 they would come back to me for the structured
20 Fairmont interview which is of the Fairmont
21 selection interview and then if that was
22 successful I would forward it back for an
23 executive committee member to interview which
24 was typically Carlos.  It may have been the
25 GM in some cases, it may have been Rajan, any
```

```
1                Reus
2  committee member basically.
3       Then we would come back, reference
4  checks and make an offer to the person if all
5  of that was successful.
6  Q    Do you know who Robert Kenyon is?
7  A    No, the name is familiar, I don't
8  remember him.
9  Q    How about Prather Remm?
10 A    Again, the name is familiar.  I could
11 tell you she was a bartender but I don't
12 remember her specifically.
13 Q    How about Heather Buesing?
14 A    Heather I remember.
15 Q    Did you interview her?
16 A    I don't remember interviewing her, but
17 I interviewed most of them so one can assume
18 I would have interviewed her.
19 Q    Do you know what her background was
20 prior to interviewing her?
21 A    I don't remember at this stage, no.
22 Q    How about Laura Swetzer?
23 A    I remember Laura, Laura I remember.
24 Q    Did you interview Laura?
25 A    Again, I don't remember interviewing
```

```
1                Reus
2  Laura, but it can be assumed because I
3  interviewed a majority of them.
4  Q    You stated earlier that you remember
5  Carlos Rivera; is that right?
6         MR. MC LANE:  Objection to
7  form.  I am not sure she said that.
8  A    I remember the name, I don't remember
9  the individual.
10 Q    Give me a few minutes, I need to look
11 at my papers for a second.  I will go off the
12 record.
13 A    All right.
14      (Brief recess was taken.)
15 Q    I have a few more questions.  I would
16 like to draw your attention to the document
17 that's been marked for identification as P13.
18 A    Okay.
19 Q    Do you have it?
20         MR. MC LANE:  Give me a minute.
21 I've got it.
22 Q    Do you recognize the document that's
23 been marked for identification as P13?
24 A    Yes, to the extent of having received
25 it yesterday, yes.
```