Reus

1
2 A     Not that I remember being aware of.
3 Q     I would like to draw your attention to
4 a document marked for identification as P4.
5 After you and Bill find it, let us know.
6 A     I have it.
7 Q     Do you recognize the document that's
8 been marked for identification as P4?
9 A     I mean, I can't say I have seen this
10 specific document before but it looks like a
11 list of bartenders from the Champagne Bar and
12 Palm Court.
13 Q     When was the first time that you saw
14 this document?
15 A     Yesterday.
16        MR. ZAPATA, JR.:  Let me look
17     at my notes.
18        I have no more questions.
19 EXAMINATION BY
20 MR. MC LANE:
21 Q     Just take a look again at Exhibit P11?
22 A     Yes.
23 Q     You were asked whether you recognize
24 the signatures on that document.  Do you
25 recognize the other handwriting on that

Reus

1
2 document, who it might belong to?
3 A     The salary on that new hire line where
4 it says salary, that looks like Rajan's
5 writing.  The top, the employee information,
6 looks like our former coordinator's writing
7 which was Ingrid Dominguez.
8 Q     Take a look at P2, do you see the
9 handwriting on the bottom, do you know whose
10 handwriting that is?
11 A     On the back pages, any of it I don't
12 recognize, no.
13 Q     Do you remember when you began your
14 employment at the Plaza in New York in the
15 fall of 2007, was the hotel opened?
16 A     No.
17 Q     Do you recall when the hotel opened?
18 A     Gosh, I should but I don't, the
19 specific dates, I really don't.  I am sorry.
20 Q     Do you know whether or not when the
21 hotel opened, whether the outlets within the
22 hotel, the food and beverage outlets,
23 specifically opened at the same time?
24 A     They didn't, they all opened at
25 different intermittent times following.

Reus

1
2 Q     Off the top of your head, do you
3 remember when the Palm Court opened?
4 A     I don't off the top of my head.
5 Q     How about the Palm Court?
6 A     The Palm Court I think opened
7 initially, if I remember correctly.
8 Q     When you say initially, do you mean at
9 the time that the hotel opened?
10 A     That's right.
11 Q     Let me try it this way.  Do you
12 remember the order in which the Palm Court,
13 Rose Club and Champagne Bar opened?
14 A     I think it was the Palm Court, the
15 Champagne Bar maybe, no -- the Palm Court,
16 Champagne Bar, I know the Rose Club was last,
17 because there was still construction up there
18 when we had guests in the lobby.
19 Q     I believe it is correct that the Rose
20 Club and the Champagne Bar were not outlets
21 that existed at the time the hotel closed,
22 correct, and when the hotel reopened, was the
23 oyster bar an outlet?
24 A     When the hotel reopened, no.
25 Q     Was the Oak Bar/Oak Room an outlet?

Reus

1
2 A     No, that didn't open until much later
3 actually.
4 Q     When it did open was it an outlet of
5 the Plaza Hotel or was it a Fairmont
6 property?
7 A     No.
8        MR. MC LANE:  That's all I
9     have.  Thank you.
10        MR. ZAPATA, JR.:  Good luck
11     with your pregnancy.
12        THE WITNESS:  Thank you very
13     much.
14        (Time noted:  10:10 a.m.)
15

16 _____

        MARTA REUS
17
18 Subscribed and sworn to before me
19 this     day of          , 2011.
20
21 _____
22     Notary Public
23
24
25

Page 41

```
 1          Reus
 2          I N D E X
 3
   WITNESS        EXAMINATION BY        PAGE
 4
   Marta Reus     MR. ZAPATA, JR.       4
 5
                  MR. MC LANE           37
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 43

```
 1          Reus
 2          ERRATA SHEET
   PAGE/LINE            CORRECTION
 3  _____  _____
 4  _____  _____
 5  _____  _____
 6  _____  _____
 7  _____  _____
 8  _____  _____
 9  _____  _____
10  _____  _____
11  _____  _____
12  _____  _____
13  _____  _____
14  _____  _____
15  _____  _____
16  _____  _____
17  _____  _____
18  _____  _____
19  _____  _____
20  _____  _____
21  _____  _____
22  _____  _____
23  _____  _____
24
25
```

Page 42

```
 1          Reus
 2          C E R T I F I C A T E
 3      I, LORI CERRANO, hereby certify that the
 4  Examination before Trial of MARTA REUS was held
 5  before me on the 14th day of July, 2011; that said
 6  witness was duly sworn before the commencement of
 7  her testimony; that the testimony was taken
 8  stenographically by myself and then transcribed by
 9  myself; that the party was represented by counsel as
10  appears herein;
11      That the within transcript is a true record
12  of the Examination Before Trial of said witness;
13      That I am not connected by blood or marriage
14  with any of the parties; that I am not interested
15  directly or indirectly in the outcome of this
16  matter; that I am not in the employ of any of the
17  counsel.
18      IN WITNESS WHEREOF, I have hereunto set my
19  hand this      day of         , 2011.
20
21      _____
            LORI CERRANO
22
23
24
25
```

Exhibit "H"



# Agreement

Agreement made this 13th day of April 2005, by and between CPS 1 LLC and its assignee CPS 1 Realty LP on their own behalf and on behalf of any affiliated or related entity as owner of The Plaza Hotel, and any successor, transferee, assignee, concessionaire, operator and/or manager ("Hotel") and the New York Hotel and Motel Trades Council, AFL-CIO ("Union").

Whereas, Hotel and Union are bound to a collective bargaining agreement known as the Industry Wide Agreement ("IWA") between the Union and the Hotel Association of New York City, Inc. ("Hotel Association"), effective July 1, 2001;

Whereas the Hotel intends to close for renovations on April 30, 2005 and reopen in approximately two years ("Renovation Period");

Whereas the Hotel is desirous of renovating the Hotel into a smaller transient hotel, condominium hotel, private condominium residences, and/or retail use;

Whereas, the Union is desirous of maintaining the Hotel as large a transient hotel as possible and preserving as many bargaining unit jobs as possible;

Whereas, all parties are desirous of preserving the architectural, historic and cultural legacy of the Hotel; and

Whereas, the parties have negotiated in good faith and wish to resolve their differences amicably.

Now, therefore it is agreed:

1.  This Agreement shall be effective upon execution by the parties and ratification by bargaining unit employees and shall be coterminous with the Successor IWA, defined below.

2.  The parties reaffirm that they are bound by all the terms and conditions of employment, both economic and non-economic in nature of the IWA, except as explicitly modified by this Agreement.  Unless otherwise provided for herein, during the duration of this Agreement, the Hotel agrees to adopt and be bound by all the terms and conditions of employment, both economic and non-economic in nature, which may be agreed to by and between the Union and the Hotel Association in any renewal or successor to the IWA, which will be negotiated between the Hotel Association and Union ("Successor IWA").  In the event that the Union and the Hotel Association fail to reach agreement on a Successor IWA prior to expiration of the current IWA, all terms of this Agreement and the current IWA shall continue in full force and effect until such time as a Successor IWA is effective.  The Successor IWA and this Agreement shall then constitute the parties' agreement.

3.  All current bargaining unit employees and employees laid off within one year of the April 30, 2005 closure shall be paid severance benefits in accordance with the attached Exhibit A, which is made part of and is incorporated in this Agreement by reference and applicable precedent from the Office of the Impartial Chairman.

4.  Current employees in the maintenance and engineering departments shall be offered the opportunity to continue working in their respective classifications (to the extent there exists work appropriate for such classifications) during the

Renovation Period and shall be paid the higher of the IWA rate of pay and the prevailing wages being paid to employees performing similar construction work in the City of New York. The terms and conditions of said employees shall continue to be governed by the IWA and thereafter by the Successor IWA, as modified by this Agreement. Notwithstanding the foregoing, said employees shall be paid severance pay pursuant to Article 52 of the IWA and offered enhanced severance benefits in accordance with Exhibit A. Subject to the above, the Hotel may, during the Renovation Period, use skilled contract construction trades employees to supplement its current maintenance and engineering staff in the performance of renovation work. The Union agrees to withdraw U05-060 with prejudice and rescind any information requests related thereto. The Union further agrees that it shall not take any action contrary to Article 38 of the IWA notwithstanding the Award issued on April 8, 2005. The Hotel acknowledges that Article 17 of the IWA does not violate the National Labor Relations Act as written or as applied and agrees to withdraw any charges or complaints alleging same, including 2-CC-2637-1 and 2-CE-190-1, with prejudice.

5.   The IWA and Successor IWA, as modified by this Agreement, shall be binding on any current or future owner, manager, operator, concessionaire, successor, assign or transferee in the manner described in Article 59 of the IWA, which is incorporated herein by reference. It is understood and agreed that this paragraph applies to any owner, manager, operator, concessionaire, successor, assign or transferee of the entire Hotel or any part thereof, without regard to the use to which the space is put. Notwithstanding the above, the previous sentence shall not apply to individual owners of individual condominium units, but shall apply to any entity which operates or manages the residential condominium portion or condominium hotel portion of the Hotel. Further, it is agreed that, with respect to a commercial retail establishment not appurtinant or ancillary to, affiliated with, or in any way controlled by or related to the Hotel, only those classifications which perform cleaning, maintenance, engineering, or food and beverage services or functions shall be included in the bargaining unit, except that limited preparation, service and seating capacity food and beverage establishments ancillary to a commercial retail establishment and wholly unrelated to the hotel shall not be covered by this Agreement (by way of example, but not limitation, food court employees would be covered whereas the employee at a chocolatier within a department store would not be covered).

6.   The Hotel agrees that the spaces so designated in the diagrams and agreement attached hereto as Exhibit B shall be used for hotel and hotel related purposes, including, but not limited to hotel, condominium hotel (i.e., wherein rooms are owned by individuals, who are entitled to occupy such rooms for no more than four months each year with the room available as a transient hotel room for the remainder of the year), restaurant, food and beverage, hotel offices, banquet and meeting rooms, lobbies, employee cafeteria and locker rooms, etc. It is understood that due to the uncertainties involved with renovations, the precise allocations set forth in Exhibit B may not be possible, in which case the parties agree to meet and discuss alternative designs which are possible from a renovation standpoint; viable from an operations standpoint; protect the same number and nature of available bargaining unit jobs; retain the same number of hotel rooms and keep the same banquet and other food and beverage space, as

well as space ancillary to the hotel; and preserve the history and architecture of the identified spaces. For example, the parties acknowledge that the kitchen areas, which are currently separate, may be combined to form a larger single kitchen. Failing agreement, the issue shall be submitted to the Impartial Chairman for final and binding resolution. These provisions shall be binding on any current or future owner, manager, operator, concessionaire, successor, assign or transferee in accordance with Paragraph 5 of this Agreement.

7.   The Hotel shall immediately take any steps necessary to ensure that any future owner, manager, operator, concessionaire, successor, assign or transferee is aware of and bound by the provisions of Paragraphs 5 and 6 hereof, including making appropriate filings setting forth the encumbrances described herein and including compliance with those provisions as a material condition in any contract or agreement which sells, transfers, or assigns any ownership or operational interest in any part of the Hotel.

8.   The Hotel acknowledges that the Landmarks Commission has "calendared" certain spaces within the Hotel, including the Grand Ballroom, Terrace Room, Palm Court, Oak Room, Oak Bar, 59th Street Lobby, and 5th Avenue Lobby. The Hotel agrees to recognize such status and abide by any further determinations of the Landmarks Commission regarding said space(s).

9.   The following classifications shall be excluded from the bargaining unit:

a.   One Executive Chef per Kitchen

b.   One Assistant Executive Chef per shift per Kitchen

c.   One Executive Pastry Chef per kitchen

d.   One Executive Banquet Chef per kitchen

e.   One Restaurant Manager per outlet

f.   One Assistant Restaurant Manager per shift per outlet

g.   One Executive Steward per kitchen

h.   One Assistant Executive Steward per shift per kitchen

i.   Host/Hostess

i.   Fitness Center Staff (other than cleaning of bath, shower, locker room, and public areas, or maintenance and engineering staff which shall continue to be included in the bargaining unit)

j.   Concierge

k.   Housekeeping Managers.



The classifications set forth in subparagraphs a through h, inclusive, of this Paragraph may perform bargaining unit work provided that no bargaining unit employee in the affected classification is on layoff or reduced work week, it would not reduce the wages or hours (including overtime) of any bargaining unit employee, and that it will not have any other adverse economic impact on any bargaining unit employee. It is agreed that the position of Floor Housekeeper shall be eliminated through attrition. The Housekeeping Manager may perform the duties of the Floor Housekeepers once the Floor Housekeeper subject to Exhibit A have been completely attrited.

10.   The following terms shall apply to "new hires", as defined in Article 6(c) of the IWA. Under no circumstances will any recalled current employee be considered a "new hire" or subject to the provisions of this Paragraph.

a.   Wages: The minimum wage rates for "new hires" shall be as follows:

   i. · Seventy-five percent (75%) of the Schedule A rate of the IWA or Successor IWA for the first thirty-six (36) months following the reopening of the hotel.

   ii. Eighty-five percent (85%) of the Schedule A rate of the IWA or Successor IWA for the twenty-four (24) months following the period referred to in subparagraph (i), or the "New Hire Wage Rate" (currently contained in Article 6(c)(1)), whichever is less.

b.   Benefits: The Hotel shall not be required to make contributions to the pre-paid legal, scholarship or training on behalf of "new hires" for the first sixty (60) months following the reopening of the hotel.

c.   Time and a Quarter Pay: For "new hires" the Hotel shall not be required to pay part time premium pay pursuant to Article 8(b) of the IWA or night differential pay pursuant to Article 51 of the IWA for the first sixty (60) months following the reopening of the hotel.

d.   Probationary Period: The probationary period defined in Article 6(a) of the IWA shall be one hundred and twenty (120) days of work for bargaining unit employees newly hired in the first sixty (60) months following the reopening of the hotel.

11.   Except as otherwise provided in Exhibit A, the Hotel may hire new employees from any source for the first sixty (60) months following the reopening of the hotel.

12.   Employees who work part time may voluntarily waive the premium pay provided for in Article 8(b) of the IWA, in writing. Execution of such waiver shall be purely voluntary on the part of the employee, and the Hotel may not discriminate or retaliate against any employee for refusal to execute same. Such waiver shall be revocable at will by the employee, in writing. The waiver form will not be effective unless and until copies of the executed form are provided to both the employee and Union.





13. The hotel may set the quota for Day Room Attendants at twelve (12) credits. The Union may challenge said quota as unreasonable at any time during the first six (6) months following reopening of the hotel. Pending agreement or an award by the Impartial Chairman, the quota shall remain in effect, provided that the Union may request expedited arbitration. Notwithstanding the foregoing, the Union may challenge at any time and without limitation the quota based on changes made subsequent to reopening to the rooms, furnishings, fixtures, amenities, duties, practices, or other factors which may adversely effect Room Attendant workload.

14. Cooks shall be paid at the Sous Chef rate of pay. The Hotel shall have flexibility in assigning to said employees any culinary work during the work day and/or work week, in accordance with seniority and provided no employee in an affected classification is on layoff or reduced work week. This paragraph is not intended and should not be interpreted to alter or modify the job combination provisions of the IWA.

15. Stewards shall be paid at the Floor Steward rate of pay. The Hotel shall have flexibility in assigning to said employees any steward work during the work day and/or work week, in accordance with seniority and provided no employee in an affected classification is on layoff or reduced work week. This paragraph is not intended and should not be interpreted to alter or modify the job combination provisions of the IWA.

16. The Hotel is not required to employ Captains in its restaurants.

17. Bartenders shall be paid at the Service Bartender rate of pay. Bartenders shall work a forty (40) hour work week and shall be compensated at the Service Bartender hourly rate of pay for such forty (40) hour work week. Bartenders shall receive straight-time benefits. Bartenders may perform bar back duties, self-banking, and serve and clear food at the bar.

18. Servers may self-bank and will be compensated therefore in accordance with the IWA and applicable precedent from the Office of the Impartial Chairman. Servers may perform busser duties at the rates established by Article 22(b) of the IWA.

19. The Hotel may discontinue use of its in house Laundry production and use outside contractors, provided the Hotel complies with Article 45 or the parties otherwise agree.

20. The Hotel may purchase pastries produced outside the Hotel to supplement those produced by bargaining unit employees, provided no employee in any affected classification is on layoff or reduced work week, or suffers an adverse economic impact.

21. The parties acknowledge that Article 45 applies to the Hotel and its concessionaires and that any such concessionaires shall be subject to the obligations and entitled to the benefits of this Agreement.

22. If any part or provision of this Agreement is rendered invalid or unenforceable by an authority of competent jurisdiction, including, but not limited to, a state or



federal court, the National Labor Relations Board, or Office of the Impartial Chairman, it shall not affect the remainder of this Agreement and the parties shall meet and negotiate an alternate provision which most closely in a lawful manner meets the objectives or intent of the parties underlying the original provision or, if necessary, provides equivalent value. In the event the parties are unable to agree, the issue shall be submitted to the Office of the Impartial Chairman for final and binding resolution.

23. Effective immediately, any dispute between the parties shall be submitted to the Office of the Impartial Chairman in accordance with the grievance and arbitration provisions of the IWA, incorporated herein by reference in their entirety.

24. The parties agree that it is in their mutual best interests that the provisions of this Agreement be kept confidential and they each will use their best good faith efforts to limit the dissemination of the terms of this Agreement to their respective members, employees, supervisors and legal representatives.

Date: April 13, 2005

ACCEPTED AND AGREED TO:

CPS 1, LLC/CPS 1 REALTY, LP:                    NEW YORK HOTEL AND MOTEL TRADES
                                                COUNCIL, AFL-CIO

By: _____                  By: _____

Name: _____                  Name: _____

Title: _____                  Title: _____

**Employee Severance/Recall Rights**

The parties agree and acknowledge that it is the intention of the Hotel to implement a radical and complete transformation of the Plaza Hotel from a transient hotel with appurtenant restaurant, banquet and other food and beverage installations and retail establishments to a multifaceted condominium apartment, condominium hotel, transient hotel (including restaurant, banquet and other food and beverage installations) and retail complex ("New Hotel") that maximizes the legally allowable use of the current hotel space for such purposes.

As a result of the aforementioned transformation process, the parties acknowledge that the present number of hotel rooms will be substantially reduced from approximately 800 transient hotel rooms to approximately 300 transient hotel and condominium hotel rooms. Due to the reduction in hotel rooms there will be substantially less bargaining unit positions and employment opportunities available, which will result in the severance and/or permanent layoff of hundreds of bargaining unit employees.

The parties agree that the Hotel shall pay to all bargaining unit employees severance pay in accordance with the provisions of the Industry Wide Agreement and all affected employees shall be put on a recall/rehire list in order of seniority. Upon the reopening of the New Hotel, all bargaining unit employees shall be recalled on the basis of his/her seniority and shall be rehired pursuant to the terms of the Industry Wide Agreement, unless as otherwise as agreed by the parties, herein.

The parties acknowledge and agree that due to the uncertainty as to the date that the New Hotel will reopen and commence business operation and further, due to the uncertainty as to the number of available bargaining unit positions that will be available, the Hotel has agreed to pay "enhanced severance benefits" to the affected bargaining unit employees equal in amount to two time (2x) the severance benefits due the employees under the provisions of Article 52 of the Industry Wide Agreement, provided that the employees who elect to receive such enhanced severance benefits must relinquish their right to recall and rehire. Any employee who elects to receive such enhanced severance benefits must make such election within forty five (45) days after the closing of the Hotel. for renovations.

Notwithstanding anything contained hereinabove seemingly to the contrary, the parties agree that employees employed by the Hotel prior to the closing of the hotel (as defined herein), who have not agreed to accept enhanced severance benefits and who have not waived their recall rights, shall retain such rights subject to the conditions set forth hereinafter.

A) Recall Notice – One hundred and twenty (120) days prior to the scheduled re-opening of the New Hotel, the Hotel shall send written notice by certified mail, return receipt requested to each employee who has not accepted enhanced severance benefits, notifying each employee of the scheduled re-opening of the New Hotel and of the employee's obligation to notify the Hotel

P. 0000





of the employee's availability and willingness to be recalled and re-employed to the employee's employment position, as the same is available. A copy of the recall notice shall be sent simultaneously by fax to the Union.

B) Employee Notice to the New Hotel – Within forty five (45) days of the employee's receipt of the recall notice, the employee or the Union on behalf of the employee, must respond to the recall notice. The employee notice to the New Hotel shall notify the New Hotel as to the employee's availability and willingness to be recalled and re-employed as of the scheduled reopening of the New Hotel.

(i) a. Any employee who elects not to be recalled and re-employed must notify the New Hotel of the same and such employee will, within ten (10) days after such notice be paid enhanced severance benefits. Such notice to the New Hotel must be given within forty five (45) days of the employee's receipt of the recall notice and may be given to the New Hotel by the Union on behalf of the employee.

(ii) b. Any employee who, absent good and sufficient cause, fails to give timely notice to the New Hotel shall be deemed to have abandoned his/her job and to have waived his/her recall and re-employment rights. In such case, the employee will within ninety (90) days of the employee's receipt of the recall notice, be paid enhanced severance benefits by the New Hotel, which payment shall be made by check payable to the employee and forwarded to the Union for delivery to the employee.

(iii) c. Subject to the provisions of the parties' agreement with respect to training and probationary period, the parties further agree that any employee who, without good and sufficient cause, fails to attend and/or satisfactorily complete the New Hotel's training program shall be deemed to have abandoned his/her job and to have waived his/her recall and re-employment rights. In such case the employee will, within ninety (90) days of the employee's receipt of the recall notice, be paid enhanced severance benefits by the New Hotel, which payment shall be made by check payable to the employee and forwarded to the Union for delivery to the employee.

If the Impartial Chairman determines upon a complaint by the Union that the Hotel or New Hotel has failed to satisfactorily perform all of its obligations hereunder, or has for the purpose of denying recall and re-employment rights to any employee, then in such case the Impartial Chairman may, in addition to ordering whatever legal and equitable remedy s/he deems appropriate, also award punitive damages in such amounts as s/he deems appropriate. Any such arbitral proceeding hereunder shall be pursuant to the parties agreement on expedited arbitration proceedings.

The parties agree, notwithstanding anything contained herein seemingly to the contrary, that recall rights of employees currently employed by the Hotel who do not elect to receive enhanced severance benefits and who are not recalled and.

(iv) The parties agree that any employee who receives enhanced severance benefits or severance benefits hereunder, shall execute a General Release running in favor of New Hotel and the Union

re-employed by the New Hotel, shall expire ~~eighteen (18)~~ months after the reopening of the New Hotel.

Any employee whose recall rights are terminated for such reasons shall be notified of same by the Hotel in writing by certified mail return receipt requested, with a copy by fax to the Union. Such notice shall be sent to the employee thirty (30) days prior to the expiration of the employee's recall rights and, shall also notify the employee of his/her right to receive enhanced severance benefits and that same will be paid to the employee by check made payable to the employee and forwarded to the Union for delivery to the employee within ten (10) days after the expiration of the employee's recall rights.

## Training/Probationary Period

The parties agree and acknowledge that it is the intention of the Hotel to own and operate a New Hotel that meets the standards established in the industry for designation as a "5 Star/5 Diamond" hotel. In connection therewith, all employees currently employed by the Hotel who are thereafter recalled after the completion of the Hotel's renovation shall be properly trained by the New Hotel for a period of sixty (60) days to ensure that the employees are ~~highly~~ qualified and capable to perform their job functions in a manner that meets the aforesaid "5 Star/5Diamond" standards, and in doing so provide "world class" service to the New Hotel's guests.

The Hotel may, at any time during an employee's sixty (60) day training period and for a period of ninety (90) days after the completion of the training period ("probationary period"), discipline or discharge the employee for just cause ~~and~~, Further, ~~the New Hotel~~ may discipline or discharge ~~the~~ employee for failure to meet the performance standards attached hereto as Exhibits A-[XX] ~~provided such discipline or discharge is for just cause~~. During the ~~probationary~~ period, the Union shall not challenge the reasonableness of the aforementioned performance standards pursuant to Article 18 [unless such ~~unless such standard~~ standards ~~specifically conflict with the provisions of the IWA—RCBP~~]. Following the probationary period, any [discipline ~~issued~~] by the Hotel with respect to] the performance standards shall be governed by the IWA ~~and applicable law~~.

In such case where the employee is terminated for failure to meet the New Hotel's performance standards during the employee's probationary period, the employee's termination may be grieved by the Union up to and through arbitration in accordance with the IWA, subject to the expedited arbitration provisions ~~agreed to herein~~.

In the event the matter is not resolved by the Hotel and the Union, the Impartial Chairman shall either (i) sustain the termination, in which case the employee shall be paid additional severance benefit at a rate of ~~one and one-quarter (1-1/4) times that~~ described in Article 52 of the IWA, or (ii) reinstate the employee to his/her job with back pay and without loss of benefits or other terms and conditions of employment, ~~plus two (2) weeks pay~~. Employees who are reinstated by the Impartial Chairman may, ~~nevertheless~~ voluntarily choose to terminate their own employment rights at their option.

in which case the Hotel shall pay to the employee ~~the greater of twenty (20) weeks pay or~~ one and one half (1 1/2) times severance pay calculated in the manner described in Article 52.

The parties acknowledge the possibility that despite ~~numerous~~ rigorous training of the recalled employees, may not be deemed qualified or capable to meet the New Hotel's "5 Star/5 Diamond" service standards.  In no event, however, shall more than fifty percent (50%) of the recalled bargaining unit employees be involuntarily terminated by the New Hotel for such ~~cause~~.

If the Impartial Chairman determines that a termination or pattern of terminations were made by the New Hotel in bad faith or for the purposes of evading its obligations hereunder, s/he shall, in addition to any other available remedies, award punitive damages in such amounts as s/he deems appropriate.

It is agreed that the Impartial Chairman shall not have the right to modify, fail to consider, or substitute his judgment as to the reasonableness of the standards ~~UNTIL PROBATION~~ agreed to by the parties.

~~The following ??? Provisions shall apply only to those employees recalled to the Hotel at any time during the probationary period???.~~

If the Impartial Chairman sustains the termination of any such employee, the employee shall nonetheless receive additional severance benefits in the amount of 1.25 times the severance benefits calculated in the manner described in Article 52 of the IWA.

Any arbitration/hearing shall be expedited and shall be held within ten (10) days from the date which the Union has been presented with the notification of discipline or discharge.  Said notice shall detail the grounds for discharge and discipline.

A mediation hearing shall be scheduled within the aforesaid time frame.

The Impartial Chairman's decision shall be made within ~~ten (10)~~ days from the conclusion of the hearing. ~~[DUPLICATIVE]~~ (INSERT HERE)

*Enhanced severance pay of ~~two (2)~~ times the contractual rate is to be paid to all employees who elect ~~to receive the same and who~~ waive recall ~~and rehire rights~~ within forty five (45) days of the closing ~~of the Hotel~~.  All ~~other employees~~ will receive severance calculated in the manner described in Article 52 of the IWA.

10

(INSERT) on P4

In the case of discharge or discipline for failing to meet performance standards, the Impartial Chairman shall assure that the following the New Hotels prima facie elements of a case have been met: The employee was notified and Trained in of the standards for which the New Hotel seeks discipline or discharge, The standard is reasonable and the Hotel is entitled to expect adherence to the standard. The Union shall be entitled to rebut the New Hotel's prima facie case.

P. 000015

Exhibit "I"



*The Plaza*

June 06, 2000

To Whom It May Concern:

This is to verify that Mr. Carlos Rivera has been an employee of The Plaza Hotel since October 12, 1988. On October 21, 1990 he was employed as a Barback in our Oyster Bar restaurant. From April 7, 1991 he was employed as a Beverage department Barback till May 14, 1995, when he was transferred to our Oak Bar as a Barback. Then on September 15, 1996 he was promoted to a Bartender stationed in our Palm Court Restaurant Service Bar; he remained in this position throughout 1997.

Please be advised that the positions of Barback and Service Bartender in the Palm Court, at The Plaza Hotel are non-tipped positions.

If you are in need of further assistance please do not hesitate to contact me.

Sincerely,

David C. Jones
Employment Manager
Human Resources Department

DCJ/dcj

Exhibit "J"



*The Plaza*

February 14, 2005

Re: Carlos Rivera

To Whom This May Concern:

This is to verify that Carlos Rivera is a current employee of The Plaza Hotel. Mr. Rivera has been with us since October 12, 1988. He is a full-time employee, working in the position of Bartender in our F&B Department. Mr. Rivera is currently earning $20.87 per hour plus tips, based on 35 hour- workweek.

If you are in need of further assistance, please do not hesitate to contact me at (212)546-5431

Sincerely,

Myoung A Nam
Human Resources Administrative Assistant




# Exhibit "K"



April 26, 2005

To Whom It May Concern:

This letter is to verify that Mr. Carlos Rivera has been an employee of The Plaza Hotel. Mr. Rivera started with us on October 22, 1988 as a Busperson in our Oak Room Restaurant. He then transferred to our Beverage Department as a Barback on October 21, 1990 and on September 15, 1996 he was promoted to the position of Bartender. Mr. Rivera has always shown himself to be a hardworking, consistent and dedicated employee. He always appears to be cheerful and friendly with a high regard for the comfort and well being of our guests.

If you are in need of further assistance, please do not hesitate to contact me at 212-546-5326.

Sincerely,

David C. Jones
Human Resources Manager
Human Resources Department

DCJ/dcj

FIFTH AVENUE AT CENTRAL PARK SOUTH NEW YORK, N.Y. 10019 · 212 PLAZA 9-3000

P. 000411

Exhibit "L"